CAPITAL CASE

No. 11-1380

─────────────────────────

THE UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

─────────────────────────

UNITED STATES OF AMERICA,

        Appellee,

    v.

DANIEL LEWIS LEE,

        Appellant.


## MOTION TO EXPAND CERTIFICATE OF APPEALABILITY

Appellant, Daniel Lewis Lee, by and through undersigned counsel, respectfully moves this Honorable Court, pursuant to Fed. R. App. P. 22(b)(1), to expand the certificate of appealability (hereinafter "COA") issued by the district court in this appeal from the denial of relief under 28 U.S.C. § 2255 in this death penalty case. The district court granted a COA as to only a single issue, namely whether the death penalty is being unconstitutionally applied in this case. *See United States v. Daniel Lewis Lee*, No. 4:97-cr-243-GTE, March 9, 2011 [Doc. 1204] (Order on Motion to Reconsider Denial of Certificate of Appealability). Mr. Lee respectfully submits that he is entitled to a COA on 17 additional claims, and moves this Court to grant same.

1

# TABLE OF CONTENTS

**PROCEDURAL HISTORY** ………………………………………………………………………...…4

**LEGAL STANDARD**………………………………………………………………………....…7

**CLAIMS FOR RELIEF UPON WHICH A COA SHOULD BE GRANTED**……................9

    1. **A COA SHOULD ISSUE ON CLAIM I.E., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CONDUCT mtDNA TESTING OF THE HAIR FOUND IN THE "RAID CAP" AND FALSELY IDENTIFIED AS THAT OF MR.LEE**…...9

    2. **A COA SHOULD ISSUE ON CLAIM I.G., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY EXERCISING PEREMPTORY CHALLENGES TO EXCLUDE JURORS ON THE BASIS OF RACE**……………………………………………...……..15

    3. **A COA SHOULD ISSUE ON CLAIM I.C., THAT DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO, AND SEEK RESCISSION OF, THE DISTRICT COURT'S ORDER FORBIDDING THEM FROM MEANINGFULLY DISCUSSING THE CASE WITH THEIR CLIENT**……...22

    4. **A COA SHOULD ISSUE ON CLAIM I.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO PRESENT AVAILABLE, MATERIALLY EXCULPATORY EVIDENCE**……………..……………………………………………………..28

    5. **A COA SHOULD ISSUE ON CLAIM I.B., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CROSS-EXAMINE THE WANKERS REGARDING THEIR RECEIPT OF COMPENSATION FROM THE GOVERNMENT**…………….42

    6. **A COA SHOULD ISSUE ON CLAIM I.K., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT**…………………………………………………...……46

    7. **A COA SHOULD ISSUE ON CLAIMS IV.D. AND III.D., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO CHALLENGE AN INSTRUCTION TO THE JURY THAT**

2

Appellate Case: 11-1380    Page: 2    Date Filed: 06/20/2011  Entry ID: 3799638

ERRONEOUSLY STATED THAT MR. LEE COULD RECEIVE A
SENTENCE OF LESS THAN LIFE IF THE JURY COULD NOT REACH
A VERDICT……………………………………………………………62

8.   A COA SHOULD ISSUE ON CLAIMS II.H. AND II.J., THAT TRIAL
COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE
PENALTY PHASE  BY FAILING TO ADEQUATELY CHALLENGE
THE THOROUGHLY MISLEADING EVIDENCE OF PSYCHOPATHY
PRESENTED BY THE GOVERNMENT THROUGH DRS.
CUNNINGHAM AND RYAN………………………………………..70

9.  A COA SHOULD ISSUE ON CLAIMS IV.B. AND III.C., THAT TRIAL
AND APPELLATE COUNSEL RENDERED INEFFECTIVE
ASSISTANCE  WITH RESPECT TO THE PENALTY PHASE BY
FAILING TO ADEQUATELY CHALLENGE THE PECUNIARY GAIN
AGGRAVATING FACTOR…………………………………….....90

10. A COA SHOULD ISSUE ON CLAIM II.A., THAT TRIAL COUNSEL
RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO
CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID
MULTIPLE MURDER AGGRAVATING FACTOR…………………...96

11. A COA SHOULD ISSUE ON CLAIM II.L., THAT TRIAL COUNSEL
RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE
BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF
PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT……98

12.  A COA SHOULD ISSUE ON CLAIM III.B., THAT APPELLATE
COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON DIRECT
APPEAL BY FAILING TO CHALLENGE THE SUBMISSION TO THE
JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING
FACTOR…………………………………………………………...113

13.  A COA SHOULD ISSUE ON CLAIM II.E., THAT TRIAL COUNSEL
WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE
INDICTMENT FOR ITS LACK OF STATUTORY AGGRAVATING
FACTORS NECESSARY TO IMPOSE A DEATH SENTENCE……………..117

14. A COA SHOULD ISSUE WITH RESPECT TO THE DISTRICT
COURT'S DENIAL OF MR. LEE'S MOTION TO ALTER AND AMEND
JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)…………………………124

CONCLUSION…………………………………………………………………132

Appellate Case: 11-1380    Page: 3    Date Filed: 06/20/2011 Entry ID: 3799638

## PROCEDURAL HISTORY

Daniel Lewis Lee was sentenced to death in the United States District Court for the Eastern District of Arkansas on May 13, 2002, following his convictions for conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1962(c) and (d), and for three murders in aid of racketeering in violation of 18 U.S.C. § 1959. Mr. Lee and his co-defendant, Chevie Kehoe, were convicted of the murders of William Mueller, his wife Nancy Mueller, and Nancy's daughter, Sarah Powell.[1] Both defendants were tried together for the three murders. Their penalty phases were severed, however, with Mr. Kehoe's preceeding Mr. Lee's. Kehoe, the undisputed leader of the purported racketeering operation and by far the more culpable defendant, received a sentence of life without possibility of release from the jury. Because the jury had declined to impose a sentence of death on the more culpable defendant, the local United States Attorney attempted to withdraw the death notice as to Mr. Lee. Then-Deputy Attorney General Eric Holder refused to authorize the withdrawal, however, and the case proceeded to a penalty trial, at the conclusion of which Mr. Lee was sentenced to death.

After the jury returned its verdict of death, Mr. Lee sought, and was granted, a new sentencing proceeding. *See United States v. Daniel Lewis Lee*, No. 4:97-cr-243-GTE, March 9, 2011 [Doc. 941] (Order Granting Motion for New Penalty Phase Trial). The court granted Mr. Lee resentencing on the ground that evidence of psychopathy had been improperly admitted, and that the Department of Justice had failed to follow its own Death Penalty Protocol when it declined to authorize withdrawal of the death notice against Mr. Lee. *Id.* [Doc. 842.] Mr. Lee sought to subpoena then-Attorney General Janet Reno and then-Deputy Attorney General Eric Holder to testify regarding their actions in this case, and the district court denied the

---

[1] The jury acquitted both defendants of numerous racketeering acts that the government alleged they had committed.

4

government's motion to quash. *Id.* [Doc. 885.]  This Court thereafter granted the government's petition for writ of mandamus with regard to the subpoenas.  *See In re United States*, 197 F.3d 310 (8th Cir. 1999).  The district court then proceeded to order a resentencing proceeding for Mr. Lee based upon its conclusion that it had erroneously permitted the government to introduce evidence of Mr. Lee's alleged future dangerousness and diagnosis of psychopathy. *Lee*, No. 4:97-cr-243-GTE [Doc. 941.] The defense had opted not to introduce evidence on those topics, and the district court found that it was error to have allowed the government to do so on cross-examination of the defense expert, Dr. Mark Cunningham, and in the rebuttal testimony of its own expert, Dr. Thomas Ryan.  The district court further found that Deputy Attorney General Holder had not followed the Justice Department's Death Penalty Protocol when he declined to authorize withdrawal of the death notice.  The court therefore further ordered the Department and the Attorney General to revisit the decision in accordance with the Protocol, which specifies that the final decision on withdrawal of a death notice shall be made by the Attorney General. *Id.*

The United States Attorney appealed both aspects of the district court's order and this Court reversed and reinstated Mr. Lee's death sentence.  *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001).  The Court thereafter considered Mr. Lee's direct appeal, and affirmed his convictions and sentences of death.  *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004).  A petition for writ of certiorari was denied by the United States Supreme Court on June 27, 2005. *Lee v. United States*, 545 U.S. 1141 (2005).

Mr. Lee filed a motion for post-conviction relief pursuant to 28 U.S.C. § 2255 in the district court on June 26, 2006.  *See Lee*, No. 4:97-cr-243-GTE, March 9, 2011 [Doc. 1118.] The government filed its Response on December 6, 2006, *Id.* [Doc. 1126], and Mr. Lee filed a

Appellate Case: 11-1380     Page: 5     Date Filed: 06/20/2011 Entry ID: 3799638

Reply thereto on April 9, 2007, *Id.* [Doc. 1134]. On November 1, 2007, the parties filed a Joint Motion to Set Status Conference, suggesting that the court schedule a conference to discuss "the need for a hearing, scheduling, and any other pertinent issues." *Id.* [Doc. 1152.] The court denied the motion, finding no reason to conduct a status conference and noting that it would schedule a hearing when it considered Mr. Lee's § 2255 motion if it concluded that one would be helpful in resolving the motion. *Id.* [Doc. 1153.]

On May 15, 2008, the court issued an order directing Mr. Lee to submit two categories of evidence mentioned in his § 2255 motion, a tape-recorded interview of government witness Gloria Kehoe by law enforcement, and evidence establishing that Kirby Kehoe was not in Arizona at the time of the Mueller murders as the government had claimed. *Id.* [Doc. 1154.] A week later, the court entered an order directing Mr. Lee to file a supplemental brief setting forth any additional legal authority or argument in support of the grounds for relief in his § 2255 motion. *Id.* [Doc. 1156 at 1.] The court's order specified that the supplemental brief "shall be limited to providing additional legal authority and analysis for claims previously presented." *Id.* at 1-2. The court again declined to schedule a status conference, and stated that "[o]nce the briefing is complete, the Court will assess whether an evidentiary hearing or conference is necessary prior to ruling on Petitioner's § 2255 motion." *Id.* at 2. Mr. Lee duly filed the transcript of the Gloria Kehoe interview, *Id.* [Doc. 1158], and a Supplemental Memorandum, *Id.* [Doc. 1161], with the court. A little over two months after Mr. Lee submitted his Supplemental Memorandum, on August 28, 2008, the court issued an order denying all relief on Mr. Lee's § 2255 motion. *Id.* [Doc. 1163.] No evidentiary hearing was held on any issue. Thus, the district court did not, in fact, rule on the question of whether an evidentiary hearing was necessary *prior* to ruling on the § 2255 motion, but rather denied the request for a hearing in the same ruling

6

denying the § 2255 motion. The court never requested affidavits or other forms or offers of proof from Mr. Lee beyond the factual averments contained in the § 2255 motion itself and with regard to the two particular issues referenced above.

Mr. Lee thereafter filed a Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e), accompanied by a number of affidavits outlining some of the proof that he would have presented at an evidentiary hearing had one been granted. *Id.* [Doc. 1165.] The court denied the Motion on December 22, 2010, noting that, had it previously been provided with the affidavits that were attached to that Motion, it "might have determined that an evidentiary hearing was required." *Id.* [Doc. 1189 at 9.] In the same order, the court denied a certificate of appealability on all claims. *Id.* at 12-13. The entirety of the court's analysis of the question of whether a COA should issue was as follows:

> The Court is required by the 2009 Amendments to Rule 11(a) of the Rules Governing 2255 Proceedings to "issue or deny a certificate of appealability when it issues a final order adverse to the applicant." After considering the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. 28 U.S.C. Sec. 2253(c). The Court therefore declines to a grant a certificate of appealability.

*Id.* at 12 (footnote omitted).

Mr. Lee subsequently filed a Motion to Reconsider the Denial of a Certificate of Appealability. *Id.* [Doc. 1194.] The district court refused to reconsider its denial of a COA with the exception of one claim, issuing an order granting the motion with respect to "whether the death penalty is being unconstitutionally applied in this case." *Id.* [Doc. 1204.]

**LEGAL STANDARD**

The standard for the issuance of a COA is set out in 28 U.S.C. § 2253, which provides, in pertinent part, that the movant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (c)(2). A movant satisfies this standard by "demonstrating that jurists of

7

reason would disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003). *See also Slack v. McDaniel*, 529 U.S. 473, 481 (2000) (same); *Carson v. Director*, 150 F.3d 973, 975 (8th Cir. 1998) ("[Petitioner] had made a 'substantial showing that reasonable courts might differ' as to whether the jury instructions violated his due process rights," and, therefore, a COA properly issued). .

It is important to emphasize that a petitioner need not establish that he will eventually win on the merits of his claims in order to demonstrate his entitlement to a COA. The Court in *Miller-El* noted specifically that "a COA does not require a showing that the appeal will succeed," and neither should a Court deny

> the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot*, *supra*, at 893 n. 4, 103 S.Ct. 3383.

*Miller-El,* 537 U.S. at 336-37 (internal quotation marks omitted). The Court continued:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

*Id.* at 337-38.

8

In capital cases, "the nature of the penalty is a proper consideration in determining whether to issue a certificate of probable cause." *Barefoot*, 463 U.S. at 893[2]. Because this case involves the death penalty, "any doubts as to whether a certificate of appealability should issue must be resolved in [Movant's] favor." *Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004), (citing *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)). *See also Valerio v. Crawford*, 306 F.3d 742, 767 (9th Cir. 2002) ("Because this is a capital case, we resolve in Valerio's favor any doubt about whether he has met the standard for a COA."); *Jermyn v. Horn*, 266 F.3d 257, 279 n.7 (3d Cir. 2001) ("In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA]").

**CLAIMS FOR RELIEF UPON WHICH A COA SHOULD BE GRANTED**

**1. A COA SHOULD ISSUE ON CLAIM I.E., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CONDUCT mtDNA TESTING OF THE HAIR FOUND IN THE "RAID CAP" AND FALSELY IDENTIFIED AS THAT OF MR. LEE**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective for failing to conduct mitochondrial DNA ("mtDNA") testing of the hair that was found in a cap that the government argued was worn during the Mueller murders and matched Mr. Lee's hair. Had counsel rendered constitutionally adequate assistance and arranged for the testing, it would have revealed conclusively that the hair did not originate from Mr. Lee. Counsel would therefore have been able to refute a cornerstone of the government's case against him – a case that was otherwise far from airtight.

---

[2] *Barefoot* was decided before the passage of the AEDPA and therefore refers to a certificate of probable cause rather than a certificate of appealability. The Supreme Court has made clear, however, that the standards for the issuance of both certificates are the same. See *Slack v. McDaniel*, 529 US 473, 483 (2000) (noting that §2253 as amended by the AEDPA is "a codification of the CPC standard announced in *Barefoot*").

9

Appellate Case: 11-1380     Page: 9     Date Filed: 06/20/2011 Entry ID: 3799638

The government's theory at trial was that co-defendant Chevie Kehoe and Mr. Lee committed the Mueller homicides while disguised in law enforcement "raid gear." Tr. 1254-1255. Gloria Kehoe, Chevie Kehoe's mother, testified that Chevie Kehoe admitted to her that he and Mr. Lee committed the crimes against the Muellers while disguised in "ATF, FBI outfits" and pretended to be ATF agents during the incident. Tr. 4972. Cheyne Kehoe, Chevie Kehoe's brother, also testified that Chevie Kehoe told him that he and Mr. Lee committed these crimes while dressed in raid gear. Tr. 5327. Approximately one year and one month after the crimes occurred, an FBI "raid cap" was seized from a blue Chevrolet Suburban that Chevie Kehoe had been driving in Wilmington, Ohio. Tr. 4633, 4638-4639. The cap was sent to the Arkansas State Crime Lab, where a trace evidence analyst recovered a hair from it. Tr. 4720-21. The hair was then subjected to microscopic analysis and comparison with known hairs, including those of Mr. Lee. Tr. 4721-23.

At trial, the technician who conducted the analysis of the hair on behalf of the government testified that the hair discovered in the cap was microscopically similar to Mr. Lee's hair. Tr. 4722-23. Moreover, she testified that she had compared the hair from the cap with all seven of the known hair samples from other individuals connected to the case that she was given, and conclusively excluded all of them as donors of the hair: Only Mr. Lee could have been the source. Tr. 4723-24 Based on this testimony, the prosecutor in closing argument assured the jury that "the evidence establishes that that was Danny Lee's hair." Tr. 7000-01. *See also* Tr. 7005 (reminding the jury that the "government . . . [has] Danny's hair"). The hair, however, was not in fact Mr. Lee's. Subsequent mtDNA testing, performed during the course of the § 2255 proceedings, conclusively *excluded* Mr. Lee as a source of the hair found in the raid cap. The jury was therefore utterly misinformed regarding this crucially important fact.

10

Had trial counsel performed as the competent advocates guaranteed by the Constitution, they would have prevented Mr. Lee from being convicted and sentenced to death based upon materially false information. mtDNA analysis of hair evidence was readily available at the time of Mr. Lee's trial. *See, e.g., State v. Scott*, 33 S.W.3d 746, 757 (Tenn. 2000) (noting mtDNA analysis performed on evidence prior to July of 1996); *State v. Torres*, No. CR 98102538, 1999 Conn. Super. LEXIS 101 at *2 (Sup. Ct. Conn. January 21) (trial court, which conducted hearings on November 19, 1998 to determine whether defense expert could be present during mtDNA testing, noted "mitochondrial DNA evaluation can be performed even on quantities as minute as the specimens to be scrutinized for this case"). In the face of impending expert testimony strongly suggesting a match, and in light of the well-known weaknesses of microscopic hair analysis, *see, e.g.,* Clive A. Stafford Smith and Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?*, 27 Colum. Human Rights L. Rev. 227 (1996), it was absolutely imperative that counsel secure such testing. No possible strategic reason could support a contrary decision and, notably, none was offered in the affidavit of trial counsel procured by the government and filed with its response to Mr. Lee's § 2255 petition below. In failing to test the hair, defense counsels' performance fell outside the "range of reasonable professional assistance" and violated the Sixth Amendment. *Anderson v. United States,* 393 F.3d 749, 752 (8th Cir. 2005).

The law is clear that, when the government's case depends crucially on a scientific fact, defense counsel is obliged to consult with an expert when the subject matter is beyond his own expertise. *See, e.g.*, *Dugas v. Coplan*, 428 F.3d 317, 329-330 (1st Cir. 2005) (counsel's performance deficient for failure to consult with arson expert when arson was "cornerstone of state's case"); *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) (counsel ineffective for failure

11

to retain ballistics expert who would have countered theory offered by ballistician called by state); *Gersten v. Senkowski,* 426 F.3d 588 (2d Cir. 2005) (affirming district court finding of ineffectiveness based on counsel's failure to "consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues."); *Soffar v. Dretke,* 368 F.3d 441 (5th Cir. 2004) (counsel ineffective for failure to retain ballistics expert to counter state's theory of case); *Dees v. Caspari*, 904 F.2d 452, 455 (8th Cir. 1990) ("counsel had a duty to garner the expertise necessary to cross examine [the State's expert];" *Foster v. Lockhart*, 811 F. Supp. 1363 (E.D. Ark. 1992) (counsel ineffective in rape case for failing to secure and present expert evidence that defendant was impotent).  *See also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (counsel has a duty to investigate all avenues leading to facts relevant to the merits); *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("To make a reasoned judgment about whether evidence is worth presenting, one must know what it says.").

Mr. Lee was severely prejudiced by counsel's deficient performance.  Contrary to the district court's conclusion, *Lee*, No.4:97-cr-243-GTE [Doc. 1163 at 49],[3] the government's case against Mr. Lee was by no means overwhelming.  The bulk of the evidence presented concerned co-defendant Chevie Kehoe and the efforts of himself and his family to establish a purported white supremacist organization with an independent nation in the Pacific Northwest.  The principal witnesses against Mr. Lee were Gloria Kehoe and Cheyne Kehoe, Chevie Kehoe's mother and brother, with James and Dalvine Wanker playing a supporting role.  Gloria Kehoe

---

[3]  The district court also suggested that the record is "unclear" as to whether the parties could have agreed to allow the defense to conduct the testing, because government testing protocols specified that the parties must agree that the entire sample may be consumed when the sample is as small as it was in this case.  Of course, testing was in fact conducted pursuant to the consent of the parties during the § 2255 proceedings, *Id.* [Doc. 1120], and so there is no reason to believe that it could not have been accomplished similarly prior to trial.  In any event, the district court expressly stated that it did not rule on the claim on that basis, and could not have done so without conducting an evidentiary hearing to resolve the factual dispute.

12

testified that both Chevie and Mr. Lee confessed their involvement in the Mueller murders to her. Tr. 4971-75. Cheyne Kehoe claimed that Chevie confessed his own involvement and implicated Mr. Lee. Tr. 5326-30. And the Wankers reported that Mr. Lee told them about a trip down south in which some people had messed with him and he did something violent to take care of them. Tr. 4082, 4093.

However, the credibility of each of these witnesses was very much in question. Gloria and Cheyne Kehoe were each directly implicated in several of the racketeering acts with which Chevie and Mr. Lee were charged, Tr. 7038, and each testified under grants of immunity, Tr. 4948, 5281-82. Gloria Kehoe received substantial monthly payments from the government in exchange for her testimony. Tr. 5205-06. In exchange for his testimony Cheyne Kehoe received government payments, Tr. 5283, favorable testimony from the federal government at his Ohio state trial wherein he was charged with the attempted murder of police officers during a shoot-out that Chevie initiated following a traffic stop, Tr. 5283, and placement into the federal witness security program, Tr. 5283. The Wankers had been in a dispute with Mr. Lee over ownership of a trailer that was parked on the property that they managed, resulting in the police being called. Tr. 4087. And it has now come to light that they, too, received cash payments from the government as a result of their coming forward as witnesses in this case. *See* pp. 42-46, *supra*. It is noteworthy that the jury rejected much of the government's case, finding the government's proof lacking on numerous racketeering acts, including an additional murder with which only Chevie was charged.

Aside from these compromised witnesses, the remainder of the government's case against Mr. Lee consisted of circumstantial evidence of Mr. Lee's later possession of property belonging to the Muellers, which failed to establish his participation in the murders as opposed to his

13

subsequent association with stolen goods. The "proof" of a match between the hair in the raid cap and Mr. Lee's hair therefore provided much-needed corroboration of the testimony of the Kehoes and Wankers, and indeed this Court specifically noted the hair evidence in its opinion on direct appeal. *United States v. Lee*, 374 F.3d 637, 643 (8th Cir. 2004). For its part, the defense called a series of reliable witnesses who provided evidence that the Muellers were still alive long after the Government theorized the crime had been committed. The evidence against Mr. Lee was thus far from overwhelming, and the prejudice he suffered from the false claim that his hair was in the raid cap was substantial. Indeed, it is more than conceivable that the hair – which the government claimed was direct scientific evidence of Mr. Lee's involvement in the murders – may have carried the day.

The significant impact of this kind of seemingly hard, scientific evidence was addressed in *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001). There, as here, defense counsel failed to seek expert assistance in challenging an alleged hair match. *Id.* at 457. The defendant was convicted of the rape, torture and murder of a young woman and sentenced to death. *Id.* at 456. A confederate of the defendant, who received the benefit of a plea agreement, "was the centerpiece of the state's case." *Id.* at 457. The state sought to corroborate the confederate's testimony by presenting the testimony of an expert "that a pubic hair found on the victim's thigh almost certainly was [the defendant's]." *Id.* As here, the prosecutor argued this significance of this testimony to the jury in closing. *Id.* Thereafter, post-conviction counsel retained an expert who found that in fact "the hair was like the victim's hair and unlike [the defendant's]." *Id.* The court held that trial counsel's performance was deficient due in part to his failure to hire a hair expert. In finding counsel's failure to have been prejudicial the court pointed out that, as here,

14

the key witness's testimony was compromised by the plea agreement. *Id.* The court reversed the district court's denial of habeas corpus relief and granted the defendant a new trial.

At a minimum, this is a claim worthy of further development and reasonable jurists could differ regarding whether Mr. Lee is entitled to relief on the ground that his trial counsel rendered constitutionally ineffective assistance by failing to test the hair evidence. A COA should therefore be issued with respect to this claim.

**2. A COA SHOULD ISSUE ON CLAIM I.G., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY EXERCISING PEREMPTORY CHALLENGES TO EXCLUDE JURORS ON THE BASIS OF RACE**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they exercised their peremptory strikes to exclude potential jurors on the basis of their race. Counsel's conduct violated not only the Sixth Amendment guarantee of the effective assistance of counsel for the defense, *see Strickland v. Washington*, 466 U.S. 668 (1984), but also the Equal Protection component of the Due Process Clause of the Fifth Amendment, *see Georgia v. McCollum*, 505 U.S. 42 (1992). A COA should accordingly issue with respect to this claim.

Equal Protection prohibits both the government and a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. *McCollum*, 505 U.S. at 44, 59. *See also Batson v. Kentucky*, 476 U.S. 79 (1986); *United States v. Pospisil*, 186 F.3d 1023, 1028 (8th Cir. 1999). Such an invidious practice is barred because the harm that results from it is manifold and wide- ranging in scope. The potential jurors who are denied the opportunity to serve as a result of racial discrimination are obviously and severely harmed. *Batson*, 476 U.S. at 87; *McCollum*, 505 U.S. at 48 (noting that *Batson* and its progeny

15

are designed in part "to remedy the harm done to the dignity of persons"). The harm extends as well to "the entire community," because discriminatory jury selection practices "undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87; *see also McCollum*, 505 U.S. at 49-50 ("Be it at the hands of the State or the defense, if a court allows jurors to be excluded because of group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice – our citizens confidence in it") (internal quotations omitted).

The Supreme Court has also recognized that the criminal defendant himself suffers an injury if he is tried by a jury selected using racially motivated procedures. *Batson*, 476 U.S. at 87 (noting that "[r]acial discrimination of jurors harms . . . the accused whose life or liberty they are summoned to try"); *McCollum*, 505 U.S. at 47 (noting that one of the multiple ends that *Batson* was designed to serve is "to protect individual defendants"). "The discriminatory use of peremptory challenges . . . causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). This is so because "racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' and places the fairness of a criminal proceeding in doubt." *Id.* (quoting *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)). And where race is implicated in the trial, either directly or indirectly, the cynicism regarding the jury's neutrality and obligation to follow the law engendered by the discriminatory selection practices is yet further aggravated. *Id.* at 412.

The jury that convicted Mr. Lee and sentenced him to death was comprised of nine African Americans and three whites. Defense counsel used every one of their 30 peremptories to strike white venire members. Tr. 1224. The prosecution commented upon this fact, even citing *McCollum* to the district court, but the court declined to conduct the requisite inquiry into the

16

propriety of the defense strikes.  Tr. 1224-25 ("I guess we could go through the process of taking up every white, but I'm not going to do it.")  The prosecution did not push the issue further, and the jury was seated.  To its Response to Mr. Lee's § 2255 Petition, the United States attached the affidavit of Mark Hampton, one of the attorneys that represented Mr. Lee's co-defendant, Chevie Kehoe, at their joint trial.  *See Lee*, No. 4:97-cr-243-GTE, December 6, 2006 [Doc. 1126-4.]   In that affidavit, attorney Hampton wrote:

> Selecting a jury with as many black jurors as possible was a strategic decision made by defense counsel.  Jury consultant Bob Berry concurred in the strategy.  Defense counsel felt this strategy was reasonable because (1) blacks are more likely than whites to discredit government testimony, (2) research of attitudes indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely to give the death penalty than whites in this particular case.  There were general conversations regarding the strategy with defendant Chevie Kehoe.

Although no direct evidence was presented establishing that Mr. Lee's counsel expressly adopted the same strategy, the district court found it to be "highly unlikely" that Mr. Lee's counsel and Chevie Kehoe's counsel did not consult on jury selection strategies. *Id.* [Doc. 1163 at 50-51.]  As with all of the claims, however, no hearing was conducted

Despite its acceptance of the fact that Mr. Lee's counsel deliberately exercised their peremptory strikes in a racially discriminatory manner, the district court nevertheless denied relief on this claim without conducting an evidentiary hearing.  It did so based upon its wholly erroneous conclusion that "[r]ace-based jury selection offends the constitutional rights of the jurors who are eliminated from jury service because of their race.  That Petitioner's counsel may have allowed race to influence the jury selection process does not offend Petitioner's constitutional rights." *Id.* [Doc. 1163 at 51] (emphasis in original) (internal citations omitted).  As is clear from the authorities cited above, racially discriminatory jury selection processes most assuredly do implicate the rights of the defendant, even in the ordinary case.  Where, as here, the

17

end result is that the defendant, an accused white supremacist, skinhead and hater of other races, is tried for his life by a mostly black jury from which members of his own race have been systematically excluded, the violation of the defendant's rights could hardly be plainer.

The fact that it was Mr. Lee's own counsel that engaged in the unconstitutional discrimination does not affect this result. As the Fifth Circuit has held:

> The discriminatory jury selection process of this trial offends the Constitution and calls into question the integrity of our judicial system. We conclude that only by repudiating all results from such a trial can public confidence in the integrity of this system be preserved, even when it means reversing the conviction of the very defendant who exercised the discriminatory challenges.

*United States v. Huey*, 76 F.3d 638, 641-42 (5th Cir. 1996). The exercise of peremptory challenges "differs significantly from other actions taken in support of a defendant's defense," because in this role, a criminal defendant is wielding the power to choose a quintessential governmental body – indeed, the institution of government on which our judicial system depends." *McCollum*, 505 U.S. at 54. As a result, for the limited purpose of jury selection, both the government and the defense are state actors, and racial discrimination by either one violates the Constitution and must be remedied. *Id.*

Trial counsel's race-based peremptory strikes additionally violated Mr. Lee's Sixth Amendment right to the effective assistance of counsel. There is simply no conceivable basis upon which a decision by the defense to exclude whites and stack the jury with African Americans in a case in which the defendant is accused of being a white supremacist engaged in murder and racketeering in order to create a whites-only Aryan nation could be deemed reasonable. Attorney Hampton's explanation, that defense counsel believed that African Americans would be less likely to impose the death penalty not only in general but in this case in particular, utterly defies comprehension. The entire trial was soaked in accounts of the defendants' repugnant racist beliefs, and the visible symbols resembling swastikas and SS

18

lightning bolts tattooed on Mr. Lee's neck were a constant visual reminder, if any were necessary, of his expressed antipathy towards minorities.  Under these circumstances there could be no reasonable basis whatsoever to conclude that jurors of color would be more likely to empathize with Mr. Lee and, despite being generally in favor of capital punishment, would be moved to spare his life.  *Cf. Popsisil*, 186 F.3d at 1028 (noting that defense counsel admitted that race was a factor in his decision to strike African American jurors in case where defendant was charged with cross-burning and other racist acts, for he feared that African American jurors would have a hard time with the case and would identify with the victim).

Moreover, counsel's performance should be deemed per se deficient when it is in flagrant violation of the Constitution.   As a general matter, "[d]efense counsel is limited to 'legitimate, lawful conduct.'"  *McCollum*, 505 U.S. at 57 (quoting *Nix v. Whiteside*, 475 U.S. 157, 166 (1986).  With respect to jury selection in particular, it is beyond cavil that the racially discriminatory use of peremptories is the antithesis of legitimate, lawful behavior and has no basis in reason or logic.  "Race cannot be a proxy for determining juror bias or competence.  'A person's race simply is unrelated to his fitness as a juror.'"  *Powers*, 499 U.S. at 410 (quoting *Batson*, 476 U.S. at 87).  *See also Lee*, No. 4:97-cr-243-GTE [Doc. 1165-2] (Affidavit of Kevin McNally (opinion of experienced capital defense lawyer that "selecting jurors strictly on the basis of racial stereotypes is not a reasonable, effective strategy in any case"). Striking a venireperson on the basis of race is thus deficient performance as a matter of law.

In the ordinary case, to make out a constitutional violation a petitioner must establish not only that his counsel performed deficiently, but also that he was prejudiced by counsel's failures. *Strickland,* 466 U.S. at 692.  However, where the error committed by counsel is structural, prejudice is presumed.  *See McGurk v. Stenberg*, 163 F.3d 470, 474 (8th Cir. 1998) (holding that

19

prejudice is presumed from counsel's failure to inform defendant that he had a right to jury trial). A structural error is one that "call[s] into question the very accuracy and reliability of the trial process and thus [is] not amenable to harmless error analysis." *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)). Racial discrimination in jury composition is a quintessential example of structural error. *See Becht v. United States*, 403 F.3d 541, 547 (8th Cir. 2005).

The error committed by Mr. Lee's counsel in this case is structural, and prejudice must be presumed. In *Ex parte Yelder*, 575 So.2d 137, 139 (Ala. 1991), the Supreme Court of Alabama held that trial counsel's failure to raise a *Batson* objection to the prosecutor's race-based peremptory strikes is presumptively prejudicial. It did so based upon its conclusion that an outcome determinative test is a wholly inappropriate standard for measuring prejudice in the *Batson* context. *Id.* "If an outcome-determinative test is used, then no . . . appellant could prove prejudice unless he relied on the very assumption that *Batson* condemns--" that jurors may be biased because of their race. *Id.*

It is the case that a panel of this Court has held to the contrary and required a showing of prejudice in order to find ineffective assistance for failing to raise a *Batson* objection. *See Young v. Bowersox*, 161 F.3d 1159, 1161 (8th Cir. 1998). However, this decision in no way defeats Mr. Lee's entitlement to a COA on this claim without regard to his ability to show prejudice. As noted above, a petitioner is entitled to a COA under 28 U.S.C. § 2253 *inter alia* if he can show that "'a court *could* resolve the issues in a different manner.'" *Lozada v. Deeds*, 498 U.S. 430, 432 (1991) (per curiam) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)) (emphasis in original). The decision in *Yelder* demonstrates that not only *could* a court resolve the question of whether a showing of prejudice is required, a court in fact *did*. A COA should therefore issue

20

without regard to prejudice. *See Lozada*, 498 U.S. at 432 (holding that court of appeals erred in denying COA[4] on ground that petitioner could not show prejudice from counsel's ineffective assistance where at least two other courts of appeal had presumed prejudice on same facts).

In any event, this is the highly unusual case where the prejudice to the defendant is clear from the record. Throughout the guilt and penalty phases of Mr. Lee's trial, the jury was subjected to an unrelenting barrage of accusations of abhorrent racist beliefs on the part of Mr. Lee. By way of example, James Wanker testified that Mr. Lee told him that "he liked to go 'nigger bashing,'" Tr. 4081, and that he was going downtown to "do some nigger bashing" on the 4th of July, Tr. 4091-92. A pamphlet found in a storage locker associated with the defendant read: "We could go on indefinitely quoting scripture to prove that the negro is merely an articulate member of the beast creation. Even though he has not been given the intelligence and spiritual understanding of the white race, he can think and reason up to a point, therefore he is to have dominion over the other animals. Let us give credit where credit is due. The negro is king, king of the beasts." Tr. 5566. In light of the overwhelming amount of evidence of Mr. Lee's particular antipathy towards people of color, the inference that the nine African-American members of the jury were affected by that evidence and that it influenced their decision to convict Mr. Lee and sentence him to death is inescapable. A COA should issue on this claim also.

---

[4] The Court in *Lozada* actually addressed the denial of a certificate of probable cause ("CPC"), the predecessor to the COA. *Id.* at 431. However, the standards for the issuance of a CPC are identical to the standards for the issuance of a COA. *See Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (noting that § 2253 as amended by the AEDPA is "a codification of the CPC standard announced in *Barefoot*").

21

**3.** **A COA SHOULD ISSUE ON CLAIM I.C., THAT DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO, AND SEEK RESCISSION OF, THE DISTRICT COURT'S ORDER FORBIDDING THEM FROM MEANINGFULLY DISCUSSING THE CASE WITH THEIR CLIENT**

Reasonable jurists could differ regarding whether the district court correctly denied Mr. Lee's claim that his trial counsel rendered ineffective assistance at the guilt phase by failing to object to, and seek rescission of, the district court's order forbidding them from meaningfully discussing the case with him. Over three months prior to trial, with no objection by the defense, the district court granted the government's motion to prevent defense counsel from disclosing to Mr. Lee the identity of government witnesses whose names appeared in discovery. The district court was openly skeptical about the wisdom of its decision as it was rendered, and invited defense counsel to revisit the issue with the court should they so wish. Defense counsel never did so, however, and the draconian and unnecessary restriction upon Mr. Lee's ability to assist counsel in his defense and to receive the effective assistance of counsel thus remained in place for the remainder of the case and throughout Mr. Lee's trial. Counsel's failures constituted ineffective assistance of counsel in violation of Mr. Lee's constitutional rights. A COA should therefore issue with respect to this claim.

On November 19, 1998, the court held a telephonic hearing to address a motion filed by the government to limit Mr. Lee's access to discovery materials. Tr. 11/19/98. The government had asked the court to instruct defense counsel to retrieve all discovery materials currently in Mr. Lee's possession, to refrain from providing him with any further documents and to ensure that in their oral discussions with him they did not disclose the identity of any government witness. Tr. 11/18/98 at 5. The basis for the request was three letters, written by Mr. Lee and intercepted by jail personnel, that the government claimed constituted a threat against witness Sean Haines. *Id.*

22

at 3.[5]  Inexplicably, counsel for Mr. Lee acquiesced in the government's request.  *Id.* at 11.  The only attorney for Mr. Lee present at this hearing was Karen Whatley, neé Coleman.  *Id.* at 8-12.  By then she had already accepted a position as an Assistant United States Attorney with the United States Attorney's office in Little Rock, the same office that was prosecuting Mr. Lee.  Tr. 38-39.  She had not yet informed Mr. Lee of her imminent defection to the office that was seeking to bring about his execution. *Id.* at 41.  The court therefore orally granted the government's motion, *id.* at 14, and later entered a written order, which stated:

> After reviewing the government's Motion, and conducting a hearing, this Court finds that the government has established good cause as required under Fed R. Crim. P. 16(d)(1) AND HEREBY ORDERS:
>
> (1) That defendant Daniel Lee's attorneys shall continue to have full access to, and receive, discovery materials;
>
> (2) That defendant Daniel Lee's attorneys shall recover all discovery materials in defendant Daniel Lee's possession except his own statements;
>
> (3) That defendant Daniel Lee's *shall have no further access to documents provided by the government during discovery other than his own statements.* However, he will be able to fully discuss the content of all such materials with his attorneys; and
>
> (4) When discussing government-supplied documents with defendant, ***counsel for defendant Lee shall not disclose the identities of the government's civilian witnesses***.

---

[5]    In fact, as the district court later found, the letters constituted no such thing.  Rather, they merely discussed the fact that Haines was cooperating with the government and predicted the criticism he would receive from his peers in the future as a result, a fact that is plainly at odds with any suggestion that Mr. Lee was anticipating Haines's imminent demise.  Indeed, the first letter expressly stated that "[t]hese copies are <u>for informational purposes only! [sic] And are in no way meant to</u> intimidate or cause harm to Sean's person!" *Lee*, No. 4:97-cr-243 GTE [Doc. 408] (emphasis in original).

23

*Lee*, No. 4:97-cr-243 GTE [Doc. 415] (emphasis added).[6]

Even as it entered the verbal order, the court was attuned to the potential problems with the government's request that counsel be forbidden from disclosing the names of witnesses to their client, noting that that part of the order in particular "can raise some very highly sensitive issues, getting between a defendant and his attorney in terms of what may be disclosed by defendant's counsel to his or her client," 11/18/98 Tr. at 9-10, and that it was "one we would have to have a little concern with." *id.* at 13. The court expressly noted that it "will be amenable to motions by [Ms. Coleman] or Mr. Lassiter or Ms. Compton for any modification later on. But this seems to be the appropriate thing to do at this point. And then we can see how it works in the future." *Id.* at 14. Significantly, the court itself acknowledged shortly before trial began that the letters upon which the order was based involved no intimidation, threats or instructions to harm Mr. Haines. *Lee*, No. 4:97-CR-00243 GTE [Doc. 553.] The court made this finding in the context of Kirby Kehoe's motion for severance, stating that "the communications merely informed others of Mr. Haines work with the Government in this case." *Id.* It is therefore clear that, had Mr. Lee's counsel performed as the reasonably competent advocates guaranteed by the Constitution and sought rescission of the court's order, such relief would have been granted. And yet, even in the face of the court's later finding regarding the letters, defense counsel never sought to have the order modified.

Counsel's failure in this regard constituted seriously deficient performance. It is manifestly impossible to adequately work with a client to assess the government's case against him and prepare a defense to it without ever mentioning the name of a single government

---

[6]  On direct appeal, this Court reviewed the district court's initial order for plain error and found none. *United States v. Lee*, 374 F.3d 637, 652 (8th Cir. 2004).

24

witness.  In order for the client to inform counsel of his relationships with the government's witnesses and his knowledge of their history, he needs to know who they are.  In order to identify witnesses who have information that could assist him in defending against those of the government, he needs to know whose testimony the government will present.  Moreover, compliance with the court's order clearly required significantly more reticence and circumspection than merely omitting the witnesses' proper names.  In the case of witnesses that Mr. Lee knew and had interacted with, in other words a large proportion of the government's case, discussing the details of what the witness would say necessarily would have revealed their identities.  And so counsel was prevented from informing Mr. Lee of testimony that would be presented against him, and he in turn was prevented from developing an understanding of the case against him and identifying and providing his counsel with any information he possessed that might have helped meet, counter, rebut, discredit or mitigate that case.  Being forced to conduct his defense under such circumstances violated Mr. Lee's constitutional rights.

The capacity to communicate with counsel is "a cornerstone of due process at trial." *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 808 (9th Cir. 2003). *See also Drope v. Missouri*, 420 U.S.162,171 (1975) (holding that incompetent defendant who cannot "consult with counsel, and [] assist in preparing his defense" may not be subjected to trial). The crippling severity of the limitation placed upon Mr. Lee's ability to communicate with his lawyers by court order "'eviscerate[d] his . . .  right to counsel'" in the same manner as an inability to communicate due to mental incompetence.  *Id.* at 815 (quoting *Calderon v. U. S. District Court (Kelly V)*, 163 F.3d 530, 541 (9th Cir. 1998) (en banc). *Cf. Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000) (holding that counsel has a duty to consult with client regarding possibility of appeal). Accordingly, the Supreme Court has held that forbidding counsel from conferring with his client during an

25

overnight recess in his trial violated the defendant's Sixth Amendment right to the assistance of counsel. *Geders v. United States*, 425 U.S. 80, 91 (1976).

The order entered against Mr. Lee in this case went far beyond orders that have been approved as necessary for the protection of witnesses and adequately protective of the defendant's rights. First of all, in all cases where such orders have been deemed proper, there was an actual factual basis to believe that witnesses might be in danger. *See, e.g., Morgan v. Bennett*, 204 F.3d 360, 362-63 (2d Cir. 2000) (approving restriction on counsel informing defendant when witness would testify where defendant's associates had visited witness in jail, told her that they knew she was testifying against defendant and asked about her 8 year old daughter in disturbing fashion, and approached other family members in threatening fashion); *United States v. Padilla*, 203 F.3d 156, 158 (2d Cir. 2000) (approving restriction on counsel's ability to disclose information where witness who provided it wrote letter asking that defendants not be informed ''because the danger for me in this instance is very real and the risk large, also my family's safety is at stake'").

Moreover, the orders approved in those cases were far narrower in scope than the one in this case, that precluded any mention of the name of any government witness against Mr. Lee at his capital trial. *See Morgan*, 204 F.3d at 368 (noting that order prohibiting counsel only from informing client that witness would testify the next day was "substantively quite limited" and that there was "no restriction on their ability to discuss any other facet of the case" and no "impairment of the ability of defense counsel's preparation for [the witness's] testimony); *Padilla*, 203 F.3d at 160 (noting that information was fully disclosed to defendant immediately before trial began and that, because it concerned only associated witness tampering investigation, order was "drawn as narrowly as possible to ensure that defendants were able to discuss with

26

counsel all matters pertaining to their defense so that the communications proscribed did not implicate counsel's representation regarding the crimes charged"). The contrast between these orders and the one in the instant case could not be starker. Trial counsel's failure to object to the order against Mr. Lee constituted ineffective assistance of counsel.

Ordinarily, in order to establish an entitlement to relief on an ineffective assistance of counsel claim, a petitioner must establish not only that his counsel performed deficiently, but also that he was prejudiced by counsel's failures. *Strickland v. Washington,* 466 U.S. 668, 692 (1984). However, where counsel's omissions resulted in structural error, prejudice is presumed. *See McGurk v. Stenberg*, 163 F.3d 470, 474 (8th Cir. 1998) (holding that prejudice is presumed from counsel's failure to inform defendant that he had a right to jury trial). A structural error is one that "call[s] into question the very accuracy and reliability of the trial process and thus [is] not amenable to harmless error analysis." *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)). In *Cronic v. United States,* 466 U.S. 648, 659-60 (1984), the Court held that such error "may be present on some occasions when, although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the conduct of the trial." *See also Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) (noting that deprivation of right to counsel that "affected – and contaminated – the entire criminal proceeding" constituted structural error). And in *Geders*, the Court held that preventing a defendant from conferring with his counsel during an overnight recess of his trial violated his Sixth Amendment right to the assistance of counsel without regard to what they may have discussed. *Id.* at 91.

27

Counsel's degree of expertise, years of experience, or level of commitment cannot compensate for an inability to consult with his client in a meaningful way. It is impossible to measure the full extent of the prejudice that Mr. Lee suffered from the order entered in this case, for it is impossible to determine what Mr. Lee would have provided in terms of information, ideas and investigative leads had he been afforded the opportunity to meaningfully participate in the preparation of his defense. The effect of the order plainly contaminated the entire trial, and was therefore structural. Prejudice from counsel's deficient performance must be presumed, and a COA should issue on this claim.

**4. A COA SHOULD ISSUE ON CLAIM I.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO PRESENT AVAILABLE, MATERIALLY EXCULPATORY EVIDENCE**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to present the testimony of numerous available witnesses who would have provided materially exculpatory evidence. In a case similar to this one, *White v. Roper*, 416 F.3d 728 (8th Cir. 2005), this Court found trial counsel ineffective for failing to investigate and present the exculpatory testimony of two witnesses in the guilt phase. The defendant was charged, along with two other men, who did not receive a death sentence, in a drug-related murder. While there were witnesses that connected the defendant to the other men, no physical evidence connected the defendant to the crime scene. While the defendant did present evidence that the third man was not the defendant, two available witnesses supporting the defense were never interviewed. In this instance, trial counsel's conduct was deficient because "counsel's investigation was too superficial." *Id.* at 732.

Appellate Case: 11-1380     Page: 28     Date Filed: 06/20/2011 Entry ID: 3799638

*White* is not an atypical ruling.  Courts routinely find ineffective assistance of counsel for failing to investigate and present evidence supporting a defense they intended to pursue.  *See Grooms v. Solem*, 923 F.2d 88, 90-91 (8th Cir. 1991) (prejudice shown where evidence would have supported alibi defense and raised reasonable doubt about veracity and credibility of state's witness); *Chambers v. Armontrout*, 907 F.2d 825, 832 (8th Cir. 1990) (failure to present disinterested witness who would have supported defendant's claim of self-defense undermined confidence in outcome of trial); *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006) (counsel ineffective in murder case, in part, for failing to investigate an exculpatory and potential witness); *Riley v. Payne*, 352 F.3d 1313 (9th Cir. 2003) (counsel ineffective in an assault with a deadly weapon case for failing to investigate and present a witness supporting a defense theory of self-defense); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) (counsel ineffective in burglary case for failing to interview and present the testimony of an exculpatory eyewitness).

In this case, trial counsel failed to call to the stand materially exculpatory witnesses whose testimony falls into four broad categories:  (1) Evidence implicating Paul Humphrey; (2) evidence of the non-existence of the APR; (3) evidence challenging the government's critically important timeline of when the Mueller homicides occurred; and (4) evidence that Mr. Mueller was in fear for his life before he was killed.

*Evidence Implicating Paul Humphrey*

One aspect of Mr. Lee's trial defense was to point the finger at Paul Humphrey. However, the district court noted in its opinion denying relief that trial counsel failed in this regard to "establish a link between Humphrey and the death of the Muellers." *Lee*, No. 4:97-cr-243-GTE [Doc. 1163 at 27.]  Mr. Lee alleged in his § 2255 motion that specific testimony from three witnesses was available and known to trial counsel, and would have established this

29

missing link: First, David Hill. *Id.* [Doc. 1118-1 at 15.] Mr. Lee alleged that Mr. Hill would have testified that he saw Paul Humphrey and another man throw something off the bridge at the Illinois Bayou in January 1996. *Id.* The bodies of the Muellers were subsequently found in the Illinois Bayou. Second, Glen Hinson. Mr. Lee alleged that Mr. Hinson observed a nervous and scared Paul Humphrey obtain the title of the Muellers' vehicle, and he also would have reported Mrs. Mueller's fear of Humphrey. *Id.* And third, Eldon King. Mr. Lee alleged that Mr. King would have testified as to Humphrey's odd behavior after the Muellers disappeared. *Id.* Each of these witnesses would thus have supported a defense theory that the district court found trial counsel tried but failed to adequately prove.

*The non-existence of the APR* [7]

The government's case depended upon its ability to prove the existence of a racketeering organization. Its theory was that Chevie Kehoe created and led the APR, a white supremacist group with the goal of establishing an Aryan homeland. The remainder of the organization, according to the government, was comprised of Mr. Lee, Cheyne and Kirby Kehoe and Faron Lovelace.[8] However, there were a number of available witnesses who would have testified that there was no such group as the APR. Trial counsel's failure to present the testimony of those witnesses was unreasonable and prejudicial to Mr. Lee.

The testimony that trial counsel failed to present was from Kelly Kramer, Faron Lovelace, Norda Lewis and Jeff Brown. Kelly Kramer was Chevie Kehoe's second wife. She

---

[7] Three different names were given for the purported racketeering organization behind the acronym "APR:" Aryan People's Republic, Aryan People's Resistance, or Aryan People's Revolution. *Id.* [Doc. 1163 at 5.] The fact the government could not even pin down a name underscores the lack of a then-existing enterprise at the time of the Muellers' disappearances.

[8] The name of the witness is alternately spelled "Faron Loveless" and "Faron Lovelace" in different parts of the record.

30

Appellate Case: 11-1380    Page: 30    Date Filed: 06/20/2011 Entry ID: 3799638

was called as a witness, but trial counsel failed to elicit from her the fact that, in all the time that she spent with Chevie, he never once mentioned the APR or anything like it. *Id.* [Doc. 1118-1 at 16.]   Faron Lovelace, who the government claimed was a member of the APR, would have testified that he had never heard of such an organization.  *Id.*  Norda Lewis, Faron Lovelace's wife, would have testified that she, too, had never heard of the APR. *Id.* [Doc 1118-1 at 17.] And Jeff Brown, had he been asked, would have testified similarly.  *Id*.  Mr. Brown was called as a witness by the government, but trial counsel failed to question him regarding the existence of the so-called APR.  *Id.* [9] Had they performed competently and presented this testimony, Mr. Lee's  counsel could have attacked the heart of the government's case.  If no enterprise existed, Mr. Lee could not have been convicted of racketeering and could not have been given the death penalty.

*Evidence Challenging the Government's Timeline*

As the district court correctly acknowledged, *Id.* [Doc. 1163 at 29], the government's theory of the case with regard to the Mueller murders rested upon an extraordinarily tight timeline.  In order to account for evidence regarding the whereabouts of Mr. Lee and Chevie Kehoe on other dates, the government had to convince the jury that the Muellers were killed on January 11, 1996. *Id.* Trial counsel challenged that timeline with evidence related to when the Muellers were last seen alive and evidence regarding Mr. Lee's arrival in Washington state. Even though these defenses were raised, trial counsel failed to present further available evidence that would have supported their position and convinced the jury that they were right.

Four witnesses would have testified that the Muellers were still alive well after January 11, 1996.  Vernon Ahrens was the owner of an auto shop that the Mueller's patronized. *Id.* [Doc.

---

[9]      Mr. Brown would also have provided testimony disputing the Wankers' account of the incident involving the trailer on the land that Wankers managed.

31

1118-1 at 15.] He and his wife, Maria Ahrens, would both have testified that they saw the Muellers in the auto shop the Thursday after the government asserted they went missing. *Id.* Pam Wrappe worked at the local Walmart. *Id.* She would have corroborated testimony that was presented regarding the presence of the Muellers in Walmart after they had supposedly disappeared. *Id.* at 15-16. Earlene Branch, Nancy Mueller's mother, would have testified that she heard William Mueller's distinctive cough in February of 1996, when she was at the home of Sylvia and David Mason. A fifth witness, Jeff Brown, would have testified, if asked, that Mr. Lee arrived in Spokane, Washington, over 1800 miles from Tilly Arkansas, either late on January 12, or in the early morning hours of January 13, 1996. Each of these pieces of evidence are irreconcilable with the government's timeline, and would have been fatal to the government's case against Mr. Lee. The timeline evidence would also have corroborated trial testimony. A school teacher, Janis Rowlands, saw the Muellers on either February 2 or February 3. Tr. 5800. Lucy Carr and Sue Sullivan saw Bill Mueller in February. Tr. 5812; 5817-18. Ron Greer saw Bill Mueller close to the time a February news article appeared. Tr. 5852-53. Mary Reid, a family friend, saw the Muellers the first week of February at a bank. Tr. 5857. Further, Susan Weaver did indicate she spoke with Mr. Mueller when he made a uniquely large water purchase. Tr. 5832. While she could not recall the exact date, Tr. 5833, a receipt for a large water purchase corroborates Weaver's testimony. Tr. 6364 (receipt dated 1/22/96). She further testified that a flyer about their disappearance could not be true because she had just seen Mr. Mueller. Tr. 5835.

*Evidence of Mr. Mueller's Fear for his Life*

Trial counsel failed to investigate and call George Eaton, Peter Langan and Micheal Brescia. Eaton interviewed Mr. Mueller and noted Mueller's expressed fear of individuals

32

(expressly indicating he feared for his life from Micheal Brescia) in the Christian Identity movement, including individuals from Elohim City, Oklahoma. Michael Brescia had been brought in by the government and was ready to testify.

A victim's expressed fear is admissible. First, the statement, at the minimum, provides circumstantial evidence of Mr. Mueller's state of mind. Fed R. Evid. 803(3). Mr. Mueller's state of mind is relevant to Mr. Lee's case and the statement is reliable given that it was a contemporaneous recordation. *See United States v. Partyka*, 561 F.2d 118, 125 (8th Cir. 1977) (noting difference between immediate statement and a recollection of a past statement). Indeed, state of mind evidence is regularly used as substantive evidence of guilt. *See United States v. Hyles*, 2007 U.S. App. LEXIS 6450 (8th Cir. 2007) (used to establish intent to kill); *United States v. Dolan*, 120 F.3d 856 (8th Cir. 1997) (used to establish intent to plan and motive).

In summary, Mr. Lee's trial counsel failed to present numerous witnesses, and failed to utilize vitally important information possessed by witnesses who did testify. Had counsel performed as the reasonably competent advocates guaranteed by the Constitution, there is a reasonable probability that at least one juror would have entertained a reasonable doubt about Mr. Lee's guilt.

The district court erred in denying this claim without conducting an evidentiary hearing. Overall, Mr. Lee was entitled to an evidentiary hearing to establish that counsel lacked strategic reasons for their failure to call these available, exculpatory witnesses. "A § 2255 movant is entitled to an evidentiary hearing unless 'the motion and the files and records of the case conclusively show that he is entitled to no relief.'" *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) (quoting 28 U.S.C. § 2255). A claim may be dismissed without a hearing only if it is inadequate on its face or if the record affirmatively refutes the factual allegations upon

33

which it is based. *See Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994). When the claim is one of ineffective assistance of counsel, it is "generally true" that the files and records of the case do not conclusively show that the petitioner is entitled to no relief. *Id.* (holding that district court erred in denying claim of ineffective assistance of counsel without conducting evidentiary hearing at which trial counsel could be questioned about the bases for their actions).

In addition, there were numerous factual disputes with respect to this claim that the district court erroneously resolved against Mr. Lee by crediting affidavits and documents instead of conducting the required hearing. Where the petitioner's factual allegations are "put in issue by [an] affidavit filed with the Government's response," and the district court cannot resolve the dispute based upon his own knowledge or recollection, an evidentiary hearing is required. *Machibroda v. United States*, 368 U.S. 487, 494-95 (1962). "Not by the pleadings and affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge." *Id.* at 495. *See also Latorre v. United States*, 193 F.3d 1035, 1038-39 (8th Cir. 1999) (reversing and remanding for evidentiary hearing notwithstanding government offers of proof contrary to petitioner's claim, noting that "[a]ssertions by counsel cannot foreclose an evidentiary hearing, at which such testimony can be taken and subject to cross-examination"); *Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) (remanding for evidentiary hearing on ineffective assistance of counsel claim, noting that while district court was not ultimately required to credit the petitioner's factual allegations, "it was required to hold a hearing before making factual determinations about [his] credibility"); *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001) (remanding for evidentiary hearing on ineffective assistance claim where lower court had erroneously determined that

34

petitioner's allegations lacked credibility in the face of the government's pleadings and affidavits).

The district court repeatedly violated these controlling legal principles in denying a hearing on this claim.  For example, as noted, Mr. Lee alleged in his petition that, if his counsel had called them to the stand, Maria Ahrens and her husband, Vernon Ahrens, would have both testified that the Muellers were in Mr. Ahrens's auto shop the Thursday after the date on which the government claimed they had been killed. *Lee,* No. 4:97-cr-243-GTE [Doc. 1118-1 at 15.]  In response, the government submitted the affidavit of ATF Special Agent Glen Jordan, in which he recounted the history of law enforcement interviews of the Ahrenses. *Id.* [Doc. 1126-2 at 2-3.] Agent Jordan stated that he had no record of any interview conducted with Maria Ahrens.  *Id.* He reported that three interviews had been conducted of Vernon Ahrens and an individual named Don Ahrens.  *Id.* at 2.  During the third interview, Vernon Ahrens allegedly looked at a calendar and fixed the last day that he saw the Muellers as January 3 or 4, 1996, i.e. several days before their disappearance per the government's theory.  *Id.*  A report of that third interview was attached to Agent Jordan's affidavit.  *Id.* at 8.  The affidavit omits any reference to the date or dates that Vernon Ahrens gave in his first or second interview, and no report of either of the first two interviews was attached.

The effect of Agent Jordan's affidavit and the report attached thereto was to establish the existence of a factual dispute.  Mr. Lee asserted that the Ahrenses would testify one way; the government at least implied that they would testify another.  As directed by the authorities cited above, such a classic factual conflict could only be resolved by conducting an evidentiary hearing.  Instead, however, the district court found unsupported facts and made a thoroughly improper credibility determination based upon the pleadings and affidavit, concluding that "the

35

Ahrens clearly retracted their statements that they had seen the Muellers after they were supposed to be missing." *Id.* [Doc. 1163 at 28.] The court lacked any basis upon which to find that Maria Ahrens had made such a "retraction," and was precluded from rejecting Mr. Lee's allegations as not credible based on Agent Jordan's statements regarding Vernon Ahrens. The district court's action was patently improper, and this Court should grant a COA and remand for an evidentiary hearing on this claim.

The district court similarly erred in refusing to hold a hearing with respect to potential witness David Hill. As noted, Mr. Lee alleged in his motion that, had trial counsel called him as a witness, David Hill would have provided support for Mr. Lee's theory that Paul Humphrey was involved in the Mueller homicides. *Id.* [Doc. 1118-1 at 15.] He alleged that Hill would have testified that, at 8:15am during the second week of January, 1996, he saw Humphrey and another man throw something off the bridge at the Illinois Bayou where the Muellers' bodies were later found. *Id.* In response, the government submitted the affidavits of one of Chevie Kehoe's attorneys, Mark Hampton, and Jack Lassister, who represented Mr. Lee. *Id.* [Docs. 1126-4, 1126-5.] Attorney Hampton wrote with regard to David Hill: "Trial counsel knew of the potential testimony of David Hill. Investigatory [sic] Taylor Eubank and I visited Mr. Hill twice. After interviewing Mr. Hill the determination was made that Mr. Hill's testimony would not be helpful to the defense." *Id.* [Doc. 1126-4 at 1.] Attorney Lassiter wrote: "We were aware of the availability of David Hill to testify. He was interviewed extensively twice by my co-counsel Mark Hampton and an investigator. Based upon these interviews, it was determined that Hill was not a witness who could provide any testimony which could be beneficial to the defense." *Id.* [Doc. 1126-5 at 1.]

36

These affidavits established a factual dispute that could only be resolved by an evidentiary hearing. Where counsel makes a strategic decision not to call a witness, after conducting a constitutionally adequate investigation, that decision may be unassailable – but only if it is reasonable and grounded in fact, as the case relied upon by the government and the district court makes clear. *See Griffin v. Delo*, 33 F.3d 895, 901 (8th Cir. 1994) ("When a claim for ineffective assistance of counsel is alleged on the basis of failing to . . . act, the reasonableness of the nonfeasance must be assessed in light of all circumstances . . . ."). A decision not to call Mr. Hill under the circumstances alleged by Mr. Lee would not be reasonable, and thus an evidentiary hearing was required to establish the facts of what Mr. Hill would have testified to and counsel's reasons for declining to present that testimony. Instead, however, the district court impermissibly relied upon the affidavits to reject Mr. Lee's allegations and find that "Petitioner's counsel's decision not to call Hill was a legitimate trial strategy." *Id.* [Doc. 1163 at 26.]

Again, with respect to potential witness Faron Lovelace, the district court erred in rejecting the claim without a hearing. In his motion Mr. Lee alleged that trial counsel was ineffective for failing to call to the stand Lovelace, who was a co-conspirator and erstwhile co-defendant of Chevie Kehoe and Mr. Lee. *Id.* [Doc. 1118-1 at 16.] Mr. Lee alleged that Lovelace would have testified that he had never heard of the APR, the organization of which the government alleged he had been a member and for which Mr. Lee and Chevie Kehoe were charged with racketeering. *Id.* The government again responded with reference to the affidavits of attorneys Hampton and Lassiter. Lassiter wrote: "Defense counsel considered calling Faron Lovelace as a witness. It was determined that Mr. Lovelace was too unstable to be trusted to call as a witness. When Mr. Lovelace was interviewed, he would indicate that he had material which

37

would aid the defense. However, Mr. Lovelace repeatedly refused to state what that evidence would be." *Id.* [Doc. 1126-5 at 1.]

To the extent that it asserts that Mr. Lovelace would not have given the favorable testimony that Mr. Lee alleged he would have, this affidavit merely serves to establish the existence of a factual dispute. Again, a decision not to call a materially exculpatory witness is constitutional only in so far as it is reasonable, and the reasonableness of counsel's decision regarding calling Mr. Lovelace on the discreet issue of the existence of the APR could only be resolved at an evidentiary hearing. Once again, however, the district court quoted extensively from the affidavit of attorney Hampton, who did not even represent Mr. Lee, as well as attorney Lassiter, and concluded on that basis that "Petitioner's counsel's decision not to call Lovelace was clearly a legitimate and prudent trial strategy." [Doc. 1163 at 32-33.] The district courts actions in each of these instances were improper.

With regard to Kelly Kramer, Chevie Kehoe's second wife, the district court erroneously rejected the claim on the ground that "there is no factual basis" for concluding that she would have testified in the manner that Mr. Lee alleged in his motion that she would have. [Doc. 1163 at 39.] At the pleading stage, however, a § 2255 petitioner need only allege, not prove, the facts that he contends entitle him to relief; an evidentiary hearing is required to enable him to put on his proof. *See Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("If the allegations are not affirmatively contradicted by the record and the claims are not patently frivolous, the district court is required to hold an evidentiary hearing. It is in such a hearing that the petitioner must offer proof."). The district court thus clearly erred in denying this claim without a hearing.

And with respect to Jeff Brown, the district court again erroneously relied upon the affidavit of Agent Glen Jordan to find that Mr. Lee had "failed to establish that Brown would

38

have testified as" he alleged. *Id.* [Doc. 1118-1 at 40.]  That affidavit merely served to establish that a factual dispute existed regarding Mr. Brown's testimony that could only be resolved by conducting an evidentiary hearing.  The court erred by rejecting Mr. Lee's allegations on the basis of an affidavit.

The district court additionally erred by failing to consider the cumulative impact of counsel's failures in this regard in its assessment of the prejudice that Mr. Lee suffered.  When a claim of ineffective assistance rests upon multiple errors or omissions, a reviewing court must consider the effects of those errors or omissions cumulatively, and assess their combined impact upon the outcome of the trial. *See, e.g., Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (holding that "question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable"); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (noting that court is required to consider counsel's errors "in the aggregate"); *Stouffer v. Reynolds*, 168 F.3d 1155, 1163-64 (10th Cir. 1999) (considering instances of alleged ineffective assistance "cumulatively"); *Mackey v. Russell*, 148 Fed. App'x 355, 365 (6th Cir. 2005) ("the *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel"); *Villaran v. Moore*, 2006 WL 2583440 at *11 (D.N.J. 2006) ("individual errors [of trial counsel] which do not alone create constitutional error can, when combined, have a cumulative effect rising to the level of constitutional error").

It is the case that, in *Girtman v. Lockhart*, 942 F.2d 468, 475 (8th Cir. 1991), a panel of this Court overruled *Harris v. Housewright*, 697 F.2d 202 (8th Cir. 1982), a decision that was in line with the authorities cited above, and held that multiple instances of alleged ineffective assistance of counsel may not be considered cumulatively.  However, the *Girtman* decision was when issued contrary to the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668

39

(1984).  The opinion in *Strickland* states implicitly, but nonetheless clearly, that the assessment of prejudice must be cumulative.  *Id.* at 694 (holding that, in order to show prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added); *id.* at 695 ("the question is whether there is a reasonable probability that, absent *the errors*, the factfinder would have had a reasonable doubt respecting guilt") (emphasis added); *id.* at 696 (defendant has "burden of showing that the decision reached would reasonably likely have been different absent *the errors*") (emphasis added).  The Court's consistent use of the plural precludes any suggestion that each individual error must be shown to be independently prejudicial.  *See Moore*, 194 F.3d at 619 (noting that requirement of cumulative assessment comes from *Strickland*); *Lindstadt*, 239 F.3d at 199 (same); *Mackey*, 148 Fed App'x at 365 (same).   The *Girtman* decision thus in no way defeats Mr. Lee's entitlement to a COA on this aspect of his claim.  The opinions in *Moore*, *Lindstadt,* and *Mackey* demonstrate that not only *could* a court resolve the question of whether cumulative assessment is required, several courts in fact *did*.  *See Lozada*, 498 U.S. at 432.

Additionally, subsequent to the decision in *Girtman*, the Supreme Court decided *Kyles v. Whitley,* 514 U.S. 419, 436 (1995), in which it held that the materiality of multiple items of evidence unconstitutionally suppressed by the prosecution in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), must be assessed cumulatively.  The standard for determining materiality in the *Brady* context is identical to the *Strickland* prejudice standard – the latter was, in fact, derived directly from the former.  *See Kyles*, 514 U.S. at 436 (noting that current formulation of materiality was later adopted as the test for prejudice in *Strickland*); *Strickland*, 466 U.S. at 694 (holding that "appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution").  It therefore follows

40

that the decision in *Kyles* requiring cumulative assessment in the *Brady* context necessitates the same analysis when determining prejudice under *Strickland*. Thus, *Kyles* has effectively overruled *Girtman*. *See Villaran*, 2006 WL 2583440 at *11 (holding that *Kyles* requires cumulative assessment of prejudice flowing from multiple errors by trial counsel); *Nance v. Nelson*, 1995 WL 380803 at *6 (10th Cir. 1995) (same). The general rule that this Court is bound by the prior decision of a panel "'does not apply when the earlier panel decision is cast into doubt by a decision of the Supreme Court.'" *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 828 (8th Cir. 2009) (quoting *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 838 (8th Cir. 1997)). *Girtman* thus does not control.

It is clear from its opinion that the district court failed to assess the cumulative prejudice to Mr. Lee from counsel's failure to call the multiple available witnesses. Instead, the court erroneously found an absence of prejudice with respect to each witness individually, treating each one as a separate claim and never confronting the combined effect of the absence of all of the available witnesses. In its discussion of each one, the court separately stated that the failure to call the particular witness at issue did not establish *Strickland* prejudice. *See, e.g, Lee*, No. 4:97-cr-243-GTE [Doc. 1163 at 24] ("Assuming Eaton would testify as alleged, this claim fails to establish either deficient performance or resulting prejudice."); *id.* at 26 ("The Court concludes that Petitioner's counsel's decision not to call Hill was a legitimate trial strategy and there is no indication that such testimony would have altered the outcome of the trial."); *id.* at 33 ("Petitioner's counsel's decision not to call Lewis was clearly a legitimate trial strategy. Additionally, Petitioner's argument fails because the limited testimony proposed, if given, would not have altered the result in this case."). At a minimum, reasonable jurists could debate whether the district court correctly denied relief on this claim, and a COA should issue.

41

**5.      A COA SHOULD ISSUE ON CLAIM I.B., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CROSS-EXAMINE THE WANKERS REGARDING THEIR RECEIPT OF COMPENSATION FROM THE GOVERNMENT**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to cross-examine government witnesses James and Dalvine Wanker regarding payments they received from the government as a result of their cooperation in this case.   At trial, James Wanker and his wife Dalvine both testified against Mr. Lee.  Tr. 4078, 4092.  Their testimony was harmful to Mr. Lee in that it included his alleged admissions to Mr. Wanker regarding a crime "down south," Tr. 4082, hate crimes, Tr. 4081, Mr. Wanker's observations of Mr. Lee's attempt to gain forcible entry into an occupied trailer, Tr. 4088, and Mr. Lee's comment to Mrs. Wanker, while in possession of a firearm, that "he wasn't afraid to use it."  Tr. 4093.  A  review of their testimony reveals that the Wankers were not impeached on any issue of consequence.  And yet defense counsel had incontrovertible impeachment evidence with which to cross-examine the Wankers in their possession; the Wankers had received cash payments from the government after becoming prosecution witnesses.

Defense counsel's failure to alert the jury to this fact through cross-examination was constitutionally deficient performance; there was no legitimate strategic reason for their failure to cross-examine on this point.  In *United States v. Librach*, 520 F.2d 550, 553 (8th Cir. 1975), this Court held that "[t]he Government's paying a monthly subsidy to a witness is certainly a fact that should be disclosed to the trier of the facts since it is relevant to the witness's interest in testifying."  In *Librach,* the prosecutor's withholding this information warranted reversal.  While in the instant case the subsidies may have been in amounts considerably smaller than those in

42

*Librach*, the significance of a payment amount to a witness necessarily depends upon a witness's particular financial status. In this case, the Wankers were nearly indigent, a point made by the prosecutor in closing argument. Tr. 7002. Thus, counsel could have convincingly argued that the payments they received were a powerful incentive for them to cooperate with the government.

The district court erred by denying this claim without conducting an evidentiary hearing. Based in part upon the affidavit of Agent Glen Jordan, the court found that counsel's failure to cross-examine the Wankers was "a legitimate trial strategy." *Lee*, No. 4:97-cr-243-GTE [Doc. 1163 at 42-43.] It did so citing Agent Jordan's statements that the Wankers received four payments of $50 to defray expenses associated with their moving around "for security reasons," and positing that trial counsel may not have wished to inform the jury that the witnesses moved because of security concerns. *Id.* [Doc 1163 at 41-42.] This affidavit raised a factual dispute regarding the motivations for counsel's omissions that could only be resolved by an evidentiary hearing. Where counsel makes a strategic decision not to present testimony after conducting a constitutionally adequate investigation, that decision may be unassailable – but only if it is reasonable and grounded in fact. *See Griffin v. Delo*, 33 F.3d 895, 901 (8th Cir. 1994) ("When a claim for ineffective assistance of counsel is alleged on the basis of failing to . . . act, the reasonableness of the nonfeasance must be assessed in light of all circumstances . . . .").

Without conducting an evidentiary hearing, the court was not at liberty to find that counsel's failure was the product of a reasoned choice to avoid exposing the jury to information regarding the Wankers' alleged security concerns, as opposed to negligence, inattention or some other deficiency. Additionally, even if the district court was correct regarding counsel's motivation, a decision not to cross-examine the Wankers under the circumstances alleged by Mr.

43

Lee would not be reasonable. First, there is no evidence that the Wankers were ever threatened with harm as a result of their status as witnesses in this case; not by Mr. Lee or anyone else. Indeed, neither at trial nor in post-conviction proceedings was any evidence presented that members of the Aryan Republic in general were known to engage in retaliation against witnesses. Thus, there was no evidence that the Wankers were subject to any greater risk of retaliation than any other witness in a criminal case, and their successful attempt to nevertheless parlay an alleged fear of harm into cash reflects negatively upon their credibility. It is notable that the Wankers were falsely presented as the *only* civilian government witnesses implicating Mr. Lee in criminal activity who received no remuneration or consideration of lenity in exchange for their testimony, which further enhanced their credibility and the prejudicial impact of their testimony.

Second, a strategy to avoid mention of the violent activities of the Aryan Republic, by forgoing cross-examination on the payments, would be unreasonable in light of the other evidence of Aryan violence presented in this case. The jury was besieged with repeated references to the violent and criminal activities of the Aryan Republic unrelated to the incidents charged in this case. *See, e.g.,* Tr. 5380 (the Aryan attitude is a "kill 'em all" attitude); Tr. 5373 (Aryan People's Republic targeted "high-ranking government officials, high-ranking law enforcement officers, people that were associated with antiracist movements, certain judges, and so forth); Tr. 1320 (Aryan Republic planned to "strategically place individuals throughout the country at one time and assassinate or kill judges, it would turn the system into mass chaos"); Tr. 1339 (according to the bible homosexuals and African Americans deserve death, therefore committing crimes against them is justified). To refrain from cross-examining the Wankers on the payments they received so that the jury would not learn what they already knew based on the

44

barrage of prejudicial evidence that was already in the record would be a "strategic" decision that could not be justified.

Third, defense counsel knew that the Wankers had voluntarily participated in media interviews regarding the crimes. *Lee*, No. 4:97-CR-00243-(2) GTE [Doc. 1163 at 42]. Their willingness to publicize their roles as witnesses in the case surely lays to rest any possible claim that they feared retaliation. Yet defense counsel failed to cross-examine them on this issue. An evidentiary hearing was therefore required to establish the facts of what the Wankers would have testified to and counsel's reasons for declining to pursue that line of cross-examination. The district court's decision to forego a hearing and rely upon the affidavit to reject Mr. Lee's allegations was error.

Even if declining to cross-examine the Wankers on the payments they received could have been justified, failing to object when the prosecutor told the jury "[n]obody has paid Mr. Wanker anything[,]" could not. Tr. 7002. Thus, part of the prejudice flowing from defense counsel's failure to cross-examine on this point is that it enabled the government to argue falsely that the Wankers received nothing as a reason to credit their testimony. Defense counsel's failure to object to this improper argument is part of their ineffectiveness with respect to the cumulative misconduct which occurred during the government's guilt phase closing argument, and is addressed in that section of the instant pleading.

The prejudice suffered by Mr. Lee was magnified by the importance of the Wanker's testimony. As discussed above, the Wankers' testimony, especially that of James Wanker, was damaging to Mr. Lee. Mr. Wanker testified that Mr. Lee told him that "down south...somebody had fucked with him and so he wrapped them up, taped them, and through [sic] them in the swamp," Tr. 4082, that Mr. Lee "by force tried to gain entry into [a] trailer...scaring the people,"

45

Tr. 4088, and "that he liked to go 'nigger bashing.'" Tr. 4081. Mr. Wanker's wife Dalvine testified that on one occasion Mr. Lee "had a firearm and said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093.

Defense counsel's woefully ineffective cross-examination attempted to establish the following points, which were of marginal significance at best: That Mr. Lee had a right to break into the trailer because he thought he still owned it; Tr. 4083-4088, 4096-4097; that Mr. Wanker never called the police or called anyone about Mr. Lee's statement regarding going down south; Tr. 4088; that other people might have been present when Mr. Lee made admissions to the Wankers; Tr. 4090, 4094; and that Mr. Wanker had Mr. Lee arrested when he tried to break into the trailer, Tr. 4091, a charge Mr. Wanker denied. The most powerful and tangible impeachment that defense counsel had, the payments to the Wankers, was never utilized.

Reasonable jurists could debate whether defense counsel's performance was both deficient and prejudicial, and whether there is a reasonable probability that, but for these unprofessional errors, the result of the trial would have been different. A COA should therefore issue on this claim.

**6. A COA SHOULD ISSUE ON CLAIM I.K., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to object to multiple improper and highly prejudicial arguments made by the government during its closing argument at the guilt phase. In its guilt phase closing arguments, the government misstated and manipulated crucial facts, and argued

Appellate Case: 11-1380     Page: 46     Date Filed: 06/20/2011     Entry ID: 3799638

facts that were simply not in evidence.  The government also likened Mr. Lee to a "dog" and a "henchman."  Defense counsel's failure to object to any of these arguments was constitutionally deficient, and Mr. Lee was severely prejudiced as a result.  A COA should therefore issue with respect to this claim.

*Argument that an "Aryan" inmate threatened Cheyne Kehoe*

In the government's initial closing argument the prosecutor stated the following:

> We made a deal with Cheyne Kehoe.  We moved him out of the state prison to a federal prison.  What did you hear about that?  That Cheyne Kehoe had been put in protective custody, and that even after being put in protective custody an Aryan inmate came looking for him and there were death threats on Cheyne's life.  Is that a fair deal?  That's a question you can answer yourself.

Tr. 6808.  This argument improperly connected Mr. Lee, an alleged member of an Aryan organization, to a threat to kill a witness, in the absence of any evidence that Mr. Lee had anything to do with the alleged threat.

In addressing this aspect of the claim the district court ruled that in view of "defense efforts to suggest that the Government had made deals with all of its witnesses, the Government had a right to question Cheyne to clarify the reason for moving Cheyne to a federal penitentiary." *Lee*, No. 4:97-CR-00243[Doc. 1163 at 61].  Co-defendant Chevie Kehoe's counsel did in fact attempt to establish through cross-examination of Cheyne Kehoe that he was transferred to federal custody in exchange for his cooperation.  Tr. 5514-5518.  It thus would have been fair response for the government on redirect examination to elicit testimony that Cheyne Kehoe's transfer to federal custody occurred because of threats he received, and not simply in exchange for his testimony.  It also would have been appropriate for the government to have argued this point in closing.

47

The prosecutor's argument, however, did much more than that. He told the jury that the threat came from an "Aryan inmate," in the absence of any competent evidence supporting that claim. In doing so, he not only connected Mr. Lee to the threats, but also made it more likely that the jury would find that the Aryan group was a racketeering entity. There was no evidence that Mr. Lee was in any way connected to the threat received by Cheyne Kehoe. There was, however, evidence, albeit disputed, that Mr. Lee was a member of an Aryan group, and he was charged with such membership in this case. Therefore, the argument that the death threat came from an "Aryan inmate" prejudiced Mr. Lee by suggesting that he had a hand in the threat. The government's interest was to prove that Cheyne Kehoe was transferred due to concerns over his safety rather than as a reward; this would have been fully accomplished by arguing that the threat occurred without reference to the fact that it allegedly came from an Aryan inmate.

Prosecutorial argument suggesting this type of "guilt by association" is condemned by this Court, and when presented warrants reversal. *See, e.g., United States v. Street*, 548 F.3d 618, 632-633 (8th Cir. 2008) (defendant's association with gang did not give prosecutor the right to elicit and argue evidence of gang's bad acts in case against defendant); *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991) (prosecutor's presentation of evidence and argument relating to actions of members of defendant's gang, but not attributable to defendant, constituted reversible error). Similarly, absent any evidence connecting Mr. Lee with the Aryan inmate who allegedly threatened Cheyne Kehoe, the prosecutor's comment was improper.

The misconduct was particularly egregious in this case because there was no admissible evidence that the threat in fact came from an Aryan inmate. The prosecutor asked Cheyne Kehoe, "[a]nd when you were in the infirmary for safety reasons, was there not an incident in which an inmate got into the infirmary, an Aryan inmate, got into the infirmary and threatened

48

you?" Tr. 5541. Cheyne Kehoe answered, "That's what I was told, yes. One of the captains told me an outside inmate from the PC unit had actually got inside the unit looking for me." *Id.* This testimony reveals that Cheyne Kehoe had no personal knowledge that an "Aryan inmate" had threatened him, but rather, he was told that by a prison official. Thus the statement regarding the "Aryan inmate" was admissible only for its effect upon Chevie Kehoe's state of mind. The prison official was never called as a witness, and therefore never subjected to cross-examination. The prosecutor's argument in closing that "an Aryan inmate came in looking for [Cheyne Kehoe] and there were death threats on Cheyne's life," Tr. 6808, was thus improper for the additional reason that it was based on inadmissible hearsay. When evidence is admitted for a limited purpose, defense counsel performs deficiently when he allows the government to argue inferences beyond the limitation, without correction. *See, e.g., Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) ("After the prosecutor drew the jury's attention to the damaging statement and invited them to draw the precise inference that a limiting instruction would have forbidden, [] trial counsel's failure to request a limiting instruction fell below an objective standard of reasonableness.") (citations omitted). In the instant case defense counsel's failure to object to the substantive use of the inadmissible hearsay fell below an objective standard of reasonableness.

In assessing whether this improper argument "warranted an objection," *Sinisterra v. United States*, 600 F.3d at 909, it is important to recognize the distinction between a prosecutor's employment of improper "colorful pejoratives," which jurors are apt to disregard, and arguments that "misstate" the admissible evidence, and "implicate other specific rights of the accused." *United States v. Branch*, 591 F.3d 602, 609-610 (8th Cir. 2009). This latter category impacts the "fundamental fairness" of a trial, *id.*, and the "Aryan inmate" argument falls well within it. First,

49

because it misstates the admissible evidence.  As noted above, there was simply no admissible evidence from which the prosecutor was permitted to make the substantive, and highly prejudicial, argument that an Aryan inmate threatened Cheyne Kehoe.

There is a second reason why the "Aryan inmate" argument impacts fundamental fairness under *Branch*, and thus defense counsel's failure to object constituted deficient performance: The argument "implicate[d] a specific right[] of the accused[,]" namely his Sixth Amendment right to confrontation and cross-examination" of the prison official who told Cheyne Kehoe about the alleged threat.  "When specific guarantees of the Bill of Rights are involved, [the Supreme] Court has taken special care to assure that the prosecutorial conduct [during closing argument] in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The Court in *Donnelly*, in denying relief, anticipated the very issue raised herein. The Court held that the prosecutor's improper arguments did not implicate the defendant's right to confrontation, because "the prosecutor here simply stated his own opinions and introduced no statements made by persons unavailable for questioning at trial." *Id*.  The instant issue is the mirror image of the issue in *Donnelly;* here the prosecutor *did* argue the truth of a statement "made by [a person] unavailable for questioning at trial." *Id.* Trial counsel rendered deficient performance by failing to object.

*Argument that Mr. Lee called Nancy Mueller a "dumb bitch"*

In his closing argument the prosecutor stated that Mr. Lee described decedent Nancy Mueller as a "dumb bitch."  Tr. 6822.  There was no evidence that Mr. Lee ever used the pejorative term "dumb bitch." The government's position below that the prosecutor's misstatement was "trivial" was properly rejected by the district court.  *Lee*, No. 4:97-CR-00243 [Doc. 1163 at 65.].  The government alleged that Nancy Mueller and her husband and daughter were shot with stun guns, had plastic bags, sealed with duct tape, placed over their heads, and

50

thereafter their bodies were placed in the Illinois bayou. *United States v. Lee,* 374 F.3d 637, 641 (8th Cir. 2004). The actual testimony, that Mr. Lee thought Mrs. Mueller "dumb" for believing that he and Chevie Kehoe were ATF agents and complying with their orders, was harmful to Mr. Lee even without false embellishment. Tr. 4975. Rather than being mindful of the high risk of inflaming the jury under these circumstances, the prosecutor falsely attributed to Mr. Lee this hateful and dismissive characterization of Ms. Mueller.

The danger of arguments that "manipulate or misstate" evidence, as opposed to those characterized by mere emotional excess, was addressed by the Supreme Court in *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). There, the prosecutor in closing made several improper comments, including attacking the department of corrections for furloughing the defendant, *id.* at 180 n.9, appealing to the jury's fear of recidivism, *id.* at n.10, describing the defendant as an "animal," *id.* at n.11, stating his wish that the defendant had been killed in the incident, *id.* at n.12). Although extremely critical of the prosecutor's conduct, the Court did not reverse. The Court distinguished the types of arguments "reflecting [the prosecutor's] emotional reaction to the case," from arguments which "manipulate or misstate the evidence." *Id.* at 180, 194. The former is less likely to mandate reversal than the latter, which directs the jury to find facts that have never been proven. *See, e.g., United States v. Earle,* 375 F.3d 1159, 1163 (D.C. Cir. 2004) (in reversing because of prosecutor's misstatement in closing, court held "[i]t is a serious error for counsel to. . .misstate admitted evidence...."). The reference in this case, accusing Mr. Lee of a vile comment about an innocent victim, explicitly directed the jury to find a prejudicial fact that had never been proven, and counsel should have objected.

51

*Referring to Mr. Lee as a "faithful dog" and "henchman"*

In his initial closing the prosecutor stated: "Chevie Kehoe is the leader of this enterprise. Danny Lee, Danny Lee is like the faithful dog. [] Danny Lee is the henchman." Tr. 6821. The case law in this circuit has long condemned prosecutors engaging in name-calling of defendants. *See, e.g., United States v. Singer,* 660 F.2d 1295, 1304 (8th Cir. 1981) (government reference to defendants as "crooks" clearly improper; prosecutors must avoid this type of characterization of criminal defendants."); *Mack v. Caspari,* 92 F.3d 637, 643 (8th Cir. 1996) (prosecutor calling defendant a "killer" improper); *Kellogg v. Skon,* 176 F.3d 447, 452 (8th Cir. 1999) ("monster," "sexual deviant," and "liar" improper comments that "create inflammatory prejudice[, and] compel the jury to focus on the grossness of the alleged conduct, rather than whether the defendant engaged in the conduct. They have no place in a courtroom."); *United States v. Carter,* 410 F.3d 1017, 1026 (8th Cir. 2005) (prosecutor's description of defendant as a "con man" and "deviate" "improper," "government [must] refrain from abusive comments in future cases."). Mr. Lee's counsel rendered deficient performance by failing to object to these references.

*Argument that Kirby Kehoe's Guilty Plea Supported a Guilty Verdict for Mr. Lee*

"Any time a guilty plea of a co-offender is either directly or indirectly brought into a trial, trial courts must ensure it is *not* being offered as substantive proof of the defendant's guilt." *United States v. Rogers,* 939 F.2d 591, 594 (8th Cir. 1991) (citation omitted, emphasis in original). If such evidence is offered or argued as "substantive proof of guilt, [t]he prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious." *United State v. Hansen*, 544 F.2d 778, 780 (5th Cir. 1977). During closing argument the prosecutor in this case stated "Kirby Kehoe is not present today, because

52

you've already been informed that Kirby Kehoe pled guilty to Racketeering Act Count 1 for his role and his participation in this criminal organization." Tr. 6824.

In denying relief, the district court held that "introducing the fact of Kirby's guilty pleas was to point out that several people joined the criminal organization that Chevie created," and not to prove Mr. Lee's guilt. *Lee*, No. 4:97-CR-00243-(2) GTE [Doc. 1163 at 67-68]. The existence of the criminal organization, however, was an element of the RICO charge against Mr. Lee. Thus the district court's finding affirmed that the government used the plea as substantive proof of guilt. This was not only impermissible but also unnecessary. The government was fully able to argue that several people joined the criminal organization without reference to the fact that anyone pled guilty. Tr. 6823-24. The plea was also referenced to make the point that Kirby Kehoe, who was "honest enough to plead guilty and accept the responsibility for [his]action[], must have told the truth." *United States v. Little Boy*, 578 F.2d 211, 212 (8th Cir. 1978). This is the precise harm to which the prohibition on reference to a plea is directed. *Id.* Trial counsel performed deficiently by failing to object to this argument.

> *Arguing as Substantive Evidence Kirby Kehoe's Hearsay Statement Implicating Mr. Lee and Exonerating Himself*

On cross-examination of Gloria Kehoe, counsel for co-defendant Chevie Kehoe attempted to impeach her by emphasizing that, despite having advance knowledge of her son's plan to burglarize the Muellers, she never tried to stop him. Tr. 5134-37. Defense counsel established Ms. Kehoe's advance knowledge by eliciting testimony regarding a conversation about the plan that she had with her husband Kirby Kehoe. Tr. 5134. During this line of questioning Ms. Kehoe stated that her husband Kirby told her that he had decided not to participate in the crime because Mr. Lee was involved and Kirby "didn't want to have anyone

53

outside the family do it." *Id.* Again, Kirby Kehoe was not called as a witness and not subjected to cross-examination.

This hearsay testimony, admissible solely for impeachment purposes, was then utilized by the government in closing argument as substantive evidence to corroborate Mr. Lee's participation in the Mueller murders. The prosecutor argued:

> If you will recall the testimony, Chevie Kehoe brought Danny Lee down to Arizona with the plans to do the January, 1996 robbery and murder of the Muellers. And because he brought Danny Lee with him, Kirby Kehoe didn't want to play. He didn't want to go. He didn't want to participate, and he stayed in Arizona.

Tr. 6821. Thus, the government offered the jury impeachment evidence cast as substantive evidence - thereby transforming it into rank hearsay - to prove that Mr. Lee was involved in the Mueller murders and Kirby Kehoe was not. Like the misconduct discussed in the preceding section, the government misstated the admissible evidence, *Branch,* 591 F.3d at 609, in arguing the truth of a statement "made by [a person] unavailable for questioning at trial," *Donnelly,* 416 U.S. at 643, by ignoring the limitation on the evidence, *Musladin,* 555 F.3d at 846. As the district court found, the prosecutor's argument regarding Kirby Kehoe's alleged decision not to participate in the crime was "improper" and "Mr. Lee's counsel should have objected to it." *Lee,* No. 4:97-cr-00243 [Doc. 1163 at 63].

*Argument that Mr. Wanker Received no Benefit for His Testimony*

In closing argument, while encouraging the jury to find government witness James Wanker to be credible, the prosecutor stated "[n]obody has paid Mr. Wanker anything." Tr. 7002. This was a blatant misrepresentation. While the jury was never told of it, Mr. Wanker and his wife had received at least four fifty dollar payments in exchange for their testimony. *Lee*, No. 4:97-CR-00243 [Doc. 1163 at 42-43.] Despite being aware of this fact, defense counsel

54

offered no objection to the misrepresentation. There was no reason for defense counsel to have sat on their hands in the face of this assertion, which they knew to be both false and prejudicial. A prosecutor commits misconduct during closing argument when he manipulates or misstates evidence. *Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986). The prosecutor's remark in this case was a clear misstatement under *Darden*.

The prosecutor's remark was also a manipulation of the evidence under *Darden.* The remark was not made in isolation. It was made as the final point in a testimonial to the credibility and character of Mr. Wanker, in which the prosecutor attested "I like Mr. Wanker. [] I don't understand Jack Lassiter up here picking on that guy. [] I think those kinds of people are the salt of the earth. [] He's not only a hard working guy, he's a mannerly guy." Tr. 7001-03. The message was clear; a straight, upright individual like James Wanker would testify only out of duty, there would never be money involved. In the absence of a defense objection the government was able to complete the picture of James Wanker it sought to present to the jury and thus manipulate the evidence to its advantage.

In addition to the error caused by the misrepresentation, the aforementioned comments surrounding it were expressions of the prosecutor's personal opinion, which implied knowledge about Mr. Wanker beyond what the jury had heard. Therefore these comments constituted improper vouching, and warranted an objection on this separate basis. *See, e.g., United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004) ("Improper vouching occurs when a prosecutor refers to facts outside the record, implies that the witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility").

55

*Prejudice*

But for defense counsel's repeated failures to object to these improper government arguments, there is a reasonable probability that Mr. Lee would not have been convicted. In order to establish a constitutional violation, Mr. Lee must show that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Sinisterra v. United States,* 600 F.3d 900, 909 (8th Cir. 2010); *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In order to assess prejudice, a reviewing court must evaluate the cumulative impact of all of the improper government arguments. *See, e.g., United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) ("Prejudice. . . may result from the cumulative effect of repeated improper comments by the prosecutor"). The interrelatedness of the issues addressed in the government's arguments in this case is such that they aggravated each other and together resulted in severe prejudice to Mr. Lee.

The improper arguments greatly aided the government in portraying Mr. Lee as a violent and dangerous man. For example, the argument that an Aryan inmate had threatened Chevie Kehoe's life, Tr. 6808, connected the threat to Mr. Lee, a member of an Aryan organization. It also had a prejudicial impact on the jury's guilt phase consideration of the RICO charges, since the question for the jury was whether the Aryan organization was a racketeering entity. Tr. 7019. The argument also likely contributed to the jury's finding of future dangerousness at the penalty phase of the trial, Tr. 8017, tainting the death verdict. Indeed, the government specifically argued in the penalty phase that Mr. Lee represented a future danger *inside a prison*. Tr. 7958-59. Inadmissible evidence of his willingness to issue a death threat to a person in custody certainly bolstered that argument.

56

An additional false assertion, that Mr. Lee described Mrs. Mueller as a "dumb bitch," Tr. 6821, improperly reinforced the impression of Mr. Lee as conscienceless, dangerous and violent. And immediately thereafter, the prosecutor's characterization of Mr. Lee as a "faithful dog" and "henchman," Tr. 6822, mounted name-calling upon the false accusations. Yet another falsehood, that the Wankers received no consideration in exchange for their testimony, Tr. 7002, further developed the negative impression of Mr. Lee pressed by the government by lending a pretense of integrity to Mr. Wanker's testimony. That testimony included the claim that Mr. Lee "liked to go nigger bashing," Tr. 4082, and that Mr. Lee "by force tried to gain entry into [a] trailer . . . scaring the people," Tr. 4088.

As with so much of this improper argument, the Wanker comment had a double edge, prejudicing Mr. Lee at both the guilt and penalty phases of his trial. Mr. Wanker's testimony that Mr. Lee told him that "down south...somebody had fucked with him and so he wrapped them up, taped them, and through [sic] them in the swamp," Tr. 4082, and Mrs. Wanker's testimony "that when he had gone down south and that some people had fucked with him, and that he had taken care of it," Tr. 4093, corroborated the government's position that Mr. Lee participated in the crimes against the Muellers. The government no longer needed to rely exclusively on the compromised testimony of confederates Cheyne Kehoe and his mother Gloria Kehoe to connect Mr. Lee to the Mueller crimes. It had witnesses who, as long as the fact of their payments was kept from the jury, were largely unimpeachable.

Instead of an objection, the government's assurance in closing that Mr. Wanker was paid nothing was met by silence. Tr. 7001-03. The government's assurance was accompanied and complimented by repeated vouching on behalf of Mr. Mueller. Tr. 7001-7003. A "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the

57

Appellate Case: 11-1380     Page: 57     Date Filed: 06/20/2011 Entry ID: 3799638

Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).  Under circumstances in which the prosecutor's improper expression of opinion is bolstered immediately thereafter with a falsehood that corroborates that opinion as occurred in this case, the risk that his misconduct will prejudice the jury is surely heightened.

Virtually all of the improper arguments urging consideration of bad acts of Mr. Lee put false information before the jury.  Asserting unproven facts is even more dangerous than prosecutorial embellishment or hyperbole, because arguments alleging facts are far less likely to be neutralized by an instruction that arguments are not evidence.  *See, e.g., Mack v. Caspari,* 92 F.3d 637, 643 (8th Cir. 1996) (contrasting "undesirable" comments with comments that "manipulate" or "misstate" evidence).

The government also made improper and prejudicial arguments that utilized Kirby Kehoe's hearsay statement and guilty plea to convince the jury of Mr. Lee's guilt.  As noted above, pp. 52-53, Kirby Kehoe's denial of involvement in the Mueller killings, Tr. 5134, was not admitted as substantive evidence at trial.  The prosecutor's substantive use of Kirby Kehoe's self-serving exculpatory statement prejudiced Mr. Lee because it allowed Kirby Kehoe to effectively "testify," without cross-examination, that he was uninvolved in the Mueller murders, and that Mr. Lee was.

There was much on which to cross-examine Kirby Kehoe, who had a number of motives to commit the murders.  Based on his racist beliefs, Kirby Kehoe believed that it was perfectly proper to "take advantage" of the Muellers because they were an "interracial" family.  Tr. 5075-76.  He planned the first burglary of the Muellers in 1995, and along with co-defendant Chevie Kehoe committed that burglary.  Tr. 4954-56.  In part, his motive for committing that burglary was his dislike of, Tr. 4952, and "infuriat[ion]" with, Tr. 5075, Bill Mueller.  After the first

Appellate Case: 11-1380     Page: 58     Date Filed: 06/20/2011 Entry ID: 3799638

burglary, Bill Mueller threatened to kill Kirby Kehoe, Tr. 4957, 5071, which further upset and angered Kirby Kehoe. Tr. 5072. Indeed, it was uncontested that Kirby Kehoe planned the second burglary during which the Muellers were murdered, and had intended to participate in that burglary. Tr. 5134.

Unlike prosecutorial hyperbole, the prosecutor's directing the jury that it find an unproven fact is not easily disregarded. *See, e.g., United States v. Beckman,* 222 F.3d 512, 527 (8th Cir. 2000) (finding reversible error after prosecutor argued fact not in evidence - that defendant failed a drug test - notwithstanding his belief that it was true); *Newlon v. Armontrout*, 885 F.2d 1328, 1335 (8th Cir. 1985) (death sentence reversed due in part to prosecutor's argument "premised on facts not in evidence" which implied he had "knowledge outside the record"). The prosecutor's argument that Kirby Kehoe didn't participate because Mr. Lee did, which was based on Kirby Kehoe's hearsay statement, allowed the jury to consider an extremely prejudicial fact that had not been proven at trial.

The prosecutor's reference to Kirby Kehoe's guilty plea also presented for the jury's consideration an impermissible and prejudicial fact; that Kirby Kehoe was "honest enough to plead guilty," and "must have told the truth." *Little Boy*, 578 F.2d at 212. As with Kirby Kehoe's hearsay statement, his guilty plea was argued to inculpate Mr. Lee. The district court declined to find *Strickland* prejudice with respect to this comment on the ground that any prejudice was cured by during its final instructions to the jury, which addressed the "legal effect or consequences" of Kirby Kehoe's guilty plea. *Lee*, No. 4:97-CR-00243 [Doc. 1163 at 68]. This instruction, however, was inadequate to cure the error created by the prosecutor's argument. As part of the final instructions it was worded in a general way and, further, included a reference to the legal effect or consequences of an unrelated court order that served to dilute any potential

59

curative effect.[10] Indeed the instruction made no reference whatsoever to the offending argument. There is little likelihood that the jury would have linked the language in that instruction to the improper argument made earlier. When a misstatement by the prosecutor warrants a curative instruction, the instruction should be given immediately. *See, e.g., United States v. Dougherty*, 810 F.2d 763, 768 (8th Cir. 1987) (approving of instruction which specifically addresses prosecutor's argument); *United States v. Hernandez*, 779 F.2d 456, 461 (8th Cir. 1985).

Overall, the court declined to find prejudice based on its conclusion that the evidence was "overwhelming." In support of this contention the district court cited to this Court's language in the direct appeal opinion that the evidence was "sufficient" to find that "both a conspiracy and a RICO enterprise existed and that Lee intentionally joined and participated in each." *Lee*, No. 4:97-CR-00243 [Doc. 1163 at 68], citing *United States v. Lee*, 374 F.3d 637, 647-648 (8th Cir. 2004). There is of course a profound distinction between evidence that is "overwhelming," and evidence that is sufficient for a jury to reasonably convict a defendant. *See, e.g., United States v. Gaona-Lopez*, 408 F.3d 500, 506 (8th Cir. 2005) (evidence not "overwhelming," but "sufficient for a jury reasonably to convict"); *Jones v. Swanson*, 341 F.3d 723, 736 (8th Cir. 2003) (though not "overwhelming...evidence was sufficient for the jury to reasonably" convict); *United States v. Williford*, 309 F.3d 507, 509 (8th Cir. 2002) ("Although certainly not overwhelming, the evidence was sufficient to [convict]"). In fact, the government's case against Mr. Lee, which relied heavily upon the testimony of alleged confederates of Mr. Lee who received substantial consideration in exchange for their testimony, was far from overwhelming. *See* pp. 12-13, *infra*. Given that the district court did find that many of the prosecutor's arguments were improper, it is

---

[10] The actual wording was: "You are instructed not to consider the legal effect or consequences of Kirby Kehoe's plea or this Court's order with respect to Mr. Faron Lovelace in your deliberations on these charges as they relate to the defendants Kehoe and Lee." Tr. 7017.

60

debatable among jurists of reason or deserves encouragement to proceed where there is at least a reasonable probability that, absent counsel's deficient performance, the outcome of the trial would have been different. A COA should therefore issue with respect to this claim.

*Appellate Ineffectiveness*

A criminal defendant has a constitutional right under the Due Process Clause to the effective assistance of counsel for his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 397 (1985); *Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). This Court reviews claims of ineffective assistance of appellate counsel under the standard announced by the Supreme Court in the Sixth Amendment context in *Strickland v. Washington*, 466 U.S. 668 (1984). *Bell*, 795 F.2d at 657. A constitutional violation is established if the petitioner shows that: (1) his "attorney's performance was deficient when compared with the assistance which would have been given by any reasonably competent attorney faced with the same circumstances;" and (2) there is "a reasonable probability that the lawyer's insufficiency made a difference in the outcome of the proceedings." *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987). Specifically, whereas here, the alleged ineffectiveness is the failure to raise an issue on appeal, the Court looks to whether the issue was "significant and would have been apparent to a reasonably competent appellate attorney," and "whether there is a reasonable probability that the outcome of [the defendant's] appeal would have been different had the issue been raised." *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998) (finding ineffective assistance of appellate counsel where there was reasonable probability that state supreme court would have found plain error and reversed had omitted issue been raised). Considering the cumulative effect of the numerous improper and prejudicial arguments made during the course of the government's guilt phase closings, the significance of the issue would have been apparent to a reasonably competent appellate attorney,

61

and if the issue had been raised, there is a reasonable probability that Mr. Lee's appeal would have been granted. A COA should therefore issue with respect to this claim.

**7.    A COA SHOULD ISSUE ON CLAIMS IV.D. AND III.D., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO CHALLENGE AN INSTRUCTION TO THE JURY THAT ERRONEOUSLY STATED THAT MR. LEE COULD RECEIVE A SENTENCE OF LESS THAN LIFE IF THE JURY COULD NOT REACH A VERDICT**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claims that both his trial and direct appeal counsel were constitutionally ineffective for failing to challenge the court's penalty phase instruction regarding available sentences. This instruction erroneously informed the jury that a sentence of less than life was a possibility if the jury could not agree on a sentence of death or of life without possibility of release, when in fact the court was required in that situation to sentence Mr. Lee to life without possibility of release and had no authority under any circumstances to impose a lesser penalty. The instruction thus violated both the Due Process Clause and the Eighth Amendment prohibition against cruel and unusual punishment, and counsel's failure to object to it was unreasonable and prejudicial. A COA should therefore issue with respect to this claim.

A death sentence which is based upon materially untrue assumptions violates the Due Process Clause. *See Townsend v. Burke*, 334 U.S. 736, 741 (1948) (holding that defendant was denied due process when sentenced to death based upon materially false assumptions about his criminal record); *Simmons v. South Carolina*, 512 U.S. 154, 158 (1994) (finding due process violation where instructions likely led jury to believe, falsely, that defendant could be released if not sentenced to death). Relatedly, a defendant has an Eighth Amendment right to be sentenced only upon accurate sentencing information. *See Gregg v. Georgia*, 428 U.S. 153, 190 (1976)

62

Appellate Case: 11-1380    Page: 62    Date Filed: 06/20/2011 Entry ID: 3799638

(opinion of Stewart, Powell and Stevens, JJ.) ("accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision"); *Johnson v. Mississippi*, 486 U.S. 578, 585-87, 590 (1988) (finding Eighth Amendment violation where capital sentencing jury was allowed to consider materially inaccurate information regarding defendant's prior conviction). When it is alleged that instructions given to the jury violated these constitutional guarantees, the standard for reviewing such a claim is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

The district court in this case gave the following instruction to the jury regarding the sentences that Mr. Lee could receive:

> At the end of your deliberations, if you determine that the defendant is to be sentenced to death, or to life imprisonment without the possibility of release, the Court is required to impose that sentence.

> If you cannot unanimously agree whether the defendant should be sentenced to death or life imprisonment without the possibility of release, the Court will impose a sentence of life imprisonment or a sentence of life imprisonment without possibility of release, as required by law.

The court read this instruction to the jury at the conclusion of Chevie Kehoe's penalty phase, Tr. 7313, and it was included in the written instructions that the court gave to each juror at the end of Mr. Lee's penalty phase, Tr. 7993. Rather than repeat the entire penalty phase instructions orally in Mr. Lee's sentencing phase, the court gave a short summary. *Id.* During that summary, the court gave a slightly different version of the instruction:

> Based upon this weighing process, you must determine whether a sentence of death is justified. If you cannot unanimously agree upon a sentence of death, you must then decide whether to return a sentence of

63

life in prison without the possibility of release,   Again, your finding with respect to a sentence of life in prison without the possibility of release must be unanimous.

If you unanimously agree upon a sentence of death or a sentence of life in prison without the possibility of release, the Court is required to impose that sentence.  If you cannot unanimously agree upon either a sentence of death or a sentence of life in prison without the possibility of release, the Court will impose the sentence required by law.

Tr. 7995-96.

After the jurors had been deliberating for approximately three and a half hours, they sent out two notes.  Tr. 7998.  The first, written by the foreperson, said: "We have a juror who does not believe in the death penalty – no matter what the crime!"  *Id.*  The second, signed by a different juror and sent out a few moments after the first, read:  "I think we need more time to discuss it."  *Id.*  The court thereafter instructed the jury to continue deliberating, and also gave them a third version of the instruction regarding available penalties which was very similar to, but not exactly the same as, the written version:

Now, there is another instruction that I want to remind you of, and that is, if at the end of your deliberations you determine that the defendant be sentenced to death or life without the possibility of release, the Court is required to impose that sentence.

If you cannot unanimously agree whether the defendant should be sentenced to death or life imprisonment without the possibility of release, the Court will impose the sentence of life imprisonment or a sentence of life imprisonment without the possibility of release, as required by law.

So your note suggests that you are deliberating with respect to the death penalty, and, of course, to impose the death penalty you must be unanimous.  If you cannot reach unanimous agreement on the death penalty, you must at least consider whether you can reach unanimous agreement on life without parole or release.

If you cannot reach agreement on either one ultimately, if you end up being a hung jury on both issues, the matter is essentially turned back to the Court for its decision under the law.

64

Tr. 8008-09.  A little over one hour after receiving this instruction, the jury returned a unanimous verdict of death.  Tr. 8015.

The court's instructions constituted clear and unequivocal misstatements of the law that were extraordinarily prejudicial to Mr. Lee.  The first and third versions of the instruction expressly stated that one possible sentence that the court could impose if the jury deadlocked was "life imprisonment." Tr. 7313, 8009.  While "life imprisonment" was left undefined, the instruction made crystal clear that it was a different sentence than life without possibility of release.  Tr. 7313 ("the Court will impose **a sentence of life imprisonment <u>or</u> a sentence of life imprisonment without possibility of release**") (emphases added); Tr. 8009 ("the Court will impose **the sentence of life imprisonment <u>or</u> a sentence of life imprisonment without the possibility of release**") (emphases added).  And the second version, sandwiched in the middle, did nothing to dispel the false impression created by the others.  Tr. 7996 ("the Court will impose the sentence required by law").

The jury was thus left with no doubt that "life imprisonment" included the possibility that Mr. Lee would be released from prison some day – a conclusion that was utterly false.  Unlike some other federal capital murder statutes, 18 U.S.C. § 1959, the statute under which Mr. Lee was convicted, provides for only two sentencing options:  Death or life.  Parole was abolished in the federal penal system in 1984, *see* Pub. L. 98-473, tit. II, ch. II, § 218(a)(5) (1984), and individuals serving life sentences are ineligible for "good time," *see* 18 U.S.C. § 3624(b)(1), and so a sentence of "life imprisonment" means that the prisoner will never be released.   Yet it is overwhelmingly likely that Mr. Lee's jurors believed that, if they did not reach an agreement, he could be released in relatively short order.  As the Supreme Court has recognized, empirical evidence establishes that potential jurors commonly, but mistakenly, believe that a convicted

65

murderer might be paroled in 30 or even 20 years. *Simmons*, 512 U.S. at 158. In the case of a young man like Mr. Lee, who was only 25 years old at the time of trial, the jury likely believed that a sentence of life imprisonment would mean that he would be back on the streets while still in his 40's, still very much young enough to pose a danger to others.

The Supreme Court has also noted research findings that revealed that more than 75% of individuals surveyed indicated that the amount of time a murderer would actually spend in prison would be a "very important" or "extremely important" factor in the decision whether to impose a death sentence. *Id.* The instruction given to Mr. Lee's jury could not help but engender the highly prejudicial, and entirely groundless, fear that failure to reach a unanimous verdict would result in Mr. Lee's release from prison. Accordingly, there is an unacceptable possibility that one or more jurors voted for death to avoid deadlock, erroneously believing that if they did not do so Mr. Lee would eventually walk free. That this eventuality occurred in this case is even more likely in light of the actual sequence of deliberations. As noted, the jury foreperson sent out a note informing the court that one of the jurors was refusing to vote for the death sentence. Tr. 7998. Barely more than an hour after the court reiterated to the jury that deadlock on verdicts of death and life without possibility of release may result in a sentence of "life imprisonment," Tr. 8008-09, the jury returned a unanimous verdict of death. Tr. 8015. The conclusion that Mr. Lee's jury likely interpreted the court's instruction in an unconstitutional manner is inescapable.

The prejudice that the erroneous instruction caused to Mr. Lee and his entitlement to a fair and accurate sentencing determination is still further heightened by the admission at the penalty phase of uncontroverted evidence, given by Mr. Lee's own expert, that Mr. Lee would be a danger to the community if released. On cross-examination, the government elicited from Dr. Mark Cunningham, Ph.D., his opinion that "[i]n the community, I think that Mr. Lee does

66

present a significant risk, as has been demonstrated by his conviction in this case.  So, in that sense, in the community I believe that he is a serious risk."  Tr. 7745.

And as their cross-examination progressed, the government repeatedly led Dr. Cunningham back to the point that Mr. Lee, who scored high enough on the Psychopathy Checklist-Revised ("PCL-R")[11] to be diagnosed as a psychopath according to the government's expert, Dr. Ryan, would be violent if released.  See Tr. 7806 ("With increasingly high scores on [the PCL-R] that's [sic] been associated with a greater likelihood of criminal activity and violent criminal activity in the community against white males"); Tr. 7807 (Dr. Cunningham agrees that "[i]n the community among white males," "psychopaths have an increased incidence of predatory violence"); Tr. 7809 (Dr. Cunningham agrees that "psychopaths [are] five times more likely to engage in violent recidivism in the community"); Tr. 7813 ("the principal purpose of [the PCL-R] is to identify individuals who are at greater risk of criminal activity or violence and that is increasingly demonstrated in the community"); Tr. 7815 ("The psychopathy check list is state-of-the-art if you are looking at likelihood of criminal activity and violent recidivism in the community among white males through midlife.").

In light of the foregoing, it is manifestly debatable amongst jurists of reason whether Mr. Lee's trial counsel rendered ineffective assistance by failing to object to the court's instruction. Mr. Lee is also entitled to a COA on his claim that his direct appeal counsel rendered ineffective assistance by failing to raise this issue.  A criminal defendant has a constitutional right under the Due Process Clause to the effective assistance of counsel for his direct appeal.  *Evitts v. Lucey*, 469 U.S. 387, 397 (1985); *Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986).  This Court reviews claims of ineffective assistance of appellate counsel under the standard announced by

---

[11]     The PCL-R is an instrument developed by a psychologist that purports to measure whether an individual is or is not a psychopath.  Tr. 7795.

67

Appellate Case: 11-1380     Page: 67     Date Filed: 06/20/2011 Entry ID: 3799638

the Supreme Court in the Sixth Amendment context in *Strickland v. Washington*, 466 U.S. 668 (1984). *Bell*, 795 F.2d at 657. A constitutional violation is established if the petitioner shows that: (1) his "attorney's performance was deficient when compared with the assistance which would have been given by any reasonably competent attorney faced with the same circumstances;" and (2) there is "a reasonable probability that the lawyer's insufficiency made a difference in the outcome of the proceedings." *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987). Specifically, where the alleged ineffectiveness is the failure to raise an issue on appeal, the Court looks to whether the issue was "significant and would have been apparent to a reasonably competent appellate attorney," and "whether there is a reasonable probability that the outcome of [the defendant's] appeal would have been different had the issue been raised." *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998) (finding ineffective assistance of appellate counsel where there was reasonable probability that state supreme court would have found plain error and reversed had omitted issue been raised).

At a minimum, it is debatable amongst jurists of reason whether Mr. Lee may be entitled to relief on this claim. The meritorious nature of the claim that the penalty phase instruction was unconstitutionally inaccurate and misleading, as set forth above, demonstrates that the claim that appellate counsel missed was indeed significant. The fact that the claim is so meritorious also establishes a reasonable probability that, had it been raised on appeal, this Court would have found plain error and granted relief, and thus demonstrates prejudice. Finally, the claim would unquestionably have been apparent to a reasonably competent appellate attorney. The United States Supreme Court decided *Simmons* in 1994, years before Mr. Lee's appeal, and later revisited similar issues in a series of cases that were all decided before Mr. Lee's direct appeal proceedings began. *See O'Dell v. Netherland*, 521 U.S. 151 (1997); *Shafer v. South Carolina*,

68

532 U.S. 36 (2001); *Kelly v. South Carolina*, 534 U.S. 246 (2002). A reasonably competent appellate attorney would therefore have been on high alert for jury instructions that falsely suggested to the jury that the defendant's release was a possible option and could not have failed to recognize the unconstitutionality of the instruction given in this case.

The district court erroneously rejected these claims, citing *Jones v. United States*, 527 U.S. 373 (1999). *Jones*, however, is a very different case than this one. The jury in *Jones* was instructed that it could impose three different sentences: Death, life imprisonment without possibility of release or "some other lesser sentence." *Id.* at 385. The court further instructed that, if the jury voted to impose the lesser sentence, the court would impose "a sentence that is authorized by law." *Id.* The defendant argued that these instructions suggested to the jury that, if they deadlocked, the court would impose the "sentence authorized by law," inferably less than life without possibility of release, because they did not specifically state that a verdict of some other lesser sentence must also be unanimous. *Id.* at 387.

The Supreme Court rejected the argument, finding no reasonable likelihood that the jury misinterpreted the instruction in the way that the defendant posited. *Id.* at 390-91. In the context of the instructions as a whole, the Court found, the unanimity requirement for the lesser sentence was sufficiently clear, and the jury was never expressly informed that the court would impose a "sentence authorized by law" if they deadlocked. *Id.* It was therefore not reasonably likely that the jury interpreted the instructions as allowing "a sentence authorized by law" under any circumstances other than in response to a unanimous jury recommendation of "some other lesser sentence." *Id.* In this case, in sharp contrast, the jury was expressly informed that the court would impose a sentence of less than life if it failed to agree on a sentence of death or life without possibility of release. Unlike in *Jones*, then, the instruction given to Mr. Lee's jury was

69

unconstitutional, and trial and appellate counsel rendered ineffective assistance by failing to challenge it.  A COA should issue as to this claim.

**8.  A COA SHOULD ISSUE ON CLAIMS II.H. AND II.J., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE  BY FAILING TO ADEQUATELY CHALLENGE THE THOROUGHLY MISLEADING EVIDENCE OF PSYCHOPATHY PRESENTED BY THE GOVERNMENT THROUGH DRS. CUNNINGHAM AND RYAN**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claims that his trial counsel were constitutionally ineffective for failing to adequately challenge the government's misleading evidence that Mr. Lee was a violent psychopath who was likely to continue to be dangerous in the future regardless of where he was incarcerated.  The government elicited this devastatingly prejudicial evidence first from the psychologist called by the defense, Dr. Mark Cunningham, Ph.D., and then, despite a court order to the contrary, from its own expert, Dr. Thomas Ryan, Ph.D.  Counsel failed to adequately challenge the testimony of either witness.  As a result, of the 57 persons currently on federal death row, Mr. Lee is the only individual whose capital sentencing proceedings featured any evidence of psychopathy; every other attempt by the government to use such evidence has resulted either in a reversal after judgment, or in the evidence being precluded from ever being presented to the jury in the first place.

The government succeeded in introducing substantial evidence regarding Mr. Lee's alleged psychopathy and resulting dangerousness during its cross-examination of Dr. Cunningham.  The government elicited from Dr. Cunningham that the term "psychopath" is a psychological term that is recognized within forensic psychology, that he himself had written a published paper on the subject, and that psychopathy is "measured by a structured interview called the psychopathy checklist revised that is developed by Dr. Hare and has been increasingly

70

widely researched within the field of forensic psychology."  Tr. 7754.  *See also* Tr. 7795 (testimony from Dr. Cunningham that psychopathy is "measured by an instrument called the psychopathy check list revised"); Tr. 7811 (agreement from Dr. Cunningham that "the psychopathy check list has emerged to be the standard for the assessment of criminal psychopathy in North America"); Tr. 7815 (testimony from Dr. Cunningham that "[t]he psychopathy check list is state-of-the-art if you are looking at likelihood of criminal activity and violent recidivism in the community among white males through midlife").  The government further elicited from Dr. Cunningham a detailed description of how the PCL-R is administered and scored in order to arrive at a diagnosis of psychopathy.  Tr.  7796.  As Dr. Cunningham explained, the individual is given a score of zero, one or two on 20 different domains that may or may not be descriptive of the individual, such as whether the individual is "glib and superficial," *id.,* has a "lack of remorse, Tr. 7805, is "impulsive," *id.*, or has "poor behavioral control," Tr. 7805-06.   As the government further elicited: "On the most simple level you might say if the person scores over 30 then they would meet criteria to be called a psychopath."  *Id*.  The jury was thus given a fairly comprehensive picture of what the PCL-R is and how it is administered and scored to arrive at a diagnosis that the individual being tested is a psychopath.

As it had previewed in its opening statement, the government frequently questioned Dr. Cunningham about various alleged acts and incidents in Mr. Lee's life and background that purportedly corresponded to the descriptive domains of the PCL-R, such as his impulsivity, poor behavioral control, instances of violence, threats to others, and lack of remorse.  *See*, *e.g.,* Tr. 7750-53; 7763; 7777-83; 7788-90; 7809-10.  And near the end of its cross-examination, the government explicitly introduced the diagnosis of Mr. Lee as a psychopath by its own expert using the PCL-R:

Appellate Case: 11-1380     Page: 71     Date Filed: 06/20/2011 Entry ID: 3799638

Q. You know Dr. Ryan is a neuropsychologist?

A. That's correct.

Q. You know Dr. Ryan is sitting in this courtroom?

A. Yes, I do.

Q. In preparation for this case, you had an opportunity to see a report prepared by him?

A. Yes, I did.

Q. And in fact, when you testified yesterday, you made reference to that report?

A. Yes, I did.

. . .

Q. But what you didn't do is you didn't tell this jury that he made a diagnosis that Mr. Lee was a psychopath, did you?

A. I don't recall that there was that report doesn't sayd (sic) diagnosis colon, but he does identify Mr. Lee as scoring in that range on the psychopathy check list and I think does make a reference to him - - I can get it specifically. Again, the only discrepancy is whether he said he had a diagnosis of. *He clearly identified him by his scoring of the PCL-R as falling into the psychopathy range based on a single standard error of measurement.*

Tr. 7825-7 (emphasis added).

The government elicited extensive testimony from Dr. Cunningham regarding the overwhelmingly negative connotations of psychopathy, and its claim that the diagnosis is a predictor of future violent and dangerous behavior. Dr. Cunningham testified that "[t]here are two factors associated with [psychopathy]. One is called, we will refer to as aggressive narcissism . . . and another one is called deviant lifestyles." Tr. 7805. He admitted that he himself had written that "psychopathy involves both maladaptive personality features and

72

socially deviant behaviors . . . [including] symptoms of impulsivity, lack of remorse, callousness and poor behavioral control." Tr. 7808. Dr. Cunningham twice referred to the need to place psychopaths in "quarantine," Tr. 7817, 7819, connoting that such individuals are more animal than human. He agreed that, at least in the community, psychopaths have "an increased incidence of predatory violence," Tr. 7807; indeed, research has shown that "psychopaths were five times more likely to engage in violent recidivism in the community," Tr. 7809. Finally, the government managed to elicit from Dr. Cunningham that individuals who achieve a score in the psychopathy range on the PCL-R "seem not to profit from . . . treatment and in fact may simply learn to be smarter about how they exploit other people." Tr. 7818-19.

Despite an order from the court forbidding it to introduce further evidence of psychopathy or the PCL-R, Tr. 7836, the government reinforced the picture of Mr. Lee as a dangerous psychopath during the testimony of its own expert, Dr. Ryan, whom it called in rebuttal. Having established with Dr. Cunningham that psychopathy is defined by " impulsivity, lack of remorse, callousness and poor behavioral control," Tr. 7808, "glib[ness] and superficial[ity]," Tr. 7796, "aggressive narcissism," Tr. 7805, and "predatory violence," Tr. 7807, the government systematically elicited Dr. Ryan's opinion that each of these traits were indeed present in Mr. Lee.

Dr. Ryan testified that his examination revealed Mr. Lee to be "suspicious . . . distrustful . . .[and] angry." Tr. 7917. He said that Mr. Lee told him he became involved in the skinhead movement "because he could have sex with a lot of women, drink a lot of beer, and get in a lot of fights." Tr. 7919. Far from showing remorse for his actions, Mr. Lee said that "he enjoyed the fighting." *Id.* Dr. Ryan described an incident that occurred during his interview of Mr. Lee where Mr. Lee "immediately just jumped out of his chair and became extremely angry at the

73

Appellate Case: 11-1380     Page: 73     Date Filed: 06/20/2011 Entry ID: 3799638

guard, arguing and using profanity," when an issue arose regarding his lunch tray, which Dr. Ryan characterized as "a great example of impulsivity." Tr. 7920. He reported that, when he asked Mr. Lee if he was the type of person who could easily con other people, Mr. Lee replied, "it depends who it is." Tr. 7920. Dr. Ryan confirmed that he observed "glibness" in Mr. Lee, in that he appeared happy, cheery and smiling in a manner incongruent with the gravity of the situation. Tr. 7923-24. And he reported that his examination of whether Mr. Lee "has a conscience" revealed that he lacked guilty or remorseful feelings about people he had harmed in the past, something that was "important diagnostically" for Dr. Ryan. Tr. 7930-31. In this manner, the government was able to unequivocally confirm Dr. Ryan's diagnosis of psychopathy for the jury, leaving out only the actual term.

The jury was thus given all the evidence it needed to definitively, yet wholly erroneously, conclude that Mr. Lee would be a future danger in prison if sentenced to life without parole, and that the only way to guarantee that he would not harm anyone again would be to sentence him to death. Indeed, the verdict form reflects that the jury unanimously found that Mr. Lee would be a future danger, a factor which it unanimously rejected in co-defendant Chevie Kehoe's case, whose life the jury spared. And when one of the jurors was interviewed by television reporters after the trial had concluded, he or she stated that "we went by the guidelines and weighed it out and felt that he would be a threat even in prison . . . a person who thrives off of violence, there's no ending to that." *See Lee*, No. 4:97-cr-243, June 16, 1999 [Doc. 856 at 3] (Defendant's Reply to Govt.'s Response to Motion for Correction of Sentence). It is beyond cavil, therefore, that the psychopathy evidence was devastatingly prejudicial to Mr. Lee.

The evidence was also highly misleading, and should never have been admitted. Even Dr. Ryan, the government's own expert, now admits that the use of the PCL-R to diagnose

74

Appellate Case: 11-1380     Page: 74     Date Filed: 06/20/2011 Entry ID: 3799638

psychopathy and predict future dangerousness in capital cases is scientifically and ethically inappropriate, because there is no scientific basis whatsoever for the proposition that individuals diagnosed as psychopaths are likely to be dangerous when incarcerated. Dr. Stephen David Hart is an eminent psychologist who worked with Dr. Hare on the development and validation of the PCL-R. In connection with another federal death penalty case in which the government sought to present the testimony of Dr. Ryan, *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), tried in May of 2000, Dr. Hart provided an affidavit. *See Lee*, No. 4:97-cr-243 9/18/08 [Doc. 1165-7 at 2-4] (Exhibit 7 to Defendant's Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e)). Dr. Hart attested that, in his expert opinion, there was "no direct scientific evidence that the PCL-R . . . [is] predictive of institutional violence in correctional offenders in the United States," and that the PCL-R is "not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States." *Id.* at 4.

Three other experts in the field of risk assessment echoed Dr. Hart's opinion in their own affidavits. Dr. Kirk Heilbrun of MCP Hahnemann University in Philadelphia wrote that "[c]urrently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration." *Id.* at 7. Dr. Norman Poythress of the University of South Florida opined that "it is inappropriate to conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores." *Id.* at 14. And Dr. John F. Edens of Sam Houston State University in Texas noted that a study he conducted showed "a non-significant association between PCL-R scores and violent infractions during inmates' first year of incarceration," and registered "significant concerns about the

75

appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence." *Id.* at 15.

In addition to the affidavits of the four psychologists with expertise in risk assessment, counsel in *Haynes* submitted an affidavit from Dr. Donald N. Bersoff, full professor of psychology at Hahnemann University and full professor of law at Villanova Law School, who is an expert in the standards and ethics of testifying as a psychological expert witness in legal proceedings. *Id.* at 16. Dr. Bersoff attested that Dr. Ryan had "acted below the professional standards of those holding themselves out as forensic psychologists" in rendering the conclusion that the defendant was a "relatively high risk of engaging in violence recidivism," because there was a "dearth of data generally accepted in the relevant psychological community to support this opinion" and Dr. Ryan had made "misleading use of the extant studies" regarding the PCL-R in order to render his opinion. *Id.* at 25-26.[12]

After reviewing these affidavits, Dr. Ryan re-evaluated his position on this issue and voluntarily withdrew his expert report in the *Haynes* case. As Dr. Ryan himself later explained:

> The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes*. In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score

---

[12] An ethical complaint was eventually filed against Dr. Ryan with the APA based on his misleading expert reports and/or testimony in three capital cases, including *Haynes*, on the issue of psychopathy and future dangerousness. *See Lee*, No. 4:97-cr-243 9/18/08 [Doc. 1165-5] (Exhibit 5 to Defendant's Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e)). Additionally, a description of Dr. Ryan's conduct with respect to psychopathy and future dangerousness testimony in *Haynes* was published in a peer-reviewed journal for psychologists and described as "not only incompetent and factually misleading, but also highly unethical." John F. Edens, *Misuses of the Hare Psychopathy Checklist-Revised in Court, Two Case Examples*, 16 Journal of Interpersonal Violence 1082-93 (2001).

76

that would support a future dangerousness determination.  I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists.  I then determined that I would withdraw my report.  As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

*See Lee*, No. 4:97-cr-243-GTE, 9/18/08 [Doc. 1165-4] (Exhibit 4 to Defendant's Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e)).  This disavowal was given in a sworn declaration which was filed with the court as part of the § 2255 proceedings in another capital case in which Dr. Ryan had testified, *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.).  In that declaration, Dr. Ryan went on to state:

> Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument.  Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison.  As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.
>
> . . .
>
> It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

*Id.  See also id.* at ¶ 10 ("Since withdrawing my report in the [*United States v. Willis*] *Haynes* case [in the Spring of 2000], I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial.  In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies.  Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*.")

77

Appellate Case: 11-1380     Page: 77     Date Filed: 06/20/2011 Entry ID: 3799638

In light of the foregoing, Mr. Lee's trial counsel rendered constitutionally ineffective assistance by failing to challenge the government's introduction of evidence of Mr. Lee's alleged psychopathy and concomitant predisposition towards violence on the ground that it was scientifically invalid and unsupportable and wholly misleading to the jury. Reasonably competent counsel would have moved to exclude the evidence under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), just as counsel did in the *Haynes* case in Maryland less than one year later. In order to be admissible under Rule 702, expert opinion testimony must "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Testimony meets this criterion only if "the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 593.

Counsel could have readily and compellingly demonstrated that testimony regarding psychopathy, the PCL-R and their implications for future dangerousness was the antithesis of scientifically valid in precisely the manner outlined above. In his affidavit given in connection with the Stitt case, Dr. Ryan averred that the basis for a challenge to testimony regarding psychopathy and the PCL-R existed at the time of the Stitt trial, which was held in September, 1998 – six months before Mr. Lee's trial began. *See Lee*, No. 4:97-cr-243-GTE, 9/18/08 [Doc. 1165-4.][13] Moreover, it is clear from the record in this case that trial counsel's expert witness, Dr. Cunningham, was well aware of the problems with this type of testimony and undoubtedly communicated his concerns to counsel. In 1998, Dr. Cunningham co-authored an article which

---

[13] Accordingly, the district court's conclusion that "Petitioner has not explained how counsel could have been expected, almost one year before Dr. Ryan himself rejected the PCL-R as an effective predictor of future conduct, to challenge the scientific underpinnings for his testimony," *Id.* [Doc. 1189 at 12], is simply wrong. The salient factor in counsel's ability to bring the challenge that was brought shortly after Mr. Lee's trial by counsel for Mr. Haynes is not Dr. Ryan's recognition that his testimony was invalid; indeed, even Mr. Haynes counsel did not have that. Rather, it is the scientific research that demonstrated that invalidity, and that, Dr. Ryan himself admits, was readily available at the time of Mr. Lee's trial.

78

stated "there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates. . .  Until a better research base develops caution should be exercised in utilizing the PCL-R in forecasting the likelihood of future serious personal violence."  Mark D. Cunningham and Thomas J. Reidy, *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, 16 Behavioral Sciences and the Law 333, 343 (1998).  *See Lee*, No. 4:97-cr-243-GTE, 9/18/08 [Doc. 1165-7 at 14].

Dr. Cunningham mentioned during his trial testimony that "there has simply not been much research about psychopathy, what it means about somebody's behavior in an institutional setting, and the research that has been done has been substantially flawed with methodological problems, and then you have some other studies that show there's no association of psychopathy scores with institutional violence."  Tr. 7806-07.  He also testified that he himself had ceased using the PCL-R in capital sentencing evaluations because of his awareness of the lack of scientific support for any connection between psychopathy and institutional violence.  Tr. 7828-29.  And in an affidavit submitted shortly after the trial concluded, in support of Mr. Lee's Motion for Correction of Sentence, Dr. Cunningham wrote:

> Psychopathy (as defined and measured by the Hare Psychopathy Checklist – Revised (PCL-R) can be diagnosed in one-fourth of prison inmates.  Psychopathy has not been demonstrated by research to be strongly or consistently associated with violent behavior in prison.  In the absence of predictive validity of these diagnoses regarding violence in prison, there are grave ethical considerations associated with the use of APD and/or psychopathy in assessments of future dangerousness at capital sentencing:
>
> > The danger of undue prejudice flowing from testimony which includes such a diagnosis may be exceptionally great.  In common usage the terms used to describe this diagnosis have a connotation of dangerousness and

79

> arguably an emotional flavor that strongly militates against rational evaluation of their objective value in predicting assaultive conduct. (Dix 1981).[14]

*See Lee*, No. 4:97-cr-243-GTE, 2/18/00 [Doc. 936 Ex.A.]

It is unlikely indeed that over the course of their work with Dr. Cunningham, his evaluation of Mr. Lee and preparation for trial, Mr. Lee's counsel did not learn of Dr. Cunningham's opinions in this regard. Mr. Lee's counsel therefore had as much, if not more, notice of the necessity to raise this challenge as did counsel in *Haynes*; they just failed to recognize it. Had counsel performed as the reasonably competent advocates guaranteed by the Constitution and raised the appropriate challenge, the district court would have excluded this devastatingly prejudicial evidence.

Reasonably competent counsel would also have moved to exclude this testimony on constitutional grounds. The Due Process Clause requires reversal of a death sentence that may have been based upon materially inaccurate or misleading information. *See, e.g., Townsend v. Burke*, 334 U.S. 736, 741 (1948) (holding that defendant was denied due process when sentenced to death based upon materially false assumptions about his criminal record); *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (reversing death sentence based upon jury's likely misunderstanding of meaning of life sentence and availability of parole as violation of due process). A defendant also has an Eighth Amendment right to be sentenced only upon accurate sentencing information. *See Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (opinion of Stewart, Powell and Stevens, JJ.) ("accurate sentencing information is an indispensible prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may

---

[14] The article that Dr. Cunningham was quoting from was G.E. Dix, *Expert Prediction Testimony in Capital Sentencing: Evidentiary and Constitutional Considerations*, 19 Am. Crim. L. Rev. 1 (1981).

Appellate Case: 11-1380     Page: 80     Date Filed: 06/20/2011   Entry ID: 3799638

never before have made a sentencing decision"); *Johnson v. Mississippi*, 486 U.S. 578, 585-87, 590 (1988) (finding Eighth Amendment violation where capital sentencing jury was allowed to consider materially inaccurate information regarding defendant's prior conviction). Had trial counsel performed effectively, the trial court would have excluded the evidence on these grounds also.

Trial counsel further rendered ineffective assistance by failing to object to evidence of Mr. Lee's purported risk of future violence in the community. In a death penalty case where the only available alternative sentence is life without possibility of parole, 'courts 'have uniformly held that the government is limited to presenting evidence on future dangerousness in the context of life imprisonment.'" *United States v. Duncan*, 2008 WL 711603 at *11 (D. Idaho) (quoting *United States v. Rodriguez*, 2006 WL 487117 at *5 (N.D.N.) and collecting cases). Obviously, if there is no possibility of a defendant reentering the community ever again, evidence that he poses a risk of violence in such a setting is wholly irrelevant; evidence of future dangerousness should therefore be limited to "analysis of past activities and propensities for danger to inmates and prison staff." *United States v. Sablan*, 555 F. Supp. 2d 1177, 1185-86 (D. Colo. 2006) (granting defense motion to exclude acts of non-institutional violence that government proposed to use as non-statutory aggravators).

In this case, as noted above, the government was permitted to introduce unequivocal, unrebutted testimony that Mr. Lee would likely be violent and dangerous in the future if released into the community. On cross-examination, the government elicited from Mr. Lee's own expert, Dr. Cunningham, his opinion that "[i]n the community, I think that Mr. Lee does present a significant risk, as has been demonstrated by his conviction in this case. So, in that sense, in the community I believe that he is a serious risk." Tr. 7745. And as their cross-examination

81

progressed, the government repeatedly led Dr. Cunningham back to the point that Mr. Lee, as a person who scored high enough on the PCL-R to be diagnosed as a psychopath according to the government's expert, Dr. Ryan, would be violent if released. *See* Tr. 7806 ("With increasingly high scores on [the PCL-R] that's [sic] been associated with a greater likelihood of criminal activity and violent criminal activity in the community against white males"); Tr. 7807 (Dr. Cunningham agrees that "[i]n the community among white males," "psychopaths have an increased incidence of predatory violence"); Tr. 7809 (Dr. Cunningham agrees that "psychopaths [are] five times more likely to engage in violent recidivism in the community"); Tr. 7813 ("the principal purpose of [the PCL-R] is to identify individuals who are at greater risk of criminal activity or violence and that is increasingly demonstrated in the community"); Tr. 7815 ("The psychopathy check list is state-of-the-art if you are looking at likelihood of criminal activity and violent recidivism in the community among white males through midlife."). Trial counsel rendered constitutionally ineffective assistance by failing to object to this testimony on this ground also.

The prejudice that inured to Mr. Lee as a result of his counsel's failure to move to exclude all of this evidence is overwhelming. Several courts have recognized the unfairly prejudicial effect that psychopathy evidence can have on a capital jury's deliberations. In *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), the government presented the testimony of a psychologist that, based on the PCL-R, he had concluded that the defendant was a psychopath who felt no remorse or guilt, and that he would be a future danger in prison. *Id.* at 811, 825. The Fourth Circuit reversed the death sentence on the grounds that the district judge erred in denying the defense request for surrebuttal to question the validity of the psychologist's methods with their own expert witness. *Id.* at 825. Rejecting the government's claim that this was harmless

82

error, the court stated that "the testimony of Dr. Duncan was as damning as it could be," and that there was therefore a reasonable possibility that his testimony regarding the PCL-R and the defendant's alleged psychopathy "contributed to the death sentence." *Id.* at 825.

In the *Stitt* case, although it granted relief on different grounds the district court also found that the outcome of the sentencing proceeding might have been different but for Dr. Ryan's testimony regarding the PCL-R and psychopathy. As it noted in its memorandum and order:

> It is also possible the jury might have reached a different conclusion if Dr. Ryan's testimony had been different. The Court only has to find that "there is more than a faint possibility of a different jury verdict but something less than a probability." [*United States v.*] *Wallace*, 528 F.2d [863] at 866 n.3 [4th Cir. 1976)]. Given the nature of Dr. Ryan's testimony about the nature and consequences of Petitioner's psychopathy, the Court finds that it is clear that jury might have reached a different verdict.

*Stitt*, 369 F. Supp. 2d at 699-700.

In *United States v. Sampson*, 335 F. Supp. 2d 217, 220 (D. Mass. 2004), another federal capital case, the district judge excluded expert evidence on future dangerousness because "its probative value would have been outweighed by the danger of creating unfair prejudice." Indeed, the district judge prohibited the government's mental health expert from even using the word "psychopath" because it "would have entailed a high risk that, despite any limiting instruction, the jury would have considered [the expert] testimony as tending to show that [the defendant] would be dangerous in the future. " *Id.* at 222 n.27. The district judge also noted that jurors may give great deference to "a supposed expert for purposes of determining future dangerousness," and that therefore, "there is good reason to fear that the testimony of a psychiatrist on the issue of future dangerousness will be given more weight than it deserves." *Id*. at 220. The court was particularly troubled by this given all the extant research which suggests

83

that "it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible." *Id*. at 222.

The risk that a jury will erroneously determine that a capital defendant is a future danger is made exponentially greater with the introduction of demonstrably inaccurate psychological evidence disguised as cutting edge science. Indeed, this is why in *United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004), another federal capital case, the district judge prohibited the government's mental health expert from administering the PCL-R to the defendant in its pre-trial evaluation. In the district court's judgment, "the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings" would undermine the reliability of the defendant's sentencing proceedings if testimony about the defendant's PCL-R score was injected into the trial. *Id.* at 794.

Additionally, empirical research confirms the prejudicial impact of psychopathy evidence on jury deliberations. As Dr. Edens attested in his affidavit submitted in the *Stitt* case:

> [M]y colleagues and I have conducted several recent experiments that have examined the effects of labeling criminal defendants as exhibiting psychopathic traits . . . The general pattern of findings from these studies is that laypersons who hear a defendant being described as psychopathic subsequently expect him to be much more violent and dangerous in the future than do laypersons who are exposed to the same case information but hear the defendant described as being non-psychopathic. Moreover, when participants in these studies are asked whether a death sentence is appropriate given the facts of the case presented to them, it is not surprising that a much higher percentage of those who hear the defendant described as psychopathic believe the appropriate sentence for his crimes is death. For example, in one of these studies (Edens, Colwell, Desforges, & Fernandez, 2003), 38% of the study participants who were informed that the defendant was not mentally disordered supported death and 30% of those who were exposed to testimony that the defendant was schizophrenic supported death. In the condition in which the defendant was described as psychopathic, however, 60% supported a death sentence, even though all other facts of the case were held constant across the three types of testimony. It is also noteworthy that these differing rates of support for the death penalty were obtained even when the

84

> prosecution expert acknowledged that the defendant was at 'low' risk for engaging in future acts of violence. Given these findings, it seems very likely that the introduction of psychopathy testimony into actual trials could increase the probability that jurors would support capital punishment.

*Lee*, No. 4:97-cr-243-GTE [Doc. 1165-6]. (footnotes omitted).

Dr. Edens' empirical research confirms the judgment of the aforementioned courts that have found that the introduction of psychopathy evidence into capital sentencing proceedings is unfairly prejudicial.

And the record is clear that the PCL-R and psychopathy evidence were a central part of the government's case for death. The government's penalty phase presentation to the jury was explicitly premised on the argument that Mr. Lee had the psychological profile of a "psychopath," and that as such, violence was intrinsic to his profile, and only a death sentence could keep him from hurting other people. The government began this line of argument in its opening statement to the jury, where it stated that the jury would learn about an aspect of Mr. Lee's "psychological profile that in the end will convince you that as he sits here today and will be in the future, Mr. Lee is a dangerous man. *That, ladies and gentlemen, is a lot of what this trial will be about*." Tr. 3739 (emphasis added). The government's use of the term "psychological profile" was not merely colloquial. As the government argued moments later to the jury: "In the end, what the evidence that will be presented will establish is that *Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use*." Tr. 7381 (emphasis added). The government repeated this theme once more when it stated: "We will prove in this case to you that Mr. Lee, *because of his psychological profile*, who he is and who

Appellate Case: 11-1380     Page: 85     Date Filed: 06/20/2011 Entry ID: 3799638

he will be for years to come, is dangerous and will continue to be dangerous." Tr. 7383 (emphasis added).[15]

The government explicitly stated that the evidence it planned to present regarding Mr. Lee's alleged prior bad acts which it would present was not merely of historical significance, but rather it established that Mr. Lee was a psychopath who "thrived" on violence, and who would continue to be a danger if allowed to live: "The evidence that will be presented in this trial is going to help you understand that Mr. Lee, this man who sits right here in this courtroom, is a violent and dangerous man. *He thrives on this stuff. That is part of his profile. Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time*." Tr. 7381 (emphasis added). Indeed, the government's opening statement specifically highlighted Mr. Lee's alleged participation in the Wavra murder in the context of its remarks that Mr. Lee was a psychopath in the medical sense of the term. Tr. 7381-2. In other words, from the very outset of the penalty phase, the government rhetorically linked all the evidence it would present with the theme of psychopathy, thus insuring that the each piece of prior bad act evidence would be viewed by the jury through that lens. Trial counsel were constitutionally ineffective in failing to prevent Mr. Lee's jury from deciding whether he should live or die on the basis of evidence that had no scientific support or any legitimate probative value.

The district court below erroneously denied relief on these claims based on its incorrect conclusion that this Court had addressed them in its opinion reversing the grant of a new trial and, in so doing, found that trial counsel had properly preserved the issues by objection. *Lee*, No. 4:97-cr-243-GTE [Doc. 1163 at 91-92, 95-96.] However, the issues outlined above are *not* the

---

[15]    *See also* Tr. 7379 ("And during this trial then we balance his life, those he has hurt or will hurt in the future"); Tr. 7381 ("even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous."); Tr. 7382 ("Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person.").

Appellate Case: 11-1380     Page: 86     Date Filed: 06/20/2011 Entry ID: 3799638

same as those previously addressed by this Court.  In its opinion in *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), this Court ruled on, and found preserved, the *evidentiary* issue regarding whether the district court erred in admitting psychopathy evidence at Mr. Lee's trial given that the defense had not gone into such topics.  The Court's resolution of that issue explicitly depended on its assumption that the psychopathy evidence was probative of Mr. Lee's alleged future dangerousness.  *Id.* at 495.

The present claim, however, is that trial counsel were ineffective in failing to fully and adequately object to the psychopathy evidence precisely on the ground that such evidence was *not* probative of the issue of future dangerousness.  This Court has not previously addressed the issue of counsel's ineffectiveness in this regard, nor has it considered the facts underlying this ineffective assistance claim – that predictions of future dangerousness based on the PCL-R and psychopathy are scientifically invalid, and that Dr. Ryan has disavowed the use of the PCL-R for this purpose.

Relatedly, the district court stated in its Order that "it is difficult to see how any additional objection that Petitioner's counsel could have made to Dr. Cunningham's or Dr. Ryan's testimony could have altered the outcome [of the sentencing proceedings]" given this Court's prior ruling that Mr. Lee was not unfairly prejudiced by the psychopathy evidence.  *Id.* [Doc. 1163 at 96.]   In *Lee*, however, this Court stated that Mr. Lee was not "unfairly" prejudiced by the psychopathy evidence because Mr. Lee's "potential psychopathy was probative of his future dangerousness." *Id.* at 495.  The Court's ruling on the matter based upon the record as it then stood, therefore, in no way forecloses the present claim of ineffective assistance of counsel, the premise of which necessarily undermines the Court's assumptions regarding the prejudice that Mr. Lee suffered.

87

Nor did this Court previously rule upon the full extent of counsel's failure to object to the prejudicial and inadmissible testimony of Dr. Ryan.  Counsel objected to, and the Court reviewed, only a single statement by Dr. Ryan, concerning Mr. Lee's alleged lack of remorseful feelings.  *Lee*, 274 F.3d at 495 ("we cannot conclude that this single comment unfairly prejudiced Lee").  However, as outlined above, the government elicited a great deal more prejudicial evidence of psychopathy than just that single answer.  Mr. Lee's counsel failed to object to any of that evidence, and in so doing rendered constitutionally ineffective assistance that has never before been addressed by this Court.

The present claim regarding trial counsel's ineffectiveness is not only legally distinct, it also rests on a set of facts which were previously unavailable to this Court due to trial counsel's ineffectiveness.  Indeed, evidence regarding trial counsel's ineffectiveness could not have been previously presented to the Court, as the Supreme Court has recognized that such claims are to be brought in § 2255 proceedings, and not on direct appeal, as habeas proceedings afford an opportunity for a full record to be developed regarding trial counsel's performance that is otherwise not a part of the existing record.  *See Massaro v. United States*, 538 U.S. 500, 504-506 (2003).  Mr. Lee was thus entitled to the opportunity for further factual development of this claim in the form of an evidentiary hearing, and the district court's refusal to conduct a hearing on this claim below was error.

"A § 2255 movant is entitled to an evidentiary hearing unless 'the motion and the files and records of the case conclusively show that he is entitled to no relief.'"  *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) (quoting 28 U.S.C. § 2255).  A claim may be dismissed without a hearing only if it is inadequate on its face or if the record affirmatively refutes the factual allegations upon which it is based.  *See Shaw v. United States*, 24 F.3d 1040,

88

1043 (8th Cir. 1994). When the claim is one of ineffective assistance of counsel, it is "generally true" that the files and records of the case do not conclusively show that the petitioner is entitled to no relief. *Id.* (holding that district court erred in denying claim of ineffective assistance of counsel without conducting evidentiary hearing at which trial counsel could be questioned about the bases for their actions).

In its order denying Mr. Lee's Motion to Alter or Amend Judgment Pursuant to Fed. R. Civ. P. 59(e), the district court stated that, had it previously been provided with the affidavits that were attached to that Motion, it "might have determined that an evidentiary hearing was required." *Lee,* No. 4:97-cr-243-GTE [Doc. 1189 at 9.] However, there is no legal requirement that Mr. Lee submit affidavits or any other type of documents along with his § 2255 motion, and the court's grafting of such a requirement into the showing necessary to trigger entitlement to a hearing was error. As noted, the law governing evidentiary hearings in § 2255 proceedings is set out in 28 U.S.C. § 2255. Nowhere in that statutory standard is there a requirement that a movant must provide supporting affidavits in order to obtain an evidentiary hearing. The statute merely requires that: (1) the movant allege facts that, if true, would entitle him to relief; and (2) there exist disputed issues of fact on the movant's claim that cannot *conclusively* be resolved on the extant record alone.

Indeed, as the Eleventh Circuit has succinctly explained, the § 2255 motion need only allege the relevant legal and factual bases for relief in order to obtain a hearing; any proof in support of those claims need not be submitted until the time of the hearing:

> The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only *allege* – not prove – reasonably specific, non-conclusory facts that, if true, would entitle him to relief. If the allegations are not affirmatively contradicted by the record and the claims are not patently frivolous, the district court is required to hold an evidentiary hearing. It is in such a hearing that the petitioner must offer proof.

Appellate Case: 11-1380     Page: 89     Date Filed: 06/20/2011 Entry ID: 3799638

*Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) (emphasis in original). *See also Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (noting that, at pleading stage, habeas petitioner "does not need to prove [his claim]; he only needs to allege a *colorable* claim for relief. This is a low bar") (emphasis in original). The district court's decision not to grant a hearing in this case, when it would have done so had affidavits been submitted, improperly grafted a requirement onto the statute that it simply does not contain. A COA should therefore issue on this claim and the case should be remanded with instructions to the district court to conduct a hearing. *See Nelson v. United States*, 297 F. App'x 563 (8th Cir. 2008) (granting in part motion for COA and remanding for evidentiary hearing on claims of ineffective assistance of trial and appellate counsel).

**9. A COA SHOULD ISSUE ON CLAIMS IV.B. AND III.C., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE WITH RESPECT TO THE PENALTY PHASE BY FAILING TO ADEQUATELY CHALLENGE THE PECUNIARY GAIN AGGRAVATING FACTOR**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claims that both his trial and direct appeal counsel were constitutionally ineffective for failing to adequately challenge the jury's consideration of the pecuniary gain aggravating factor at the penalty phase of Mr. Lee's trial. This Court has held that felony murder in which the *underlying felony* was committed for pecuniary gain is not a federal capital offense. *United States v. Bolden*, 545 F.3d 609, 615 (8th Cir. 2008). Rather, the pecuniary gain aggravating circumstance applies "only 'where pecuniary gain is expected to follow as a direct result of the murder.'" *Id.* (quoting *United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002)). It applies, for example, where the murder is

90

Appellate Case: 11-1380     Page: 90     Date Filed: 06/20/2011 Entry ID: 3799638

committed "to remove an obstacle" to the completion of the underlying felony and secure the pecuniary gain. *Id.* at 616.

The district court in this case held that the pecuniary gain aggravator was properly submitted to Mr. Lee's jury because "the Muellers 'were not murdered incidentally, or solely to cover up a crime, but because pecuniary gain was expected to flow directly from the homicide.'" [Doc. 1163 at 77] (quoting *United States v. Mitchell*, 502 F.3d 931, 975 (9th Cir. 2007)). The court based this conclusion on evidence that "William Mueller strongly resisted the robbery," and thus that the jury could have concluded that he had to be killed "in order for the defendants to successfully complete the robbery." *Id.*

This theory relies upon the premise that the murder of the three decedents became necessary because of events that happened to occur while the robbery was in progress, as in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), a case relied upon by the district court. *Lee,* No. 4:97-cr-243-GTE [Doc. 1163 at 73-75.] In *Brown*, the court of appeals held that the pecuniary gain aggravator was properly submitted to the jury in a case in which the defendant was convicted of murdering a postal clerk during the robbery of the post office. *Id.* at 1371. Based on evidence that the decedent struggled during the robbery, and that the decedent was fatally wounded before the defendant gained control of the money orders he was attempting to steal, the court found a reasonable basis upon which the jury could conclude that the murder was necessary in order to successfully complete the robbery and secure the items of pecuniary value. *Id.*

In this case, however, the premise upon which the theory relies is contradicted by the evidence presented at trial. The testimony regarding Mr. Mueller's supposed resistance was contradicted by the physical evidence. The evidence that the district court relied upon to find

91

that Mr. Mueller strongly resisted the robbery came from Gloria and Cheyne Kehoe. Both witnesses insisted that Chevie Kehoe told them that he subdued a struggling Mr. Mueller by bashing in his head with the butt of a shotgun. Tr. 4973 (Gloria Kehoe) ("Chevie used the butt of a shotgun. . . [He said] Bill was putting up such a fight that he had to take the shotgun and hit him over the head, and it busted his head"); Tr. 5328 (Cheyne Kehoe) ("[Chevie] said that he . . . turned the shotgun that he had around and hit Mr. Mueller with the stock of the shotgun and that it shattered the stock of the shotgun. He said he then took it, turned it around and grabbed it by the receiver and hit him in the back of the head with the barrel. He said that he knew it was over when he hit him with the barrel. He said he felt his skull cave in, and Mr. Mueller quit moving at that point"); Tr. 5442 (Cheyne Kehoe) ("[Chevie] said he hit him with the butt of the shotgun . . . [h]e said he felt the skull collapse"). However, the autopsy of Mr. Mueller showed that there were no fractures to his skull, no hemorrhage in the brain tissue that was present and no other evidence of trauma to the head. Tr. 3563.

Additionally, the government's evidence at trial showed that the plan to kill the Muellers was fully formed, at least by Mr. Lee's co-defendant, Chevie Kehoe, before the defendants ever arrived at the Mueller residence, and that the motive for those killings was entirely separate from the incidental robbery. Chevie Kehoe's brother, Cheyne Kehoe, testified that Chevie told him that he took the duct tape and plastic bags with which he killed the decedents with him to the residence. Tr. at 5328, 5329. Chevie told Cheyne that he also took with him in his truck three rocks, which he planned to, and did, use to weigh down the bodies before placing them in the bayou where they were later found. Tr. at 5329. These facts clearly establish that the homicides were planned in advance, and were not the product of William Mueller's decision to physically resist the taking of his property. Indeed, the government argued as much in its closing. Tr. 6821

92

("Chevie Kehoe brought Danny Lee down to Arizona with the plans to do the January 1996 robbery and murder of the Muellers").

This conclusion is further reinforced by evidence that the defendants broke into the Mueller home and waited for the family to return, rather than simply taking the property and leaving town before the Muellers arrived back home. Both Cheyne, Tr. at 5327, and Gloria Kehoe, Tr. at 4972, testified that Chevie told them that they broke into the house and waited for the Muellers. This conduct is even more suggestive of a plan to kill the decedents in light of the fact that Chevie Kehoe and his father, Kirby Kehoe, had burglarized the residence once before, in 1995, discerning no need to wait for the occupants to return home on that occasion. Tr. 5431. Chevie had therefore proven himself eminently capable of simply robbing the property, and yet he chose not to do so in 1996.

Most importantly, Chevie Kehoe told his brother Cheyne that he decided to "do a hit" on the Muellers because he thought that they were government or ATF informants. Tr. 5327, 5444, 5445. Cheyne also testified that their father, Kirby Kehoe, told him that several people around the gun shows had told Kirby to be careful because they thought that Mr. Mueller might be involved in "shady deals" to catch people doing illegal activities. Tr. 5456-57. This testimony was further corroborated by government witness Larry McPheron, who was in jail with Chevie Kehoe in Ohio after Kehoe's arrest in that state. Tr. 4119. McPheron testified that Chevie Kehoe told him that he had acquired an automatic weapon from Mr. Mueller, only to discover that it did not work. Tr. 4122. Chevie stated that this made him mad, and made him suspect that Mueller was attempting to pull some kind of sting operation on him as an informant for the ATF. *Id.* McPheron also testified that Chevie told him that Mueller "had to die" because "they couldn't leave no witnesses." Tr. 2122-23. While Chevie Kehoe plainly also wanted the

93

Appellate Case: 11-1380     Page: 93     Date Filed: 06/20/2011 Entry ID: 3799638

Muellers' money and property, Tr. 5327, 5444, 5445, not a shred of evidence was presented justifying the inference that the murders, as opposed to the burglary and theft, were necessary or committed for that purpose.

This case is thus more analogous to *United States v. Bernard*, 299 F.3d 467, 483-84 (5th Cir. 2002), than *Brown*. In *Bernard*, the Fifth Circuit found the pecuniary gain aggravator to be inapplicable where the defendants carjacked the decedents, put them in the trunk of their car, and used their ATM cards and PIN numbers to attempt to withdraw money at various locations. *Id.* at 472. After several hours, the defendants shot both decedents and set the car on fire. *Id.* at 472-73. The court found that the motive for the murders was not pecuniary gain but rather to prevent the decedents reporting the underlying felonies to police, and thus the pecuniary gain aggravator was inapplicable. *Id.* at 483-84. Similarly, in this case, the evidence establishes the existence of an entirely separate motive for murder, unrelated to the activities that were for the purpose of pecuniary gain, and thus the pecuniary gain aggravator was equally inapplicable.

Reasonable jurists could thus readily disagree with the district court's ruling that the pecuniary gain aggravator was properly submitted to the jury in this case. Reasonable jurists could also differ regarding the court's rulings that trial and appellate counsel rendered effective assistance in their respective handling of this issue. The district court found that trial counsel timely objected to the submission of this aggravating factor and that, even if counsel had not objected, Mr. Lee cannot demonstrate that he was prejudiced because any challenge would have been rejected. *Lee,* No. 4:97-cr-243-GTE [Doc. 1163 at 77-78.] As the foregoing demonstrates, the court's finding regarding the lack of prejudice is, at a minimum, highly debatable. Trial counsel's objection should have been sustained and the aggravating factor stricken, and so Mr. Lee can amply demonstrate prejudice from any deficient performance.

94

Mr. Lee is also entitled to a COA on his claim that his direct appeal counsel rendered ineffective assistance by failing to raise this issue.  A criminal defendant has a constitutional right under the Due Process Clause to the effective assistance of counsel for his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 397 (1985); *Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). This Court reviews claims of ineffective assistance of appellate counsel under the standard announced by the Supreme Court in the Sixth Amendment context in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Bell*, 795 F.2d at 657.  A constitutional violation is established if the petitioner shows that: (1) his "attorney's performance was deficient when compared with the assistance which would have been given by any reasonably competent attorney faced with the same circumstances;" and (2) there is "a reasonable probability that the lawyer's insufficiency made a difference in the outcome of the proceedings."  *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987).  Specifically, where the alleged ineffectiveness is the failure to raise an issue on appeal, the Court looks to whether the issue was "significant and would have been apparent to a reasonably competent appellate attorney," and "whether there is a reasonable probability that the outcome of [the defendant's] appeal would have been different had the issue been raised."  *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998) (finding ineffective assistance of appellate counsel where there was reasonable probability that state supreme court would have found plain error and reversed had omitted issue been raised).

At a minimum, it is debatable amongst jurists of reason whether Mr. Lee may be entitled to relief on this claim.  The meritorious nature of the claim that the pecuniary gain aggravating factor was inapplicable to this case and improperly submitted to the jury, as set forth above, demonstrates that the claim that appellate counsel missed was indeed significant.  The fact that the claim is so meritorious also establishes a reasonable probability that, had it been raised on

95

appeal, this Court would have granted relief, and thus demonstrates prejudice. Finally, the claim would unquestionably have been apparent to a reasonably competent appellate attorney. While Mr. Lee's direct appeal was pending, a closely analogous issue regarding the applicability of the pecuniary gain aggravator was being litigated before this very Court in *United States v. Allen*, 357 F.3d 745, 750-51 (8th Cir. 2004), *vacated en banc on other grounds*, 406 F.3d 940 (2005).

**10. A COA SHOULD ISSUE ON CLAIM II.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING FACTOR**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective for failing to challenge the jury's improper consideration of the invalid multiple murder aggravating factor at the penalty phase of Mr. Lee's trial. Pursuant to the version of the federal death penalty statute in effect at the time of Mr. Lee's trial, the fact that "[t]he defendant intentionally killed or attempted to kill more than one person in a single criminal episode" constituted a statutory aggravating factor for the crime of homicide. *See* 18 U.S.C. § 3592(c)(16). However, that multiple murder aggravating factor was not made a part of the statute until April, 1996, three months after the government claims that the homicides of the Muellers took place. *See United States v. Higgs*, 353 F.3d 281, 300 (4th Cir. 2003). The submission of that factor to Mr. Lee's jury was therefore improper and violated the Ex Post Facto Clause. *Id.* at 300-301. The United States conceded as much below, arguing only that the error was harmless. *See Lee*, No. 4:97-cr-243-GTE [Doc. 1126 at 61-63].

The district court below agreed with the government. The court found that there was another valid statutory aggravating factor presented to the jury with respect to each victim, and so an objection by trial counsel to the invalid multiple murder aggravator would have simply

96

resulted in the submission of that factor to the jury as a non-statutory aggravator and would have had no impact of Mr. Lee's eligibility for a sentence of death. With respect to the two adult victims, however, the only other statutory aggravator found by the jury was pecuniary gain. As noted above, the pecuniary gain aggravator was itself invalid on the facts of this case and should not have been submitted and this Court should grant a COA on that issue and so find. If it does, the prejudice to Mr. Lee from the concededly erroneous submission of the multiple murder aggravator becomes manifest – there was no valid aggravating circumstance with respect to the adult victims, and Mr. Lee was ineligible for the death sentence for those crimes.

It is the case that there was an additional aggravating circumstance presented to the jury with respect to the child victim, namely the vulnerable victim aggravator. However, it is more than reasonably likely that the jury's analysis regarding whether to impose a death sentence for this crime would have been dramatically different had it imposed a sentence of life without possibility of release for the murders of the two adult victims. This is especially so given that it was the government's theory at trial that it was co-defendant Chevie Kehoe who killed Sarah Powell, after Mr. Lee refused to do so. *See* Tr. 4974, 5328. Reasonable jurists could therefore disagree regarding whether the district court correctly denied relief on this claim, and a COA should issue.

97

**11.    A COA SHOULD ISSUE ON CLAIM II.L., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to object to multiple improper and highly prejudicial arguments made by the government during its closing argument at the penalty phase. In its arguments the government disparaged defense counsel at length, made impermissible comparisons between Mr. Lee and his codefendant Chevie Kehoe, argued the necessity of a causal connection between mitigation evidence and the commission of the crimes, argued that Mr. Lee was a "rare" capital defendant because he had been involved in a prior murder, and argued several uncharged aggravating circumstances. Defense counsel's failure to object to any of these arguments constituted deficient performance. Had defense counsel lodged appropriate and timely objections to the misconduct, there is a reasonable probability that the result of the trial would have been different. A COA should therefore issue with respect to this claim.

*Disparaging Defense Counsel*

In closing arguments during the penalty phase the government engaged in extended negative commentary on the motives and character of defense counsel. The consistent message of these references was that defense counsel was manipulating the jury in an underhanded way and somehow trying to mislead or hoodwink them.

In the initial closing the prosecutor argued that: The jury should expect, in the defense closing to follow, "subtle, and . . . effective manipulation," Tr. 7973; the defense used "smoke and mirrors" in suggesting that Mr. Lee suffered from brain damage, which "is easy to come up with," Tr. 7967; and the defense "dumbed . . . down" the brain dysfunction evidence in an effort

98

Appellate Case: 11-1380     Page: 98     Date Filed: 06/20/2011 Entry ID: 3799638

to sell it to the jury. Tr. 7973.  The prosecutor also disparaged defense counsel's submission of the mitigating factor that Mr. Lee lacked a significant adult criminal record by suggesting that it was "like the kid who killed his parents who walked into court, said, 'Take mercy on me.  I'm an orphan.'"  Tr. 7968.

In the rebuttal closing, the second prosecutor continued on this theme, suggesting that defense counsel's argument that Mr. Lee was a follower, was not "appropriate." Tr. 7988. Expounding on this he suggested:

> Ms. Compton [defense attorney for Mr. Lee,] has sort of seized upon that as the theme of her argument with the idea, I think, that it would inevitably lead you to the decision she is requesting.

Tr. 7988-89.  This theme of defense manipulation was a thread that continued throughout the rebuttal closing, as the prosecutor ruminated on defense counsel's thought processes during her preparation of the penalty phase defense:

> I'm over there thinking why is Ms. Compton, putting on all this proof, and why do we have to go to the trouble to rebut this proof? It didn't make any sense to me.  But it makes sense now after I've heard the arguments.  It all made sense to me.  Mrs. Compton knew that her situation, even though Chevie Kehoe was the leader, her situation in defending Danny Lee was way different than Professor Sullivan's situation when he tried to argue for the life of Chevie Kehoe. [] And I just believe Ms. Compton realized that...she couldn't sell grace to you.  She had to go to all this mental stuff....

Tr. 7991.  This commentary on defense counsel's state of mind not only suggested defense counsel's desperation, but also implied a lack of integrity in seizing on a penalty phase defense that was not borne out by the evidence.

Arguments such as these, which focus on the character, thought processes and motives of defense counsel, are "highly improper."  *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir.

99

Appellate Case: 11-1380     Page: 99     Date Filed: 06/20/2011 Entry ID: 3799638

2005).  In *Holmes,* the prosecutor similarly described defense counsel's argument as "smoke and mirrors," *id.*, and also accused defense counsel of manipulation, *id.* ("[Defense counsel] wants to distract you...."). In reversing, the Court held that "[s]uch personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case." *Id.*  There is a clear line between arguing evidence and arguing the character of opposing counsel, and when that line is crossed the prosecutor engages in prohibited misconduct.  *See, e.g., McDonnell v. United States*, 457 F.2d 1049, 1052-53 (8th Cir. 1972) (finding prosecutor deserved censure for describing defense counsel's offer of proof as a "common trick"); *Cline v. United States*, 395 F.2d 138, 141 (8th Cir. 1968) (holding it improper for a prosecutor to accuse defense counsel of dishonesty).  Cliches and metaphors may be less problematic when employed to characterize evidence, *see, e.g., Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010), but when used to assail the integrity of defense counsel, their use is improper.  *Holmes*, 413 F.3d at 775.  It is additionally problematic that some of the offending arguments in this case were made during the rebuttal closing.   Obviously, defense counsel is not in a position to answer improper remarks which focus on his conduct, rather than his client's, when the prosecutor has the last word.  *See, e.g.*, *United States v. Cannon*, 88 F.3d 1495, 1503 (8th Cir. 1996) (reversing a conviction based on a prosecutor's improper remarks during closing and noting, "because the remark came during rebuttal arguments, defense counsel was unable to respond except by objection.").

Unless otherwise instructed, the sentencing jury will surely consider such arguments, as they are presented with the "imprimatur of the Government." *United States v. Young*, 470 U.S. 1, 18-19 (1985).  In the absence of an objection and curative instruction, the jury in this case had free rein to accept the prosecutor's characterizations of defense counsel, and allow those

100

characterizations to influence its view of Mr. Lee's case. Defense counsel rendered deficient performance in failing to object.

*Comparison of the Relative Worth of the Lives of Chevie Kehoe and Mr. Lee*

In both closing arguments, the government invited the jury to compare the worth of co-defendant Chevie Kehoe with the worth of Mr. Lee. These arguments violated Mr. Lee's constitutional right to an individualized sentencing determination, and trial counsel rendered deficient performance by failing to object to them.

Entering into Mr. Lee's penalty phase proceeding, the prosecution was confronted with a problem. Between Chevie Kehoe and Mr. Lee, Chevie Kehoe was the unquestioned leader. At trial, "the proof as a whole left the definite impression that Defendant Kehoe was the orchestrator of the entire RICO operation, and that Defendant Lee served as his subordinate for only a brief portion of the lengthy multi-state conspiracy." *United States v. Lee,* 89 F. Supp. 2d 1017, n. 9 (E.D. Ark. 2000), *rev'd on other grounds, United States v. Lee,* 274 F.3d 485 (8th Cir. 2001). Indeed, the prosecution openly acknowledged before the jury that Chevie Kehoe was the leader. Tr. 7990. Chevie Kehoe, however, had just been spared by the same jury now deciding the fate of his follower, Mr. Lee. The government chose to deal with this problem in a constitutionally impermissible manner, by arguing that Mr. Lee was less deserving of a life sentence than Chevie Kehoe, based on their respective backgrounds. The comparisons between the two defendants were overt, as was the prosecutors' contention that Mr. Lee was the more death-worthy:

> [Y]ou should consider in distinguishing Lee from Kehoe [that] Lee has been here before. Lee has stood in the court of justice. Lee has had the opportunity to regret, and Lee has had that opportunity to change his ways.

Tr. 7964 (initial closing)

101

Appellate Case: 11-1380     Page: 101     Date Filed: 06/20/2011 Entry ID: 3799638

> Chevie is not Danny. The most obvious, and the most glaring
> difference is this. It all comes under the heading of "future
> dangerousness." To begin with, there was no evidence that
> Chevie ever had the opportunity to go repeatedly through the
> system to get out of the house. Remember every time [Danny]
> went into the system, he was taken out of the house and given an
> opportunity to meet with something positive and constructive.
> Chevie didn't have that.

Tr. 7969 (initial closing).

> [D]efending Danny Lee was way different than. . .argu[ing] for the
> life of Chevie Kehoe. And it was way different because of the
> Wavra murder. It was way different because Danny Lee had his
> opportunity before. He had a chance to come in and take a look at
> his life. . .and say "I will make a change." And he didn't.

Tr. 7991 (rebuttal closing).

The government also argued to the jury that Mr. Lee was more likely to be a danger to

others in the future if kept alive than Chevie Kehoe:

> There's no evidence of the prior dangerousness [as to Chevie
> Kehoe]. There's no prior Joey Wavra as to Chevie. There is as to
> Mr. Lee. And there is secondly that most disturbing issue about
> this free-flowing hostility and volatility. [] Danny Lee, you know
> those awful guns that you saw, really ugly guns that you saw?
> Danny Lee is like one of those guns, those deadly lethal weapons,
> loaded, cocked. The only thing Chevie did was point that lethal
> weapon.

Tr. 7970.

That this impermissible comparison was one of the main themes of each of the

government's closings is underscored by the fact that it was the final, emphatic point made in the

initial closing:

> Just go back to that scale. You start with equally culpable
> defendants. [] And you realize the scale is starting to tip. And then
> when you start to add the things that truly separate him from

102

Appellate Case: 11-1380    Page: 102    Date Filed: 06/20/2011 Entry ID: 3799638

> Chevie Kehoe and you realize people are different, and if you walk
> out of this courtroom you can say there was a difference.

Tr. 7974-75.  There could be no clearer comparison of the backgrounds of the defendants, than the condemnatory message that "what separate[s]" Chevie Kehoe from Mr. Lee "tips" the "scale" in favor of death for Mr. Lee.

These comments, which direct the jury to compare the value of one defendant's life to another's, represent the antithesis of the individualized consideration required by the Constitution in capital sentencing proceedings.  In an unbroken string of cases beginning with *Woodson v. North Carolina*, 428 U.S. 280 (1976), the Supreme Court has held that individualized consideration of a defendant's evidence is a central feature of a constitutional capital sentencing procedure.  *See, e.g., Stringer v. Black*, 503 U.S. 222, 230-31 (1992) (vague aggravating factor denied defendant "individualized consideration"); *Parker v. Dugger*, 498 U.S. 308, 322 (1991) (appellate court's failure to reweigh aggravating and mitigating factors after striking two aggravating factors failed to provide "individualized treatment"); *Clemons v. Mississippi,* 494 U.S. 738, 751  (1990) (reweighing required to provide individualized treatment).  "The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." *Lockett v. Ohio,* 438 U.S. 586, 605 (1978).  The unique finality of the death penalty requires a uniquely certain determination of the appropriateness of the penalty.  "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305.  The "individualized consideration" doctrine ensures that a death

103

verdict is not based on a trial process that "interjects irrelevant considerations into the jury's decision-making process." *Beck v. Alabama*, 447 U.S. 625, 642 (1980).

The district court's decision to hold separate penalty phase proceedings for Mr. Lee and Chevie Kehoe was no doubt designed to promote individualized consideration for each defendant, by preventing evidence relating to one defendant from being used in aggravation against the other. A joint penalty phase proceeding is often antithetical to this goal. *See, e.g., Foster v. Commonwealth,* 827 S.W.2d 670, 683 (Ky. 1991) (reversing death sentence where co-defendant's evidence, prejudicial to defendant, was introduced at joint penalty phase proceeding). The benefit of a separate penalty proceeding, however, was vitiated in this case when the co-defendant's mitigation was argued as aggravation against Mr. Lee during his penalty phase proceeding. The prosecutors' arguments regarding Chevie Kehoe's life circumstances interjected a wholly irrelevant consideration into the jury's deliberations and denied Mr. Lee the right to individualized consideration. Defense counsel rendered deficient performance by failing to object.

*Argument Requiring Nexus Between Mitigating Evidence and Commission of the Capital Crime*

The government suggested several times in closing argument that the mitigation evidence presented on behalf of Mr. Lee did not lessen his criminal responsibility for the acts, and thus should be disregarded by the jury. Tr. 7966, 7970-71. These arguments improperly imposed upon the defense a burden of proving a nexus between evidence in mitigation and the commission of the crimes. Such a requirement does not exist. *See, e.g., Abu-Kabir v. Quarterman,* 550 U.S. 233, 259 (2007) (requirement that mitigation evidence rebut either "deliberateness" or "future dangerousness" is impermissible limitation on consideration of mitigation); *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (rejecting "nexus" requirement

104

between mitigation evidence and crime); *Williams v. Taylor*, 529 U.S. 362, 398 (2000)

(mitigation evidence "may alter the jury's selection of penalty, even if it does not undermine or

rebut the prosecution's death-eligibility case").  The evidence in mitigation was never offered as

a defense or as an explanation for the criminal conduct, nor could it have been; rather, it was

offered to suggest to the jury that, despite the offense for which they had just convicted him, they

should spare his life and punish him with life imprisonment.  The government's

mischaracterization of the value and purpose of mitigation evidence surely negated its

significance in the minds of the jurors.

In response to mitigating evidence of Mr. Lee's brain dysfunction the prosecutor argued:

> He has a learning disability.  That does not explain this behavior.
> Because he can't spell, because he has learning disability in
> regards to math does not alleviate his responsibility in this case.

Tr. 7966.

> He suffers from a learning disability.  Working with a learning
> disability would not have made him less a killer.

Tr. 7967.  The argument of the prosecutor in the first excerpt, that because Mr. Lee's learning

disability "does not alleviate" his criminal responsibility he should not receive the benefit of the

mitigating factor, is impermissible under *Abul-Kabir, Tennard,* and *Williams.* The argument in

the second excerpt, that even if Mr. Lee's learning disability had been addressed he still would

have committed this crime, is similarly improper.

The same prosecutor then argued in response to mitigating evidence of Mr. Lee's

introduction to drugs and alcohol as a child:

> Was he high on drugs while he was bagging the Muellers?  Did he
> do this crime for money to buy drugs?  Did the drugs make him
> dangerous and crazy?  Do you know?  In order to be satisfied with
> that mitigating factor, they have to prove something that makes it

105

make sense. But, as bad as drugs are, drugs don't make you do the crimes that this man has done.

Tr. 7970-71. Again, the prosecutor argued that there must be a connection between the mitigating factor, "introduction to drugs and alcohol while still a child," and the commission of the crime, for the jury to find the mitigating factor.

Finally, in response to mitigating evidence of abuse, abandonment and neglect suffered by Mr. Lee as a child, the prosecutor argued:

> Is Danny's stepfather responsible for these crimes? Did he place these bags over the Muellers' heads? They are going to argue figuratively he did. Did Lea Graham help tape the rock to Sarah Mueller's abdomen? They are arguing Lea Graham figuratively did.

Tr. 7972. As with the prosecutor's other comments, this argument essentially misinstructed the jury that to find this mitigating factor they had to find that the treatment of Mr. Lee by his relatives was responsible for the commission of the murders. After these arguments were pressed upon the jury, it is unsurprising that, despite significant evidence of brain dysfunction, abuse, abandonment and neglect, and Mr. Lee's introduction to drugs and alcohol as a child, no juror found any of those mitigating factors to exist. Tr. 8019. Defense counsel was ineffective for failing to object to these improper arguments.

*Argument that it is "Rare" for a Defendant With a Prior Murder Charge to Appear Before a Death Penalty Jury.*

In closing the government argued the following:

> Usually you commit a murder, and you get sent away for a very long time. And you don't get an opportunity for a do over. [] It is rare for a murderer like Danny Lee to stand before a jury who is about to determine his death penalty, who has an earlier murder under his belt, who has a prior victim's blood on his hands.

106

Tr. 7963-64.  The rarity of a capital defendant with a prior murder, however, was a fact that was never proven.[16]  There was no basis, whatsoever, for the prosecutor to make this claim.  A prosecutor commits misconduct when he directs a jury to consider purported facts not in evidence.  *See e.g., United States v. Beckman,* 222 F.3d 512, 527 (8th Cir. 2000) (finding reversible error after prosecutor argued fact not in evidence - that defendant failed a drug test - notwithstanding his belief that it was true); *Newlon v. Armontrout*, 885 F.2d 1328, 1335 (8th Cir. 1985) (death sentence reversed due in part to prosecutor's argument "premised on facts not in evidence" which implied he had "knowledge outside the record").

*Un-Noticed Non-Statutory Aggravating Factors*

The Federal Death Penalty Act (FPDA) provides that the government may present nonstatutory aggravating factors, but only when "notice has been given." 18 U.S.C. 3592(c).  In the instant case several nonstatutory aggravating factors were argued to the jury for which no notice was ever provided.  This violated Mr. Lee's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, as well as his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.  Mr. Lee was entitled in advance to know the nature and extent of the aggravating factors that he had to confront, so that he would be able to prepare the most effective defense to those factors.  *See, e.g., Goodloe v. Parratt*,  605 F.2d 1041, 1046 (8th Cir. 1979) (when "[t]he defendant is given insufficient notice to prepare a defense . . . the prosecution is left free to roam at large to shift its theory . . . so as to take advantage of each passing vicissitude . . . . ") (citations omitted).

---

[16]  There is a real question as to how "rare" this situation really is, considering the fact that most death penalty jurisdictions have a "prior murder" aggravating factor,  *see* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme,* 6 William & Mary Bill of Rights J., 345 (1998), and considering the number of reported cases in which this aggravating factor appears.

107

While the government's arguments may have referenced evidence elicited to rebut Mr. Lee's evidence in mitigation, the evidence was not *argued* in this way; rather it was argued as uncharged aggravation. When evidence is admitted for a limited purpose, defense counsel performs deficiently when he allows the government to argue inferences beyond the limitation, without correction. *See, e.g., Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) ("After the prosecutor drew the jury's attention to the damaging statement and invited them to draw the precise inference that a limiting instruction would have forbidden, [] trial counsel's failure to request a limiting instruction fell below an objective standard of reasonableness.") (citations omitted).

The government argued the following uncharged nonstatutory aggravating factors:

1. The government discussed an incident in which Mr. Lee allegedly threatened, Nancy Cummings, a sheriff's deputy, with violence. Tr. 7958-59. The incident involved Mr. Lee "banging and kicking" at a door, "yelling obscenities," and telling the deputy "I'm going to kill you, like I killed the others." *Id.* The prosecutor concluded his discussion of this incident by admonishing the jury as follows:

> Do you want to send Mr. Lee to prison for the rest of his life, as will shortly be requested, with his history of assaulting staff, with a history of assaulting fellow patients or inmates? We do have a responsibility at this juncture to ask ourselves this question. Who is going to be the next Nancy Cummings? And will he or she be so lucky? And you have the right to be concerned.

*id.*

2. The government referenced assaults by Mr. Lee against his family, other individuals, other inmates, patients and institutional staff, in support of its argument that he "is a violent and dangerous man." Tr. 7960.

108

3. The government argued as an aggravating factor that it was rare for a capital defendant to have committed a prior murder. Tr. 7964. As discussed above, this highly prejudicial argument was presented without any factual support, and was improper for that reason. The argument was also improper because the defense received no notice of this nonstatutory aggravating factor.

4. As discussed above, the government exerted considerable effort in comparing the life of Chevie Kehoe with the life of Mr. Lee. While these arguments violated Mr. Lee's rights to individualized consideration, they also violated his right to notice of nonstatutory aggravation. The information conveyed to the jury about Chevie Kehoe's greater suitability for a life sentence constitutes evidence of aggravation. Indeed the evidence was presented in a rather detailed way, characterizing Chevie Kehoe and his background in markedly different terms than Mr. Lee (i.e., more life-worthy). Of course defense counsel did not receive notice of this aggravating factor, for such argument, pursuant to *Woodson* and its progeny, was impermissible.

Some of the impermissible arguments were offered in support of a finding of the non-statutory aggravating factor of future dangerousness. However, the statutorily required notice to defense counsel regarding this factor contained only three predicate elements: The commission of a prior murder, the commission of a prior misdemeanor, and Mr. Lee's alleged lack of remorse. Tr. 8017. The government provided this explicit notice and was bound by it. *Goodloe,* 605 F.2d at 1046. In *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001), this Court noted that Mr. Lee obtained "a limiting instruction which told the jury it could consider only future dangerousness evidence which had been brought out in the government's case in chief." The fact that the government proceeded to ignore this limitation and argue improperly that that the jury should rely on other prejudicial evidence to find that Mr. Lee would be a danger in the

109

future vitiated the effectiveness of that instruction. *See, e.g., United States v. Van Eyl*, 468 F.3d 428, 436, 438 (7th Cir. 2006) (upholding district court grant of new trial based on prosecutor's argument ignoring trial court's limitation on permissible use of evidence"). Defense counsel's failure to object to these arguments was unreasonable.

*Prejudice*

But for defense counsel's repeated failures to object to the numerous improper government arguments, there is a reasonable probability that Mr. Lee would have received a life sentence. In order to establish a constitutional violation, Mr. Lee must show that, but for counsel's deficient performance there is a reasonable probability that the outcome of the proceeding would have been different. *Sinisterra v. United States,* 600 F.3d 900, 909 (8th Cir. 2010); *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In order to assess prejudice, a reviewing court must evaluate the cumulative impact of all of the improper government arguments. *See, e.g., United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) ("Prejudice. . . may result from the cumulative effect of repeated improper comments by the prosecutor"). Considering the relative brevity of the government's closings,[17] and the number, variety and significant prejudice of the improper arguments, their cumulative effect was extremely powerful. Improper arguments appeared early in the closings, Tr. 7958, re-appeared incessantly throughout, and continued through the very end of the rebuttal closing, Tr. 7974-75. The prejudice was undiminished by any curative instructions because defense counsel failed to object to any of the arguments.

Nor is this a case in which the government's case for death was overwhelming. *See Strickland,* 466 U.S. at 701 (holding that prejudice should be assessed in light of the strength of

---

[17]    The initial and rebuttal closings took up a total of 25 pages of transcript. Tr. 7956-75; 7992-98.

110

the government's case). The nature of a defendant's role in a capital crime is a crucial consideration for a sentencing jury. *Lockett v. Ohio,* 438 U.S. 586, 608 (1978). In this case the government's theory was that Chevie Kehoe was the planner and leader of all of the criminal activities undertaken by him and Mr. Lee. As noted above, the trial court recognized this fact, *United States v. Lee,* 89 F. Supp. 2d 1017, n. 9 (E.D. Ark. W.D. 2000), *rev'd on other grounds*, *United States v. Lee,* 274 F.3d 485 (8th Cir. 2001). Additionally, the government alleged that what is arguably the most heinous act to have taken place during the course of all of the incidents in this case, the murder of eight year old Sarah Powell, was committed solely by Chevie Kehoe because Mr. Lee would not participate in taking her life. Tr. 4974.

Notwithstanding Chevie Kehoe's significantly greater culpability, he received a life sentence from the jury. Accordingly, there is at least a reasonable probability, that but for defense counsel's consistent failure to object to repeated instances of improper and prejudicial prosecutorial argument, all of which was dedicated to convincing the jury that the less culpable Mr. Lee was more deserving of death, there is a reasonable probability that Mr. Lee too would have received a life sentence. A review of the government's closing penalty phase arguments in Chevie Kehoe's trial only strengthens this conclusion. Tr. 7259-69, 7293-96. Unlike the closings for Mr. Lee, the government offered no improper arguments against Chevie Kehoe. No comparisons to Mr. Lee were offered, there were no misstatements of evidence or law, no name calling of Chevie Kehoe nor disparagement of his counsel occurred, and no evidence of uncharged aggravating factors was argued. After hearing constitutionally permissible closing arguments, urging death for the admittedly more culpable Chevie Kehoe, the jury returned a life verdict. There is every reason to believe that the jury would have returned the same life verdict

111

for Mr. Lee, had the government's closings in his case been constitutionally permissible as well. A COA should issue on this claim.

*Appellate Ineffectiveness*

A criminal defendant has a constitutional right under the Due Process Clause to the effective assistance of counsel for his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 397 (1985); *Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). This Court reviews claims of ineffective assistance of appellate counsel under the standard announced by the Supreme Court in the Sixth Amendment context in *Strickland v. Washington*, 466 U.S. 668 (1984). *Bell*, 795 F.2d at 657. A constitutional violation is established if the petitioner shows that: (1) his "attorney's performance was deficient when compared with the assistance which would have been given by any reasonably competent attorney faced with the same circumstances;" and (2) there is "a reasonable probability that the lawyer's insufficiency made a difference in the outcome of the proceedings." *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987). Specifically, where, as here, the alleged ineffectiveness is the failure to raise an issue on appeal, the Court looks to whether the issue was "significant and would have been apparent to a reasonably competent appellate attorney," and "whether there is a reasonable probability that the outcome of [the defendant's] appeal would have been different had the issue been raised." *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998) (finding ineffective assistance of appellate counsel where there was reasonable probability that state supreme court would have found plain error and reversed had omitted issue been raised). Considering the cumulative effect of the numerous improper and prejudicial arguments made during the course of the government's penalty phase closings, the significance of the issue would have been apparent to a reasonably competent appellate attorney,

112

and if the issue had been raised, there is a reasonable probability that Mr. Lee's appeal would have been granted.

**12.    A COA SHOULD ISSUE ON CLAIM III.B., THAT APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON DIRECT APPEAL BY FAILING TO  CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING FACTOR**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his direct appeal counsel were constitutionally ineffective for failing to challenge the jury's improper consideration of the invalid multiple murder aggravating factor at the penalty phase of Mr. Lee's trial.  Pursuant to the version of the federal death penalty statute in effect at the time of Mr. Lee's trial, the fact that "[t]he defendant intentionally killed or attempted to kill more than one person in a single criminal episode" constituted a statutory aggravating factor for the crime of homicide.  *See* 18 U.S.C. § 3592(c)(16).  However, that multiple murder aggravating factor was not made a part of the statute until April, 1996, three months after the government claims that the homicides of the Muellers took place. *See United States v. Higgs*, 353 F.3d 281, 300 (4th Cir. 2003).  The submission of that factor to Mr. Lee's jury was therefore improper and violated the Ex Post Facto Clause. *Id.* at 300-301.  The United States conceded as much below, arguing only that the error was harmless.  *See Lee*, No. 4:97-cr-243-GTE [Doc. 1126 at 61-63].

Where a death sentence is based in part on an invalid aggravating factor that should never have been submitted to the jury, that sentence "is unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentence to give aggravating weight to the same facts and circumstances." *Brown v. Sanders*, 546 U.S. 212, 220 (2006) (emphasis in original). *See also Rousan v. Roper*, 436 F.3d 951, 962-64 (8th Cir. 2006); *Clayton v. Roper*, 515 F.3d 784, 792-93

113

(2008).  If not, there is a constitutionally impermissible risk that the jury's verdict was skewed from its "consideration *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty."  *Brown*, 546 U.S. at 221.  The requisite analysis thus requires the reviewing court to examine each of the remaining aggravating factors that were properly submitted to the jury and to determine whether any of them would have enabled the juror to consider as aggravating the facts and circumstances that supported the invalid factor.  *Id.* at 223-24; *Rousan*, 436 F.3d at 964; *Clayton*, 515 F.3d at 792-93.

In addition to the invalid multiple murder aggravator, the jury found two other aggravating factors with respect to the Nancy and William Mueller homicides: the statutory aggravating factor of commission of murder in the expectation of receipt of something of pecuniary gain, and the non-statutory aggravator of future dangerousness.  Tr. 8017, 8020.  With respect to the Sarah Powell homicide, the jury also found a third statutory aggravator, that she was a vulnerable victim.  Tr. 8020. None of these aggravating factors enabled the jury to give aggravating weight to the facts and circumstances underlying the invalid multiple murder aggravator.

The pecuniary gain aggravator was also invalid under the facts of this case and should not have been submitted to the jury.  *See infra*, pp. 90-96.  Even if it had been validly submitted, this factor, focused on the defendants' expectation of receiving items of pecuniary value, did not enable the jury to give aggravating weight to the fact that multiple murders had been committed. Both aggravators are statutory aggravators, which means in the federal system that they are the factors that determine whether a defendant is eligible for the death sentence.  *See* 18 U.S.C. § 3593(d) (directing that, if no statutory aggravating factor is unanimously found to be present by the jury, the defendant shall not be sentenced to death).  And as the Supreme Court held in

114

*Brown*, death-eligibility factors "by definition identif[y] distinct and particular aggravating features," such that facts relevant to one cannot be considered as relevant to another. *Brown*, 546 U.S. at 217. The same is true of the vulnerable victim aggravator found with respect to Sarah Powell. It, too, is a statutory aggravator, see 18 U.S.C. § 3592(b)(11), and plainly has no relation to the facts of the multiple murder aggravator. Under *Brown*, then, the submission of the multiple murder aggravating factor was clear constitutional error.

In light of the foregoing, it is manifestly debatable amongst jurists of reason whether Mr. Lee's appellate counsel rendered constitutionally ineffective assistance by failing to raise this issue on direct appeal. A criminal defendant has a constitutional right under the Due Process Clause to the effective assistance of counsel for his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 397 (1985); *Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). This Court reviews claims of ineffective assistance of appellate counsel under the standard announced by the Supreme Court in the Sixth Amendment context in *Strickland v. Washington*, 466 U.S. 668 (1984). *Bell*, 795 F.2d at 657. A constitutional violation is established if the petitioner shows that: (1) his "attorney's performance was deficient when compared with the assistance which would have been given by any reasonably competent attorney faced with the same circumstances;" and (2) there is "a reasonable probability that the lawyer's insufficiency made a difference in the outcome of the proceedings." *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987).

Specifically, where the alleged ineffectiveness is the failure to raise an issue on appeal, the Court looks to whether the issue was "significant and would have been apparent to a reasonably competent appellate attorney," and "whether there is a reasonable probability that the outcome of [the defendant's] appeal would have been different had the issue been raised." *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998) (finding ineffective assistance of appellate counsel

115

where there was reasonable probability that state supreme court would have reversed had omitted issue been raised).

At the very least, it is debatable amongst jurists of reason whether appellate counsel was ineffective for missing this claim. The meritorious nature of the claim that the penalty phase instruction was unconstitutionally inaccurate and misleading, as set forth above, demonstrates that the claim that appellate counsel missed was indeed significant. The fact that the claim is so meritorious also establishes a reasonable probability that, had it been raised on appeal, this Court would have granted relief, and thus demonstrates prejudice. Because Mr. Lee's trial counsel failed to object to submission of the aggravator at the time of trial, this Court's review would have been for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Barbiar*, 410 F.3d 432, 433 (8th Cir. 2005). To establish plain error, appellate counsel would have had to show (1) an error occurred, (2) that is plain, and (3) affected Mr. Lee's substantial rights and seriously affected the fairness, integrity, or public reputation of the proceedings. *Id.* (quoting *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc)). The submission to the jury of an aggravating factor that was not even in existence at the time of the homicides would have easily met this standard.

Finally, the claim would unquestionably have been apparent to a reasonably competent appellate attorney. As early as 1984, two justices of the United States Supreme Court noted that "the retroactive application of a statutory aggravating factor [is] in violation of the Federal Constitution's prohibition against ex post facto punishments." *Justus v. Florida*, 465 U.S. 1052 (1984) (Marshall and Brennan, JJ., dissenting from denial of cert.). *Higgs*, too, was decided by the Fourth Circuit before appellate counsel filed their direct appeal brief on behalf of Mr. Lee, and at least one court had found that retroactive application of the Federal Death Penalty Act

116

would violate the Ex Post Facto Clause, in part because it added new statutory aggravating factors. *United States v. Safarini*, 257 F. Supp. 2d 191, 200 (D.D.C. 2003). A reasonably competent appellate attorney would therefore not have failed to recognize the unconstitutionality of the multiple murder aggravator submitted in this case.

**13. A COA SHOULD ISSUE ON CLAIM II.E., THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE INDICTMENT FOR ITS LACK OF STATUTORY AGGRAVATING FACTORS NECESSARY TO IMPOSE A DEATH SENTENCE**

It is at least debatable among jurists of reason and worthy of further review whether the district court correctly denied Mr. Lee's claim that his trial counsel rendered ineffective assistance at the penalty phase by failing to move to quash the indictment on the ground that it failed to allege the two statutory aggravating factors submitted to Mr. Lee's jury for the two adult victims. Because the existence of a statutory aggravating factor determines a defendant's eligibility for the death penalty, the Fifth Amendment to the United States Constitution requires that statutory aggravating factors be charged in the indictment. *United States v. Allen,* 406 F.3d 940, 942 (8th Cir. 2005). Although appellate counsel raised this error on appeal, *United States v. Daniel Lewis Lee,* No. 02-2389, (8th Cir.) [Doc. 170350 at 39-43], the claim was reviewed under a stringent plain error standard. *See United States v. Olano,* 507 U.S. 725, 735-36 (1993) (plain error standard applicable when claim is "forfeited" at trial). Had the claim been raised and denied at trial, this Court would have reviewed the error under the standard announced in *Chapman v. California,* 386 U.S. 18, 24 (1967), which requires the government to prove that the error was harmless beyond a reasonable doubt. Under that lesser standard, it is at least debatable among jurists of reason that relief would have been granted, because a properly instructed grand jury could not have found legally sufficient evidence of either of the alleged statutory aggravating factors. Additionally, had trial counsel objected to the indictment, this Court may

117

never have had occasion to even review the claim; there is at least a reasonable probability that the district court would have refused to allow the aggravating factors to be submitted to the jury, or would have required the aggravating factors to be considered by the grand jury before allowing the case to proceed capitally. Defense counsel was ineffective for failing to raise this issue before the district court, and but for this failure there is reasonable probability that Mr. Lee would have been granted relief at trial, or on direct appeal. A COA should therefore issue with respect to this claim.

"Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243, n.6 (1999). In *Ring v. Arizona,* 536 U.S. 584, 609 (2002), this requirement was held to apply to aggravating factors in death penalty prosecutions. *Ring* did not address the indictment issue; however, the decision has been held by this Court to require, pursuant to the Fifth Amendment indictment clause, that "capital aggravating factors [] be found by the grand jury and included in the indictment." *United States v. Allen,* 406 F.3d 940, 942 (8th Cir. 2005). This requirement applies retroactively to the instant case, because this case was still pending on direct review when *Ring* was decided. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). Therefore, Mr. Lee's indictment, which did not include the statutory aggravating factors alleged by the government, failed to fulfill this requirement and was thus invalid.

Defense counsel performed deficiently by failing to move to quash the indictment. At the time of Mr. Lee's trial, it was standard procedure nationally among counsel in federal capital trials to object to indictments that failed to allege statutory aggravating factors. It was not long

118

after counsel began raising this argument that it was vindicated by the Supreme Court in *Ring.* There are numerous reported cases in which defense counsel, before the trial was held in the instant case, raised the argument. *See, e.g., United States v. Allen,* 247 F.3d 741, 761 (8th Cir. 2001), *vacated sub nom, Allen v. United States,* 536 U.S. 953 (2002); *United States v. Spivey,* 958 F. Supp. 1523, 1527 (D.N.M. 1997); *United States v. Johnson,* No. 96 CR 379 U.S. Dist. LEXIS 12620 at *16 (N.D.Ill. August 20); *United States v. Nguyen,* 928 F. Supp. 1525, 1545 (D.Kan. 1996).

In view of this national standard of practice it is no answer to defense counsel's failure to raise the claim that *Ring* had yet to be decided. "[T]he law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change." *Model Rules of Professional Conduct,* American Bar Association, Comment to Rule 3.1. For this reason, "[m]ore is expected from a reasonably competent attorney, especially one in a major criminal case, than merely to parrot Supreme Court cases. A law student could do as much." *Everett v. Beard,* 290 F.3d 500, 513 (3rd Cir. 2002) (finding ineffectiveness for failure to object to instruction, even though instruction had never been disapproved by state supreme court, and noting that "reasonably competent attorney is not strictly confined to the law as enunciated by the decisions of the jurisdiction's highest court."); *See also Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000) (although the circuit court had never disapproved of the use of evidence of prearrest silence evidence, "counsel should have realized that the use of [defendant's] prearrest silence against him was at least constitutionally suspect and should have lodged an objection on that basis. Counsel's failure to have objected at any point is inexplicable, and we can perceive no possible strategic reason for such failure").

119

Thus, trial counsel must consider not only the current state of the law, but also good faith arguments for changes in the law. This rule is particularly important in death penalty cases. The United States Supreme Court has emphasized that heightened standards of reliability apply in death penalty cases—that "death is different." *California v. Ramos*, 463 U.S. 922, 998-999 (1983) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 117-118, (O'Connor, J., concurring), *Beck v. Alabama*, 447 U.S. 625, 637-638 (1980) (opinion of Stevens, J., joined by Burger, C.J., Brennan, Stewart, Blackmun, and Powell, JJ.); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (opinion of Burger, C.J., Stewart, Powell, and Stevens, JJ.), *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (opinion of Stevens, Stewart, and Powell, JJ.); id., at 363-364 (White, J., concurring in the judgment), *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). .

The Commentary to Guideline 10.8 of the American Bar Association *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (hereafter "ABA Guidelines"), specifically notes that counsel must raise issues calling for a change in the law: "[C]ounsel also has a duty, pursuant to Subsection (A)(3)(a)-(c) of this Guideline, to preserve issues calling for a change in existing precedent; the client's life may well depend on how zealously counsel discharges this duty." In the introduction to the ABA Guidelines, the authors also note the importance of presenting grounds that may not appear meritorious to preserve them for later review:

> [C]ounsel throughout the process, must raise every legal ground that may ultimately prove meritorious, lest default doctrines later bar its assertion.
>
> [T]he courts have shown a remarkable lack of solicitude for prisoners— including ones executed as a result—whose attorneys through no fault of the prisoners were not sufficiently versed in the law to . . . consider the possibility that a ground long rejected by local, state, and federal courts nonetheless might succeed in the future or in a higher court.

120

ABA Guidelines, citing 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.2(a), at 482 (4th ed. 2001). For all of these reasons, defense counsel performed deficiently, as that term is defined by *Strickland v. Washington,* 466 U.S. 668, 687 (1984), by failing to object to the indictment in the instant case.

A determination of *Strickland* prejudice is informed by the analysis advanced in the preceding section at pp. 90-96, pertaining to the validity of the pecuniary gain aggravating factor. In that section, Mr. Lee has argued that it is at least debatable among jurists of reason whether the district court was correct in its ruling denying his claims that both his trial and direct appeal counsel were constitutionally ineffective for failing to adequately challenge the jury's consideration of the pecuniary gain aggravating factor at the penalty phase of Mr. Lee's trial. Mr. Lee incorporates that discussion herein. That claim is predicated on the argument that the evidence presented at trial was legally insufficient to establish the pecuniary gain aggravating factor.

It is axiomatic that, if the evidence was legally insufficient to establish the pecuniary gain aggravating factor before the petit jury, the grand jury could not have returned an indictment charging Mr. Lee with the factor. That would have left the grand jury without any valid statutory aggravating factors with respect to the murders of Bill and Nancy Mueller, because the other alleged statutory aggravating factor, multiple murder, was invalid on *ex post facto* grounds. *See* pp. 98-113, *supra.*

Given the invalidity of both statutory aggravating factors, but for counsel's failure to object to the indictment, there is a reasonable probability that the result of Mr. Lee's trial would have been different. An objection would have impelled the district court to rule in one of three possible ways. The court could have refused to submit the statutory aggravating circumstances

121

to the jury.  This would have ensured a non-capital trial with no risk of death.  It could have

ordered the government to submit the aggravating factors to a grand jury for its consideration,

consistent with the requirement of the Fifth Amendment indictment clause.  In that event, the

jury would have had no basis upon which to charge Mr. Lee with either aggravating factor, and

this too would have ensured a non-capital trial.  Finally, the district court could have overruled a

defense objection and allowed the case to proceed to trial as a capital case.  Had that occurred,

the result of the appellate proceeding would have been different.  On direct appeal, this Court

would have conducted a *Chapman* harmless error analysis, instead of applying the stringent plain

error standard that was required due to trial counsel's failure to object to the defect in the

indictment.

This Court has explained how to conduct a *Chapman* harmless error analysis when an

indictment is defective under *Ring*.  *United States v. Allen,* 406 F.3d 940, 945 (8th Cir. 2005).

The question a reviewing court must answer "is whether any rational grand jury . . . would have

found the existence of . . . one or more of the statutory aggravating factors found by the petit jury

if the grand jury had been asked to do so." *Id.*  Had the Court been given the opportunity to

apply the *Chapman* standard to the factual circumstance of this case, it is at least reasonably

likely that it would have granted Mr. Lee relief on the ground that no rational grand jury could

have found the two invalid aggravating factors alleged in this case.  Thus, but for trial counsel's

deficient performance there is reasonable probability that Mr. Lee would have either been

granted relief at trial  or on direct appeal under the *Chapman* standard.

Finally, even if there had been sufficient evidence to charge Mr. Lee with the pecuniary

gain aggravating factor, the failure to object to the defective indictment, under the facts of this

case, would still satisfy the prejudice standard of *Strickland.*  In *United States v. Cotton,* 535 U.S.

122

625, 632 (2002) the defendant challenged a defective indictment for its failure to allege a fact, drug quantity, that increased the statutory maximum sentence. As here, the defendant in *Cotton* failed to raise the issue in the district court, and because it was first raised on direct appeal, the Supreme Court applied the stringent plain error standard. Even under this standard, the Court grounded its decision upon the fact that the evidence supporting the increase in the statutory maximum was "overwhelming" and "essentially uncontroverted." *Id.* at 633. The Court acknowledged that the "grand jury right serves a vital function in providing for a body of citizens that acts as a check on prosecutorial power," *id.* at 634, giving no indication that mere sufficiency of the evidence at trial would ever suffice to nullify the role of the grand jury. In Mr. Lee's case, even if one were to assume legal sufficiency of the pecuniary gain aggravating factor, based on the discussion in Section 1, *supra* above at pp. 12-13, the evidence in support of the factor cannot reasonably be termed "overwhelming" or "essentially uncontroverted." Absent overwhelming or uncontroverted evidence, due deference to the grand jury function counsels against assuming that the grand jury would have brought the charge. *See also Stirone v. United States,* 361 U.S. 212, 219 (1960) (notwithstanding evidentiary support, Court disallowed charge not made in the indictment, declaring that "we cannot know whether the grand jury would have included in its indictment [the] charge...."). This Court has also recognized the crucial importance of the grand jury, choosing in *Allen* to analyze what the grand jury would have done based on the evidence the grand jury had before it, without considering the entire record and or the petit jury's verdict on the statutory aggravating factors.

For all of the above reasons, but for defense counsel's deficient performance in failing to object to the defective indictment in this case, there is a reasonable probability that Mr. Lee

123

would not have been charged with any statutory aggravating factors and therefore would not have been subject to the death penalty. A COA should issue with respect to this claim.

**14.    A COA SHOULD ISSUE WITH RESPECT TO THE DISTRICT COURT'S DENIAL OF MR. LEE'S MOTION TO ALTER AND AMEND JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling refusing to consider the affidavits attached to Mr. Lee's Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e) and denying the Motion as a result. The court's ruling was based upon its erroneous conclusion that the Motion was the equivalent of a second or successive § 2255 motion which it lacked jurisdiction to consider. In fact, it was well within the court's discretion to consider the motions and affidavits and to grant the requested relief. A COA should issue on this claim.

In its Order Denying Post-Judgment Relief, the district court stated that, had the affidavits accompanying the Rule 59(e) motion been provided to the court before it ruled on Mr. Lee's § 2255 motion, "the Court might have determined that an evidentiary hearing was required." *Lee,* No. 4:97-cr-243-GTE [Doc. 1189 at 9.]   However, the court further found that it was "foreclosed by existing legal principles from considering the information now, absent permission and direction from the Eighth Circuit to do so." *Id.* at 10. Although it did not cite the statutory provision, the court was clearly referring to the restriction contained in 28 U.S.C. § 2255(h) upon the filing of second or successive motions absent authorization by the circuit court. *See* 28 U.S.C. § 2255(h) ("A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals"); 28 U.S.C. § 2244(b)(3)(A) ("Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district

124

court to consider the application."). The government had urged the court to deny the motion on that ground in its response thereto. *Id.* [Doc. 1170.] The government and the district court were wrong; a Rule 59(e) motion such as that filed by Mr. Lee is not the equivalent of a second or successive motion.

The argument made by the government and accepted by the court relies on a gross distortion of the Supreme Court's decision in *Gonzalez v. Crosby*, 545 U.S. 524 (2005), whose scope and applicability was restricted to motions filed pursuant to Rule 60(b), not Rule 59(e). There are stark policy differences between Rule 59 and Rule 60 that explain why a Rule 59(e) motion properly addresses the Court's resolution of the merits of the § 2255 claims, while a Rule 60(b) motion may not – most notably, because a Rule 59(e) motion expressly suspends the finality of the judgment so that errors of law and fact brought to the attention of the district court may be corrected before a final judgment is entered and the case proceeds to the circuit court.

In *Gonzalez*, the Supreme Court addressed the narrow question of whether a motion brought under Fed. R. Civ. P. 60(b) by a state prisoner always constitutes a successive habeas petition, and thus an attempted "end run" around the strict statutory filing provisions established under the Anti-terrorism and Effective Death Penalty Act ("AEDPA"). In its opinion, the Court distinguished between motions that raise claims on the merits, which are effectively successor petitions and thus cannot be brought under Rule 60(b), and those that challenge the judgment on other grounds, such as for example, the district court's ruling on the statute of limitations, which are properly made pursuant to Rule 60(b).

A key distinction between motions filed pursuant to Rule 59(e) and those filed pursuant to Rule 60(b) is that the former suspend the finality of the district court's judgment, while the latter do not. As the Federal Rules of Civil Procedure Advisory Committee recognized in its

125

notes to the 1946 Amendment to Rule 60(b), "a motion under Rule 60(b) does not affect the finality of the judgment, but a motion under Rule 59, made within 10 days, *does affect finality and the running of the time for appeal.*" (Emphasis added.)

This difference illustrates why, under *Gonzalez*, AEDPA's restrictions on second or successive petitions could not apply to Rule 59(e) motions like Mr. Lee's that challenge errors of law and fact in the district court's resolution of the § 2255 claims on the merits. At the time that the Rule 59(e) motion is filed, the finality of the judgment is suspended until the district court either grants or denies the motion. *See Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir. 1986) ("[a] Rule 59(e) motion . . ., in effect, 'suspends' the finality of the initial judgment" until the district court either grants or denies the motion). Because the judgment is not final, the Rule 59(e) motion cannot be "successive" because there is no final judgment to which the motion could be "successive." In other words, because a Rule 59(e) motion, filed within ten days, suspends the finality of the judgment, it may not, as a technical matter, qualify as a "successive" or second petition within the meaning of the AEDPA.

A Rule 60(b) motion, on the other hand, does not suspend finality and can be filed even over a year after judgment. Thus, where a Rule 60(b) motion advances one or more claims, it is deemed a second or successive habeas application so as not to run afoul of the AEDPA's statute of limitations and other relevant provisions. *See Gonzalez* at 530-31. As the Seventh Circuit explained in *Curry v. United States*, 307, F.3d 664, 665 (7th Cir. 2002):

> A Rule 60(b) motion is a collateral attack on a judgment that has become final through exhaustion of judicial remedies. A Rule 59(e) motion is not; filed as it must be within 10 days of the judgment, it suspends the time for appealing. Since such a motion does not seek collateral relief, it is not subject to the statutory limitations on such relief.

Appellate Case: 11-1380     Page: 126     Date Filed: 06/20/2011 Entry ID: 3799638

The district court's extension of *Gonzalez* to a Rule 59(e) motion ignores the distinct purposes and polices behind each rule. One of the purposes of Rule 59(e) is to provide district courts the opportunity to correct significant errors of fact or law that are brought to their immediate attention, and thus spare the parties and appellate courts the burden of unnecessary appeals. *See*, *e.g.*, *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986). Effectuation of this purpose does not in any way undermine the AEDPA's intent to avoid repetitive or multiple petitions, i.e., the rationale behind the successive petition rule. Indeed, there is no policy or purpose of the AEDPA or the successive petition rule that would be furthered by depriving district courts of the ability to correct errors of law or fact that are promptly brought to their attention within 10 days and to revisit their ultimate judgments.

Mr. Lee sought reconsideration of his previously presented claims on the ground that the denial of his § 2255 motion and request for an evidentiary hearing was based on significant errors of fact and law. That is precisely the purpose and policy behind Rule 59(e). Indeed, the ten-day limit of Rule 59(e) applies to an inherent power that a district court has even prior to the entry of judgment. *K.C. 1986 L.P v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007). That power is "distinct from the power explicitly granted by Rule 60 to reopen cases well after final judgment has been entered." *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008).

Extending the holding of *Gonzalez* to Rule 59(e) motions would attribute to the Supreme Court and Congress the unlikely intent to broadly preclude the reconsideration of just-entered judgments. Such an extension of *Gonzalez* would make it almost always effectively impossible for a district court to reconsider its denial and correct errors of law and fact. Permission of the court of appeals to do so would be required and could only be granted in the extremely limited circumstances provided by 28 U.S.C. § 2255(h). Such a result is simply inconsistent with the

127

purpose and policy behind Rule 59(e) – to allow the district court to correct its own errors, sparing the parties and appellate court the burden of unnecessary appellate proceedings.

This Court's opinion in *Williams v. Norris*, 461 F.3d 999 (8th Cir. 2006), is not to the contrary. In *Williams*, the issue was whether the petitioner could raise – for the first time – in a post-judgment renewed motion for relief the claim that he could not be executed because he was mentally retarded.[18] The district court denied that renewed motion on the basis that it was a successive habeas petition, *id.* at 1000-01, but granted a certificate of appealability on the issue of whether the petitioner could argue his claim of mental retardation at that stage of the proceedings.

On appeal, the petitioner made a variety of arguments as to why the new mental retardation claim should be construed as an amendment to the original § 2254 petition, rather than as a successive petition, each of which this Court rejected.[19] Citing to *Bannister v. Armontrout*, 4 F.3d 1434 (8th Cir. 1993), a pre-*Gonzalez* case, the Court stated: "A Rule 59(e) motion cannot be used to raise arguments which could, and should, have been made before the trial court entered final judgment." *Williams*, 461 F.3d at 1004. In other words, the Court was

---

[18]     In *Williams*, the petitioner filed a Rule 59(e) motion challenging the denial of his § 2254 petition. Nearly a month after his Rule 59(e) motion was denied, the petitioner filed a*nother* motion for relief, *outside the ten-day filing period*, in which the petitioner "raised for the first time the claim that [the petitioner] could not be executed as a result of the United States Supreme court's ruling in *Atkins v. Virginia*[,]" 461 F.3d at 1001, which prohibited the execution of the mentally retarded.

[19]     The petitioner argued that: (1) the post-judgment motions should have been treated as motions to amend the initial habeas petition under Fed. R. Civ. P. 15 because they were filed prior to the formal entry of a separate judgment per Fed. R. Civ. P. 58, *Williams,* 461 F.3d at 1001-02; (2) he should be permitted to amend his petition because he received ineffective assistance of counsel in filing his initial petition, *id.* at 1002-03; (3) his motions were not successive habeas petitions because the denial of his initial petition had not yet been affirmed on appeal, *id.* at 1003-04; and (4) that his post-judgment motion attacked deficiencies in the habeas proceedings rather than the underlying conviction, *id.* at 1004.

128

merely affirming the well-settled principle that a petitioner cannot raise an entirely new legal claim after the petition has already been filed and the statute of limitations has run. In *Williams*, the Rule 59(e) motion was deemed a successive petition precisely because it argued a new legal claim which was not raised in the initial petition – i.e., that the petitioner could not be executed because he was mentally retarded. In contrast, Mr. Lee's Rule 59(e) motion does not raise any new legal claims – each of the claims argued in his Rule 59(e) motion are in the § 2255 motion itself. Thus, *Williams* is inapposite.

Nor does *Bannister* itself provide authority for the district court's decision. In *Bannister*, 4 F.3d at 1434, the petitioner appealed a judgment of the district court denying his § 2254 petition. The federal petition challenged certain inculpatory statements that the petitioner made to law enforcement officers on the ground that at the time of the interrogation, he had already requested and been appointed counsel at his initial arraignment, and that the admission of his statements violated his Sixth Amendment right to counsel. *Id.* at 1439. The state argued that review of the petitioner's claim concerning the effect of his initial arraignment was procedurally barred because the petitioner failed to previously present to the *state* courts the factual and legal bases of his Sixth Amendment claim that he was appointed counsel at his initial arraignment. This Court agreed that the claim was procedurally barred because the petitioner failed to previously raise his Sixth Amendment claim in his state habeas petition.

In ruling on the case, the Court began by noting that in deciding a habeas petition brought under § 2254, federal law requires that the federal petition only raise claims that were already presented to the state courts. *Id.* at 1439 (citing *Bolder v. Armontrout*, 921 F.2d 1359, 1364 (8th Cir. 1990)). The petitioner, however, had neither presented his Sixth Amendment claim to the state courts, nor had he sought to develop the facts upon which this claim relied (the date and

129

time of his arraignment at which counsel was allegedly appointed) in state court. Indeed, the first time that the petitioner had raised his new legal argument and facts in support of that argument (in the form of an unsigned affidavit), was in connection with his Rule 59(e) motion filed in federal court.[20] *Id.* at 1440. The question presented and resolved in *Bannister*, therefore, was not whether the Rule 59(e) motion was a successive petition, but rather whether the petitioner had defaulted his Sixth Amendment claim by failing to previously present that claim and the material facts in support in state court before raising them in federal court.[21]

Notably, an attempt to extend *Gonzalez* to Rule 59(e) motions was recently rejected by the Advisory Committee on Criminal Rules. In 2008, the Justice Department launched an effort to amend the Rules Governing § 2255 Proceedings for the United States Courts (hereafter "§ 2255 Rules") to accomplish the same result reached by the district court in this case.

---

[20]  It should be noted that *Bannister* was decided under § 2254, which requires that a petitioner develop the material facts in support of a constitutional claim in a state court evidentiary hearing so that the state courts have "a full and fair opportunity to address and resolve the claim on the merits." *Bannister*, 4 F.3d at 1439 (quoting *Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1720 (1992)). Unlike § 2254 litigants, movants under § 2255 have no prior opportunity to develop the facts in support of their habeas claims because is there is no prior state court proceeding involved. Thus, as Mr. Lee has consistently argued in this case, an evidentiary hearing was, and is, warranted in order to develop the factual record necessary before his legal claims can be properly and adequately resolved on the merits.

[21]  *Bannister*, in turn, cites to two cases, *Woods v. City of Michigan City*, 940 F.2d 275, 280 (7th Cir. 1991), and *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990), which further undermine the government's position. In *Woods*, the Seventh Circuit affirmed the denial of the plaintiff's Rule 59(e) motion because the Rule 59(e) motion raised a new legal argument – a new theory of municipal liability – that had not been presented as an independent ground for liability in the pleadings preceding summary judgment. *Id.* at 279-80. In *Simon*, the Fifth Circuit affirmed the denial of the appellant's Rule 59(e) motion in medical malpractice case because the Rule 59(e) motion was based on a legal theory, an affirmative defense, that was not raised or argued at the trial. *Id.* at 1158-59. Neither of these cases is apposite here, as Mr. Lee's Rule 59(e) motion raised no new legal claims. Rather, Mr. Lee's motion requested that the court reconsider its judgment on the legal claims that were pleaded in his § 2255 motion – which is precisely the purpose of a Rule 59(e) motion.

130

Specifically, the DOJ proposed amending Rule 11 of the § 2255 Rules to prohibit movants from litigating any post-judgment motions that addressed the merits of previously rejected claims. *See* Agenda Materials for the Advisory Committee on Criminal Rules, Washington, D.C., April 28-29, 2008 at 138 (available online at:

http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Agenda%20Books/Criminal/CR2008-04.pdf) (last visited June 20, 2011). The DOJ claimed that its proposed amendment to preclude litigants from addressing the merits of the district court's judgment in any reconsideration motion, including one filed pursuant to Rule 59(e), was merely a codification of the "successive petition" rule articulated in *Gonzalez. Id.*

In considering the proposed rule change, the Advisory Committee on Criminal Rules was briefed on the arguments against adopting the proposal. Specifically, the Committee was informed that Rules 52 and 59 were not addressed in *Gonzalez*, and that extending *Gonzalez* beyond Rule 60(b) would not only unnecessarily eliminate remedial routes currently available to movants in district court, but would also introduce inefficiencies into the legal system: "[Rules 52 and 59] give the district court the opportunity to correct significant errors of fact or law that are brought to their immediate attention. Under the proposed rule a litigant would have to appeal to the Court of Appeals rather than bring a clear error of fact or law to the attention of the district court, resulting in a waste of judicial resources." *Id*. at 141.

After careful consideration and debate on the proposed rule change, the Committee rejected the Department's proposed amendment. *See* Minutes of the Advisory Committee on Criminal Rules, Washington, D.C., April 28-29, 2008 at 11 (available online at: http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Minutes/CR2008-04.pdf (last visited June 20, 2011). As noted in the Committee's Minutes, one of the key arguments made against

131

the proposed amendment was that "by eliminating Rules 52 and 59 as avenues for relief, the proposed Rule 11(b) amendment would be going far beyond merely codifying *Gonzalez*." *Id*. This decision is thus compelling evidence that the district court's treatment of Mr. Lee's Rule 59(e) motion was fundamentally incorrect.

Not only was Mr. Lee's motion properly before the court, so were the affidavits attached thereto. The plain language of subsection (c) of Rule 59 contemplates the filing of affidavits with the motion. *See* Rule 59(c) ("Time to Serve Affidavits") ("When a motion for new trial is based on affidavit, they must be filed with the motion. The opposing party has 14 days after beig served to file opposing affidavits. The court may permit reply affidavits). Mr. Lee's submission of his affidavits was therefore fully in compliance with the dictates of Rule 59. At a minimum, reasonable jurists could disagree regarding the district court's refusal to consider the affidavits and its denial of Mr. Lee's motion, and a COA should therefore issue with respect to this ruling.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Appellant Daniel Lewis Lee respectfully requests that this Motion be granted and that the certificate of appealability granted by the district court be expanded to include all of the issues discussed herein.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

-and-

/s/ Laurence E. Komp

132

Laurence E. Komp
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330
(636) 207–7351 (fax)
lekomp@swbell.net

-and-

/s/ Julie Brain

Julie Brain
Karl Schwartz
Delaware Federal Defender Office
Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
Julie_brain@fd.org
Karl_schwartz@fd.org

COUNSEL FOR MOVANT

133

<u>CERTIFICATE OF SERVICE</u>

Movant's counsel have filed this Motion to Expand Certificate of Appealability on today's date via ECF, thereby serving the United States and all parties.

<u>/s/ David A. Ruhnke</u>
COUNSEL FOR MOVANT

<u>Electronically filed</u>:  St. Louis, Missouri
June 20, 2011

134