In the

# United States Court of Appeals
## For the Eighth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

DANIEL LEWIS LEE,
Defendant-Appellant.

(Capital Case)

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO EXPAND CERTIFICATE OF APPEALABILITY**

CHRISTOPHER R. THYER
  United States Attorney
  Eastern District of Arkansas

LANNY A. BREUER
  Assistant Attorney General

GREG D. ANDRES
  Acting Deputy Assistant Attorney
    General

JOHN M. PELLETTIERI
  Attorney, U.S. Department of Justice
  Criminal Division, Appellate Section
  950 Pennsylvania Ave., N.W.
  Rm. 1264
  Washington, D.C. 20530
  (202) 307-3766
  john.pellettieri@usdoj.gov

# TABLE OF CONTENTS

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

APPLICABLE LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   I.    Certificate of Appealability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   II.   Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   I.    Claims Pertaining to the Guilt Phase of Lee's Trial . . . . . . . . . . . . . . 10

      A.    Issue 1: DNA Testing of the Hair Found in a Raid
           Cap in Kehoe's Vehicle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          2.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    Issue 2: Alleged Race-Based Jury Selection . . . . . . . . . . . . . . . . 15

          1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          2.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.    Issue 3: The Protective Order Regarding
           Pretrial Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          2.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    Issue 4: Alleged Failure to Introduce Purportedly
           Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          1.    Alleged Failure to Call Witnesses Who
              Purportedly Would Testify About Paul

Appellate Case: 11-1380   Page: 2   Date Filed: 11/21/2011 Entry ID: 3851678

Humphrey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2.    Alleged Failure to Call Witnesses Who
Purportedly Would Testify They Had Never
Heard of the APR . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3.    Alleged Failure to Call Witnesses Who
Purportedly Saw or Heard the Muellers
After January 11, 1996 . . . . . . . . . . . . . . . . . . . . . . . . 27

4.    Purported Evidence that William Mueller
Feared for His Life . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.    Issue 5: Allegedly Inadequate Cross-Examine
of the Wankers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

F.    Issue 6: Failure to Object to Allegedly Improper
Closing Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

a.    Statements Regarding an Aryan Inmate
and Threats to Cheyne Kehoe . . . . . . . . . . . . . . . . . 34

b.    Statement that Lee Called Nancy Mueller
a "Dumb Bitch" . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

c.    Reference to Gloria Kehoe's Testimony
Regarding Kirby Kehoe . . . . . . . . . . . . . . . . . . . . . 35

d.    Referring to Lee as a "Faithful Dog" and a
"Henchman" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

e.    Reference to Kirby Kehoe's Guilty Plea . . . . . . . . . . 36

-ii-

| | f. | Argument That James Wanker Received No Benefit for His Testimony | 37 |

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

II. Claims Pertaining to the Penalty Phase of Lee's Trial . . . . . . . . . . . . 42

    A. Allegedly Deficient Failures to Challenge Statutory Aggravating Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

            a. Alleged Failures to Challenge the Pecuniary Gain Aggravating Factor at Trial and on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                i. Issue 7: Effective Assistance of Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . 46

                ii. Issue 8: Effective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . . . . . . . 47

            b. Alleged Failures to Challenge the Multiple Murder Aggravating Factor at Trial and on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

                i. Issue 9: Effective Assistance of Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . 50

                ii. Issue 10: Effective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . . . . . . . 54

    B. Issue 11: Alleged Failure to Challenge the Indictment for Not Alleging Aggravating Factors . . . . . . . . . . . . . . . . . . . . . 58

        1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Appellate Case: 11-1380   Page: 4   Date Filed: 11/21/2011 Entry ID: 3851678

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C. Issues 12 & 13: Alleged Failures to Challenge
Jury Instructions Regarding the Result of Juror
Deadlock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

D. Issues 14 & 15: Allegedly Deficient Failure to
Prevent Introduction of Testimony About
Psychopathy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

        a. The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

        b. The New Trial Motion . . . . . . . . . . . . . . . . . . . . . . . . 73

        c. The Section 2255 Motion . . . . . . . . . . . . . . . . . . . . . 75

        d. The Rule 59(e) Motion . . . . . . . . . . . . . . . . . . . . . . . 76

    2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

E. Issue 16: Failure to Object to and Raise on Appeal
Alleged Prosecutorial Misconduct During Closing
Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    1. Alleged Disparagement of Defense Counsel . . . . . . . . . . . 81

    2. Allegedly Improper Comparison with Chevie
Kehoe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    3. Allegedly Improper Argument Regarding
Mitigating Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    4. Allegedly Improper Argument Regarding Lee's

Appellate Case: 11-1380    Page: 5    Date Filed: 11/21/2011 Entry ID: 3851678

Involvement in a Prior Murder ...................... 84

     5.     Allegedly Improper Argument of Non-Statutory
           Aggravating Factors Without Notice ................. 87

III.    Issue 17: The District Court's Denial of Lee's Rule 59(e)
       Motion for Reconsideration ............................... 89

    A.     Background ........................................ 89

    B.     Discussion ........................................ 89

CONCLUSION ............................................ 92

CERTIFICATE OF SERVICE .................................... 93

Appellate Case: 11-1380    Page: 6    Date Filed: 11/21/2011 Entry ID: 3851678

UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA, )
                                )
            Plaintiff/Appellee,  )
                                )    Case No. 11-1380
        v.                       )      (Capital Case)
                                )
DANIEL LEWIS LEE,                )
                                )
            Defendant/Appellant. )

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO EXPAND CERTIFICATE OF APPEALABILITY

In accordance with this Court's order dated June 21, 2011, the government submits this response to defendant Daniel Lewis Lee's Motion to Expand Certificate of Appealability.

After a jury trial in the United States District Court for the Eastern District of Arkansas, Lee was convicted and sentenced to death for committing three murders in 1996. This Court affirmed. United States v. Lee, 374 F.3d 637 (8th Cir. 2004), cert. denied, 545 U.S. 1141 (2005). The district court denied Lee's motion for post-conviction relief under 28 U.S.C. § 2255, United States v. Lee, No. 97-CR-00243, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008), and granted a certificate of appealability as to one issue, see Dkt.1204.[1]

---

[1] Citations to district court docket entries are referred to as "Dkt." and where applicable are followed by the pertinent page number. "Tr." refers to the consecutively-paginated trial transcript. Citations to other transcripts are referred to as "Tr." preceded by the applicable date and followed by the applicable page number. "COA Motion" refers to Lee's Motion to Expand Certificate of

Lee now asks this Court to expand the certificate of appealability to 17 additional issues. For the reasons stated below, the Court should grant Lee's motion as to one issue but should deny the motion in all other respects.

## STATEMENT

1. Lee, Chevie Kehoe (Kehoe), Kehoe's father Kirby Kehoe, Kehoe's brother Cheyne Kehoe, and Faron Lovelace participated in a variety of criminal activities to promote and finance a white supremacist organization known as the Aryan Peoples' Republic, or the Aryan Peoples' Resistance (APR). See United States v. Lee, 374 F.3d 637, 641 (8th Cir. 2004). Kehoe founded the APR for the purpose of establishing an independent nation of white members of the Christian Identity faith in the Pacific Northwest. He recruited Lee into the APR in 1995. Id.

In January 1996, Lee and Kehoe traveled from Washington to Arkansas where, dressed in police raid clothing, they went to the home of William Mueller. Lee and Kehoe expected to find valuable property in Mueller's house. Mueller was a gun dealer who owned a large collection of weapons and ammunition, and Chevie and Kirby Kehoe had previously robbed Mueller in February 1995. Id.

No one was home when Lee and Kehoe arrived, so they waited. Mueller

---

Appealability.

-2-

eventually arrived home with his wife, Nancy Mueller, and their eight-year-old-daughter, Sarah Powell. Lee and Kehoe overpowered William and Nancy Mueller and incapacitated them. They then questioned Sarah Powell about where they could find cash, guns, and ammunition. After finding weapons and $50,000 in cash, Lee and Kehoe shot the three victims ("the Muellers") with stun guns and placed plastic trash bags over their heads, sealing the bags with duct tape to asphyxiate the victims. The men taped rocks to the Muellers' bodies and threw them into the nearby Illinois bayou. The Muellers' bodies were discovered almost six months later, in June 2006. 374 F.3d at 641-42.

Lee and Kehoe returned to Washington with the stolen property around January 14, 1996. Id. at 642. Lee confessed to Kehoe's mother, Gloria Kehoe. He said that "Bill [Mueller] was one tough son of a bitch because he fought so hard" and that Nancy Mueller was "dumb . . . because she . . . helped put the trash bag on her head." United States v. Kehoe, 310 F.3d 579, 590 (8th Cir. 2002), cert. denied, 538 U.S. 1048 (2003). According to Lee, Chevie Kehoe had given him one thousand dollars and a rifle for participating in the robbery and murders, and he and Kehoe had disposed of the bodies by weighing them down with rocks and throwing them in the river. Id. Lee also told James Wanker, who lived at the motel where Lee resided after the murders, that he had taken a trip "down south" and that some people "had fucked with him

-3-

and so he wrapped them up, taped them, and [threw] them in the swamp." Tr.
4082-83. Lee made a similar statement to Wanker's wife, Dalvine Wanker.
Tr. 4093. In addition, Chevie Kehoe also confessed to his mother. He said that
he and Lee had murdered William and Nancy Mueller, and that he had
murdered Sarah Powell by himself. Lee, 374 F.3d at 642.

In December 1996, Lee and Kehoe learned that a friend had been
arrested in possession of one of Mueller's guns and that an ATF agent had
asked if he had purchased the gun from Chevie Kehoe. Tr. 2794, 2799. Lee
and Kehoe panicked. Lee went to Oklahoma, where his mother lived. Tr.
4980. Kehoe went to Montana and later traveled throughout the country with
his brother, Cheyne Kehoe, selling Mueller's property. Tr. 5318-20, 5323; see
Kehoe, 310 F.3d at 584. The Kehoe brothers got into a shootout with police in
Ohio and after escaping went to Utah. Id. at 585. Kehoe gave a detailed
confession to his brother during this time about how he and Lee murdered the
Muellers. Id. at 584-85; Tr. 5326-31.

Cheyne Kehoe eventually turned himself in to police, leading to Chevie
Kehoe's apprehension.  Gloria Kehoe also later cooperated with law
enforcement. Kehoe, 310 F.3d at 585. Based on information she provided,
police searched storage units in Montana and Idaho, finding guns,
ammunition, and white supremacist literature. The police also found items
that had belonged to the Muellers  – including display cases that William

-4-

Appellate Case: 11-1380     Page: 10     Date Filed: 11/21/2011 Entry ID: 3851678

Mueller had used at gun shows to display items he offered for sale – and a key fitting the handcuffs found on William Mueller's body. Tr. 3378-3403, 3479, 3610-28, 3650; see Kehoe, 310 F.3d at 585. Fingerprints of both Lee and Chevie Kehoe were recovered from one of the display cases. Tr. 3710.

2. a. A federal grand jury charged Lee and Kehoe with one count of participating in the conduct of the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); one count of conspiring to commit that offense, in violation of 18 U.S.C. § 1962(d); and three counts of committing murder in aid of racketeering, in violation of 18 U.S.C. § 1959. Dkt. 195.[2] The government filed notices of intent to seek the death penalty against both defendants. Lee, 374 F.3d at 642. The jury found Lee and Kehoe guilty on all counts. Id. at 643. Separate sentencing hearings were held for Kehoe and Lee. The jury returned a verdict of life imprisonment for Kehoe and a verdict of death for Lee on each of the three capital murder counts. Id.

b. Lee filed a motion for a new sentencing hearing and sought to subpoena Attorney General Janet Reno and Deputy Attorney General Eric Holder. In re United States, 197 F.3d 310, 312 (8th Cir. 1999). This Court

---

[2]The indictment also charged Lee and Kehoe with a Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a), and using a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c). Dkt. 195. The district court dismissed those charges upon motion of the government. Dkt. 546.

-5-

Appellate Case: 11-1380   Page: 11   Date Filed: 11/21/2011 Entry ID: 3851678

issued a writ of mandamus requiring the district court to quash the subpoenas. Id. at 316. After the district granted Lee a new sentencing hearing, see United States v. Lee, 89 F. Supp. 2d 1017 (E.D. Ark. 2000), this Court reversed and reinstated the sentence of death, United States v. Lee, 274 F.3d 485 (8th Cir. 2001), cert. denied, 537 U.S. 1000 (2002). The Court concluded that Lee had no enforceable rights under the Department of Justice's death penalty protocol and that the district court's evidence rulings at the penalty phase – including allowing the government to elicit testimony on the issue of psychopathy from Lee's expert witness – were not erroneous or unfairly prejudicial. Id. at 496-97. The Court subsequently affirmed Lee's conviction and sentence on direct appeal. United States v. Lee, 374 F.3d 637 (8th Cir. 2004), cert. denied, 545 U.S. 1141 (2005).

c. Lee filed a motion for post-conviction relief under 28 U.S.C. § 2255. Dkt. 1118. After the district court denied the motion, see United States v. Lee, No. 97-CR-00243, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008), Lee filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), see Dkt. 1165. The district court denied reconsideration. United States v. Lee, No. 97-CR-00243, 2010 WL 5347174 (E.D. Ark. Dec. 22, 2010).

The district court initially denied Lee a certificate of appealability. Id. at *6. After Lee filed a motion for reconsideration, Dkt. 1194, the district court granted a certificate of appealability as to one issue, whether imposition

-6-

of the death penalty on Lee but not Kehoe violated the Constitution, <u>see</u> Dkt. 1204. Lee filed a motion asking this Court to expand the certificate of appealability to encompass 17 additional issues. The Court directed the government to file a response.

APPLICABLE LEGAL STANDARDS

## I.   Certificate of Appealability

An appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255 unless a judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate of appealability must "indicate which specific issue or issues satisfy" that showing, 28 U.S.C. § 2253(c)(3). To make a substantial showing of the denial of a constitutional right, an applicant must establish that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)); <u>see</u> <u>Clay v. Bowersox</u>, 628 F.3d 996, 998 (8th Cir. 2011) (per curiam) (denying certificate of appealability).

## II.   Ineffective Assistance of Counsel

This Court reviews claims of ineffective assistance of counsel under the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> <u>New</u>

-7-

v. United States, 652 F.3d 949, 952 (8th Cir. 2011). The Court applies the Strickland standard *de novo*, while reviewing any underlying findings of fact for clear error. See, e.g., United States v. Regenos, 405 F.3d 691, 692-93 (8th Cir. 2005).

Under Strickland, a defendant must make two showings to obtain relief. United States v. Davis, 583 F.3d 1081, 1092 (8th Cir. 2009). First, a defendant must establish that his counsel's performance was deficient. New, 652 F.3d at 952. This requires showing that counsel's performance "'fell below an objective standard of reasonableness.'" Noe v. United States, 601 F.3d 784, 791 (8th Cir. 2010) (quoting Strickland, 466 U.S. at 688). The Court's scrutiny of counsel's performance is highly deferential. New, 652 F.3d at 952. The defendant must overcome a presumption that, "under the circumstances, the challenged action might be considered sound trial strategy." Theus v. United States, 611 F.3d 441, 446-47 (8th Cir. 2010) (internal quotations and citations omitted). Second, a defendant must establish that his counsel's deficient performance prejudiced the defense. New, 652 F.3d at 952. The defendant must show that "there is a reasonable probability that the outcome would have been different but for counsel's deficient performance." Theus, 611 F.3d at 447.

Lee recasts a number of claims rejected by this Court on direct appeal as claims of ineffective assistance of counsel. See infra pp. 19, 60-61, 74-75. A

Appellate Case: 11-1380     Page: 14     Date Filed: 11/21/2011 Entry ID: 3851678

defendant may not raise claims in a Section 2255 motion that were rejected on direct appeal. <u>See</u> <u>United States v. McGee</u>, 201 F.3d 1022, 1023 (8th Cir. 2000) (per curiam); <u>see also</u> <u>Thompson v. United States</u>, 7 F.3d 1377, 1378-79 (8th Cir. 1993) (rejecting claims of prosecutorial misconduct as attempts to relitigate Fourth Amendment claims considered on direct appeal). When a defendant seeks to recast a claim rejected on direct appeal as a claim of ineffective assistance of counsel, he must surmount the "rigorous" and "highly demanding" standard erected by <u>Strickland</u>. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381-82 (1986).

## ARGUMENT

This Court should grant a certificate of appealability on the question of whether Lee received ineffective assistance of counsel due to alleged race-based jury selection by his lawyers. <u>See</u> <u>infra</u> pp. 15-16. In all other respects, the Court should deny Lee's motion. His other claims plainly lack merit and do not satisfy the threshold for issuance of a certificate of appealability.[3]

---

[3]There are a number of reasons why each of Lee's claims lacks merit. Because of the applicable standard for a certificate of appealability, the discussion below focuses on only some of the most evident deficiencies in Lee's claims.

Appellate Case: 11-1380    Page: 15    Date Filed: 11/21/2011 Entry ID: 3851678

## I. Claims Pertaining to the Guilt Phase of Lee's Trial

### A. Issue 1: DNA Testing of the Hair Found in a Raid Cap in Kehoe's Vehicle

#### 1. Background

Kehoe told his mother (Gloria) and brother (Cheyne) that he and Lee wore raid gear when they went to the Muellers' house and committed the murders. Tr. 4971-72. Police later found a raid cap with the FBI logo on it in Kehoe's car after the shootout in Ohio involving Kehoe and his brother. Tr. 4720. Chantelle Banquette, a forensic analyst with the Arkansas State Crime Laboratory, examined a hair taken from the raid cap. Tr. 4720-24.

Banquette testified at trial as an expert in hair and fiber analysis. Tr. 3644-46. She testified that she examined the hair using a microscope and concluded that the hair was microscopically similar to a hair sample taken from Lee. Tr. 4722-23. According to Banquette, the hair was microscopically dissimilar to hair samples from William Mueller, Nancy Mueller, Sarah Powell, Mueller neighbor Paul Humphrey, Chevie Kehoe, Cheyne Kehoe, and Karena Kehoe (Cheyne's wife). Tr. 4723. Banquette explained that the dissimilarities between the hair and those samples ruled out those individuals as sources of the hair, but that the similarity to Lee's hair did not lead to a positive identification of Lee as the source. Tr. 4724; see Tr. 3652-54.

During cross-examination of Banquette, Lee's counsel elicited that her

Appellate Case: 11-1380     Page: 16     Date Filed: 11/21/2011 Entry ID: 3851678

examination of the hair "was done with a microscope and [did] not involve any of the other instruments out at the crime lab." Tr. 4724. He also elicited confirmation that the hair did not "possess enough individual characteristics to be positively identified as having originated from a particular person." Id.

Lee's counsel returned to these points during closing arguments. He argued that there was a "lack of any meaningful forensic evidence in this case." Tr. 6945. According to counsel, the government offered two witnesses who provided forensic evidence regarding Lee, one of whom was Banquette. Counsel emphasized that Banquette concluded that the hair found in the cap was similar to Lee's hair but that she could not, and did not, conclude that there was "a match" between the hairs. Counsel quoted the portion of Banquette's forensic report stating that "hairs do not possess enough individual microscopic characteristics to be positively identified as having originated from a particular person to the exclusion of all others." Tr. 6946. Counsel accordingly argued that Banquette's analysis was "certainly far from proving anything beyond a reasonable doubt." Id.

The government addressed counsel's argument during its rebuttal closing. The government acknowledged the limitations of Banquette's analysis, recognizing that "there might be out there somewhere another hair that could match" the hair from the cap. Tr. 7000. The government argued, however, that the evidence in the case supported the conclusion that it was

-11-

Appellate Case: 11-1380    Page: 17    Date Filed: 11/21/2011  Entry ID: 3851678

Lee's hair. The government noted, for example, that Lee's fingerprints were found on a display case that had been owned by Mueller and later stored by Kehoe. Tr. 7001.

In October 2006, while Lee's Section 2255 motion was pending, he submitted the hair found in the cap to a lab for mitochondrial DNA ("mtDNA") testing. Dkt. 1138-2, at 1. On June 8, 2007, the lab reported that its tests excluded Lee as the source of the hair. Id. at 4.

### 2. Discussion

Lee argues that he received ineffective assistance of counsel because his lawyers did not obtain mtDNA testing of the hair prior to trial. COA Motion 9-15. His arguments plainly lack merit.

First, assuming Lee's lawyers did not seek to obtain mtDNA testing on the hair, Lee cannot show that he was prejudiced. Lee cannot show that he would have been able to obtain results from an mtDNA test even if his lawyers had sought such a test. At the time of trial, only one private lab offered to provide mtDNA testing on hair samples. Dkt. 1144-2, at 2.[4] That lab's protocols called for at least two centimeters of hair. Dkt. 1144-5, at 1-2. The hair found in the raid cap, however, was only 1.1 centimeters long. Dkt.

---

[4]There are two types of DNA testing: nuclear DNA testing and mitochondrial DNA testing. Nuclear DNA testing of hair samples is feasible only if the sample containing roots, which was not the case for the hair sample found in the raid cap. See Dkt. 1142-2, at 1; Dkt. 1145, at 3.

-12-

1138-2, at 1. While the lab may have attempted to conduct mtDNA testing on the hair if it had permission to consume the sample, <u>see</u> Dkt. 1144-5, at 1, it appears highly unlikely that the lab would have been able to obtain a result given the state of the art at the time. In fact, ATF agents sought DNA testing of the hair but were informed that mtDNA testing could not be performed because the sample was less than two centimeters long. Dkt. 1145, at 3; <u>see also</u> Dkt. 1144-2, at 1; Dkt. 1144-3, at 1-2 (FBI lab protocols).

Lee also cannot show that his counsel's performance fell below an objective standard of reasonableness even assuming that (1) mtDNA testing was available at the time, and (2) his lawyers did not pursue such testing. The evidence against Lee was substantial. It was therefore reasonable to conclude that a DNA test likely would have linked Lee to the hair from the raid cap. The absence of DNA testing on the hair, however, allowed Lee's counsel to argue that the government's forensic evidence was inconclusive and supported a reasonable doubt. Arguing the weakness of the evidence based on the microscopic analysis of the hair, instead of taking the gamble that a DNA test would conclusively link Lee to the hair, was a reasonable trial strategy. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." <u>Harrison v. Richter</u>, 131 S.Ct. 770, 789-90 (2011). Put differently, "declining to request DNA testing can be sound strategy when weaknesses in a defendant's story

-13-

could lead reasonable lawyers to think the client guilty and any test results potentially damning." Jardine v. Dittmann, 658 F.3d 772, 776 n.2 (7th Cir. 2011); see also Stanley v. Schiro, 598 F.3d 612, 636 (9th Cir. 2010) ("Capable lawyers evaluate not only what they ought to do, but what they ought not to do. Where action on behalf of a client has a considerable likelihood of backfiring, they avoid it."); Rice v. Hall, 564 F.3d 523, 525 (1st Cir. 2009) ("Defense counsel had to consider the likelihood that further forensic testing on items found in the apartment would have provided a link to [defendant], thus supplying the missing forensic link. Counsel's judgment in situations like this is accorded great respect."); Skinner v. Quarterman, 528 F.3d 336, 341-42 (5th Cir. 2008) ("Conducting its own DNA test would also have deprived the defense of its primary argument at trial that the government conducted a shoddy investigation. Not knowing what more thorough DNA testing would have uncovered, a jury might have found reasonable doubt in such uncertainty.").

To be sure, Lee subsequently obtained an expert DNA analysis in 2006 concluding that it was not his hair in the raid cap. It is therefore tempting, in the "harsh light of hindsight," Bell v. Cone, 535 U.S. 685, 702 (2002), to contend that Lee's lawyers should have obtained pretrial mtDNA testing of the hair (assuming of course that such testing of the hair was feasible and available at the time). But the reasonableness of his counsel's conduct at trial

-14-

must be assessed on the basis of circumstances as they then existed. A court must "'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time.'" Harrison v. Richter, 131 S.Ct. at 789 (quoting Strickland, 466 U.S. at 689). Under that standard, it is plain that Lee cannot show he received ineffective assistance of counsel.

### B. Issue 2: Alleged Race-Based Jury Selection

#### 1. Background

After conferring with a jury consultant, Kehoe's counsel decided to pursue a strategy of "[s]electing a jury with as many black jurors as possible." Dkt. 1126-4, at 2. According to Kehoe's counsel, they believed that this strategy was reasonable based on (1) their determination that "blacks are more likely than whites to discredit government testimony," (2) "research of attitudes indicat[ing] that blacks are generally less likely to give the death penalty," and (3) their assessment that "blacks were less likely to give the death penalty than whites in this particular case." Id.

The record does not establish whether Lee's counsel pursued the same or a similar strategy. In denying Lee's Section 2255 motion, the district court declined to resolve that issue, but noted that "it appears highly unlikely that counsel for Kehoe and Lee would not have consulted in jury selection strategies." Lee, 2008 WL 4079315, at *25.

-15-

Appellate Case: 11-1380    Page: 21    Date Filed: 11/21/2011 Entry ID: 3851678

### 2. Discussion

Lee argues that his counsel "exercised their peremptory strikes to exclude jurors on the basis of their race" and therefore provided ineffective assistance of counsel. COA Motion 15. Lee cannot show that he is entitled to relief on the basis of this claim. This Court recently entered an order, however, granting Chevie Kehoe a certificate of appealability "on the question whether Kehoe received ineffective assistance of counsel under the Sixth Amendment because his trial counsel exercised peremptory challenges based on race, and otherwise denying the application." October 3, 2011 Order, United States v. Kehoe, No. 11-1382. The government accordingly does not oppose expansion of the certificate of appealability in Lee's case to encompass this issue.

### C. Issue 3: The Protective Order Regarding Pretrial Discovery

### 1. Background

Several months before trial, the government provided Lee with pre-trial discovery, including copies of ATF reports memorializing interviews with Sean Haines, an individual the government intended to call as a witness at trial. 11/19/1998 Tr. 3. In or around November 1998, Lee sent letters to several individuals containing copies of the ATF reports regarding Haines.

-16-

11/19/1998 Tr. 3-5.[5] He sent one letter to Joy Campbell in Spokane, Washington, for example, enclosing the ATF report and stating that he was providing the information to "inform and prevent others from potential endangerment due to Sean's lack of character." Id. at 3. The letter contained instructions to give the materials to John Perry, Jr. when he (Perry) got out of jail and stated that Perry "can handle the rest." Id. The letter also contained instructions to "burn or flush" the letter and its envelope. Id.

The government filed a motion under Rule 16(d)(1) of the Federal Rules of Criminal Procedure asking the district court to enter a protective order. Dkt. 408.[6] In an *ex parte* conference with the court, the government said it was concerned that the discovery material would be "disseminated widely prior to trial" and that the safety of Sean Haines would be compromised. 11/19/1998 Tr. at 5-6.[7] One of Lee's lawyers was eventually invited into the conference and stated that the defense did not object to the government's proposed order. Id. at 11-12, 13. The court accordingly entered an order stating that (1) Lee's attorneys "shall continue to have full access to, and

---

[5]The letters were intercepted by prison officials before they reached their intended destinations. 11/19/1998 Tr. 3-5.

[6]Rule 16(d)(1) states that a court "may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."

[7]The government filed the motion *ex parte*, as contemplated by Fed. R. Crim. P. 16(d)(1), but notified Lee's counsel about the motion and its contents. 11/19/1998 Tr. 8-10.

-17-

receive, discovery materials"; (2) Lee's attorneys "shall recover all discovery materials in defendant [Lee's] possession except his own statements"; (3) Lee "shall have no further access to documents provided by the government during discovery other than his own statements" but "will be able to fully discuss the content of all such materials with his attorneys"; and (4) counsel for Lee "shall not disclose the identities of the government's civilian witnesses" when "discussing government-supplied documents with defendant." Dkt. 415; see 11/19/1998 Tr. 13.

The court explained that under the order, "if you [defense counsel] go out there [to visit Lee] and you have documents that you get in discovery that has information that you think is pertinent to the defense that you should disclose to your client, you can do so," but "rather than just turn over the documents, [defense counsel] should detail to [Lee] the information that's pertinent and relevant and exclude . . . the particular identification of government witnesses." 11/19/1998 Tr. 14. The court also pointed out that "the whole discovery process is really at the grace of the government," and that under the relevant rules the government "could have delayed [discovery] until right before the trial." Id.[8] The government, the court stated, was "being

[8]The government is not obligated to produce witness statements "until after the Government witness has testified against the defendant on direct examination in open court." United States v. Coppa, 267 F.3d 132, 145 & n.15 (2d Cir. 2001). In addition, in a capital case, the government is not obligated

-18-

Appellate Case: 11-1380   Page: 24   Date Filed: 11/21/2011 Entry ID: 3851678

forthcoming about discovery, [and] continue[d] to be even in the light of . . . their serious concerns, as expressed in the motion." Id.

On direct appeal, Lee argued that the protective order "was an impermissible intrusion into the attorney client relationship and effectively denied him counsel." Lee, 374 F.3d at 652. Because Lee's trial counsel did not object to the order, this Court reviewed Lee's claim for plain error. Id. The Court concluded that the "order limiting discovery was not plain error because it did not impermissibly limit Lee's communications with his attorneys." Id. "The order prevented Lee from accessing discovery documents and the names of witnesses," the Court observed, "but it permitted him to be informed about all other matters and to discuss them with counsel." Id.

### 2.    Discussion

Lee contends that his trial counsel was ineffective for failing to object to the restrictions imposed by the district court's protective order. COA Motion 22-28. This claim plainly lacks merit.

Lee cannot show that his counsel's performance was deficient or prejudicial. Defense counsel had no grounds for an objection. The government was under no obligation to provide witness statements until after the

---

to disclose the names of witnesses until three days before trial, and even then the witness list "need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." 18 U.S.C. § 3432.

-19-

witnesses testified on direct examination, <u>Coppa</u>, 267 F.3d at 145 & n.15, and did not have an obligation to disclose the names of witnesses until three days before trial, 18 U.S.C. § 3432. As the district court put it, "the whole discovery process [was] really at the grace of the government." 11/19/1998 Tr. 14. If defense counsel asked the court to reject or modify the protective order, the government could have – and likely would have – simply stopped providing the defense with witness reports and the names of witnesses. In these circumstances, defense counsel cannot be faulted for acquiescing to the discovery limitations sought by the government. The conduct of Lee's lawyers did not fall below an objective standard of reasonableness.

Lee also cannot show that he was prejudiced by the protective order. The order was narrow and tailored. Under the protective order, defense counsel could discuss with Lee any information derived from the discovery materials, even though Lee could not be provided with copies of those materials. While Lee could not be told the names of the individuals who would be called as witnesses, defense counsel could discuss with Lee information pertaining to those individuals. Lee's current broad reading of the protective order, <u>see</u> COA Motion 24-25, is unsupported by the order's language or the district court's explanation of it. Moreover, Lee provides no basis to conclude that his trial counsel misinterpreted the order or felt themselves constrained in the broad manner he now advances.

-20-

Lee makes no effort to establish prejudice under <u>Strickland</u>. Rather, he asks this Court to presume prejudice. COA Motion 27-28. The circumstances in which a court may presume prejudice are highly circumscribed, however, and include the "complete denial of counsel" and an attorney's "complete" failure to test a prosecutor's case. <u>See</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, 124-25 & n.* (2008) (discussing <u>United States v. Cronic</u>, 466 U.S. 648 (1984)). There is no colorable argument that the protective order resulted in the complete denial of counsel or counsel's complete failure to test the government's case. As this Court has concluded, the discovery order "permitted [Lee] to be informed about all other matters and to discuss them with counsel." <u>Lee</u>, 374 F.3d at 652.

### D. Issue 4: Alleged Failure to Introduce Purportedly Exculpatory Evidence

Lee contends that his lawyers should have called several witnesses to testify at trial. COA Motion 28-46. The decision not to call a witness "'is a virtually unchallengeable decision of trial strategy.'" <u>Rodela-Aguilar v. United States</u>, 596 F.3d 457, 464 (8th Cir. 2010) (quoting <u>United States v. Staples</u>, 410 F.3d 484, 488-89 (8th Cir. 2005)). But even if Lee could establish that his counsel's performance was deficient, he plainly cannot show that he suffered prejudice. There is no reasonable probability that the jury would have reached a different result at the guilt phase of the trial if Lee's lawyers had

-21-

called the additional witnesses. See Armstrong v. Kemna, 590 F.3d 592, 595-96 (8th Cir. 2010).

To assess whether a defendant was prejudiced by a lawyer's failure to call a witness at trial, this Court "add[s] the testimony of [defendant's] uncalled witnesses to the body of evidence actually presented at his trial." Id. at 596. There is "no prejudice if, factoring in the uncalled witnesses, the government's case remains overwhelming." Id. at 605 (internal citation and quotations omitted). Relevant considerations include "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." Id. at 596 (internal citation and quotations omitted).

### 1. Alleged Failure to Call Witnesses Who Purportedly Would Testify About Paul Humphrey

Lee contends that his lawyers should have introduced testimony from three witnesses relating to an individual named Paul Humphrey. COA Motion 29-30. Humphrey – who testified at trial – lived near the Muellers in Arkansas and was friends with William Mueller. Tr. 6145-50. Humphrey came to possess the titles to Mueller's vehicle after Mueller's death. Humphrey testified that he and Mueller had devised a plan – based on a reading of the Seventh Amendment they had learned at a seminar – to take

-22-

the titles to their respective vehicles "from the state out of its hands and back to our hands." The plan involved exchanging the titles to their vehicles for "pieces of silver." According to Humphrey, he told the Muellers' landlord about the scheme after the Muellers went missing, and she sent the titles over to him. Tr. 6153-67, 6176.

The defense suggested Humphrey – and several other individuals – as a possible perpetrator of the Mueller murders. Tr. 6907-12, 6948, 6953; see Tr. 6887, 6922. Lee now argues that his lawyers were ineffective because they failed to call witnesses who, he contends, would have supported this theory. According to Lee, if called as a witness, an individual named David Hill would have testified that he "saw Humphrey and another man throw something off the bridge at the Illinois Bayou at about 8:15 a.m. during the second week of January 1996." Dkt. 1118, at 15. Lee contends that an individual named Glen Hinson would have testified that Humphrey appeared "nervous and scared" after he obtained the titles to Mueller's vehicle and that Nancy Mueller had said she was frightened of Humphrey. Id. Lee further contends that an individual named Eldon King would have testified that "Humphrey began acting strangely after the [Muellers] disappeared." Id.

There is no reasonable possibility that the jury would not have convicted Lee of the Mueller murders had this testimony been introduced at trial. The argument that Humphrey may have committed the murders is

-23-

based on conjecture and speculation. In contrast, the evidence showing that Lee and Kehoe committed the murders was overwhelming. That evidence included but was not limited to evidence showing the following: Kehoe and Lee were traveling together in early January. They left Lee's mother's house in Oklahoma on January 10, the day before the Muellers were murdered. Tr. 2619-20, 2633. They arrived in Washington three or four days later, flush with cash and in possession of property owned by the Muellers. Tr. 2610, 2620-22, 2896, 2900-01, 2916, 2915. They separately confessed to Gloria Kehoe that they murdered the Muellers. Tr. 4972-75. Lee additionally told the Wankers he had wrapped and taped up some individuals "down south" and thrown them in the swamp. Tr. 4082-83, 4093. Kehoe later confessed in detail to his brother, reporting Lee's involvement. Tr. 5326-31; see Kehoe, 310 F.3d 584-85. When police eventually searched storage units in Idaho and Washington used by Kehoe, they seized – among other things – display cases that Mueller had used to display his merchandise at gun shows and that contained Lee's fingerprints. Tr. 3380-3403, 3610-28, 3650, 3710; see Kehoe, 310 F.3d at 585.

The jury obviously rejected the suggestion that Humphrey may have been involved. At trial, Humphrey flatly denied involvement in the Mueller murders, Tr. 6204, and the jury had the opportunity to observe him and assess his credibility. There is no reasonable possibility that the jury's

-24-

conclusion could have been altered by additional testimony that Humphrey was seen "throwing something" into the Illinois Bayou and that he was observed acting "nervous" and "strangely."

### 2. Alleged Failure to Call Witnesses Who Purportedly Would Testify They Had Never Heard of the APR

Lee argues that his lawyers were ineffective for failing to call to the stand three witnesses – Kelly Kramer (Kehoe's "second wife" for a period of time), Faron Lovelace, and Norda Lewis (Lovelace's wife) – who (according to Lee) would have testified either that they had never heard Chevie Kehoe mention setting up the APR or had never heard any mention of the APR. COA Motion 30-31; see Dkt. 1118, at 16-17. Lee also contends that his lawyers were deficient because they did not elicit, during cross-examination of Jeff Brown, that Brown had never heard of the APR. COA Motion 31; see Dkt. 1118, at 17.[9]

There is no reasonable possibility that this testimony would have led the jury to concluded that the APR did not exist. The proof of the APR's existence was overwhelming. The evidence showed that Chevie Kehoe decided to form a group modeled on Robert Matthews' group, "The Order," described in a book entitled *The Silent Brotherhood*. Kehoe intended to avoid

---

[9]Brown was the manager of the Shadows Motel in Spokane, Washington, were Kehoe sometimes lived, including during the period after the Mueller murders. Tr. 2880-82, 2894-96.

-25-

Appellate Case: 11-1380     Page: 31     Date Filed: 11/21/2011 Entry ID: 3851678

Matthews' mistakes. His plan was to commit robberies and obtain land for the an "Aryan homeland." Tr. 1316-22. At Kehoe's direction, Faron Lovelace kidnaped Malcolm and Jill Friedman and stole $15,000. Tr. 4139-47, 4963, 5284. Kehoe kept most of the money and used it to purchase land near Priest River, Idaho. Tr. 5300-02, 4188-97, 4199. Members of the group, including Lee, congregated there. Kehoe recruited Lee into the group and tried to recruit Sean Haines. Tr. 2800, 4353-55. Kehoe killed a member of the group, Jon Cox, because he believed Cox was revealing information about planned robberies of armored cars. Tr. 5365. Kehoe and Lee detonated a bomb at the Spokane city hall to determine how officials would react. Tr. 4977. Kehoe and Lee also murdered the Muellers and brought the property stolen from the Muellers back to the Pacific Northwest. The group dispersed after Sean Haines was arrested with one of Mueller's guns. Kehoe planned for the future of the APR while he was on the run in Utah. He planned to get in touch with Lee and devised a logo. Tr. 5370-73. Lee obtained a tattoo that he said was an emblem of the APR. Tr. 4115-16.

The evidence of the APR's existence remains overwhelming even after factoring in the uncalled witnesses. The jury's conclusion that the APR existed would not have been affected by testimony from a few people that they had not heard Chevie Kehoe mention the APR. Moreover, if Faron Lovelace had testified that he had never heard of the APR, he would have

-26-

been subject to damaging impeachment on cross-examination. See Armstrong v. Kemna, 590 F.3d at 602-03 (considering credibility and potential for impeachment of uncalled witness).

### 3. Alleged Failure to Call Witnesses Who Purportedly Saw or Heard the Muellers After January 11, 1996

Lee contends that his lawyers were ineffective for failing to call four witnesses – Maria Ahrens, Vernon Ahrens, Pam Wrappe, and Earlene Branch – who (according to Lee) would have testified that they saw the Muellers or heard William Mueller's "distinctive cough" after January 11, 1996. COA Motion 31-32. Lee contends that this testimony, together with evidence showing that Lee was in Washington as of January 13, 1996, "would have been fatal to the government's case against" him. COA Motion 32.

The evidence that the Muellers were murdered on January 11, 1996 was overwhelming. The evidence showed that William Mueller, who worked at an electrician, was in the middle of installing an intercom system for a customer and ceased work as of January 11 and did not come to pick up the $800 the customer owed him. Tr. 1789-95. According to the records from an electronics store and hardware store where Mueller held accounts, Mueller ceased his regular purchases as of January 11. Tr. 1811-17, 1830. Phone records showed that calls from the Muellers' home phone ceased on January 11, as did calls using their credit card. Tr. 1828-37. Activity in Nancy

-27-

Appellate Case: 11-1380     Page: 33     Date Filed: 11/21/2011 Entry ID: 3851678

Mueller's checking account ceased as of January 11. Tr. 1837-55. Deliveries of gun parts that William Mueller had been receiving via UPS ceased as of January 11. Tr. 2287-90. After January 11, Mueller ceased cashing the monthly pension checks. Tr. 2164-68. The Muellers' contact with a number of close friends ceased as of January 11. <u>See, e.g.</u>, Tr. 1913-19, 1928-30.

Lee and Kehoe offered evidence and made a strenuous effort at trial to try to convince the jury that the Muellers were murdered sometime after January 11. <u>See</u> Tr. 6948-54. The jury obviously rejected these witness's recollections in light of the much stronger documentary evidence and corroborated testimony offered by the government. There is no reasonable possibility that the additional recollections that Lee contends his lawyers should have introduced at trial would have changed that result.

Lee contends, for example, that Wal-Mart employee Pam Wrappe would have testified that she "participated in discussions regarding the Muellers being in the Wal-Mart." Dkt. 1118, at 15-16. This would have added nothing to the testimony of two Wal-Mart employees, Susan Weaver and Betty Gray, who said that they saw William Mueller sometime between January 6 and 18 (Gray) and sometime in 1995 or 1996 (Weaver). Tr. 5830, 5833; <u>see, e.g.</u>, <u>Paul v. United States</u>, 534 F.3d 832, 838 (8th Cir. 2008) (no effective assistance for failing to present testimony "largely cumulative of evidence already presented"). Similarly, according to Lee, Earlene Branch would have testified

-28-

that she "heard Mueller's distinctive cough" while she was at the home of Sylvia and David Mason in February 1996. Dkt. 1118, at 16. But the Masons (the Muellers' landlords) testified that they learned that the Muellers were missing around January 19 and last saw or heard from the Muellers on January 3. Tr. 6009, 6226, 6229-30. With regard to Vernon and Marie Ahrens, Lee contends they would have testified that they saw the Muellers at their auto shop "after [the Muellers] were supposed to be missing." Dkt. 1118, at 15. Had they so testified at trial, the government would have impeached them (or more likely refreshed their recollections) with ATF agent interview summaries reflecting that when previously interviewed Vernon Ahrens had fixed the date he last saw the Muellers as either January 3 or 4. Dkt. 1126-2, at 2-3. In sum, even after factoring in the uncalled witnesses, the evidence that the Muellers were murdered on January 11 remains overwhelming.

### 4. Purported Evidence that William Mueller Feared for His Life

Lee argues that his lawyers should have called a witness, George Eaton, who (according to Lee) would have testified that Mueller "expressed fear for his life" two months before he went missing. Dkt. 1118, at 13; see COA Motion 32-33. Lee also contends that his lawyers should have called Peter Langan and Michael Brescia. Id.

These arguments plainly lack merit. Lee does not explain how Mueller's

-29-

expression of fear to Eaton was relevant to any issues at trial, let alone how introduction of the evidence possibly could have changed the result at trial. As for Langan and Brescia, Lee states that they are white supremacists who committed a series of bank robberies in the Midwest in the early to mid-1990s. <u>See</u> Dkt. 1118, at 14. But he does not explain what their testimony would have been, let alone what its relevance would have been at trial. To the extent he suggests that Langan and Brescia committed the murders, and not Lee and Kehoe, the vague and speculative testimony Lee now says should have been introduced at trial would not have changed the jury's verdict in light of the overwhelming evidence of Lee and Kehoe's guilt.

### E.    Issue 5: Allegedly Inadequate Cross-Examine of the Wankers

#### 1.    Background

ATF agents investigating the Mueller murders identified James Wanker and Delvine Wanker – a couple who lived at and for a time managed the motel in Spokane, Washington, where Kehoe and Lee resided after the murders – as witnesses against Lee. Dkt. 1126-2, at 1. After the media in Spokane identified the Wankers as potential witnesses, ATF agents became concerned for the Wankers' safety because a number of individuals associated with Kehoe and Lee lived in the Washington and Idaho area. The ATF therefore decided to assist the Wankers in moving. The ATF provided the Wankers with four $50 subsistence payments totaling $200 –  one $50

-30-

payment for each of the four days the Wankers would be moving between January 20 and 23, 1998. Dkt. 1126-2, at 1-2, 5-7.

Over a year later, the Wankers testified at Lee and Kehoe's trial. Tr. 4078-4104. James Wanker testified that, in late July 1996, Lee said that he had taken a trip "down south" and that "somebody had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83. Dalvine Wanker testified about a conversation with Lee in which he said that "he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093.

On cross examination of the Wankers, Lee's counsel elicited testimony that Lee had left behind a trailer when he departed from the motel and that the Wankers, who by then were the hotel's managers, rented out and allowed a family to move into the trailer. Tr. 4086-88, 4091, 4096. Lee's counsel referenced this testimony during closing arguments, arguing that the Wankers "literally stole these trailers" and that they were not credible because their conduct " demonstrated their bias towards" Lee.  Tr. 6943-44. Lee's counsel did not ask the Wankers about the four $50 payments.

### 2.  Discussion

Lee argues that he received ineffective assistance of counsel because his lawyers did not cross examine the Wankers about the four $50 payments. COA Motion 42-46. Lee's arguments plainly lack merit.

-31-

The cross examination of the Wankers by Lee's counsel was well within the "wide range of reasonable professional assistance" that a competent criminal defense counsel could provide under "prevailing professional norms." Strickland, 466 U.S. at 688-89. As this Court noted in Lee's direct appeal, the decision not to question the Wankers about the relocation money from the government "could well have been strategic." Lee, 374 F.3d at 652. Questioning the Wankers about the money would have opened the door to questions about the reasons for the Wankers' relocation, namely "previous retaliation against witnesses by white supremacist groups." Id. Lee's counsel reasonably "may have wanted to keep any evidence of this type from the jury." Id. That's particularly true in light of the meager impeachment value of the payments: four payments to two individual totaling $200 made over a year before their testimony.

Lee argues that it is necessary to plumb his counsel's subjective reasoning in order to determine whether his counsel's cross-examination of the Wanker's fell within the range of reasonable professional assistance. According to Lee, the district court should have held a hearing to assess whether the cross-examination of the Wankers "was the product of reasoned choice" or the product of "negligence, inattention or some other deficiency." COA Motion 43. Such an inquiry, however, would be inconsistent with the applicable standards. When assessing whether counsel's performance might

-32-

be considered sound trial strategy, the inquiry focuses on "the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Harrington v. Richter, 131 S.Ct. at 790. A reviewing court "'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1407 (2011) (quoting Strickland, 466 U.S. at 689-90). The court must not only give counsel the benefit of the doubt, but it must "affirmatively entertain the range of possible 'reasons [defendant's] counsel may have had for proceeding as they did.'" Id. (quoting Pinholster v. Ayers, 590 F.3d 651, 692 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting)). Under the applicable objective standard, it is clear that counsel's cross-examination of the Wankers was reasonable.

### F. Issue 6: Failure to Object to Allegedly Improper Closing Arguments

Lee argues that the government prosecutors made six improper arguments during their summation. COA Motion 46-55. According to Lee, if his trial counsel had objected to these purportedly improper arguments, it is likely he would not have been convicted of the three murders. Id. at 56-60. He also argues that it is likely this Court would have reversed his conviction if his lawyers had raised these claims of improper closing arguments on direct appeal. Id. 61-62. These claims do not withstand scrutiny.

-33-

Appellate Case: 11-1380    Page: 39    Date Filed: 11/21/2011 Entry ID: 3851678

### 1. Background

Lee contends that the following comments by the government during closing arguments were improper.

#### a. Statements Regarding an Aryan Inmate and Threats to Cheyne Kehoe

During cross examination, Chevie Kehoe's lawyer elicited from Cheyne Kehoe that he was transferred from an Ohio prison to a federal facility, Tr. 5511-12, and that while in the Ohio prison he had been placed in the infirmary for protective custody as a result of "a threat sent into the prison that [inmates] were going to try and kill" him. Tr. 5514-15. Cheyne Kehoe testified that "[t]here was a written threat received at the institution sent to me that said they were going to come and get me and kill me." Tr. 5518.

Inquiring about the threats and transfer to a federal prison during re-direct of Cheyne Kehoe, the prosecutor asked if "there was in incident in which an inmate got into the [prison] infirmary, an Aryan inmate, got into the infirmary and threatened" him. Tr. 5541. Cheyne Kehoe answered, "That's what I was told, yes," adding that he had been told that "an outside inmate from the [protective custody] unit had actually got inside the unit looking for me." Id. Cheyne Kehoe stated that he was taken into federal custody three days later. Id.

The government mentioned Cheyne Kehoe's testimony during closing

-34-

arguments. The prosecutor explained that the government had "made a deal with Cheyne Kehoe" and had "moved him out of state prison to a federal prison." Tr. 6808. The prosecutor explained that "even after being put in protective custody an Aryan inmate came in looking for him and there were death threats on Cheyne's life." Id. The prosecutor rhetorically asked whether the transfer was a "fair deal." Id.

### b. Statement that Lee Called Nancy Mueller a "Dumb Bitch"

Gloria Kehoe testified that Lee said to her that "Bill was one tough son of a bitch because he fought so hard and how dumb Nancy was because she thought it was real and helped put the trash bag on her head because she thought it was real." Tr. 4975. During closing arguments, the prosecutor said:

> Danny told Gloria about the murders, Gloria Kehoe, "Bill was one tough son of a bitch," talking about the fight when Bill fought for his life. "Bill was one tough son of a bitch." But Nancy was a dumb bitch because she pulled that plastic bag over her own head. Take a look at the color of that bag, ladies and gentlemen.

Tr. 6821-22.

### c. Reference to Gloria Kehoe's Testimony Regarding Kirby Kehoe

During closing arguments, the prosecutor explained that the government had to prove that each defendant "had a position in the [racketeering] enterprise." Tr. 6820-21. The prosecutor first addressed Chevie Keho's position in the enterprise. The prosecutor argued that "Chevie Kehoe

-35-

was the leader and founder of a criminal enterprise." Id. at 6821. The prosecutor contrasted Chevie Kehoe with Kirby Kehoe: "Kirby Kehoe talked about things," the prosecutor argued, like practicing polygamy and setting off bombs, while "Chevie Kehoe did them." Id. Further to that point, the prosecutor asked the jury to "recall the testimony" that "Chevie Kehoe brought Danny Lee down to Arizona with the plans to do the January 1996 robbery and murder of the Muellers. And because he brought Danny Lee with him, Kirby Kehoe didn't want to play. He didn't want to go. He didn't want to participate, and he stayed in Arizona." Id.

### d. Referring to Lee as a "Faithful Dog" and a "Henchman"

After discussing Kehoe's position in the enterprise, the prosecutor addressed Lee's position in the enterprise. The prosecutor argued that while "Chevie Kehoe is the leader of this enterprise," "Danny Lee is like the faithful dog." Tr. 6821. "They had a position," the government argued, "Chevie Kehoe is the leader. Danny Lee is the henchman." Id.

### e. Reference to Kirby Kehoe's Guilty Plea

When discussing the RICO conspiracy count (Count 2) during closing arguments, the prosecutor said that such a conspiracy is one that the participants "deliberately join[] with knowledge of the criminal organization's purpose." Tr. 6824. The prosecutor argued that "Chevie Kehoe didn't join

-36-

Appellate Case: 11-1380    Page: 42    Date Filed: 11/21/2011 Entry ID: 3851678

this," he "created it." <u>Id.</u> The prosecutor argued that Lee "joined it" and that Faron Lovelace, Cheyne Kehoe, and Kirby Kehoe were involved. <u>Id.</u> The prosecutor said that "Kirby Kehoe is not present today, because you've already been informed that Kirby Kehoe pled guilty to Racketeering Count 1 for his role and his participation in this criminal organization." <u>Id.</u>

### f. Argument That James Wanker Received No Benefit for His Testimony

During his summation, Lee's lawyer argued that the Wankers had "demonstrated their bias towards Lee" and that they "continue to demonstrate that now." <u>Id.</u> at 6944. In rebuttal, the prosecutor said that "[n]obody paid Mr. Wanker anything." Tr. 7002. The prosecutor argued that "[t]here is no reason for him to come in here to tell you that story" – i.e., that Lee said he had wrapped and taped up some people and "threw them in the swamp" – "unless it's the truth." <u>Id.</u>

### 2. Discussion

In determining whether a defendant received ineffective assistance of counsel for failing to object to allegedly improper closing arguments, this Court considers (1) whether the allegedly improper comments were in fact improper and warranted an objection; (2) whether counsel's performance was deficient for failing to object; and (3) whether "there is a reasonable probability that, but for [counsel's] failure to object, the result of the

-37-

proceeding would have been different." <u>Sinisterra v. United States</u>, 600 F.3d 900, 909-12 (8th Cir. 2010); <u>see also</u> <u>Seehan v. Iowa</u>, 72 F.3d 607, 608-12 (8th Cir. 1995) (en banc) (finding no ineffective assistance of counsel for failure to object to prosecutor's allegedly improper comments). To assess the effect of an improper closing argument on the proceedings, the Court looks to three factors: the cumulative effect of the improper statements, the strength of the properly admitted evidence of defendant's guilt, and any curative actions taken by the trial court. <u>See, e.g.</u>, <u>United States v. New</u>, 491 F.3d 369, 377 (8th Cir. 2007). Lee's claims fail under this analysis.

As a preliminary matter, Lee's claims pertaining to the closing arguments mentioning James Wanker are not properly before this Court. Lee raised five claims of improper closing argument in his Section 2255 motion. <u>See</u> Dkt. 1118, at 24; <u>see also</u> <u>Lee</u>, 2008 WL 4079315, at *30-*35 (setting forth and discussing five allegedly improper arguments listed in Lee's Section 2255 motion). He did not claim that the prosecutor's arguments with regard to James Wanker were improper. Lee therefore cannot now raise this issue on appeal. <u>See</u> <u>Abdullah v. United States</u>, 240 F.3d 683, 685 (8th Cir. 2001); <u>see also</u> <u>Hines v. United States</u>, 282 F.3d 1002, 1005 (8th Cir. 2002); <u>United States v. Pettiford</u>, 612 F.3d 270, 281 (4th Cir. 2010); <u>Carty v. Thaler</u>, 583 F.3d 244, 266 (5th Cir. 2009); <u>Rodriguez v. United States</u>, 286 F.3d 972, 978-79 (7th Cir. 2002); <u>David v. United States</u>, 134 F.3d 470, 474 (1st Cir.

-38-

1998).

In any case, Lee's claims fail on the merits. First, most of the allegedly improper comments raised by Lee were in fact proper. There was no impropriety, for example, in referring to Lee as a "faithful dog." While referring to someone as a "dog" may be derogatory in some contexts, it is not derogatory to liken someone to a "faithful dog," which implies loyalty and devotion. See Miller v. Clark County, 340 F.3d 959, 968 n.13 (9th Cir. 2003) (noting "many of the excellent qualities that have been admired in [dogs] for centuries"). Similarly, it was not misleading to say that "[n]obody paid [James] Wanker anything" to testify at the trial. Defense counsel had urged the jury to disregard testimony from Gloria Kehoe and Sean Haines because they purportedly received $27,000 and $6,500, respectively, from the government as cooperators. See Tr. 6884, 6927, 6937, 6942. In contrast, the Wankers in effect each received $25 per day over the course of four days, which is less than the $40 daily attendance fee due to witnesses in a federal case. See 18 U.S.C. § 1821(b). Moreover, the Wankers were given the money because they had to move due to their involvement as witnesses in the case, see supra pp. 30-31, not to compensate them for their cooperation.

Second, even accepting Lee's claims that the closing arguments he enumerates were improper – and that the failure to object was not the product of reasonable trial strategy – Lee cannot establish that he was

-39-

prejudiced. There is no reasonable probability that the result of the trial would have been different had his lawyers objected. Lee cannot establish that the jury's "verdict would have changed absent these comments." United States v. Branch, 591 F.3d 602, 609 (8th Cir. 2009).

For instance, Lee suggests that the prosecutor's reference to an Aryan who "came looking for" Cheyne Kehoe and the "death threats on Cheyne's life" improperly provided support for the contention that Kehoe was a member of a "racketeering entity." COA Motion 48. But the prosecutor mentioned the Aryan inmate and the threat only to argue that it was those incidents, and not the attempt to provide a benefit to Kehoe for his testimony, that led to his transfer to a federal prison. The prosecutor did not use the incidents to argue that Lee joined a white supremacist organization, the APR, or that Lee was in any way implicated in the death threat or the incident in the infirmary. Moreover, the evidence establishing Lee's involvement with the APR was overwhelming. Lee and Kehoe planted a bomb at the Spokane city hall, for example, and Lee obtained a tattoo that (according to him) was the emblem of the APR. Tr. 4115-16. He also told another white supremacist that he "was with a group that was doing militia-type activities, things similar to the Order, that they would be making history." Tr. 4416; see supra pp. 25-26 (discussing evidence regarding APR).

The evidence of the APR and Lee's involvement in it also obviates any

-40-

potential prejudice from reference to Kirby Kehoe's guilty plea during closing arguments. Even if (as Lee argues) the reference to the guilty plea suggested the existence of an enterprise, the jury would have reached the same verdict in light of the overwhelming evidence. Moreover, the district court specifically told the jury that "[y]ou are instructed not to consider the legal effect or consequences of Kirby Kehoe's plea . . . in your deliberations on these charges as they relate to the defendants [Chevie] Kehoe and Lee." Tr. 7017. The jurors are presumed to have followed this admonition. See Jones v. United States, 527 U.S. 373, 394 (1999) (collecting cases).

The prosecutor mistakenly said that Lee referred to Nancy Mueller as a "dumb bitch." It appears he mistakenly juxtaposed Lee's statement that William Mueller was a "tough son of a bitch" with Lee's statement that Nancy Mueller was "dumb." In any case, the incorrect statement that Nancy Mueller was a "dumb bitch" was only marginally more offensive than Lee's actual statement that Nancy Mueller was "dumb" because she willingly placed a plastic bag over her head so that Lee could tape it around her neck to suffocate and kill her. Moreover, the prosecutor did not place any emphasis on his mistaken recollection of the testimony, and the evidence that Lee murdered the Muellers was overwhelming. Cf. Lee, 374 F.3d at 645 (concluding that Kehoe's confession to his mother "merely corroborated the large amount of evidence presented against Lee at trial" and that "[a]ny error

-41-

in the admission of these statements was harmless beyond a reasonable doubt").

The substantial evidence that Lee murdered the Muellers also precludes a finding that the jury would have reached a different verdict had the prosecutor not alluded to Gloria Kehoe's testimony that Kirby Kehoe said he intended to participate in the Mueller robbery and murders but decided not to because of Lee's involvement. According to Lee, Kirby Kehoe's statements suggested that Lee but not Kirby Kehoe was involved in the murders. COA Motion 53-54. But even if Kirby Kehoe's statements were hearsay that should not have been relied on as substantive evidence, in light of the overwhelming evidence that Lee murdered the Muellers, the jury clearly would have reached the same decision even without any reference to those statements. Moreover, the prosecutor did not use those statements to argue that Lee murdered the Muellers. Rather, he mentioned the statements to show that Chevie Kehoe was the leader of the APR.

## II. Claims Pertaining to the Penalty Phase of Lee's Trial

### A. Allegedly Deficient Failures to Challenge Statutory Aggravating Factors

#### 1. Background

In a case involving a homicide for which the death penalty is an available punishment, if the government believes that a sentence of death is

justified, it must serve on the defendant a notice "setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(2). The Federal Death Penalty Act (FDPA) enumerates several aggravating factors for homicide cases. See 18 U.S.C. § 3592(c). In addition to these statutory aggravating factors, the FDPA allows the government to prove the existence of "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592(c). Courts refer to these unenumerated aggravating factors as "non-statutory aggravating factors." See Jones v. United States, 527 U.S. 373, 378 n.2 (1999).

If the defendant is found guilty, the district court must "conduct a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C. § 3593(b). At this hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," regardless of its admissibility under the Federal Rules of Evidence. 18 U.S.C. § 3593(c). Accordingly, the government "may present any information relevant to an aggravating factor for which notice had been provided." 18 U.S.C. § 3593(c). The government has the burden of proving "any aggravating factor . . . beyond a reasonable doubt." Id. The defendant has the burden of proving "any mitigating factor . . . by a preponderance of the evidence." Id.

At this stage, the jury in a homicide case must make three

-43-

Appellate Case: 11-1380    Page: 49    Date Filed: 11/21/2011 Entry ID: 3851678

determinations before it can impose the death penalty. First, it must "find, unanimously and beyond a reasonable doubt, that the defendant acted with the requisite *mens rea*." United States v. Purkey, 428 F.3d 738, 749 (8th Cir. 2005) (citing 18 U.S.C. § 3591(a)(2)). "Second, again unanimously and beyond a reasonable doubt, it must find the existence of at least one statutory aggravating factor." Id. (citing 18 U.S.C. §§ 3592(c) & 3593(d)). If the jury makes these first two determinations, it "must then determine whether the aggravating factors, both statutory and non-statutory, 'sufficiently outweigh' the mitigating factors presented by the defendant to justify a death sentence, 'or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify' that sentence." Id. (quoting 18 U.S.C. § 3593(e)).

The government here filed a notice of intent to seek the death penalty against Lee for each of the three capital murder counts. The notice identified three statutory aggravating factors and one non-statutory aggravating factor that the government intended to prove in support of death sentences for each of the three murder counts: expectation of receiving something of pecuniary value, 18 U.S.C. § 3592(c)(8); substantial planning and premeditation to cause the death of the victim, 18 U.S.C. § 3592(c)(9); intentional killing of more than one person in a single criminal episode, 18 U.S.C. § 3592(c)(16); and risk of future dangerousness. See Lee, 374 F.3d at 642. The government

-44-

Appellate Case: 11-1380    Page: 50    Date Filed: 11/21/2011 Entry ID: 3851678

also notified Lee that for the murder of Sarah Powell the government intended to prove the additional statutory aggravating factor that at the time of the murder Powell was particularly vulnerable because she was eight years old. 18 U.S.C. § 3592(c)(11); see Lee, 374 F.3d at 642.

The jury returned a verdict of death on each of the three capital counts. For each of the murders, the jury unanimously found the expectation of receiving something of pecuniary value, the intentional killing of more than one person in a single criminal episode,[10] and the risk of future dangerousness. For Sarah Powell's murder, the jury unanimously found that she was a vulnerable victim. The jury did not find as to any of the counts that there was substantial planning and premeditation. Tr. 8016-22.

### 2. Discussion

#### a. Alleged Failures to Challenge the Pecuniary Gain Aggravating Factor at Trial and on Appeal

Lee argues that he received ineffective assistance of counsel because his lawyers "fail[ed] to adequately challenge the jury's consideration of the pecuniary gain aggravating factor at the penalty phase of" his trial. COA Motion 90. Lee contends that his appellate counsel were later ineffective for

---

[10]As we explain below, the multiple-killing aggravator should have been submitted only as a selection-stage non-statutory aggravating factor and not as an eligibility-stage statutory aggravating factor. Because at least one other statutory aggravating factor existed with respect to each murder count, the denomination of the multiple-killing aggravator as a statutory aggravating factor had no effect on Lee's eligibility for the death penalty or on the jury's weighing process.

-45-

failing to raise the issue on appeal. <u>Id.</u> at 90, 95-96. According to Lee, the evidence at trial did not support submission of the pecuniary gain aggravator to the jury. <u>Id.</u> at 91-94. In essence, Lee argues that the pecuniary gain aggravator only applies "to situations where the murder was the direct and indispensable key to the pecuniary gain, such as a killing done for hire, or a killing done to gain an inheritance or insurance proceeds." Dkt. 1118, at 27-28. Lee's arguments plainly lack merit.

### i. Issue 7: Effective Assistance of Trial Counsel

Lee cannot show that his trial counsel's performance fell below an objective standard of reasonable competence. His trial counsel made a timely objection to the district court that the pecuniary gain aggravator was inapplicable to Lee and should not be submitted to the jury, arguing that "this aggravator was meant to be used in cases of murder for hire." <u>Lee</u>, 2008 WL 4079315, at *36. Counsel referred the court to <u>United States v. Davis</u>, 904 F. Supp 554 (E.D. La. 1995), where the court said that the pecuniary-gain aggravator "in essence" describes "a murder-for-hire." <u>Id.</u> at 558. Regardless of whether, as Lee believes, his "[t]rial counsel's objection should have been sustained and the aggravating factor stricken," COA Motion 94, in light of the objection, he cannot establish that his trial counsel's performance was deficient.

Lee also cannot establish prejudice. For the reasons stated below, <u>see</u>

-46-

infra pp. 47-50, the pecuniary gain aggravator was properly submitted to the jury.

> ### ii. Issue 8: Effective Assistance of Appellate Counsel

Lee cannot establish that he received ineffective assistance from his appellate counsel due to a failure to raise the pecuniary-gain issue on appeal. Even assuming that appellate counsel's performance was deficient for failing to raise the issue, Lee cannot establish prejudice. If the issue had been raised, Lee would not have been entitled to relief, because it was plainly correct to submit the pecuniary-gain aggravator to the jury.[11]

This Court has held that the pecuniary-gain aggravator applies "not only to murder-for-hire," but also when a murder is committed during the course of another crime, like a robbery, so long as "'pecuniary gain is expected to follow as a direct result of the murder.'" United States v. Bolden, 545 F.3d 609, 615 (8th Cir. 2008) (quoting United States v. Bernard, 299 F.3d 467, 483-84 (5th Cir. 2002)). In Bolden, the defendant and two accomplices

---

[11]Even assuming that the multiple-murder aggravator should have been submitted as a selection-stage non-statutory aggravating factor, see infra pp. 50-53, Lee's argument regarding the pecuniary gain aggravator has relevance only with respect to the two death sentences imposed for the murders of William and Nancy Mueller. In imposing a sentence of death for the murder of Sarah Powell, the jury found the existence of the vulnerable victim statutory aggravating factor. Lee does not contend that the vulnerable victim aggravator should not have been submitted to the jury or that there was insufficient evidence to establish that aggravator. Thus the sentence of death for the murder of Sarah Powell was sound whether or not the pecuniary gain aggravator was properly submitted to the jury.

-47-

planned to go to a bank, take a guard hostage, demand money, and drive away. When the men went to implement the plan, Bolden pulled a gun on a guard, but the guard resisted and reached for the gun. After a struggle, Bolden regained controlled of the gun and fatally shot the guard. Id. at 613. This Court concluded that the evidence sufficed to apply the pecuniary-gain aggravator because "a reasonable jury" could "find that Bolden shot [the guard] to remove an obstacle to completing the robbery and that his intention was to continue with the robbery once [the guard] had been removed." Id. at 616.

It is clear under Bolden that the evidence at Lee's trial was sufficient to support the pecuniary-gain aggavator. The evidence established that Lee and Kehoe's goal was to fill the coffers of the APR using money and property found at the Mueller home. In order to achieve that goal, Kehoe and Lee waited for the Muellers to get home, forced the Muellers to reveal where their valuables were located, and tightly taped bags around the Muellers' heads to suffocate them. They then retrieved the valuables from the house and disposed of the Muellers' bodies in a nearby bayou. As in Bolden, a reasonable jury could find that Lee killed the Muellers "to remove an obstacle to completing the robbery." Bolden, 545 F.3d at 616. Moreover, not only was it Lee's intention "to continue with the robbery once [the Muellers] had been

-48-

removed," id., but he in fact did continue and complete the robbery.[12]

Lee argues that the evidence at trial tends to show that he and Kehoe had reasons for killing the Muellers other than an expectation of pecuniary gain. COA Motion 91-94. He argues, for example, that there was evidence suggesting that the murders were committed because Chevie Kehoe thought the Muellers were "government or ATF informants." COA Motion 93. These arguments miss the mark. The statute "does not require that pecuniary gain be the only motive for a murder." Bolden, 545 F.3d at 616. Moreover, the evidence supporting a jury-found aggravating factor is reviewed in the light most favorable to the government, not to the defendant. See United States v. Allen, 247 F.3d 741, 787 (8th Cir.2001) (upholding jury's finding of "grave risk of death" statutory aggravating factor because evidence, viewed in light most favorable to government, was sufficient to support finding), vacated on other grounds, 536 U.S. 953 (2002). In reviewing the sufficiency of the evidence supporting an aggravating factor, this Court considers "whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." Bolden, 545 F.3d at 815 (internal citation and quotations

---

[12]Moreover, consistent with Bolden, the jury was instructed that the pecuniary-gain aggravator was applicable if it found that Lee "expected to receive as a result of his murder of [the Muellers], the Mueller family's money, firearms, firearms parts, books, audio cassettes, military surplus equipment, display equipment, or other merchandise that the Muellers sold at gun shows." Dkt. 815, at 8; see Lee, 2008 WL 4079315, at *41 n.286.

-49-

omitted). Under that standard, Lee's alternative interpretations of the evidence are irrelevant.

### b. Alleged Failures to Challenge the Multiple Murder Aggravating Factor at Trial and on Appeal

Lee argues that his lawyers were ineffective for failing to challenge the jury's consideration of his commission of multiple murders as an aggravating factor at the penalty phase. COA Motion 96-97, 113-17. Lee notes that Congress enacted the multiple-murder aggravator of 18 U.S.C. § 3592(c)(16) in April 1996, id. at 113, a few months after he and Kehoe killed the Muellers. He argues that his trial counsel therefore should have challenged as a violation of the Ex Post Facto Clause the submission of the multiple-murder aggravator to the jury as a statutory aggravating factor that could make him eligible to receive the death penalty. Id. 96-97. He also argues that his appellate lawyers were ineffective because they did not raise this issue on appeal. Id. 113-17. These claims plainly lack merit.

### i. Issue 9: Effective Assistance of Trial Counsel

Lee cannot show that he was prejudiced by his trial counsel's failure to object to the jury's consideration of his commission of multiple murders as a statutory aggravating factor. As the district court has made clear, if Lee had lodged such an objection, the court would have instructed the jury to consider Lee's commission of multiple murders as a non-statutory aggravating factor,

Appellate Case: 11-1380    Page: 56    Date Filed: 11/21/2011 Entry ID: 3851678

see Lee, 2008 WL 4079315, at \*35, and the jury's consideration of the multiple murders as a non-statutory aggravating factor would have been fully appropriate. The jury was entitled to consider whether any "aggravating factor for which notice has been given exists," 18 U.S.C. § 3592(c), and the government provided notice to Lee that it intended to prove Lee's commission of multiple murders as an aggravating factor, see Lee, 2008 WL 4079315, at \*35. The Ex Post Facto Clause would not have precluded the jury from considering the multiple murders as a non-statutory aggravating factor. See United States v. Higgs, 353 F.3d 281, 300 (4th Cir. 2003). Thus an objection by Lee's counsel would have resulted only in the submission of the multiple murders as a non-statutory aggravating factor, instead of a statutory aggravating factor.

The submission of the multiple murders as a statutory aggravating factor, instead of a non-statutory aggravating factor, did not prejudice Lee. First, the submission of the multiple murders as a statutory aggravating factor did not affect the jury's determination that Lee was eligible to receive the death penalty. The jury had to find that the government proved beyond a reasonable doubt the existence of "1 of the 16 statutory aggravating factors set forth at 18 U.S.C. § 3592(c)." Jones v. United States, 527 U.S. at 377; see United States v. Paul, 217 F.3d 989, 1001 (8th Cir. 2000). With respect to each of the three murders, the jury unanimously found that the government

-51-

had proved beyond a reasonable doubt the existence of the pecuniary-gain statutory aggravating factor. The jury also unanimously found that the government had proved beyond a reasonable doubt the existence of the vulnerable victim statutory aggravating factor for the murder of Sarah Powell. The submission of the multiple-murder aggravator was therefore immaterial to the jury's determination that Lee was death eligible.

Second, the submission of the multiple murders as a statutory aggravating factor, instead of a non-statutory aggravating factor, did not affect the jury's determination that Lee should receive the death penalty. After finding the existence of at least one statutory aggravating factor, the jury was required to "determine whether the aggravating factors, *both statutory and non-statutory*, 'sufficiently outweigh[ed]' the mitigating factors" presented by Lee. Purkey, 428 F.3d at 749. (quoting 18 U.S.C. § 3593(e)) (emphasis added). The FDPA makes no distinction between statutory and non-statutory aggravating factors at this stage. In order to consider it, the jury must find the existence of any statutory or non-statutory factor beyond a reasonable doubt. The jury must then weigh all aggravating factors, both statutory and non-statutory, against the mitigating factors.  In other words, once Lee "became death eligible, all of the aggravating factors – statutory and non-statutory alike – and all of the mitigating factors were thrown into the pot to be weighed by the jury as it saw fit." United States v. Mitchell, 502

-52-

Appellate Case: 11-1380    Page: 58    Date Filed: 11/21/2011 Entry ID: 3851678

F.3d 931, 977 (9th Cir. 2007).

The mere denomination of the multiple-murder aggravating factor as a "statutory aggravating factor," instead of a "non-statutory aggravating factor," did not prejudice Lee. The Supreme Court has rejected the argument that attaching a "statutory label" to an aggravating factor causes a constitutional defect in the sentencing process by placing special emphasis  on the factor. See Brown v. Sanders, 546 U.S. 212, 224-25 (2006); Zant v. Stephens, 462 U.S. 862, 888-89 (1983). In any case, the jury instructions in this case eliminated the possibility that the jury would give additional weight to aggravating factors denominated as "statutory aggravating factors." The jury was instructed that "[i]n determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist – statutory or non-statutory – and each of you must weigh any mitigating factors that anyone of you individually found to exist." Dkt. 815, at 20. The jurors were further instructed that "[t]he process of weighing aggravating and mitigating factors against each other in order to determine the proper punishment is not a mechanical process," that they "should consider the weight and value of each factor," and that "[t]he law contemplates that different factors may be given different weights or values by different jurors." Id. at 20-21. The jury presumptively followed the court's weighing instructions. Jones, 527 U.S. at 394.

-53-

### ii. Issue 10: Effective Assistance of Appellate Counsel

Lee similarly cannot show that he received ineffective assistance of counsel on appeal due to his appellate counsel's failure to challenge submission of the multiple-murder aggravator to the jury as a statutory aggravating factor. A court of appeals may "not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C. § 3595(c)(2). As Lee recognizes, his appellate counsel would have had to overcome the plain-error standard because his trial counsel did not raise the issue below. COA Motion 116. Under that demanding standard, Lee cannot demonstrate that the denomination of the multiple-killing aggravator as a statutory aggravating factor either affected his substantial rights or "seriously affect[ed] the fairness, integrity or public reputation of the judicial proceeding." United States v. Olano, 507 U.S. 725, 732 -737 (1993). In any event, even if the issue were properly preserved and raised on appeal, it is clear that submission of the multiple-murder aggravator to the jury as a statutory aggravating factor, instead of a non-statutory aggravating factor, was harmless beyond a reasonable doubt. Thus, Lee would not have been entitled to relief.

-54-

Appellate Case: 11-1380     Page: 60     Date Filed: 11/21/2011 Entry ID: 3851678

The harmless-error analysis here "is straightforward, and certain." Mitchell, 502 F.3d at 978. The jury found the pecuniary-gain statutory aggravator beyond a reasonable doubt for each of the three murders, as well as the vulnerable-victim statutory aggravator for the murder of Sarah Powell. The jury's finding of the multiple-murder aggravator therefore did not affect Lee's eligibility for the death penalty. Even if it was incorrect to submit the multiple-murder aggravator to the jury as a statutory aggravating factor, the government provided notice that it intended to prove the multiple-murder aggravator, and it was therefore proper for the jury to consider the multiple-murder aggravator when deciding whether to impose the death penalty. See supra pp. 50-53.

This is the analysis the Fourth Circuit employed in United States v. Higgs, 353 F.3d 281 (4th Cir. 2003). In that case, Higgs was convicted of nine capital offenses. Id. at 288. Higgs committed the offenses before Congress enacted the multiple-killing aggravator of 18 U.S.C.A. § 3592(c)(16). See 353 F.3d at 300. The district court denied Higgs's motion to strike multiple killings in a single criminal episode as a statutory aggravating factor on the basis of an alleged violation of his rights under the Ex Post Facto Clause. Id. at 319. The jury then found at least three statutory aggravating factors – including the multiple-killing aggravator – for each of the offenses, as well as two non-statutory aggravating factors. Id. at 295. After weighing the

-55-

aggravating and mitigating factors, the jury sentenced Higgs to death for each capital offense. Id. On appeal, the Fourth Circuit concluded that "[r]eliance upon a statutory aggravating factor that was added to the death-penalty statute after a murder is committed would run afoul of the Ex Post Facto Clause *if* the aggravating factor served as the sole aggravating factor that rendered the crime death-eligible," and that therefore "the district court's submission of the 'multiple killings' aggravating factor as a *statutory* aggravating factor was error." Id. at 319 (emphasis in original). The court concluded, however, that submission of the multiple-killings aggravating factor as a statutory aggravating factor "was harmless error." Id. "Because the jury found the existence of at least one intent factor and at least one other properly-submitted statutory aggravating factor, the murder was death-eligible," the court concluded, and "[a]ny additional statutory and nonstatutory aggravating factors did not increase the available punishment and were, instead, appropriately considered by the jury in determining whether to impose the death sentence." Id. at 319-20; see also United States v. Mitchell, 502 F.3d 931, 977 (9th Cir. 2007) (employing the same analysis in similar circumstances).

Brown v. Sanders, 546 U.S. 212 (2006), strongly supports this analysis. Sanders establishes that a jury's consideration of an "invalid sentencing factor" – either as an eligibility factor (a "statutory aggravating factor" in the

-56-

federal death penalty scheme) or an aggravating factor (which in the federal scheme encompasses the statutory and non-statutory aggravating factors) – will not give rise to constitutional error if the jury could have "given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." 546 U.S. at 221. In these circumstances, there is no possibility of "the skewing that could result from the jury's consideration *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty." Id. (emphasis in original). There similarly is no potential for improper skewing in this case. It was proper for the jury to weigh Lee's commission of multiple murders in a single criminal episode in favor of the death penalty. The multiple killing aggravating factor was not "invalid." Rather, the only potential error was the denomination of the multiple-killing aggravator as a "statutory aggravating factor." Thus the analysis of Sanders, applied to the circumstances of this case, strongly supports the analyses performed by the Fourth and Ninth Circuits in Higgs and Mitchell. See, e.g, Mitchell, 502 F.3d at 977 (citing Sanders); see also Jones v. United States, 527 U.S. 373, 402-05 (1999) ( holding that a federal court of appeals may declare an error concerning an aggravating factor harmless if the judges are convinced that the jury would have returned the same verdict had the invalid aggravating factor not been submitted at trial).

-57-

## B. Issue 11: Alleged Failure to Challenge the Indictment for Not Alleging Aggravating Factors

### 1. Background

In <u>Walton v. Arizona</u>, the Supreme Court held that the Arizona capital sentencing scheme – in which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge determined the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty, <u>see</u> <u>Ring v. Arizona</u>, 536 U.S. 584, 588 (2002) – did not violate the Sixth Amendment. 497 U.S. 639, 649 (1990). The Court concluded that the Sixth Amendment does not require a State to "denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances." <u>Id.</u>

On March 24, 1999, in the middle of Lee's trial, the Supreme Court decided <u>Jones v. United States</u>, 526 U.S. 227 (1999). <u>Jones</u> interpreted the federal carjacking statute in a manner that avoided constitutional concerns, namely the potential for violating the principle that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." <u>Id.</u> at 243 n.6. The majority distinguished <u>Walton</u>. <u>Walton</u>, the Court explained,

-58-

Appellate Case: 11-1380    Page: 64    Date Filed: 11/21/2011 Entry ID: 3851678

"characterized the finding of aggravating facts falling within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, not as a process of raising the ceiling of the sentencing range available." 526 U.S. at 251.

Apprendi v. New Jersey, 530 U.S. 466 (2000), decided after Lee's trial, marked a substantial shift in Sixth Amendment jurisprudence. Apprendi held that the Sixth Amendment does not permit a defendant to be "expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." Id. at 483. The majority again distinguished Walton. "[O]nce a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death," the court stated, "it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." 530 U.S., at 497 (internal citations and quotations omitted).

While Lee's case was on direct appeal, the Supreme Court revisited Walton in Ring v. Arizona, 536 U.S. 584 (2002). On Ring's way to the Supreme Court, the Arizona Supreme Court criticized Apprendi's factual characterization of the Arizona capital sentencing scheme. According to the Arizona Supreme Court, "[a] defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical

-59-

finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." <u>Ring</u>, 536 U.S. at 596 (internal citation and quotations omitted). With this clarification, the Supreme Court concluded that "<u>Walton</u> and <u>Apprendi</u> are irreconcilable" and that "our Sixth Amendment jurisprudence cannot be home to both." <u>Id.</u> at 609. The Court accordingly "overrule[d] <u>Walton</u> to the extent that it allow[ed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." <u>Id.</u>

This Court has held that in light of <u>Jones</u>, <u>Apprendi</u>, and <u>Ring</u>, "at least one statutory aggravating factor and the *mens rea* requirement" must be "found by the grand jury and charged in the indictment" in a federal capital case. <u>United States v. Allen</u>, 406 F.3d 940, 943 (8th Cir. 2005) (en banc). "The indictment must include at least one statutory aggravating factor to satisfy the Fifth Amendment," the Court concluded, "because that is what is required to elevate the available statutory maximum sentence from life imprisonment to death." <u>Id.</u>

In his direct appeal, Lee argued that "the district court erred in failing to dismiss the indictment against him because it did not allege every element of a capital offense by including the aggravating factors necessary to impose a death sentence." <u>Lee</u>, 374 F.3d at 650. This Court determined that Lee had to show plain error because he raised the issue for the first time on appeal. <u>Id.</u>

-60-

at 651. "Even if the indictment was defective," the Court concluded, "Lee cannot show plain error because it did not seriously affect the fairness and integrity of the judicial proceedings." <u>Id.</u> The Court specifically noted that this case "does not raise any of the notice problems generally associated with a defective indictment," because "Lee received an amended death penalty notice on October 16, 1998." <u>Id.</u> The Court further noted that "the petit jury's findings confirmed the soundness of the judicial proceedings and rendered harmless any conceivable error in the charging decision." <u>Id.</u>

### 2. Discussion

Lee argues that his trial counsel were ineffective because they did not move to quash the indictment on the ground that, with respect to the William and Nancy Mueller murder charges, it failed to allege the pecuniary-gain and multiple-murder statutory aggravating factors. COA Motion 117.[13] This claim plainly lacks merit.

First, Lee cannot show that his trial counsel's representation fell below an objective standard of reasonableness. At the time of trial, a claim of deficiency in the indictment was contrary to binding precedent, namely <u>Walton</u>, where the Supreme Court "[e]ssentially . . . held that the facts necessary to render a defendant eligible for the death penalty were not

---

[13]Lee apparently concedes that the indictment was sufficient with regard to the Sarah Powell murder charge.

-61-

elements of the offense itself, making inapplicable the Fifth Amendment requirement that the elements of an offense be charged by a grand jury in an indictment." United States v. Sampson, 486 F.3d 13, 20 (1st Cir. 2007). The "decision not to raise an issue unsupported by then-existing precedent did not constitute ineffective assistance." Brown v. United States, 311 F.3d 875, 878 (8th Cir. 2002). "[C]ounsel's failure to anticipate a change in the law will not establish that counsel performed below professional standards." Fields v. United States, 201 F.3d 1025, 1027-28 (8th Cir. 2000); see also Wajda v. United States, 64 F.3d 385, 388 (8th Cir. 1995) ("[C]ounsel's performance is not deficient by failing to predict future developments in the law."). This Court has concluded that the failure to anticipate Apprendi does not support an ineffective assistance claim. Brown v. United States, 311 F.3d at 878. It therefore follows that the failure to anticipate Apprendi and Ring and their application in the context of the Fifth Amendment right to indictment by a grand jury (Allen) was not deficient performance.

Lee's claim that challenging the indictment "was standard procedure nationally among counsel in federal capital trials," COA Motion 118, is irrelevant. Even if a Ring-type claim "was reasonably available prior to the Supreme Court's decision" in Ring, Lee's counsel were not ineffective for failing to raise that claim, Brown, 311 F.3d at 878, particularly in the face of directly-contrary precedent. "Even if counsel had objected to the [indictment],

-62-

the District Court would have had no reason based on controlling legal authority to sustain the objection." Fields, 201 F.3d at 1028. In fact, in each of the district court cases Lee cites for the proposition that the claim was commonly raised, the courts – applying then-binding precedent – rejected the defendant's challenge. See Allen, 406 F.3d at 945-59 (applying harmless error analysis after district court rejected claim); United States v. Johnson, No. 96-CR-379, 1997 WL 534163, at *5 (N.D. Ill. Aug. 20, 1997); United States v. Spivey, 958 F. Supp. 1523, 1527-28 (D.N.M. 1997) (citing Walton); United States v. Nguyen, 928 F. Supp. 1525, 1545 (D. Kan. 1996) ("Defendant cites no convincing authority, nor has the court been able to locate any, which requires that the death notice be presented before a grand jury.").

Second, even if the performance of Lee's trial counsel fell below an objective standard of reasonableness, Lee cannot establish prejudice. Had his trial counsel challenged the indictment, the district court would have rejected the challenge, and the only result would have been that this Court would have reviewed the claim on direct appeal for harmless error instead of under the plain-error standard. A different standard of review, however, would not have changed the result of Lee's appeal. This Court found that Lee could not surmount the plain-error standard in effect because he was not prejudiced by "any conceivable error in the charging decision." Lee, 374 F.3d at 651. Lee had adequate notice, and the petit jury found the existence of a statutory

-63-

aggravating factor beyond a reasonable doubt. <u>Id.</u> These same circumstances establish that any error was harmless beyond a reasonable doubt. <u>See</u> <u>Higgs</u>, 353 F.3d at 306-07 (finding failure to charge statutory aggravating factors in the indictment harmless error because, *inter alia*, defendant had sufficient notice and the petit jury found the aggravating factors beyond a reasonable doubt); <u>United States v. Trennell</u>, 290 F.3d 881, 890 (7th Cir. 2002) ("[E]ven if an <u>Apprendi</u> error occurred by failing to allege drug quantity in the indictment, it was harmless because the trier of fact did in fact determine drug quantity beyond a reasonable doubt."); <u>United States v. Mechanik</u>, 475 U.S. 66, 72-73 (1986) (holding that petit jury's guilty verdict rendered harmless any error in grand jury's charging decision); <u>see generally</u> <u>United States v. Olano</u>, 507 U.S. 725, 734-35 (1993) (explaining that prejudice analysis under the harmless error and plain-error standards are the same except that the government bears the burden of persuasion in the former and the defendant bears the burden in the latter).

C.  **Issues 12 & 13: Alleged Failures to Challenge Jury Instructions Regarding the Result of Juror Deadlock**

1.  **Background**

The district court instructed the jurors that for each capital count they had to determine – after weighing aggravating factors against mitigating factors – whether to impose a sentence of death. "If you cannot unanimously

-64-

agree upon a sentence of death," the court instructed, "you must then decide whether to return a sentence of life in prison without the possibility of release." Tr. 7995. The court reiterated that the jury's "finding with respect to a sentence of life in prison without the possibility of release must be unanimous." Tr. 7995-96.

The court further instructed the jurors that if they "unanimously agree upon a sentence of death or life in prison without the possibility of release, the Court is required to impose that sentence." Tr. 7996. "If you cannot unanimously agree upon either a sentence of death or a sentence of life in prison without the possibility of release," the court explained, "the Court will impose the sentence required by law." Id.

During deliberations, the jury sent two notes within moments of each other. The first note was from the foreperson and stated, "We have a juror who does not believe in the death penalty – no matter what the crime." Tr. 7998. The second note was signed by a juror and stated, "I think we need more time to discuss it." Id.

After consulting with the parties, see Tr. 7998-8007, the court reminded the jury "of some of the instructions that [the court] gave earlier." Tr. 8008. First, the court explained that it was the jurors' duty "to consult with one another and to deliberate with a view to reaching an agreement" but that they "must not surrender [their] honest convictions as to the weight or effect

-65-

of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict." Tr. 8008. Second, the court instructed the jurors that "if at the end of your deliberations you determine that the defendant be sentenced to death or life without the possibility of release, the Court is required to impose that sentence." Tr. 8008. "If you cannot unanimously agree whether the defendant should be sentenced to death or life imprisonment without the possibility of release," the court stated, "the Court will impose the sentence of life imprisonment or a sentence of life imprisonment without the possibility of release as required by law." Tr. 8009.[14]

The court further explained that "to impose the death penalty you must be unanimous," and "[i]f you cannot reach unanimous agreement on the death penalty, you must at least consider whether you can reach unanimous agreement on life without parole or release." Tr. 8009. "If you cannot reach agreement on either one ultimately, if you end up being a hung jury on both issues," the court summarized, "the matter is essentially turned back to the Court for its decision under the law." Id.

### 2. Discussion

Lee argues that the jury instructions violated his rights under the Due

---

[14]The written instructions provided to the jurors contained this language. See Dkt. 815, at 24; Lee, 2008 WL 4079315, at *41 n.286 (explaining that the court provided the jurors with the written instructions).

-66-

Appellate Case: 11-1380    Page: 72    Date Filed: 11/21/2011 Entry ID: 3851678

Process Clause and the Eighth Amendment because they "erroneously informed the jury that a sentence of less than life was a possibility if the jury could not agree on a sentence of death or of life without possibility of release." COA Motion 62.[15] According to Lee, his trial counsel should have objected to the instructions and his appellate counsel should have raised the issue on appeal. Tr. 67-68. His argument is not viable in light of <u>Jones v. United States</u>, 527 U.S. 373 (1999).

In <u>Jones</u>, the defendant was convicted of kidnaping with death resulting to the victim, in violation of 18 U.S.C. § 1201(a)(2), which carries a sentence of death or life imprisonment without the possibility of release. 527 U.S. at 376. The district court instructed the jurors that they had to unanimously decide whether Jones should be sentenced to death, life imprisonment without the possibility of release, or "some other lesser sentence." <u>Id.</u> at 385. The district court further instructed the jurors that if they decided to "recommend that some other lesser sentence be imposed, the court is required to impose a sentence that is authorized by the law." <u>Id.</u>

Jones argued that the instructions were reversible error because they "caused the jurors to infer that the District Court would impose a lesser

---

[15]The relevant statute provides that a defendant convicted of murder in aid or racketeering "shall be punished" "by death or life imprisonment." 18 U.S.C. § 1959(a)(1); <u>see</u> <u>United States v. Rollness</u>, 561 F.3d 996, 997-98 (9th Cir. 2009) (per curiam).

-67-

sentence if they could not unanimously agree on a sentence of death or life without the possibility of release." Id. at 391. The Supreme Court concluded that Jones could not establish that he was prejudiced by any error in the jury instructions. "[E]ven assuming that the jurors were confused over the consequences of deadlock," the Court concluded, "[Jones] cannot show the confusion necessarily worked to his detriment." Id. at 394. As the Court explained, "[i]t is just as likely that the jurors, loath to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence." Id. at 394. Speculation about the instruction's potential effect on the jury therefore could not suffice to establish prejudice. Id. at 394-95.

Under Jones, even if the instructions in this case erroneously caused the jurors to believe the district court could impose a sentence of life with the possibility of parole in the event of a deadlock, Lee cannot establish that he was prejudiced by the instructions. The desire not to allow the district court to impose a term of life with the possibility of parole could just as easily have caused jurors to compromise on a sentence of life imprisonment without the possibility of parole. Thus Lee cannot show that he was prejudiced due to his trial counsel's failure to object to the instructions. Nor can he show he was prejudiced because his appellate counsel did not argue that the instructions were erroneous on appeal.

-68-

Lee relies on <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994). <u>See</u> COA Motion 65-66. In <u>Simmons</u>, the prosecution argued that Simmons should receive a death sentence in part based on his future dangerousness, while the defense argued that Simmons did not pose a danger in the prison setting. 512 U.S. at 157-58. The jury was instructed that it had to choose between a sentence of death and a sentence of life imprisonment, but the trial judge refused to instruct the jury that a term of life imprisonment meant life in prison without the possibility of parole. <u>Id.</u> at 158-60. The Supreme Court concluded that the state unconstitutionally "succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole." 512 U.S. at 162 (plurality opinion).

It is <u>Jones</u>, not <u>Simmons</u>, that applies here. This is not a case where the jury may have thought that it only two options, a death sentence or a term of imprisonment that might allow for release. As in <u>Jones</u>, the jury knew it had the option of imposing a sentence of life imprisonment without the possibility of release. The dissent in <u>Jones</u>, like Lee here, argued that "a jury may be swayed toward death if it believes the defendant otherwise may serve less than life in prison." 527 U.S. at 416 (Ginsburg, J., dissenting) (citing <u>Simmons</u>). But the <u>Jones</u> majority concluded that such speculation is

-69-

insufficient to establish prejudice. <u>Id.</u> at 394-95. It is that holding that controls here.

### D. Issues 14 & 15: Allegedly Deficient Failure to Prevent Introduction of Testimony About Psychopathy

#### 1. Background

#### a. The Penalty Phase

In its case-in-chief at the penalty phase, the government offered evidence to prove Lee's future dangerousness. <u>See</u> <u>United States v. Lee</u>, 89 F. Supp. 2d 1017, 1019 (E.D. Ark. 2000). As part of the defense case in mitigation, Lee presented Dr. Mark Cunningham, who testified on direct "about a number of mitigating factors from Lee's upbringing that might have predisposed him toward criminal behavior." <u>United States v. Lee</u>, 274 F.3d 485, 490 (8th Cir. 2001).

After the government commenced cross-examination of Dr. Cunningham with questions about Lee's capacity for violence, Lee's counsel moved in limine to prevent cross-examination of Dr. Cunningham regarding risk assessment or Lee's future dangerousness. Tr. 7745-46. Lee's counsel argued that these topics were outside the scope of Dr. Cunningham's direct testimony, which was limited to an assessment of the mitigation factors. 7746-47. The district court concluded that the government should be able to ask Dr. Cunningham about Lee's dangerousness and said that Dr.

-70-

Appellate Case: 11-1380    Page: 76    Date Filed: 11/21/2011 Entry ID: 3851678

Cunningham was "fully capable of explaining why he can't answer certain of these questions." Tr. 7747; see Lee, 274 F.3d at 490.

After the end of the trial day, Lee's counsel filed a motion in limine asking the court to preclude Dr. Paul Ryan – the expert the government intended to call on rebuttal – from testifying about the topics of risk assessment, future dangerousness, and psychopathy. Lee, 274 F.3d at 490. Defense counsel argued that these topics were not responsive to the topics Dr. Cunningham had discussed in his direct examination. 5/13/1999 Tr. 9. In response, the government informed the court that it was "not going to present evidence in this case of Dr. Ryan's risk assessment evaluation of [Lee]," id. at 2, but argued that Dr. Cunningham's direct testimony had opened the door to certain questions pertaining to psychopathy, id. at 2-7.

The court voir dired Dr. Cunningham, who said he had not performed the Hare psychopathy checklist revised (PCL-R) or done any other analysis to determine whether Lee was a psychopath. Id. at 19.[16] The district judge said that the government could cross-examine Dr. Cunningham about conclusions he could draw from the investigation he performed, but that with regard to "taking him into areas that he didn't do and didn't investigate, then . . . I'm going to cut off some of that." Id. at 27. The court concluded that it would

_____

[16]The Hare psychopathy checklist revised, the PCL-R, is a test developed by a well-respected psychologist, Dr. Robert Hare, to determine whether an individual meets the criteria to be categorized as a "psychopath." Tr. 7782-84, 7797.

-71-

delay a ruling on the scope of Dr. Ryan's rebuttal testimony until after Dr. Cunningham finished testifying. Id. at 26-29.

When cross-examination of Dr. Cunningham continued, the government elicited testimony about, among other things, the Hare psychopathy checklist revised and whether the checklist was useful to determine whether an individual would be dangerous in the future. See, e.g., 7795-98. Dr. Cunningham testified that the test was useful to assess the risk of future violence in the community but that it had "not yet been shown to be predictive of correctional institutional violence." Tr. 7812. The government also elicited testimony that Dr. Cunningham had reviewed a report by Dr. Ryan and that Dr. Ryan had identified Lee as falling into the psychopathy range under the Hare psychopathy checklist. Tr. 7825-27; see generally Lee, 89 F. Supp. 2d at 1024-26.

After cross-examination of Dr. Cunningham ended, Lee's counsel asked the court for a ruling on whether Dr. Ryan would be allowed "to testify regarding risk assessment or psychopathy," explaining that if the testimony was going to be allowed, she had "a lot of work to do." Tr. 7830. Lee's counsel also said she "was assuming that [she] had an ongoing objection because of [her] motion" and explained that as a result she did not "stand up and object every time" during Dr. Cunningham's cross-examination. Tr. 7832. The court confirmed that Lee's counsel had an ongoing objection. Id. The court also said

-72-

it was "convinced that I probably permitted the government to go much farther on cross-examination than is proper." Tr. 7836. The court then granted Lee's "motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote, on the basis that such would not be proper rebuttal." Id.

The government called Dr. Ryan as a rebuttal witness. On direct examination, he testified that he had spent over 20 hours interviewing and speaking with Lee. Tr. 7906. Dr. Ryan testified, among other things, that Lee did not have brain damage and did not suffer from a mental illness. Tr. 7907-18. Dr. Ryan also testified that Lee said he became involved in the skinhead movement because he "enjoyed the fighting." Tr. 7919-20. In addition, the court allowed the government to elicit testimony, over the objection of Lee's counsel, that Lee did not express remorse for getting into fights or other misconduct. Tr. 7929-31.

### b.     The New Trial Motion

Lee filed a motion asking for a new sentencing hearing. He argued, in relevant part, that the government "used its cross-examination of Dr. Cunningham to improperly develop new evidence of risk assessment and future dangerousness." Lee, 89 F. Supp. 2d at 1020. He also argued that the district court "erred in permitting the government to go beyond the scope of permissible rebuttal by questioning Dr. Ryan about risk assessment and

-73-

future dangerousness." <u>Id.</u>

The district court granted the motion. <u>Lee</u>, 89 F. Supp. 2d at 1041-42. The court concluded, in relevant part, that the government's "questioning of Dr. Cunningham went well beyond the mitigation evidence raised by Dr. Cunningham on direct and ultimately became an expanded encore presentation of the Government's case for future dangerousness." <u>Id.</u> at 1028. The court also determined that Dr. Ryan's testimony "improperly focused on Defendant Lee's violent character traits." <u>Id.</u> The court concluded that it "erred in failing to restrain the Government in these respects despite Defendant Lee's insistence that the questioning was improper." <u>Id.</u>

This Court reversed. The Court concluded, in relevant part, that "[e]ven if the government's examination of Dr. Cunningham about psychopathy exceeded the scope of his direct, we fail to find a threat of unfair prejudice." <u>Lee</u>, 274 F.3d at 495. Lee "opened the door to testimony concerning psychological diagnosis" by "introducing a mental health expert in defense," the Court explained, and "the FDPA provides for a broad scope of evidence at the penalty phase in a capital case." <u>Id.</u> As for Dr. Ryan's rebuttal testimony, the Court concluded that "[t]he government's brief examination of Dr. Ryan concerning Lee's lack of remorse exceeded the scope of Dr. Cunningham's direct testimony, but Dr. Ryan's statement fell within the wide boundaries set for the admission of evidence at capital sentencing hearings." <u>Id.</u> The Court

-74-

said it could not "conclude that this single comment unfairly prejudiced Lee."
Id.

### c.    The Section 2255 Motion

In his Section 2255 Motion, Lee argued that his trial counsel were ineffective because they failed to "fully and continuously object" to the government's cross examination of Dr. Cunningham as "exceed[ing] the proper scope of cross examination." Dkt. 1118, at 33. According to Lee, "Dr. Cunningham never performed a risk assessment," and the government therefore should not have been allowed to cross-examine him on the subject of Lee's future dangerousness. Id.

Lee also asserted, in a separate claim, that his counsel were ineffective because they "failed to object to Dr. Ryan's testimony as improper rebuttal given that Dr. Cunningham never offered a diagnosis." Dkt. 1118, at 34. Lee also argued that his lawyers should have objected to the "submission of Dr. Ryan's report," because it included a risk assessment, which "Dr. Cunningham had not included in his testimony." Id. Lee stated in a footnote that Dr. Ryan no longer believes that the Hare psychopathy checklist is "an appropriate instrument to be utilized in evaluating the future danger of capital defendants." Id. at 34 n.14

The district court rejected Lee's arguments. The court concluded, in relevant part, that "[t]rial counsel performed exactly as [Lee] now argues that

-75-

they should have – by interposing a continuing objection to said cross-examination of Dr. Cunningham." <u>Lee</u>, 2008 WL 4079315, at \*46. With regard to Dr. Ryan's rebuttal testimony, the court concluded that Dr. Ryan was properly called to rebut the testimony of Kevin Joseph Bianchini, Ph.D., that Lee had brain damage. <u>Id.</u> at \*48. The court also noted that Lee's counsel had objected to questions about Lee's lack of remorse. <u>Id.</u>

### d. The Rule 59(e) Motion

Lee filed a motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure, arguing (in relevant part) that his counsel were ineffective because they failed to object to introduction of psychopathy evidence "as scientifically invalid and non-probative of the issue of future dangerousness." Dkt. 1165, at 20. Lee attached to the motion affidavits from psychologists stating that the current research was insufficient to conclude that the Hare psychopathy checklist could predict future dangerousness in prison, Dkt. 1165-7, and an affidavit from Dr. Ryan stating that as of 2000 he determined it was not appropriate to use the Hare psychopathy checklist to assess an individual's future dangerousness in prison, Dkt. 1165-4.

The district court denied the motion. The court concluded that Lee's Section 2255 motion did not put the court on notice of the arguments he later advanced in the Rule 59(e) motion. The court also noted that Lee did not "explain why the information he now includes [with the Rule 59(e) motion]

-76-

was not included in connection with his original petition." <u>Lee</u>, 2010 WL 5347174, at *6. On the merits, the court concluded that Lee had not shown his counsel were ineffective in 1999 for not challenging the scientific validity of using the Hare psychopathy checklist to prove future dangerousness. <u>Id.</u>

### 2.    Discussion

Lee argues that his counsel were ineffective because they failed to take adequate measures to prevent the government from eliciting testimony from Dr. Cunningham and Dr. Ryan that Lee was a psychopath. COA Motion 70. Specifically, Lee argues that his counsel should have (1) moved to exclude testimony about psychopathy under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993), <u>see</u> COA Motion 78-80; (2) sought to exclude testimony about psychopathy as contravening the Due Process Clause and the Eighth Amendment, <u>see</u> <u>id.</u> at 80-81; and (3) objected to testimony regarding the risk of future violence in the community, <u>see</u> <u>id.</u> at 81-82. According to Lee, if his lawyers had "performed as the reasonably competent advocates guaranteed by the Constitution and raised the appropriate challenge, the district court would have excluded" the psychopathy evidence. <u>Id.</u> at 80.

As a preliminary matter, Lee did not raise these claims in his Section 2255 motion, and he consequently cannot seek to expand the certificate of appealability to encompass them.  <u>See</u> <u>Abdullah v. United States</u>, 240 F.3d

-77-

683, 685 (8th Cir. 2001); <u>Hines v. United States</u>, 282 F.3d 1002, 1005 (8th Cir. 2002). Lee's Section 2255 motion faulted his lawyers for not continuously objecting to the cross-examination of Dr. Cunningham as outside the scope of direct. Dkt. 1118, at 33. He similarly faulted his lawyers for purportedly not challenging Dr. Ryan's rebuttal testimony as outside the scope of Dr. Cunningham's testimony. <u>Id.</u> at 44. Lee did not claim his lawyers should have challenged the testimony on other grounds.

In any case, Lee cannot show that his counsel's performance fell below a an objective standard of reasonableness. Lee's counsel made clear that they believed "psychopath" to be a "very pejorative term" and wanted to prevent it from being attached to Lee. 5/13/1999 Tr. 9-10. Lee's counsel therefore submitted both oral and written in limine motions in an effort to prevent the government from offering evidence pertaining to psychopathy. Counsel sought exclusion of the psychopathy evidence by arguing that the defense case was solely addressed to the mitigating factors, and not future dangerousness, and that therefore testimony about psychopathy was outside the bounds of proper cross-examination and rebuttal. Ultimately, this position prevailed. The district court granted the "motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote." Tr. 7836. As a result, Dr. Ryan did not testify about psychopathy when he was called on rebuttal. To be sure, the

-78-

district court, under its own analysis, "permitted the government to go much farther on cross examination [of Dr. Cunningham] than [was] proper." Id. But Lee's counsel ensured that it preserved its objections to the cross-examination and eventually convinced the district court – although not this Court on appeal – to grant a motion for a new sentencing hearing.

While Lee now argues that his lawyers should have asked the judge to exclude psychopathy evidence on different grounds, it was reasonable for his lawyers to follow the (successful) district court strategy that they adopted. Moreover, the arguments Lee now contends his lawyers should have instead asserted at trial were not well-supported in the law. The FDPA limits "the applicability of the Federal Rules of Evidence" at capital sentencing hearings. Lee, 274 F.3d at 495. And in United States v. Barnette, 211 F.3d 803 (4th Cir. 2000), where the government offered the Hare psychopathy checklist to prove defendant's future dangerousness in prison, id. at 811, the court of appeals held that – assuming Daubert applies at capital sentencing hearings – the checklist meets Daubert's "standard for admissibility," id. at 815-16.[17]

_____

[17]In Barnette, the court ordered a new sentencing hearing not because evidence about the Hare psychopathy checklist was introduced at the hearing, but because the district court prevented the defendant from offering Dr. Cunningham on sur-rebuttal to testify about the validity of using the checklist. 211 F.3d 823-24. Here, in contrast, the psychopathy evidence came in only through Dr. Cunningham, who was able to provide his opinion about the propriety of using the checklist to assess future dangerousness in institutional settings. See, e.g., Tr. 7806-07, 7828-29.

-79-

Appellate Case: 11-1380     Page: 85     Date Filed: 11/21/2011 Entry ID: 3851678

Similarly, Lee does not identify a court that has precluded psychopathy evidence as a violation of the Due Process Clause or the Eighth Amendment.

In sum, Lee's lawyers made a strong effort to exclude psychopathy evidence at the sentencing hearing. They did so by arguing that psychopathy evidence was outside the scope of proper cross-examination or rebuttal. The district judge ultimately agreed with that position, and prevented the government's expert from testifying about psychopathy, but in the interim allowed Dr. Cunningham to testify about psychopathy on cross-examination. Defense counsel preserved an objection to that cross-examination and later convinced the district judge to grant a new sentencing hearing on that basis, an order that was later reversed. Lee's lawyers were not ineffective.

### E. Issue 16: Failure to Object to and Raise on Appeal Alleged Prosecutorial Misconduct During Closing Arguments

Lee argues that his counsel should have objected to and raised on appeal five claims of improper closing argument by government prosecutors at the sentencing hearing. COA Motion 98-113. None of Lee's claims of improper argument, however, have merit. Consequently, Lee cannot establish that his counsel should have objected at trial or raised these arguments on appeal, let alone that he was prejudiced. Moreover, two of the claims are not properly before this Court, because Lee did not raise them in his Section 2255 motion.

-80-

### 1. Alleged Disparagement of Defense Counsel

Lee contends that prosecutors "engaged in extended negative commentary on the motives and character of defense counsel." COA Motion 98. That claim does not withstand scrutiny.

The comments of the prosecutors during closing arguments were addressed to the merits of Lee's arguments. Lee argued, for example, that the jurors should find – and consider as a mitigating factor – that he did "not have a significant prior criminal record other than his juvenile record." Tr. 7374. The prosecutor said "[t]hat's like the kid who killed his parents who walked into court, said, 'Take mercy on me. I'm an orphan.'" Tr. 7968; see Motorala Credit Corp.v. Uzan, 561F.3d 123, 129 n.5 (2d Cir. 2009) ("The 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.'") (internal citation omitted). This comment was not a disparagement of defense counsel, it was a an argument that the jury should not weigh Lee's criminal history in mitigation in light of "[h]is arsons, his burglaries, the robbery of Joey Wavra, [and] the concealed weapon." Tr. 7968.

### 2. Allegedly Improper Comparison with Chevie Kehoe

Lee argues that prosecutors improperly "invited the jury to compare" his "worth" with the "worth of co-defendant Chevie Kehoe." COA Motion 101.

-81-

As a result, Lee contends, his "constitutional right to an individualized sentencing determination" was violated. Id. This claim does not withstand scrutiny.

The prosecutor made clear to the jurors that they had to individually consider whether to sentence Lee to death. In opening arguments, the prosecutor emphasized that Lee and Kehoe had separate penalty phases and the jury was required "to study their individual cases separately." Tr. 7379. Similarly, during closing arguments, the prosecutor explained that the jury was "charged with the responsibility of judging [Lee and Kehoe] separately." Tr. 7959; see also Tr. 7368 (jury instructed that "the penalty phase has been conducted separately for each defendant" and "[t]his penalty phase deals only with the Defendant Daniel Lee").

Lee asked the jury, however, to weigh as a mitigating factor whether "[a]nother person equally culpable in the crimes will not be punished by death." Tr. 7374; see also Tr. 7384 (defense opening argument comparing Lee and Kehoe); Tr. 7388 (same); Tr. 7985-86 (defense closing argument comparing Lee and Kehoe). The government was entitled to address this mitigating factor and to urge the jury to give it little if any weight. Thus the prosecutor argued that "Chevie is not Danny" and that, in particular, there was substantially more evidence of Lee's future dangerousness. Tr. 7969. That argument was proper.

Appellate Case: 11-1380     Page: 88     Date Filed: 11/21/2011 Entry ID: 3851678

### 3. Allegedly Improper Argument Regarding Mitigating Evidence

Lee argues that the government improperly suggested during closing argument that the jury should disregard mitigating evidence unless the evidence lessened his criminal responsibility for the murders. COA Motion 104-06. This claim does not withstand scrutiny.

The prosecutor argued that Lee's learning disability, drug abuse, and mistreatment by his stepfather were entitled to little mitigating weight because they did not cause him to murder the Muellers. The prosecutor argued in essence that Lee "had free will and an opportunity to make the right choices, [his] difficult childhood notwithstanding." United States v. Johnson, 495 F.3d 951, 978 (8th Cir. 2007); see also United States v. Rodriguez, 581 F.3d 775, 799 (8th Cir. 2009). This Court has repeatedly explained that "as long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight." Johnson, 495 F.3d at 978; see also Sinisterra v. United States, 600 F.3d 900, 909-10 (8th Cir. 2010); United States v. Rodriguez, 581 F.3d 775, 798-99 (8th Cir. 2009); United States v. Bolden, 545 F.3d 609, 630 (8th Cir. 2008); United States v. Johnson, 495 F.3d 951, 978 (8th Cir. 2007). In Johnson, for example, the prosecutor argued that the defendant's murder of children was "an unspeakable evil" that could not

Appellate Case: 11-1380    Page: 89    Date Filed: 11/21/2011 Entry ID: 3851678

"be mitigated by any evidence," and that "[n]one of the defendant's mitigators can take away what [defendant] did and her involvement in killing those children." 495 F.3d at 978. The argument was proper, the Court concluded, because the prosecutor had argued that the mitigators were insufficient to outweigh the gravity of the offense," not that "the jurors could choose to ignore the mitigators or exclude them from consideration." Id. Similarly, in Rodriguez, the prosecutor asked in summation what particular mitigating evidence – i.e., that defendant was a colicky baby, was one of the poor kids in school, had been teased, and encountered racism and sexual abuse – "could . . . have to do with" the kidnap, rape, and murder the defendant had committed. 581 F.3d 798-99. This Court concluded that the argument was permissible and did "not direct jurors to disregard mitigating factors because no nexus links them to the killing." Id. at 799. The same principle applies here.

> 4.     Allegedly Improper Argument Regarding Lee's Involvement in a Prior Murder

At the sentencing hearing, the government argued that Lee's involvement in a prior murder supported the conclusion that he would be dangerous in the future. The evidence showed that Lee severely beat an individual named Joey Wavra, forced Wavra down a manhole into a storm sewer, and retrieved a knife for his cousin, who killed Wavra by repeatedly

-84-

stabbing him and slitting his throat. Tr. 7394-96, 7401-07, 7412-15, 7441-46. Lee pleaded guilty to robbery for his involvement in the murder and was sentenced to a short term of imprisonment. Tr. 7470.

Lee argues that the prosecutor committed error by stating that "[u]sually" "you get sent away for a very long time" when "you commit a murder" and that "[i]t is rare for a murderer like Danny Lee to stand before a jury who is about to determine his death penalty, who has an earlier murder under his belt." Tr. 7964; <u>see</u> COA Motion 106-07. According to Lee, the record did not support these assertions, and his lawyers were ineffective because they did not object or raise the issue on appeal. <u>Id.</u>

Lee's argument does not provide a basis for expansion of the certificate of appealability. First, Lee did not raise this issue before the district court in his Section 2255 motion, and he therefore cannot now raise it on appeal. <u>See</u> <u>Abdullah v. United States</u>, 240 F.3d 683, 685 (8th Cir. 2001); <u>Hines v. United States</u>, 282 F.3d 1002, 1005 (8th Cir. 2002). Before the district court, Lee challenged as improper eight distinct closing arguments by government prosecutors. <u>See</u> Dkt. 1118, at 35-36; <u>see also</u> <u>Lee</u>, 2008 WL 4079315, at *49-*50 (setting forth eight allegedly improper arguments listed in Lee's Section 2255 motion). He did not claim any impropriety based on the government's statement about the rarity of Lee's circumstances in light of his involvement in a prior murder.

Appellate Case: 11-1380   Page: 91   Date Filed: 11/21/2011 Entry ID: 3851678

Second, even if Lee could properly raise the claim, it plainly lacks merit. He cannot show his counsel were ineffective for not challenging the comment, or that he was prejudiced. The comment – i.e., that it was rare for someone to escape involvement in a murder with a light sentence and then later face the death penalty for three murders – derived from a fair inference based on common sense. Cf. United States v. Redlightning, 624 F.3d 1090, 1123 (9th Cir. 2010 ) ("While empirical evidence has shown that at times innocent people have confessed to crimes that they did not commit, a prosecutor should not be prevented from arguing in closing remarks that common sense tells us that people do not confess to crimes they did not commit."). In any case, the comment was largely immaterial to the government's case for the death penalty. The government argued that Lee's involvement in the Wavra murder proved Lee's future dangerousness because it showed that Lee was highly volatile and violent. See Tr. 7961-62. The government further argued that Lee was given a second chance after his involvement in the Wavra murder but he nonetheless went on to commit three additional murders. See Tr. 7962-64. The prosecutor's comments about the rarity of Lee's prior lenient treatment was not important to these contentions. Thus the comments did not prevent Lee from obtaining a fair trial. See, e.g., United States v. Rodriguez, 581 F.3d 775, 798 (8th Cir. 2009).

-86-

### 5. Allegedly Improper Argument of Non-Statutory Aggravating Factors Without Notice

Lee contends that the government argued in favor of four non-statutory aggravating factors during the penalty-phase closing arguments that it had not listed on its death penalty notice: (1) an incident in which Lee violently threatened a deputy sheriff (Nancy Cummings) during pre-trial custody; (2) assaults Lee committed against his family, other inmates, and various other individuals; (3) the rarity of Lee facing the death penalty for the Mueller murders after he received minimal jail time for his involvement in the Wavra murder; and (4) a comparison of Lee's circumstances with those of Chevie Kehoe. COA Motion 107-09.

Lee's claim is not properly before this Court, as Lee did not argue in his Section 2255 motion that the government improperly argued non-statutory aggravating factors without providing adequate notice under 18 U.S.C. § 3592(c). See Dkt. 1118, at 35-36; see also Lee, 2008 WL 4079315, at *49-*50 (setting forth eight allegedly improper arguments listed in Lee's Section 2255 motion). He therefore cannot raise this claim on appeal. Abdullah v. United States, 240 F.3d 683, 685 (8th Cir. 2001).

In any case, Lee's claim lacks merit. The Cummings incident, the Wavra murder, and the various assaults were all relevant to Lee's future dangerousness – a non-statutory aggravating factor that was expressly

-87-

alleged in the government's death penalty notice. As this Court has explained, "[a]lthough Lee had a right to advance notice of the aggravating factors the government sought to prove at sentencing, Lee had no right to advance notice of the specific evidence the government would use to prove those factors." Lee, 274 F.3d at 485; see also Higgs, 353 F.3d at 325. Moreover, the government informed Lee before trial that it intended to use the Cummings incident and the Wavra murder to prove future dangerousness. Lee, 274 F.3d at 489.

In addition, the assaults and the comparison with Kehoe were relevant to rebut Lee's mitigation case. As this Court has explained, Lee presented mitigation testimony from a psychiatrist, Dr. Mark Cunningham, that "selectively presented facts about Lee's past and his upbringing to cast him in a sympathetic light." Lee, 274 F.3d at 494. The government was entitled to elicit testimony from Dr. Cunningham about Lee's assaults to test the psychiatrist's credibility and "whether Dr. Cunningham's presentation produced a distorted account." Id. The comparison with Kehoe was similarly relevant to address Lee's contention that the jury should consider as a mitigation factor whether "[a]nother person equally culpable in the crimes will not be punished by death." Tr. 7374; see supra pp. 81-82.

Appellate Case: 11-1380    Page: 94    Date Filed: 11/21/2011 Entry ID: 3851678

## III. Issue 17: The District Court's Denial of Lee's Rule 59(e) Motion for Reconsideration

### A. Background

After the district court entered judgment denying Lee's Section 2255 motion, Lee filed a motion to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Dkt. 1165. The district court determined that it was required to examine Lee's Rule 59(e) motion to ensure that it is not a second or successive petition for purposes of 18 U.S.C. § 2255(h). Lee, 2010 WL 5347174, at *1. The court further determined that at least some of the claims in the motion were second or successive. Id. at *5, *6.

The court nonetheless denied the motion. Id. at *6. The court concluded that it had not "applied incorrect legal standards" in denying the Section 2255 motion; that Lee had not "presented anything that would require the Court to revisit a previously asserted claim, such as showing manifest errors of law or fact"; and that many of Lee's claims were "either reiterations of previous arguments or attempts to introduce new evidence or legal theories which could have been raised prior to the entry of judgment." Id.

### B. Discussion

Lee argues that the district court erroneously concluded that his Rule 59(e) motion "was the equivalent of a second or successive 2255 motion which it lacked jurisdiction to consider." COA Motion 124. As a result, Lee contends,

Appellate Case: 11-1380    Page: 95    Date Filed: 11/21/2011 Entry ID: 3851678

the district court improperly refused to consider affidavits attached to his motion and grant him relief. Id.

The district court determined, however, that relief was not warranted under Rule 59(e). The court concluded that Lee had not "presented *anything* that would require the Court to revisit a previously asserted claim, such as showing manifest errors of law or fact." Lee, 2010 WL 5347174, at *6 (emphasis added); see United States v. Metropolitan St. Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2006) (explaining that one of the "limited function[s]" of a Rule 59(e) motion is to "correct[] manifest errors of law or fact"). The district court also concluded that many of Lee's claims were "either reiterations of previous arguments or attempts to introduce new evidence or legal theories which could have been raised prior to the entry of judgment." Lee, 2010 WL 5347174, at *6; see Metropolitan St. Louis Sewer Dist., 440 F.3d at 933 (explaining that a Rule 59(e) motion "cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment"). Thus the court noted that Lee had offered "no explanation" for why the affidavits submitted with the Rule 59(e) motion were not "provided to the Court before it ruled on his original motion for § 2255 relief." Lee, 2010 WL 5347174, at *6

The district court plainly acted within its broad discretion when it denied Lee's Rule 59(e) motion on these grounds. A district court has "broad

-90-

discretion" in deciding whether to grant or deny a Rule 59(e) motion. Metropolitan St. Louis Sewer Dist., 440 F.3d at 933. Because of the well-recognized "limited function" function of Rule 59(e) motions, id., "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2810.1 (2d ed. 2011).

To be sure, the court observed that at least some of Lee's claims were second or successive for purposes of 18 U.S.C. § 2255(h). That assessment was correct in light of this Court's decision in Williams v. Norris, 461 F.3d 999, 1004 (8th Cir. 2006). But ultimately the assessment was irrelevant, because the court did not dispose of the motion on those grounds. If the district court had decided the Rule 59(e) motion on grounds that it was the equivalent of a second or successive 2255 motion, the court would have dismissed the motion for lack of jurisdiction or transferred it to this Court. See Boyd v. United States, 304 F.3d 813, 814 (8th Cir. 2002) (instructing district courts that they should dismiss or transfer post-trial motions determined to be second or successive collateral attacks under 18 U.S.C. § 2255). The Court would have lacked jurisdiction to deny the motion.

In any case, even if the court erroneously disposed of the motion in part because Lee's claims were second or successive, any error was harmless. The court's decision makes clear that the court also concluded relief was not

-91-

warranted under Rule 59(e). <u>See</u> <u>Williams v. Hobbs</u>, 658 F.3d 842, 853 (8th Cir. 2011) (finding that defendant could "show no prejudice through dismissal of his habeas petition because he sought identical relief" in a related action under 18 U.S.C. § 1983, which was dismissed for failure to state a claim).

## CONCLUSION

The Court should grant Lee's motion to expand the certificate of appealability to encompass the question whether Lee received ineffective assistance of counsel due to alleged race-based jury selection by his lawyers. In all other respects, the Court should deny the motion.

Respectfully submitted,

 /s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

Date: November 21, 2011

Appellate Case: 11-1380    Page: 98    Date Filed: 11/21/2011 Entry ID: 3851678

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on November 21, 2011.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

Appellate Case: 11-1380    Page: 99    Date Filed: 11/21/2011 Entry ID: 3851678