**CAPITAL CASE**

**No. 11-1380**

_____

**THE UNITED STATES COURT OF APPEALS**

**FOR THE EIGHTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

Appellee,

**v.**

**DANIEL LEWIS LEE,**

Appellant.

**REPLY TO RESPONSE TO MOTION TO EXPAND**
**CERTIFICATE OF APPEALABILITY**

Appellant, Daniel Lewis Lee, by and through undersigned counsel, respectfully submits this Reply to the Government's Response to his Motion to Expand Certificate of Appealability. At the COA stage, a court must merely make "an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* Accordingly, it is error for a court to essentially decide the merits of the appeal, and then to justify the denial of a COA based upon that decision. *Id.* at 336-37. In its Response, the Government nevertheless purports to assess the merits of Mr. Lee's claims in detail, frequently declining to defend the rulings of the district court on the basis on which they were made and instead arguing alternative bases for affirmance. This Court should decline the invitation of the Government to essentially adjudicate the merits of

1

the appeal, and should instead find that, after the appropriate overview and general assessment, a COA should be granted as to each claim to enable final resolution of each after full briefing and oral argument.

Appellate Case: 11-1380     Page: 2     Date Filed: 02/13/2012 Entry ID: 3879827

# TABLE OF CONTENTS

**CLAIMS FOR RELIEF UPON WHICH A COA SHOULD BE GRANTED**……..................5

1. **A COA SHOULD ISSUE ON CLAIM I.E., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CONDUCT mtDNA TESTING OF THE HAIR FOUND IN THE "RAID CAP" AND FALSELY IDENTIFIED AS THAT OF MR.LEE**…...5

2. **A COA SHOULD ISSUE ON CLAIM I.G., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY EXERCISING PEREMPTORY CHALLENGES TO EXCLUDE JURORS ON THE BASIS OF RACE**…………………………………………..…….8

3. **A COA SHOULD ISSUE ON CLAIM I.C., THAT DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO, AND SEEK RESCISSION OF, THE DISTRICT COURT'S ORDER FORBIDDING THEM FROM MEANINGFULLY DISCUSSING THE CASE WITH THEIR CLIENT**…….. 8

4. **A COA SHOULD ISSUE ON CLAIM I.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO PRESENT AVAILABLE, MATERIALLY EXCULPATORY EVIDENCE**…………..…………………………………………………..12

5. **A COA SHOULD ISSUE ON CLAIM I.B., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CROSS-EXAMINE THE WANKERS REGARDING THEIR RECEIPT OF COMPENSATION FROM THE GOVERNMENT**……………..14

6. **A COA SHOULD ISSUE ON CLAIM I.K., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT**……………………………………………..……17

7. **A COA SHOULD ISSUE ON CLAIMS IV.D. AND III.D., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO CHALLENGE AN INSTRUCTION TO THE JURY THAT ERRONEOUSLY STATED THAT MR. LEE COULD RECEIVE A SENTENCE OF LESS THAN LIFE IF THE JURY COULD NOT REACH A VERDICT**…………………………………........................................20

Appellate Case: 11-1380    Page: 3    Date Filed: 02/13/2012 Entry ID: 3879827

8.   A COA SHOULD ISSUE ON CLAIMS II.H. AND II.J., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE  BY FAILING TO ADEQUATELY CHALLENGE THE THOROUGHLY MISLEADING EVIDENCE OF PSYCHOPATHY PRESENTED BY THE GOVERNMENT THROUGH DRS. CUNNINGHAM AND RYAN…………………………………………………..25

9.   A COA SHOULD ISSUE ON CLAIMS IV.B. AND III.C., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE  WITH RESPECT TO THE PENALTY PHASE BY FAILING TO ADEQUATELY CHALLENGE THE PECUNIARY GAIN AGGRAVATING FACTOR………………………………………………….....28

10. A COA SHOULD ISSUE ON CLAIM II.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING FACTOR…………………………...30

11. A COA SHOULD ISSUE ON CLAIM II.L., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT……32

12.  A COA SHOULD ISSUE ON CLAIM III.B., THAT APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON DIRECT APPEAL BY FAILING TO CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING FACTOR…………………………………………………………..40

13.  A COA SHOULD ISSUE ON CLAIM II.E., THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE INDICTMENT FOR ITS LACK OF STATUTORY AGGRAVATING FACTORS NECESSARY TO IMPOSE A DEATH SENTENCE…………….41

14. A COA SHOULD ISSUE WITH RESPECT TO THE DISTRICT COURT'S DENIAL OF MR. LEE'S MOTION TO ALTER AND AMEND JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)………………………….47

CONCLUSION……………………………………………………………………………..52

Appellate Case: 11-1380     Page: 4     Date Filed: 02/13/2012 Entry ID: 3879827

**CLAIMS FOR RELIEF UPON WHICH A COA SHOULD BE GRANTED**

**1.     A COA SHOULD ISSUE ON CLAIM I.E., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT  THE GUILT PHASE BY FAILING TO CONDUCT mtDNA TESTING OF THE HAIR FOUND IN THE "RAID CAP" AND FALSELY IDENTIFIED AS THAT OF MR. LEE**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective for failing to conduct mitochondrial DNA ("mtDNA") testing of the hair that was found in a cap that the government argued was worn during the Mueller murders and matched Mr. Lee's hair.  This evidence constituted a highly significant part of the Government's case; the Government referred to it in closing argument more than once, assuring the jury that "the evidence establishes that that was Danny Lee's hair," Tr. 7000-01, and later reminding them that the "government . . . [has] Danny's hair," Tr. 7005. The hair, however, was not Mr. Lee's.  Subsequent mtDNA testing, performed during the course of the § 2255 proceedings, conclusively *excluded* Mr. Lee as a source of the hair found in the raid cap.  As a result of trial counsel's unreasonable failure to conduct this testing, the jury was utterly misinformed regarding a crucially important piece of evidence.

The district court denied relief on this claim based upon its finding that Mr. Lee had failed to demonstrate prejudice from counsel's failure in light of what it described as overwhelming evidence of his guilt.  [Doc. 1163 at 49.]  The Government declines to attempt to defend this ruling, or to rebut the showing of prejudice made by Mr. Lee in his Motion.  Rather, it urges the Court to deny a COA on two alternative grounds, neither of which supports its position.

First, the Government asserts that Mr. Lee's claim lacks merit because he "cannot show that he would have been able to obtain results from an [sic] mtDNA test even if his lawyers had

5

Appellate Case: 11-1380     Page: 5     Date Filed: 02/13/2012 Entry ID: 3879827

sought such a test." Resp. at 12.  This averment is based upon a factual dispute that was resolved by the district court in Mr. Lee's favor, a finding to which this Court must defer unless it is clearly erroneous.  *See* Fed. R. Civ. P. 52(a)(6); *Schlup v. Armontrout*, 941 F.2d 631, 638 (8th Cir. 1991).  Before the district court, [Doc. 1144 at 5-6], as here, Resp. at 12-13, the Government argued that the hair from the cap was too short to allow mtDNA testing to be performed on it at the time of Mr. Lee's trial.  In support of its argument the Government submitted, inter alia, affidavits from Arkansas State Crime Laboratory criminalist Chantelle Taylor, [Doc. 1144-2], and from LabCorp technician Meghan Clement, [Doc. 1144-5].  Ms. Taylor stated that all of the mtDNA testing protocols with which she was familiar during the relevant time period "stated that a hair should be at least 2 cm in length" to be suitable for testing.[1]  [Doc. 1144-2.]  However, Ms. Clement stated that her employer, LabCorp, was performing mtDNA analysis on hairs in 1998, and that the company would indeed test hairs shorter than 2 cm if permitted to consume the entire sample.  [Doc. 1144-5.]  Ms. Clement's information was thereafter corroborated and confirmed by the affidavit of Brain Wrexall of the Serological Research Institute, submitted by Mr. Lee.  [Doc. 1151-2.]  Mr. Wrexall verified that mtDNA testing could have been conducted at the time of Mr. Lee's trial in a sample under 2 cm long.  *Id.*

In its memorandum opinion, the district court found that mtDNA testing of the hair from the cap was available and technologically feasible at the time of Mr. Lee's trial.  [Doc. 1163 at 49] ("The Court accepts that in 1998, mtDNA testing of a single hair required a 2 centimeter section of hair, *unless the submitting agency authorized consumption of the entire sample*.") (emphasis added).   Based on the record before the court, this factual finding cannot be deemed clearly erroneous.  This Court must therefore defer to the finding, and the Government's

---

[1]  The hair at issue in this case was 1.1 cm in length.  [Doc. 1138-2 at 1.]

6

Appellate Case: 11-1380     Page: 6     Date Filed: 02/13/2012 Entry ID: 3879827

continuing dispute of the issue is irrelevant to the appeal.  By no means, then, can the Government's argument defeat Mr. Lee's entitlement to a COA on this claim.

The Government's second point also implicates a factual dispute, this time one that the district court did not resolve.  Mr. Lee alleged in his § 2255 Motion that his trial counsel's failure to obtain mtDNA testing of the hair from the cap constituted ineffective assistance of counsel in violation of the Sixth Amendment.  [Doc. 118-1 at 12, 19-20.]  Mr. Lee alleged that his counsel's performance was deficient because it fell below the standard of reasonable conduct under prevailing professional norms, and that this deficient performance was prejudicial because there is a reasonable probability that the outcome of the trial would have been different absent the error.  *Id.*  The Government disputed the allegation of deficient performance, contending instead that trial counsel had made a reasonable strategic decision not to subject the hair to mtDNA testing because they feared that the results might be incriminating.  [Doc. 1126 at 48.]  The Government offered only the bare assertion that counsel's omission had been tactical; no indication of the factual basis for the claim was supplied.  *Id.*  Although the Government procured and submitted affidavits from two attorneys involved in Mr. Lee's defense, Jack Lassiter and Karen Whatley, responding to other allegations that they performed ineffectively, the issue of why they failed to conduct mtDNA testing on the hair was left unaddressed in both. [Docs. 1126-5 and 1126-6.]

For its part, the district court declined to resolve the dispute, making no mention in its opinion of the Government's claim that counsel had a strategic basis for their failure.  [Doc. 1163 at 46-49.]  Instead, as noted, the court addressed only the question of prejudice and denied relief solely on that basis.  *Id.* at 49.  The factual dispute regarding the deficient performance prong is accordingly irrelevant to this Court's review of the district court's ruling that prejudice could not

7

be established. To the extent that this Court were to reject the district court's ruling on appeal, as indeed it should, and find that the question of deficient performance must be addressed, the only appropriate course of action would be to remand the matter for an evidentiary hearing to resolve the factual dispute highlighted by the Government. *See, e.g., Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (noting that an evidentiary hearing on a claim of ineffective assistance of trial counsel in § 2255 proceeding is required unless the record conclusively shows that the prisoner is entitled to no relief and remanding for a hearing on, inter alia, counsel's reasons for the alleged unconstitutional omissions). Mr. Lee is entitled to a COA on this claim.

**2.    A COA SHOULD ISSUE ON CLAIM I.G., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY EXERCISING PEREMPTORY CHALLENGES TO EXCLUDE JURORS ON THE BASIS OF RACE**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they exercised their peremptory strikes to exclude potential jurors on the basis of their race. The Government concedes that a COA should issue on this claim, in light of the fact that the Court has granted a COA on an identical claim in the case of Mr. Lee's co-defendant, Chevie Kehoe. Resp. at 16. *See United States v. Kehoe*, No. 11-1382 (8th Cir.) (October 3, 2011, Order).

**3.    A COA SHOULD ISSUE ON CLAIM I.C., THAT DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO, AND SEEK RESCISSION OF, THE DISTRICT COURT'S ORDER FORBIDDING THEM FROM MEANINGFULLY DISCUSSING THE CASE WITH THEIR CLIENT**

Reasonable jurists could differ regarding whether the district court correctly denied Mr. Lee's claim that his trial counsel rendered ineffective assistance at the guilt phase by failing to object to, and seek rescission of, the district court's order forbidding them from meaningfully

Appellate Case: 11-1380     Page: 8     Date Filed: 02/13/2012 Entry ID: 3879827

discussing the case with their client.  Mr. Lee was put on trial for his life while hobbled by an order that directed that he have "no . . . access to documents provided by the government during discovery other than his own statements," and that his ability to communicate with his attorneys regarding any "government-supplied documents" be limited to conversations that did "not disclose the identities of the government's civilian witnesses."  [Doc. 415.]  Because it remained in effect for the entire duration of the trial, this order affected counsel's ability to communicate with Mr. Lee about the contents of not only documents produced in discovery pursuant to Fed. R. Crim. P. 16, but also witness statements produced under the Jencks Act, 18 U.S.C. § 3500.

The order was entered by the court at the Government's request based upon three letters, written by Mr. Lee and intercepted by jail personnel, that the government claimed contained threats against witness Sean Haines.  *Id.* at 3.  In fact, as the district court later found, the letters constituted no such thing.  *Lee*, No. 4:97-CR-00243 GTE [Doc. 553] (noting that "the communications merely informed others of Mr. Haines work with the Government in this case"). The letters discussed the fact that Haines was cooperating with the government and predicted the criticism he would receive from his peers in the future as a result, a fact that is plainly at odds with any suggestion that Mr. Lee was anticipating Haines's imminent demise.  Indeed, the first letter expressly stated that "[t]hese copies are <u>for informational purposes only! [sic] And are in no way meant to</u> intimidate or cause harm to Sean's person!" *Lee*, No. 4:97-cr-243 GTE [Doc. 408] (emphasis in original).  The restrictions upon Mr. Lee's counsel, imposed during a hearing at which Mr. Lee was represented only by the attorney who had, unbeknownst to Mr. Lee, already accepted employment with the United States Attorney's Office, nevertheless remained in effect throughout the pretrial and trial proceedings.

9

In its Response, the Government asserts that no error occurred because, had counsel objected to the order, the Government would likely have "simply stopped providing the defense with witness reports and the names of witnesses" in advance of trial. Resp. at 20. This argument fails for two reasons. First, it addresses only the production of Jencks material and witness names; it ignores the additional restriction imposed by the order upon counsel discussing documents required to be disclosed under Rule 16, which included, inter alia, all documents "material to preparing the defense," and all documents that "the government intends to use . . . in its case-in-chief at trial." Fed. R. Crim. P. 16 (a)(1)(E)(i)-(ii). The Government was not free to decline pretrial disclosure of those materials.

More importantly, the Government's argument ignores the fact that the restrictions upon counsel's communications with Mr. Lee did not end when the trial commenced, but rather remained in effect for the duration of the proceeding. Mr. Lee therefore continued to be deprived of access to all documents and counsel continued to be prohibited from discussing any of the contents of them that revealed the identity of a witness even as the evidence was being presented. Faced with the choice of receiving advance disclosure of Jencks material, on the condition that their client never see that material or anything else produced in discovery and that their ability to discuss the contents of the documents with him be limited, or accepting disclosure during trial with the ability to thereafter fully share it with their client, reasonably competent counsel would have unequivocally opted for the latter. This is especially true in light of the fact that, had the disclosure been delayed until midtrial, counsel would have been entitled to a reasonable recess to allow them to review the material with Mr. Lee. *See, e.g., United States v. Holmes*, 722 F.2d 37, 40-41 (4th Cir. 1983) (reversing conviction where district court denied defense counsel a reasonable opportunity to review Jencks material).

Appellate Case: 11-1380     Page: 10     Date Filed: 02/13/2012 Entry ID: 3879827

The Government additionally takes issue with Mr. Lee's argument that, given the pervasive and unquantifiable impact of counsel's error, prejudice should be presumed. Resp. at 21. While the Government is correct that the circumstances under which a court may presume prejudice "include the 'complete denial of counsel' and an attorney's 'complete' failure to test a prosecutor's case," *id.*, the implication that the presumption of prejudice is limited to those instances is incorrect. As the cases cited by Mr. Lee in his Motion make clear, where counsel's errors and omissions result in structural error, prejudice is presumed. Mtn. at 27 (citing, inter alia, *McGurk v. Stenberg*, 163 F.3d 470 (8th Cir. 1998)). A structural error is one that "'call[s] into question the very accuracy and reliability of the trial process.'" *Miller v. Dormire*, 310 F.3d 600, 603 (8th Cir. 2002) (quoting *McGurk*, 163 F.3d at 174). The harm resulting from such an error is "'necessarily unquantifiable and indeterminate.'" *United States v. Mosley*, 505 F.3d 804, 811 (8th Cir. 2007) (quoting *United States v. Gonzales-Lopez*, 548 U.S. 140, 150 (2006)).

Depriving a defendant of all access to discovery documents and witness statements and severely limiting his ability to communicate about the case with his counsel throughout his entire capital trial is a quintessential example of such an error.[2] It is impossible to determine the myriad ways in which the conduct of the defense would have changed had counsel had the benefit of Mr. Lee's thoughts, memories and insights prompted by the contents of the discovery and Jencks materials. Indeed, the trial court's order essentially put counsel in a conflict situation, where their interest in complying with the order was irreconcilable with their duty to zealously represent Mr. Lee and present the best possible defense on his behalf, a duty that necessarily

---

[2] The Government also characterizes Mr. Lee's description of the limitations on counsel imposed by the trial court as a "broad reading" of the court's order. Resp. at 20. The Government's argument centers on a factual dispute regarding trial counsel's interpretation of the order and their conduct pursuant thereto, which highlights the fact that it was error for the district court to deny relief on this claim without conducting an evidentiary hearing.

11

Appellate Case: 11-1380    Page: 11    Date Filed: 02/13/2012 Entry ID: 3879827

required close collaboration with their client.  A conflict of interest on the part of trial counsel is unquestionably a structural error under this Court's precedents.  *See Wooten v. Norris*, 578 F.3d 767, 780 (8th Cir. 2009) ("a conflict of interest on the part of trial counsel would be a structural error").  A COA should issue with respect to this claim.

**4.    A COA SHOULD ISSUE ON CLAIM I.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO PRESENT AVAILABLE, MATERIALLY EXCULPATORY EVIDENCE**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to present the testimony of numerous available witnesses who would have provided materially exculpatory evidence.  In his Motion, Mr. Lee identified four categories of exculpatory evidence that counsel failed to present and multiple witnesses who would have provided evidence in each category.  Mtn. at 29-32.   The Government's response in all four instances is that a COA should be denied because the evidence against Mr. Lee was "overwhelming," Resp. at 24, 26, 27, 30, and thus he cannot show that he was prejudiced by his counsel's failures, Resp. at 23, 25, 28, 30.  Under the correct legal standard, it is clear that a COA should issue with respect to this claim.

Trial counsel's failure to present affirmative evidence[3] that there was no existing "APR" enterprise and that Mr. Mueller was seen by other individuals after his purported death merits some discussion.  Yet again, even 14 years after the crime, the Government offers alternatives for what the "APR" means, but has no definitive statement as to which one actually existed.  *See* Resp. at 2.  The Government also cites as proof that an "APR" existed acts that the jury declined

---

[3] In addressing this aspect of the claim, Mr. Lee is not abandoning the other sub-parts of the claim.  For instance, he continues to assert that trial counsel were ineffective in failing to call Michael Brescia.  He merely highlights these sub-claims to demonstrate that the claim is colorable enough to proceed to full merits briefing.

12

to find that Mr. Lee and Kehoe had committed. *See id.* at 26 (mentioning Cox murder and Spokane bombing). Thus, the Government is inviting this Court to conclude that the "APR" existed and that Mr. Lee was a member based upon activities of which Mr. Lee was acquitted. Because there was not a single witness that identified the "APR," including even Cheyne Kehoe, trial counsel were ineffective in failing to present affirmative evidence that no "APR" existed.

As noted more fully in Mr. Lee's Motion, there existed evidence that Mr. Mueller was seen at a bank and an area Walmart after the Government asserts he was dead, including a receipt for a large purchase of water at the Walmart. Motion at 31-32. The additional evidence corroborates this defense at the time of trial. It is at least debatable among jurists of reason whether trial counsel were ineffective for failing to present evidence that supported a pursued defense.

It bears repeating that, at the COA stage, a court is merely to make "an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* Accordingly, it is error for a court to essentially decide the merits of the appeal, and then to justify the denial of a COA based upon that decision. *Id.* at 336-37. This Court should therefore decline the invitation of the Government to decide the merits of the appeal on this issue. The required general assessment reveals that, while the Government insists that the evidence against Mr. Lee was overwhelming, Mr. Lee has explained persuasively and in detail that, in fact, the contrary is true and there were serious weaknesses in the Government's proof. Mtn. at 12-14. This is therefore precisely the type of issue whose final resolution must await the conclusion of plenary briefing and argument before the Court, and that is worthy of same.

13

**5.** **A COA SHOULD ISSUE ON CLAIM I.B., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO CROSS-EXAMINE THE WANKERS REGARDING THEIR RECEIPT OF COMPENSATION FROM THE GOVERNMENT**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to cross-examine government witnesses James and Dalvine Wanker regarding payments they received from the government as a result of their cooperation in this case. Reasonable jurists could also disagree regarding whether the district court erred in its procedural ruling denying relief on this claim without conducting an evidentiary hearing.

In § 2255 proceedings a petitioner is entitled to an evidentiary hearing to prove his claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). *See, e.g., Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (noting that evidentiary hearing on claim of ineffective assistance of trial counsel in § 2255 proceeding is required unless record conclusively shows that prisoner is entitled to no relief; remanding for hearing on, inter alia, counsel's reasons for the alleged unconstitutional omissions). The Government fails to acknowledge this standard in its Response, relying instead upon the wholly inapposite case of *Harrington v. Richter*, 131 S. Ct. 770 (2011).

*Richter* is a case involving a state prisoner seeking federal habeas corpus relief under 28 U.S.C. § 2254. As such, it articulates the legal standards that apply when a federal court is reviewing the decision of a state court – standards that are heavily informed by considerations of comity and federalism that are wholly absent in the § 2255 context. *See Richter*, 131 S. Ct. at 785 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."). Additionally, a federal court in a §

14

Appellate Case: 11-1380     Page: 14     Date Filed: 02/13/2012 Entry ID: 3879827

2254 proceeding must examine the prisoner's claim based upon the completed record that was before the state court, and assess the reasonableness of the state court's decision in light of that record.  *See Pinholster v. Cullen*, 131 S. Ct. 1388, 1398 (2011).  Under these circumstances, the *Richter* court held that it was reasonable for a state court to speculate regarding the possible motivations for conduct by counsel that is the subject of an ineffectiveness claim.  *Richter*, 131 S. Ct. at 790l; *Pinholster*, 131 S. Ct. at 1407.

This holding obviously has no application to the circumstances of Mr. Lee's case as he stood before the district court, in a § 2255 proceeding in which he was entitled to an evidentiary hearing to present the evidence that proves his right to relief, including evidence of his trial counsel's reasons, if any, for failing to adequately cross examine the Wankers.  While there is a "'strong presumption'" that counsel acted in accordance with sound strategic judgment, Resp. at 33 (quoting *Pinholster*, 131 S. Ct. at 1407), Mr. Lee was fully entitled to rebut that presumption with evidence at a hearing that in fact counsel's failure was the product of negligence, oversight or other unreasonable mistake.  *See also Massaro v. United States*, 538 U.S. 500, 505 (2003) (holding that ineffective assistance claims should be brought in § 2255 proceedings rather than on direct appeal because "record may reflect the action taken by counsel but not the reasons for it," and "appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because counsel's alternatives were even worse," and § 2255 court is the forum best suited to developing these necessary facts).

Moreover, the *Richter* opinion does not stand for the proposition for which it is cited by the Government.  In its Response, the Government asserts that, under *Richter*, trial counsel's actual reasons for an error or omission are irrelevant to the inquiry into whether their

15

performance was deficient.  Resp. at 32-33.  In support of this extraordinary claim, the Government quotes *Richter*, stating:  "When assessing whether counsel's performance might be considered sound trial strategy, the inquiry focuses on 'the objective reasonableness of counsel's performance, not counsel's subjective state of mind.' *Harrington v. Richter*, 131 S. Ct. at 790." Resp. at 32-33.  However, this language is lifted entirely out of context.  A review of the opinion makes clear that the point being made by the Court was that, once the record of counsel's conduct and, where available, decision-making is established, whether that conduct constituted deficient performance is to be determined by the federal court by reference to an objective standard of reasonable professional conduct, and not by counsel's own assessment of whether an alternative strategy might have been more successful.  *Id.* at 790 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").  The Court was certainly not suggesting that counsel's report of his or her strategy or lack thereof behind a particular act or omission is irrelevant to the inquiry.  Indeed, in the same opinion the Court reiterated the established principle that "courts may not indulge '*post hoc* rationalization' for counsel's decision-making that contradicts the available evidence of counsel's actions."  *Id.*

Instead of conducting the required hearing to resolve the factual disputes regarding the reasoning, if any, behind counsel's conduct and the precise contours of the testimony that the Wankers would have given if cross-examined on their receipt of cash payments, the district court erroneously credited the affidavit of ATF Agent Glen Jordan submitted by the Government and speculated regarding counsel's thinking, reaching a conclusion that was contradicted by the

16

evidence in the record as it stood even without a hearing.  Mtn. at 43-45.  A COA should issue with respect to this claim.

**6.      A COA SHOULD ISSUE ON CLAIM I.K., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT**

It is at least debatable among jurists of reason and worthy of further review whether the district court was correct in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to object to multiple improper and highly prejudicial arguments made by the government during its closing argument at the guilt phase.  In its Response, the Government defends as proper only two of the six separate instances of misconduct identified by Mr. Lee, and fails to consider the cumulative prejudice that resulted from the multiple improper arguments.  A COA should issue on this claim.

The Government first contends that one of the six instances of misconduct alleged by Mr. Lee is not properly before the Court because it was not expressly argued before the district court below.  Resp. at 38.  The claim for relief raised by Mr. Lee before the district court and on appeal is that he received constitutionally ineffective assistance of counsel due to his counsel's failure to object to prosecutorial misconduct in closing argument.  The particular instance of that misconduct that was not specifically argued below, the inaccurate statement that James Wanker received no monetary benefit as a result of his involvement in this case, is properly understood not as a new claim, but rather as another factual incident that supports the existing claim.  *See Miller v. Estelle*, 677 F.2d 1080, 1083-84 (5th Cir. 1982) (in analogous context of exhaustion of state remedies in § 2254 proceeding, holding that allegation of additional incidences of improper jury contact did not fundamentally alter petitioner's claim, as "the incidents left out differed only in number, not in kind, from the one" raised below); *Willis v. Newsome*, 771 F.2d. 1145, 1449

17

Appellate Case: 11-1380     Page: 17     Date Filed: 02/13/2012 Entry ID: 3879827

n.5 (11th Cir. 1985) (in exhaustion context, considering all seven allegations of ineffective assistance even though only six were previously presented)

To the extent that the Court does consider the failure to object to the Wanker statement to be a new argument, the Court should exercise its discretion to nevertheless include the point in its analysis as it is solely a legal question and the record is fully developed. While it is correct that a circuit court of appeals generally will not consider a claim for relief that was not raised before the district court below, where an argument is "sufficiently similar" to the arguments made below that the lower court's ruling "implicitly encompassed" the issue, a circuit court will consider it. *Collier v. Jones*, 910 F.2d 770, 774 n.3 (11th Cir. 1991) (finding petitioner's argument that trial counsel was ineffective for failing to move for acquittal based on uncorroborated testimony of accomplice sufficiently similar to claim of ineffectiveness for failing to investigate background of accomplice raised below to permit consideration of former on appeal). Circuit courts will also consider an argument not raised below if it involves a "'purely legal'" question and the record is fully developed. *United States v. Bigman*, 906 F.2d 392, 395 (9th Cir. 1988). *See also DeLuna v. Lynaugh*, 873 F.2d 757, 760 (5th Cir. 1989) (considering question not raised below that is "question solely of law"). The additional instance of failure to object to improper closing argument is a purely legal issue and the record on the matter is fully developed; it is thus manifestly appropriate for the Court to consider Mr. Lee's entire claim.

With respect to the merits of the claim, as noted the Government attempts to defend as proper only two of the six arguments that Mr. Lee identifies as improper. With respect to the prosecutor calling Mr. Lee a "faithful dog," the Government suggests that the comment was meant to imply "loyalty and devotion" and thus was a compliment, not a derogatory

18

characterization.  Resp. at 39.  Plainly, the point of the prosecutor's argument was not to laud Mr. Lee or highlight his positive qualities.  The loyalty and devotion that the prosecutor was referring to was, after all, directed towards codefendant Chevie Kehoe, a white supremacist alleged to have been the mastermind behind a triple murder.   The comment was clearly intended to be derogatory, and was meant to imply unintelligent, sub-human devotion to an abhorrent cause.  As such, it is the type of reference that numerous courts, including this one, have found to be improper.  *See, e.g., Hall v. Luebbers*, 341 F.3d 706, 716 (8th Cir. 2003) (holding that prosecutor's comparison of jury's decision to vote for death for defendant to his own decision to put a dog to sleep was "irrelevant, unnecessary, and improper"); *United States v. Allen*, 247 F.3d 741, 776 (8th Cir. 2001) (finding that prosecutor's description of defendant as "murderous dog" was "inappropriate and improper"); *Miller v. Lockhart*, 65 F.3d 676, 684 (8th Cir. 1995) (finding improper prosecutor's description of defendant as a "mad dog"); *Shepard v. Lane*, 818 F.2d 615, 621 (7th Cir. 1987) ( holding that prosecutor's argument calling defendant a "dog" and an "animal" was improper); *State v. Williams*, 529 A.2d 653, 546 (Conn. 1987) (finding improper prosecutor's description of defendant as "hiding like a dog" when police found him); *State v. Hairston*, 988 P.2d 1170, 1181 (Idaho 1999) (finding "clearly improper and condemn[ing]" prosecutor's reference to defendant as "murdering dog"); *Holmes v. State*, 2002 WL 1558617 at *6 (Tenn. Crim. App.) (noting that referring to defendant as a "dog" generally constitutes misconduct); *People v. Bracey*, 417 N.E.2d 1029, 1038 (Ill. App. Ct. 1981) (finding improper prosecutor's reference to defendant as a "punk thug dog").

     With respect to the prosecutor's inaccurate assertion that James Wanker received no money in connection with this case, the Government argues that the comment was not misleading because Mr. Wanker did not receive very much money, especially in comparison to

19

other witnesses.  Resp. at 39.  This argument, which amounts to a claim that the prosecutor's statement was only a little bit untrue, ignores the fact that, to individuals in the financial straits that the Wankers found themselves, $200 could constitute a significant inducement to testify against a criminal defendant.  *See* Mtn. at 43.  The prosecutor's argument was therefore a material misstatement and constituted misconduct.

As the district court did below, the Government goes on in its Response to erroneously analyze the prejudice flowing from the prosecutor's improper arguments individually, failing to assess the cumulative impact of all of the misconduct combined as the law requires.  In order to assess prejudice, a reviewing court must evaluate the cumulative impact of all of the improper government arguments.  *See, e.g., United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) ("Prejudice. . . may result from the cumulative effect of repeated improper comments by the prosecutor").  In light of the fact that the Government concedes that the prosecutor made improper remarks on four separate occasions during his closing argument, this claim is manifestly worthy of a COA so that this Court may undertake "full consideration of the factual or legal bases adduced in support of" it and determine whether the district court's ruling was correct.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2004).

**7.      A COA SHOULD ISSUE ON CLAIMS IV.D. AND III.D., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE  AT THE PENALTY PHASE BY FAILING TO CHALLENGE AN INSTRUCTION TO THE JURY THAT ERRONEOUSLY STATED THAT MR. LEE COULD RECEIVE A SENTENCE OF LESS THAN LIFE IF THE JURY COULD NOT REACH A VERDICT**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claims that both his trial and direct appeal counsel were constitutionally ineffective for failing to challenge the court's penalty phase instruction regarding available sentences.  The Government declines to defend the reasoning of

20

the district court denying relief on this claim, arguing instead that Mr. Lee cannot show he was prejudiced by the instruction. This argument, however, is based solely upon dicta in the Supreme Court's opinion in *Jones v. United States*, 527 U.S. 373 (1999), a decision that is inapplicable to the instant case. A COA should issue on this claim.

The district court denied relief on this claim based upon a finding that "[t]he Court did not erroneously instruct the jury on the issue of potential punishment, as it clearly stated that it would impose a sentence of life imprisonment or a sentence of life imprisonment without possibility of release, as required by law." [Doc. 1163 at 82.] As Mr. Lee explained in his Motion, this finding is insupportable – it is precisely *because* the court instructed the jury that it would impose a sentence of life imprisonment *or* a sentence of life imprisonment without possibility of release that the instruction was inaccurate and unconstitutional. Stated as it was in the disjunctive, the court's instruction erroneously suggested that a sentence of life imprisonment *with* the possibility of release was a potential sentencing option if the jury did not return a death sentence. Mtn. at 62-66. In its Response, the Government does not try to defend the district court's ruling, arguing instead that Mr. Lee cannot show that he was prejudiced by the instruction because it "could just as easily have caused jurors to compromise on a sentence of life imprisonment without possibility of parole" as a sentence of death. Resp. at 68.

In support of its argument, the Government relies on dicta contained in the Supreme Court's decision in *Jones v. United States*, 527 U.S. 373 (1999). In *Jones*, the defendant averred that an instruction given to his penalty phase jury misled the jurors into thinking that he could be given a sentence of less than life without parole and potentially released if they failed to unanimously vote for a sentence of death or life without parole. *Id.* at 389-92. The instruction was similar to, but in crucially important respects different from, the instructions given to Mr.

21

Lee's jury in this case. The Court rejected Jones's argument, finding that there was no error because there was no reasonable likelihood that the jury interpreted the instruction in the manner that the defense claimed they had. *Id.* at 390-92. While the Court went on to remark that, even assuming that there was error, the defendant could not show that it affected his substantial rights because he could not show that the understanding that release was possible if they deadlocked could have made the jury more likely to compromise on a sentence of death or a sentence of life without parole, *id.* at 394-95, that conclusion is dicta. *See, e.g., United States v. Bowman*, 660 F.3d 338, 343 n.6 (8th Cir. 2011) (noting that conclusion in prior opinion not necessary to the court's decision is non-binding dicta).

The passage in *Jones* also fails to support the Government's position as it is applicable at best only to an ambiguous jury instruction, and not to one that is subject to only one, unconstitutional, reading. When a jury is given an ambiguous instruction that could have been interpreted in a manner that violates the Constitution, courts are required to assess whether there is a reasonable likelihood that the jury in fact interpreted the instruction that way. *Jones*, 527 U.S. at 390; *Boyde v. California*, 494 U.S. 370, 380 (1990). A defendant must show more than "a possibility" that the instruction was so interpreted in order to justify relief. *Id.* In contrast, when the instruction complained of is clearly erroneous the jury is known to have considered unconstitutional information. If, therefore, while "it is possible that the . . . verdict may have had a proper basis, 'it is equally likely that the verdict . . . rested on an unconstitutional ground,'" the verdict cannot stand. *Id.* at 380 (quoting *Bachellar v. Maryland*, 397 U.S. 564, 571 (1970)). *See also Stromberg v. California*, 283 U.S. 359 (1931); *Leary v. United States*, 395 U.S. 6 (1969).

The instruction in this case clearly falls into the latter category for, as described in the Motion, the jury was plainly and unambiguously informed that, if it failed to reach a unanimous

22

verdict of death or life without parole, the court would impose a sentence of life without parole *or* a sentence of life. Mtn. at 63-65. This instruction was wholly inaccurate, for under no circumstances could the court have imposed a sentence of less than life without parole upon Mr. Lee. *Id.* at 65. While the jury could have unanimously voted for death without regard to the possibility that release would result from a deadlock, it is at least equally likely that one or more jurors compromised and voted for death based on a desire to avoid the risk – a risk that was in truth non-existent. Indeed, there is good reason to believe that that is exactly what happened. As noted in the Motion, after the jurors had been deliberating for approximately three and a half hours, they sent out two notes. Mtn. at 64. The first, written by the foreperson, said: "We have a juror who does not believe in the death penalty – no matter what the crime!" *Id.* The second, signed by a different juror and sent out a few moments after the first, read: "I think we need more time to discuss it." *Id.* These notes clearly indicate that one juror was holding out for a life sentence while one or more of the other jurors were attempting to persuade him or her to change his or her vote and avoid deadlock. The court thereafter instructed the jury to continue deliberating, and repeated its unconstitutional instruction regarding the consequences of deadlock. *Id.* A little over one hour after receiving this instruction, the jury returned a unanimous verdict of death. *Id.* at 65. It is thus at least equally, if not more, likely that the verdict resulted from the compromise of the holdout juror motivated by the unconstitutional instruction.

The dicta in *Jones* upon which the Government relies is based upon the Supreme Court's previous holding in *Romano v. Oklahoma*, 512 U.S. 1 (1994). *See Jones*, 527 U.S. at 394-95 (quoting *Romano*, 512 U.S. at 14). *Romano* is not a case involving erroneous jury instructions; rather, the error complained of was the introduction of evidence that the defendant was already

Appellate Case: 11-1380     Page: 23     Date Filed: 02/13/2012 Entry ID: 3879827

under a death sentence imposed in a previous case. *Id.* at 5-6. The defendant argued that this knowledge reduced the jury's sense of responsibility for imposing a second death sentence, in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). *Id.* The Court rejected that argument, noting that the jury instructions gave the jurors no means to give effect to the evidence and so, presuming as it must that the jury followed the instructions, the evidence could have had little or no effect on the verdict. *Id.* at 13. The Court went on to note that, even if the jury disregarded the instructions and gave weight to the evidence, it was not possible to know how it would have affected the verdict as it was "equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so." *Id.* at 13-14. In such a circumstance, the Court declined to find that the evidence rendered the defendant's trial fundamentally unfair and affirmed the death sentence.

As noted above, when the error at issue is an unambiguously erroneous jury instruction, a finding that it is equally plausible that the verdict rested upon an unconstitutional as a constitutional basis means that the verdict cannot stand. Thus, the analysis in *Romano* is inapplicable to the instant case. Additionally, the effect on Mr. Lee's jury of the unconstitutional instruction is far more determinable than the effect of the evidence in *Romano*. Because the effect of the instruction would necessarily be to urge a compromise in order to avoid deadlock and the resulting possibility of release, and the instruction patently did not have the effect of inducing the jury to compromise on a sentence of life without parole, it follows ineluctably that, if it had an effect, as the evidence strongly suggests that it did, that effect was necessarily to cause a compromise on a sentence of death. It is at least equally plausible that such an unconstitutional result occurred as not, and Mr. Lee's death sentence must be vacated. A COA should issue with respect to this claim.

24

**8. A COA SHOULD ISSUE ON CLAIMS II.H. AND II.J., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO ADEQUATELY CHALLENGE THE THOROUGHLY MISLEADING EVIDENCE OF PSYCHOPATHY PRESENTED BY THE GOVERNMENT THROUGH DRS. CUNNINGHAM AND RYAN**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claims that his trial counsel were constitutionally ineffective for failing to adequately challenge the admissibility of the Government's scientifically invalid and unreliable evidence that Mr. Lee was a violent psychopath who was likely to continue to be dangerous in the future. In its Response, the Government first asserts that Mr. Lee did not adequately raise below his trial counsel's ineffectiveness for failing to challenge the psychopathy evidence on *Daubert*, constitutional and relevancy grounds. Resp. at 77-78. A fair reading of the § 2255 motion, however, reveals that Mr. Lee's counsel did alert the court to the full scope of the issues upon which they stood ready to present testimony at an evidentiary hearing, and that the district court erred in failing to conduct such a hearing.

In the § 2255 motion, under the point heading "Trial counsel were ineffective in failing to object to Dr. Ryan's testimony and report," counsel wrote: "At a hearing, Movant's counsel are prepared to offer evidence that Dr. Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis." [Doc. 1118 at 34 n.14.] In the preceding paragraphs, counsel also noted that "[d]efense counsel failed to fully and continuously object" to the admission of psychopathy evidence during the cross-examination of their own expert, Dr. Cunningham, *id.* at 33, and that "[o]ne can imagine few things that are as damaging to a

25

Appellate Case: 11-1380    Page: 25    Date Filed: 02/13/2012 Entry ID: 3879827

defendant on trial for his life as being characterized, 'scientifically,' as a 'psychopath,'" *id*. at 34 (quotation marks in original).  Counsel thus alerted the court that they had proof that the psychopathy evidence admitted at trial was scientifically invalid and unreliable, and that they were challenging trial counsel's failure to object to the evidence on that basis.[4]

On the merits of the issue, the Government first asserts that Mr. Lee's trial counsel were not ineffective for failing to challenge the psychopathy evidence on *Daubert*, constitutional and relevancy grounds because they objected to its admission on the ground that it was beyond the scope of proper cross-examination and rebuttal.  Resp. at 78-79.  This argument is a non sequitur; counsel renders ineffective assistance when he fails to raise an available and compelling basis upon which to exclude highly prejudicial evidence against his client, notwithstanding the fact that he did manage to raise a separate and distinct objection to the same evidence.  There is no question that Mr. Lee's counsel recognized the damning nature of the psychopathy evidence and their obligation to seek to exclude it; the Government concedes the fact.  Resp. at 78.  Accordingly counsel's failure to challenge the evidence on *Daubert*, constitutional and relevancy grounds was not the product of a strategic decision; rather, out of negligence, ignorance or oversight they simply missed the issues, and thus failed to fulfill their constitutional obligation to Mr. Lee as a result.

The Government additionally argues that the challenges that Mr. Lee asserts his counsel should have mounted "were not well-supported in the law."  Resp. at 79.  This claim misses the point, for the relevant question is, had counsel performed competently and raised the available objections, is it reasonably likely that the evidence would have been excluded and the result of

---

[4] After the district court denied relief without conducting an evidentiary hearing, counsel expounded further on the evidence they would have presented in their Rule 59(e) motion and the evidence attached thereto.  At a minimum, it was error for the district court to refuse to reopen the matter and grant a hearing at that point.  *See* Section 14, *infra*.

26

the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). The answer is a resounding yes. As noted in the Motion, in the case where the proper objections were made, the Government abandoned its attempt to admit the evidence and Mr. Haynes's jury never heard it. Mtn. at 76-77. Mr. Haynes received a life sentence, and indeed no individual has been sentenced to death on the basis of such evidence since that time. Mtn. at 70. *See, e.g., United States v. Taylor*, 320 F. Supp.2d 790, 794 (N.D. Ind. 2004) (precluding government expert from administering Psychopathy Checklist Revised "due to the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings"). The relative dearth of case law on the matter is a testament to the widespread receptivity of district courts to the challenges that should have been brought in Mr. Lee's case, and the frequency with which the evidence has been excluded pre-trial. It therefore supports Mr. Lee's position, rather than cuts against it as the Government suggests.

The case cited by the Government, *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), in no way casts doubt upon the validity of the challenge to the psychopathy evidence that Mr. Lee's counsel unreasonably failed to bring. While the Fourth Circuit affirmed the denial of a *Daubert* challenge to the use of the PCL-R in a capital sentencing proceeding, the challenge that was actually brought in the case was limited to the claims that the instrument had not been standardized for use with the black or post middle age populations. *Id.* at 816. Additionally, the sole evidence proffered by the defendant in support of his arguments was two journal articles, written by his own expert. *Id.* Unsuprisingly, the appellate court found no error in the district court's rejection of this extremely narrow and inadequately supported objection. *Id.* Notably, the court vacated Mr. Barnette's death sentence on a separate ground, and remanded for resentencing. *Id.* at 826. At the second sentencing proceeding, the Government abandoned its

27

efforts to introduce evidence of psychopathy and the PCL-R, and the jury never heard it. A COA should issue on this claim.

**9. A COA SHOULD ISSUE ON CLAIMS IV.B. AND III.C., THAT TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE WITH RESPECT TO THE PENALTY PHASE BY FAILING TO ADEQUATELY CHALLENGE THE PECUNIARY GAIN AGGRAVATING FACTOR**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claims that both his trial and direct appeal counsel were constitutionally ineffective for failing to adequately challenge the jury's consideration of the pecuniary gain aggravating factor at the penalty phase of Mr. Lee's trial. In its Response, the Government correctly notes that this issue is controlled by the Court's decision in *United States v. Bolden*, 545 F.3d 609, 615 (8th Cir. 2008). Resp. at 47-49. However, it goes on to misapply that precedent to the facts of this case, which clearly demonstrate that, under *Bolden*, the pecuniary gain aggravating circumstance should never have been submitted to Mr. Lee's jury.

As explained in *Bolden*, the pecuniary gain aggravating circumstance applies "only 'where pecuniary gain is expected to follow as a direct result of the murder," as opposed to the underlying felony. *Id.* (quoting *United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002)). It applies, for example, where the murder is committed "to remove an obstacle" to the completion of the underlying felony and to secure the pecuniary gain. *Id.* at 616. It does *not* apply when the motive for the murder was not pecuniary gain but rather to eliminate witnesses to the completed felony, or for some other reason. *See United States v. Bernard*, 299 F.3d 467, 483-84 (5th Cir. 2002).

The Government argues, in conclusory fashion, that "a reasonable jury could find that Lee killed the Muellers 'to remove an obstacle to completing the robbery.'" Resp. at 48 (citing

28

*Bolden*, 545 F.3d at 616). Its basis for that assertion is the claim that, after the murders had been committed, Mr. Lee "in fact did continue and complete the robbery." *Id.* at 49. However, this factual premise, unaccompanied by any citation to the record, is not supported by the evidence. Firstly, it is inconsistent with the Government's own recounting of the evidence, earlier in its Response:

> No one was home when Lee and Kehoe arrived, so they waited. Mueller eventually arrived home with his wife, Nancy Mueller, and their eight-year-old-daughter, Sarah Powell. Lee and Kehoe overpowered William and Nancy Mueller and incapacitated them. They then questioned Sarah Powell about where they could find cash, guns and ammunition. After finding weapons and $50,000 in cash, Lee and Kehoe shot the three victims ("the Muellers") with stun guns and placed plastic trash bags over their heads, sealing the bags with duct tape to asphyxiate the victims. The men taped rocks to the Muellers' bodies and threw them into the nearby Illinois bayou.

Resp. at 2-3. Thus, the Government concedes in its own statement of facts that the two adult victims were both already "incapacitated" when the robbery took place, and that not until the robbery was over and Chevie Kehoe and Mr. Lee had allegedly already retrieved the "weapons and $50,000 in cash" did they "asphyxiate" the Muellers. *Id.* There is no indication whatsoever from the Government's statement that the murders were necessary in order for the robbery to be completed.

The only evidence presented at trial regarding the series of events that took place inside the Mueller home and leading up to the placement of the bodies in the bayou came from Chevie Kehoe's brother, Cheyne Kehoe, and mother, Gloria Kehoe, who recounted statements made to them by Chevie Kehoe and Mr. Lee. Neither witness's testimony provided any basis upon which to find that the murders were a necessary prerequisite to the robbery of the Muellers' property. Rather, as explained in the Motion, the evidence at trial was that the deaths of the Muellers were a "hit," planned and executed by Chevie Kehoe because of his belief that the Muellers were ATF

29

informants, and entirely independent of Kehoe's incidental desire to help himself to the Muellers' property. Mtn. at 92-93.

The district court's justification for denying relief on this claim, which the Government does not defend, was that the jury could have concluded that the Muellers had to be killed "in order for the defendants to successfully complete the robbery" because of evidence that "William Mueller strongly resisted the robbery." [Doc. 1163 at 77.] As set forth in the Motion, the physical evidence at trial directly and conclusively refuted the truth of the claims that Mr. Mueller resisted the robbery, such that no reasonable juror could have so found. Mtn. at 91-92. Not only did the evidence establish that the murders were planned in advance by Chevie Kehoe, who brought the plastic bags and rocks that were the murder weapons along with him to the scene, but the autopsy showed that Mr. Mueller had none of the head injuries that the witnesses claimed he had received during the alleged struggle. *Id.* In addition, Mr. Mueller's body was found with a plastic bag duct-taped over the head and his cause of death was determined to be suffocation with submersion, the same as Mrs. Mueller and Sarah Powell. Tr. at 3560, 3566, 3574. These facts, too, belie the claim that Mr. Mueller was murdered during the robbery in order to overcome his resistance, rather than killed afterwards for wholly different reasons. A COA should be granted on the questions of whether Mr. Lee's trial and direct appeal counsel rendered ineffective assistance with respect to this issue.

**10. A COA SHOULD ISSUE ON CLAIM II.A., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING FACTOR**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective for failing to challenge the jury's improper consideration of the

30

invalid multiple murder aggravating factor at the penalty phase of Mr. Lee's trial. As it must, the Government essentially concedes in its Response that the submission of this factor to the jury was error in violation of the Ex Post Facto Clause, and argues only that the error was harmless. Because the jury found the existence of an additional statutory aggravating factor with respect to each murder that independently established Mr. Lee's eligibility for a death sentence in each instance, it urges, no harm was inflicted by the jury's consideration of the invalid factor. Resp. at 50-53, 55-57.

This argument, of course, presupposes the validity of the additional statutory aggravating factor. With respect to the William and Nancy Mueller murders, the only other statutory aggravating factor found by the jury was that the murders were committed for pecuniary gain. As set forth in Mr. Lee's Motion, Mtn. at 90-96, and above, *see* Section 9, *supra*, this factor, too, was invalid in this case, and so it cannot form the basis upon which to salvage these two death sentences. The validity of the pecuniary gain aggravator is at the very least debatable amongst jurists of reason, entitling Mr. Lee to a COA on that issue, and it follows that a COA should also issue on the instant claim.

With respect to the third death sentence, imposed for the murder of Sarah Powell, a third statutory aggravator was found by the jury, namely that Powell was a vulnerable victim. However, as noted in the Motion, Mtn. at 97, it is more than reasonably likely that the jury's analysis regarding whether to impose a death sentence for this crime would have been dramatically different had it been required to impose a sentence of life without possibility of release for the murders of the two adult victims. This is especially so given that it was the Government's theory at trial that Chevie Kehoe killed Sarah Powell, after Mr. Lee refused to do

31

so.  *See* Tr. 4974, 5328.  Reasonable jurists could therefore disagree regarding whether the district court correctly denied relief on this portion of the claim also, and a COA should issue.

**11.     A COA SHOULD ISSUE ON CLAIM II.L., THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE BY FAILING TO OBJECT TO MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his trial counsel were constitutionally ineffective when they failed to object to multiple improper and highly prejudicial arguments made by the government during its closing argument at the penalty phase.

*Disparaging Defense Counsel*

Mr. Lee has identified multiple instances of impermissible and disparaging remarks by the prosecution about Mr. Lee's trial counsel, their strategies and their thinking about the case during closing arguments at the penalty phase.  Mtn. at 98-99.  With respect to all but one of these improper comments, the Government offers only the conclusory assertion that they "were addressed to the merits of Lee's arguments."  Resp. at 81.  The Government thus offers no meaningful counterargument to Mr. Lee's position and the authorities he cited therefor, and no basis upon which a COA should be denied.

The one improper comment that the Government does address in its Response is the prosecution's ridiculing of defense counsel's position as follows:

> This is a man with a significant record.  And yet it is suggested to you in mitigating factor No. 3 that you should find this to be a mitigation [sic].  I will read it to you.  "Mr. Lee does not have a significant prior criminal record, other than his juvenile record."  That's like the kid who killed his parents who walked into court, said, "Take mercy on me.  I'm an orphan."  This is a man with a track record of harm against others documented for the last 10 years.  And they are saying his criminal record is insignificant?  His arsons, his burglaries, the robbery of Joey Wavra, the concealed weapon, this is insignificant?

32

Tr. 7968.  The Government correctly characterizes this argument as an allegation of chutzpah on the part of defense counsel.  Resp. at 81 (quoting *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 n.5 (2d Cir. 2009) ("The 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.'").  It then inexplicably goes on to assert that the comment was "not a disparagement" of counsel.  Resp. at 81.

This argument is a non sequitur.  As numerous courts have recognized, accusing counsel of chutzpah is not intended to be flattering.  *See, e.g., United States v. Kresler*, 392 Fed. Appx. 765, 770 (11th Cir. 2010) (noting that chutzpah "has evolved into a legal term 'analytically similar to unclean hands'" that is used "'where a party's conduct is especially and brazenly faulty' or where judges 'encounter such flagrant abuses that no single word adequately expresses appropriate disgust'") (quoting *Motorola*, 561 F.3d at 128 n.5); *In re Damon Pursell Constr. Co.*, 2011 WL 6130528 at *4 n.16 (W.D. Mo.) (noting that chutzpah denotes "'gall, brazen nerve, effrontery, incredible guts, presumption plus arrogance as no other word and no other language can do justice to'") (quoting Leo Rosten, *Joys of Yiddish* (1968)).  Examples of litigant behavior that the courts have deemed to constitute chutzpah include the man mauled by a 450 lb Siberian tiger that he kept, along with an alligator, in his New York City apartment who sued police for entering the apartment without a warrant when they went to capture the tiger, *Yates v. City of New York*, 2006 WL 2239430 (S.D.N.Y.); the man who appealed a trial court's decision to deny him the proceeds from a life insurance policy following his wife's death that was based on the fact that he and his girlfriend murdered the wife, *Zabrani v. Riveron*, 495 So.23d 1195 (Fla. Dist. Ct. App. 1986); the defendant who appealed his criminal conviction on a claim of jury misconduct after he approached the juror after court during the trial, gave her a ride home and

33

talked to her about the case, *State v. Bonaparte*, 384 N.W.2d 304 (Neb. 1986); and the defendant who was convicted of burglary for breaking into the country courthouse and stealing guns from the Sheriff's evidence locker, *Williams v. State*, 190 S.E.2d 785 (Ga. Ct. App. 1972). There can therefore be little doubt that the prosecutor's comment in this case was, and was intended to be, disparaging of defense counsel.

*Comparison of the Relative Worth of the Lives of Chevie Kehoe and Mr. Lee*

In both of its penalty phase closing arguments, the Government invited the jury to compare the worth of co-defendant Chevie Kehoe with the worth of Mr. Lee, and to sentence Mr. Lee to death based upon the unfavorable comparison. These arguments violated Mr. Lee's constitutional right to an individualized sentencing determination, and trial counsel rendered ineffective assistance by failing to object to them. The Government argues in its Response that the arguments were a proper rejoinder to Mr. Lee's invocation of the mitigating factor that Chevie Kehoe, who was equally culpable in the crimes of which Mr. Lee was convicted, would not be punished by death. Resp. at 82. This argument defies logic. The mitigating factor of a codefendant's punishment is based upon two factual premises: (1) that the codefendant is equally culpable in the crimes; and (2) that the codefendant will not be put to death. The codefendant's character, background and experiences are in no way responsive or relevant to either of these factual premises. Rather, such evidence was used by the Government in exactly the way Mr. Lee described in his Motion, Mtn. at 101-04, namely to urge the jury to conclude that Mr. Lee was a much worse person than Chevie Kehoe and was much less deserving of the opportunity to live, and to sentence him to death on that basis. These arguments accordingly violated Mr. Lee's constitutional right to be sentenced based solely upon his own characteristics.

*Argument Requiring Nexus Between Mitigating Evidence and Commission of the Capital Crime*

34

As set forth in the Motion, Mtn. at 104-06, the Government repeatedly suggested in closing argument that, because there was no direct nexus between Mr. Lee's mitigation evidence and the commission of the crime, it must be disregarded.  Tr. 7966-67, 7970-72.  Such an argument is constitutionally impermissible.  *See, e.g., Abu-Kabir v. Quarterman,* 550 U.S. 233, 259 (2007) (requirement that mitigation evidence rebut either "deliberateness" or "future dangerousness" is impermissible limitation on consideration of mitigation); *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (rejecting "nexus" requirement  between mitigation evidence and crime); *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (mitigation evidence "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case").

In its Response the Government cites to *United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007), for the proposition that "as long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight."  Resp. at 89.  Mr. Lee takes no issue with this proposition.  In *Johnson* the prosecutor never suggested that because the mitigators did not explain or provide a nexus to the crime they should be disregarded.  Indeed as the *Johnson* Court noted and the government had to concede, in stating that the mitigators cannot "take away what [the defendant did]," the prosecutor in *Johnson* was only arguing that the mitigators "were insufficient to outweigh the gravity of the offense." *Id.* at 90.  The Government also cites to *United States v. Rodriguez*, 581 F.3d 775, 798-99 (8th Cir. 2010), a case in which the defense claimed the prosecutor had made a nexus argument in closing.  *Id.* at 799.  In rejecting the defense argument the Court did not remotely suggest that a nexus argument was permissible.  Rather, the Court found that no nexus argument had been made, *id.,* a decision that was no doubt informed by the fact that the

35

prosecutor's remark was a general one (i.e., "what could [the mitigation] have to do with [the crime]...."), isolated, and made moments after he acknowledged that the mitigation did in fact involve "very serious matters." *Id.* at 798-99.

There is a crucial constitutional distinction between a prosecution argument that focuses on weight to be accorded a mitigator, even as against the crime, as in *Johnson* and *Rodriguez*, and one that focuses on nexus or causation. Mr. Lee's prosecutors' repetitive use of telltale phrases such as, does the mitigation "explain this behavior," does the mitigation "ma[k]e him . . . a killer," did the "drugs make him...do the crimes," and did the abusive "stepfather" commit the criminal act, leave no doubt these arguments were directed not at the weight to be accorded the mitigation, but rather its lack of nexus to the crime itself. Tr. 7966-77, 7970-72.

Thus, while a prosecutor is free to argue that a defendant's learning disability is entitled to little weight, when, as Mr. Lee's prosecutor did, he requires the defendant to "explain" how it caused him to commit the crime, Tr. 7966, that is error. And although Mr. Lee's prosecutor was entitled to argue that his learning disability should be given little weight in comparison to the crime, he was not entitled to argue as he did that if the learning disability did not explain the killing it should be disregarded, Tr. 7967; so, too, was it constitutionally impermissible for Mr. Lee's prosecutor to argue that unless Mr. Lee's severe drug and alcohol addiction "ma[d]e [him] do the crime" this mitigator was entitled to no consideration. Tr. 7970-71.

Perhaps the most egregious violation of the standard established in *Abu-Kabir, Tennard* and *Quarterman* was the prosecutor's constitutionally improper response to Mr. Lee's evidence of abandonment and neglect. Tr. 7972. Again, the prosecutor was free to make any argument he chose regarding the weight to be accorded such evidence, or any other constitutionally permissible arguments. Instead, he mischaracterized Mr. Lee's argument as one which blamed

36

the stepfather for the commission of the crime, and rhetorically asked the jury whether this nexus made any sense to them at all. *Id.* All of these references, separately and cumulatively, violated Mr. Lee's constitutional rights, and reasonably competent defense counsel would have objected to each of them.

> *Argument that it is "Rare" for a Defendant With a Prior Murder Charge to Appear Before a Death Penalty Jury.*

In closing the Government argued the following:

> Usually you commit a murder, and you get sent away for a very long time. And you don't get an opportunity for a do over. [] It is rare for a murderer like Danny Lee to stand before a jury who is about to determine his death penalty, who has an earlier murder under his belt, who has a prior victim's blood on his hands.

Tr. 7963-64. The Government thus urged the jury to conclude that Mr. Lee was almost uniquely bad and particularly deserving of death amongst the universe of individuals convicted of capital crimes. However, no evidence whatsoever was presented regarding the supposed rarity of a capital defendant with involvement in a prior murder, and the argument was therefore improper. *See, e,g, United States v. Bolden*, 545 F.3d 609, 630 (8th Cir. 2008) (holding that prosecutor's argument in closing that the decedent's family desired that jury impose a death sentence, for which there was no supporting evidence, was improper).

The Government first contends that this particular instance of misconduct alleged by Mr. Lee is not properly before the Court because it was not expressly argued before the district court below. Resp. at 85. The claim for relief raised by Mr. Lee before the district court and on appeal is that he received constitutionally ineffective assistance of counsel due to his counsel's failure to object to prosecutorial misconduct in the penalty phase closing arguments. This particular instance of that misconduct, although not specifically argued below, is properly understood not as a new claim, but rather as another factual incident that supports the existing claim. *See Miller*

37

*v. Estelle*, 677 F.2d 1080, 1083-84 (5th Cir. 1982) (in analogous context of exhaustion of state remedies in § 2254 proceeding, holding that allegation of additional incidences of improper jury contact did not fundamentally alter petitioner's claim, as "the incidents left out differed only in number, not in kind, from the one" raised below); *Willis v. Newsome*, 771 F.2d. 1145, 1449 n.5 (11th Cir. 1985) (in exhaustion context, considering all seven allegations of ineffective assistance even though only six were previously presented).

To the extent that the Court does consider the failure to object to the rarity statement to be a new argument, the Court should exercise its discretion to nevertheless include the point in its analysis as it is solely a legal question and the record is fully developed. While it is correct that a circuit court of appeals generally will not consider a claim for relief that was not raised before the district court below, where an argument is "sufficiently similar" to the arguments made below that the lower court's ruling "implicitly encompassed" the issue, a circuit court will consider it. *Collier v. Jones*, 910 F.2d 770, 774 n.3 (11th Cir. 1991) (finding petitioner's argument that trial counsel was ineffective for failing to move for acquittal based on uncorroborated testimony of accomplice sufficiently similar to claim of ineffectiveness for failing to investigate background of accomplice raised below to permit consideration of former on appeal). Circuit courts will also consider an argument not raised below if it involves a "'purely legal'" question and the record is fully developed. *United States v. Bigman*, 906 F.2d 392, 395 (9th Cir. 1988). *See also DeLuna v. Lynaugh*, 873 F.2d 757, 760 (5th Cir. 1989) (considering question not raised below that is "question solely of law"). The additional instance of failure to object to improper closing argument is a purely legal issue and the record on the matter is fully developed; it is thus manifestly appropriate for the Court to consider Mr. Lee's entire claim.

38

The Government alternatively argues that the prosecutor's statement was not improper. Resp. at 86. Relying upon *United States v. Redlightning*, 624 F.3d 1090, 1123 (9th Cir. 2010), the Government characterizes the statement as "a fair inference based on common sense." Resp. at 86. However, in *Redlightning* the court made such a finding, and found no misconduct, "because [the challenged statement] is generally true." *Id.* The same cannot be said in this case. As noted in the Motion, a prior murder charge is so common amongst capital defendants that it is separately listed as a statutory aggravating factor in the death penalty schemes of 16 states, and incorporated into the statutes of the 14 others and the federal government that designate all prior violent felonies as aggravating. *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme,* 6 Wm. & Mary Bill Rts. J. 345, 395-96 (1998); Jeffrey Kirchmeier, *Casting a Wider Net: Another Decade of Legislative Expansion of the Death Penalty in the United States*, 34 Pepp. L. Rev. 1, 18-25 (2006).

Finally, the Government argues that a COA should be denied because "the comment was largely immaterial to the government's case for the death penalty." Resp. at 86. This argument is akin to a claim that the admission of highly prejudicial evidence against a defendant should be ignored because the government had other evidence upon which the jury could convict. Clearly, prejudicial evidence or argument taints the proceeding, whether or not it is an indispensible part of the government's case, and a reviewing court cannot simply disregard the error on this basis.

*Un-Noticed Non-Statutory Aggravating Factors*

The final category of prosecutorial misconduct in the penalty phase closing argument identified by Mr. Lee in the Motion is comprised of the instances in which the prosecutor argued to the jury several non-statutory aggravating factors for which no notice was provided to the

39

defense as required by law.  The Government once again argues that this category of errors is not properly before the Court because it was not specifically argued in the district court below. Resp. at 87.  For the reasons noted above, it is entirely proper for this Court to consider Mr. Lee's claim for relief in its entirety.  A COA should issue on this claim.

**12.  A COA SHOULD ISSUE ON CLAIM III.B., THAT APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON DIRECT APPEAL BY FAILING TO  CHALLENGE THE SUBMISSION TO THE JURY OF THE INVALID MULTIPLE MURDER AGGRAVATING FACTOR**

It is at least debatable among jurists of reason and worthy of further review whether the district court erred in its ruling denying Mr. Lee's claim that his direct appeal counsel were constitutionally ineffective for failing to challenge the jury's improper consideration of the invalid multiple murder aggravating factor.   The Government relies upon the Fourth Circuit's opinion in *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003), to argue that the submission of the invalid aggravator was harmless because it did not affect Mr. Lee's eligibility for the death penalty, and thus counsel could not have prevailed on appeal.  Resp. at 55-57.  The Government further invokes *Brown v. Sanders*, 546 U.S. 212 (2006), which it describes as "strongly support[ing]" the analysis in *Higgs*.  Resp. at 56.  To the contrary, however, *Brown* makes clear that the submission of an invalid aggravating factor, even if it does not affect eligibility for a death sentence, is nonetheless reversible constitutional error "*unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Id.* at 220 (emphasis in original).  *See* Mtn. at 35-37.  To the extent that the *Higgs* decision is to the contrary, it does not survive *Brown*.

As explained in the Motion, the only other sentencing factors submitted in this case were the pecuniary gain statutory aggravator, the future dangerousness non-statutory aggravator and, with respect to the Sarah Powell homicide, the vulnerable victim statutory aggravator.  Mtn. at

40

36-37. Unlike some state death penalty schemes, the federal statute contains no statutory omnibus "circumstances of the crime" aggravator, *see* 18 U.S.C. § 3592, *Brown*, 546 U.S. at 217, and the circumstances of the crime were not alleged as a non-statutory aggravator in this case. There was thus no valid sentencing factor in the case that would have enabled the jury to give aggravating weight to the fact that multiple homicides had been committed, and the instruction to the jury to weigh that fact in favor of the death penalty in its decision constituted a "'thumb [on] death's side of the scale'" that a "reviewing court may not assume . . . made no difference." *Id.* at 221 (quoting *Stringer v. Black*, 503 U.S. 222, 232 (1992)). Had Mr. Lee's direct appeal counsel performed as reasonably competent advocates and raised this claim, therefore, they would have prevailed and Mr. Lee's death sentence would have been vacated. A COA should issue with respect to this claim.

**13. A COA SHOULD ISSUE ON CLAIM II.E., THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE INDICTMENT FOR ITS LACK OF STATUTORY AGGRAVATING FACTORS NECESSARY TO IMPOSE A DEATH SENTENCE**

It is at least debatable among jurists of reason and worthy of further review whether the district court erroneously denied Mr. Lee's claim that his trial counsel rendered ineffective assistance by failing to move to quash the indictment on the ground that it failed to allege the two statutory aggravating factors relied upon by the Government to establish Mr. Lee's death eligibility for the murders of the two adult victims. It is now beyond dispute that the Fifth Amendment indictment clause requires that "capital aggravating factors [] be found by the grand jury and included in the indictment." *United States v. Allen,* 406 F.3d 940, 942 (8th Cir. 2005) (en banc). Despite the fact that this requirement was actively being litigated in federal death penalty prosecutions around the country at the time of Mr. Lee's trial, Mr. Lee's counsel failed to

41

raise the issue.  As a result, this Court reviewed the defective indictment on direct appeal only for plain error, finding none.  *See United States v. Lee*, 374 F.3d 637, 651 (8th Cir. 2004).

The district court erroneously denied relief on this claim on three grounds:  (1) that the indictment adequately charged the pecuniary gain aggravating factor; (2) that counsel did not perform deficiently by failing to object to the indictment in light of the state of the law at the time of trial; and (3) that any deficiency in the indictment was harmless, and thus Mr. Lee would not have prevailed on direct appeal even if his counsel had objected to it.  [Doc. 1163 at 84-88.] In its Response, the Government declines to attempt to defend the first ground.  As to the second, the Government urges that defense counsel were not ineffective for failing to move to quash the indictment because the Supreme Court cases that established its deficiency were not decided until after Mr. Lee's trial.  Resp. at 61-63.  It dismisses Mr. Lee's argument that counsel's deficient performance is established by the fact that similarly situated counsel around the nation were aware of, and were raising, the issue well before Mr. Lee's trial as "irrelevant."  Resp. at 62.  To the contrary, the standard of care exercised by counsel's peers is the very yardstick against which his effectiveness must be measured.  *See Wiggins v. Smith*, 539 U.S. 510, 521, 524 (2003) (holding that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" and finding counsel's assistance in that case "fell short of the professional standards that prevailed in Maryland in 1989," which dictated that "standard practice . . . included the preparation of a social history report") (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) ("The [ineffective assistance] standard is an objective one, viewed in light of professional norms prevailing when the representation took place."); *Dawan v. Lockhart*, 980

42

Appellate Case: 11-1380     Page: 42     Date Filed: 02/13/2012 Entry ID: 3879827

F.2d 470, 473 (8th Cir. 1992) ("Unreasonable attorney conduct may be determined by reference to the legal profession's prevailing norms of practice.").

To be sure, in *Brown v. United States*, 311 F.3d 875 (8th Cir. 2001), this Court found that counsel for a defendant in a drug case was not ineffective for failing to raise an argument under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), before that decision was issued. In that case, however, there was no argument or reason to suspect that it was standard practice amongst defense counsel in non-capital federal criminal cases to raise the argument that Mr. Brown's lawyer missed. In stark contrast, Mr. Lee stood ready to prove with expert testimony that bringing a challenge to an indictment that failed to allege statutory aggravating factors was indeed required by prevailing professional norms amongst competent counsel in federal death penalty prosecutions. *See* [Doc. 1163 at 82-83] (Memorandum Opinion of District Court) (noting that "Petitioner asserts that his trial counsel erred by failing to make the standard challenge to the indictment," and that "whether raising this issue was standard practice at the time will have to await a hearing, and likely, expert evidence"). Rather than receiving that proof, however, the district court denied relief on this claim without conducting an evidentiary hearing. The district court's action was error and should be vacated.

The district court also erred in its final determination, that the failure of the indictment to allege statutory aggravating circumstances was harmless error, and thus that Mr. Lee could not have prevailed on direct appeal even if his counsel had made the proper objections. The Government avers that this Court has previously found that Mr. Lee "was not prejudiced by 'any conceivable error in the charging decision,'" and that this finding is necessarily the equivalent of a finding of harmless error. Resp. at 63-64. This is an incorrect statement of the Court's prior holding.

43

As noted, because counsel failed to challenge the indictment in the district court, this Court reviewed the issue on direct appeal under the plain error standard.  A reviewing court can correct an error not raised by counsel at trial only if there is "'(1) error, (2) that is plain, and (3) that affects substantial rights,'" *and* "'(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"  *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)).  *See also United States v. Maynie*, 257 F.3d 908, 918 (8th Cir. 2001).  While the determination of whether a plain error affects substantial rights involves the same inquiry as the determination of whether a preserved error is harmless, whether a plain error also seriously affect the fairness and integrity of the proceedings is a separate and distinct question. *See Cotton*, 535 U.S. at 632-33 (conducting plain error analysis of *Apprendi* error, assuming arguendo that error affected defendants' substantial rights, but finding no serious effect upon fairness or integrity of proceedings and thus denying relief); *Lee*, 374 F.3d at 651 (noting that plain error is "a different standard" than harmless error that "includes a separate fairness-integrity inquiry") (internal quotations omitted); *United States v. Frazier*, 280 F.3d 835, 854-56 (8th Cir. 2002) (finding that *Apprendi* error affected defendant's substantial rights but did not seriously affect fairness or integrity of proceedings).  A determination that a claimed plain error fails to meet the fairness-integrity standard thus in no way answers the question of whether the error affected the defendant's substantial rights, and therefore fails to resolve the issue of whether the error would have been deemed harmless if preserved.

This Court's opinion on direct appeal makes clear that it decided Mr. Lee's case under the fairness and integrity provision.  The Court wrote: "Even if the indictment was defective, Lee cannot show plain error because it did not seriously affect the fairness and integrity of the

44

judicial proceedings." *Lee*, 374 F.3d at 651. The reference to "any conceivable error in the charging decision" quoted by the Government, Resp. at 63, actually appears in the following sentence: "Furthermore, the petit jury's finding confirmed the soundness of the judicial proceedings and rendered harmless any conceivable error in the charging decision." *Id.* It is thus clear that the Court assessed the record solely to determine the impact of the deficient indictment on the fairness and integrity of the proceedings, and made no finding regarding whether it affected Mr. Lee's substantial rights.

In fact, the failure to allege the statutory aggravating factors in the indictment did prejudice Mr. Lee's substantial rights, and the district court's finding to the contrary was error. As an initial matter, the court used the wrong harmless error analysis. In *Allen,* 406 F.3d at 945-46, this Court held that the failure to allege statutory aggravating factors in the indictment is to be assessed for harmlessness by determining "whether any rational grand jury would have found the existence of . . . one or more of the statutory aggravating factors found by the petit jury if the grand jury had been asked to do so." The Court limited this review to the evidence presented to the grand jury at the time that it was asked to indict. *Id.* at 946. The Court noted that harmless error review in this context could be conducted in two other ways, namely either by reviewing the entire record, including the evidence presented at trial, to assess what a rational grand jury would have done, or by accepting the trial jury's verdict on the statutory aggravators as conclusive proof that a rational grand jury would have found them in an indictment. *Id.* at 945-46. However, the Court declined to endorse either alternative analysis and stated that it "express[ed] no present opinion on the validity of conducting harmless-error review" using those methods. *Allen*, 406 F.3d at 946.

45

Inexplicably, the district court decided to forego the analysis endorsed in *Allen* and to conduct instead the two different analyses as to which this Court expressly withheld its approval. [Doc. 1163 at 85-88.] First, the district court relied upon the verdict of the trial jury, finding that "[u]pon review of the petit jury's verdict, the Court is convinced beyond a reasonable doubt that any such claimed error in this case was harmless," because "the petit jury found beyond a reasonable doubt that the Government established that petitioner 'committed the offense of murdering' William Mueller, Nancy Moeller, and Sarah Powell 'in the expectation of receiving something of pecuniary value' and 'intentionally killed more than one person in a single criminal episode.'" *Id.* at 85-86. Then the court alternatively found "beyond a reasonable doubt that the grand jury would have charged Petitioner with the . . . pecuniary gain statutory aggravating factor," based upon "the evidence at trial." *Id.* at 87. At no point did the district court review the evidence that was actually presented to Mr. Lee's grand jury. A COA should therefore be granted on this claim, and the Court should ultimately remand the case to the district court with instructions to conduct the analysis adopted by the Court in *Allen*.

Additionally, even if the Court were to approve the district court's decision to assess the actions of the grand jury by reference to the entire trial record, the district court's decision cannot stand. As set forth in the Motion, Mtn. at 90-98, and Sections 9 & 10, *supra*, both the pecuniary gain and the multiple murder aggravators are invalid in this case, the former because the trial evidence established that it is inapplicable and the latter because its application would violate the Ex Post Facto Clause. Accordingly, the Court cannot find that a rational grand jury would have returned an indictment containing these statutory aggravators.

46

**14.    A COA SHOULD ISSUE WITH RESPECT TO THE DISTRICT COURT'S DENIAL OF MR. LEE'S MOTION TO ALTER AND AMEND JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

It is at least debatable among jurists of reason and worthy of further review whether the district court erroneously refused to consider the affidavits attached to Mr. Lee's Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e) because of the restrictions upon second or successive § 2255 petitions, and whether it correctly denied the motion with respect to the claim that trial counsel failed to effectively challenge the psychopathy evidence as a result. The principal thrust of the Government's Response in this regard is that the district court in fact denied this portion of the motion on the merits, and correctly so. Resp. at 90-91. This contention is untenable in light of the district court's order.

As noted in Mr. Lee's Motion before this Court, Mtn. at 124, in its Order Denying Post-Judgment Relief the district court stated that, had the affidavits accompanying the Rule 59(e) motion been provided to the court before it ruled on Mr. Lee's § 2255 motion, "the Court might have determined that an evidentiary hearing was required." *Lee,* No. 4:97-cr-243-GTE [Doc. 1189 at 9.] The court further unequivocally stated that it was nevertheless "foreclosed by existing legal principles from considering the information now, absent permission and direction from the Eighth Circuit to do so." *Id.* at 10. The court clearly, and erroneously, see Mtn. at 125-32, believed itself bound by the restriction contained in 28 U.S.C. § 2255(h) upon the consideration of second or successive motions absent authorization by the circuit court. *See* 28 U.S.C. § 2255(h) ("A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals"); 28 U.S.C. § 2244(b)(3)(A) ("Before a second or successive application permitted by this section is filed in the district court, the applicant shall

47

Appellate Case: 11-1380     Page: 47     Date Filed: 02/13/2012 Entry ID: 3879827

move in the appropriate court of appeals for an order authorizing the district court to consider the application.").

It is the case that, in a later section of its order, the district court went on to "comment[]" that, even as supported by the additional materials, the merits of the claim were "problematic." [Doc. 1189 at 10, 11.] However, the court based this observation solely upon a portion of the declaration of the Government's trial expert, Dr. Thomas Ryan, which "describes how, in the Spring of 2000, he concluded that it was inappropriate to rely on the PCL-R to assess the future dangerousness of capital defendants." *Id.* at 11-12. Given that Mr. Lee's trial was in the Spring of 1999, the Court mused, Mr. Lee had failed to explain how counsel could have challenged the scientific underpinnings of Dr. Ryan's testimony when Dr. Ryan had yet to acknowledge the error of his practice. *Id.* at 12.

Had it deemed itself free to review all of the materials that Mr. Lee submitted with his Rule 59(e) motion, the district court would readily have ascertained that ample evidence supporting a challenge to Dr. Ryan's testimony was already in existence and freely available to Mr. Lee's counsel at the time of trial. Dr. Ryan's own later admission that he was wrong, while a powerful affirmation of the strength and validity of the challenge that should have been brought, was in no way a prerequisite for it. The basis for the challenge brought in the *Haynes* case, which was tried in 2000, was the opinions of no less than five prominent researchers in the field of violence risk assessment and the appropriate use of the PCL-R that, based upon existing research, Dr. Ryan's use of the PCL-R to support a prediction of future dangerousness in prison was ethically and scientifically unsupportable. [Doc. 1165-7.] It was only after he was confronted with this evidence that Dr. Ryan himself conceded that the defense experts were right and withdrew his report.

48

The *Haynes* case was tried barely a year after Mr. Lee's, and plainly the evidence marshaled by Mr. Haynes's lawyers could and should have been presented on behalf of Mr. Lee. One of the *Haynes* experts, Dr. John Edens, later expressly confirmed that, "[h]ad [he] been asked for such an affidavit in 1998, I would have made substantially the same statements I made in 2000." [Doc. 1165-6 at 3.] Additionally, Dr. Norman Poythress noted in his affidavit in the *Haynes* case that "the state of the field" in 2000 was fairly represented by a review article published in 1998, well before Mr. Lee's trial, by Mark Cunningham and Thomas Reidy. [Doc. 1165-7 at 14.] That article concluded that "there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates . . . Until a better research base develops caution should be exercised in utilizing the PCL-R in forecasting the likelihood of future serious personal violence." *Id.* (quoting Mark D. Cunningham and Thomas J. Reidy, *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, 16 Behav. Sci. & L. 333, 343 (1998)). Dr. Mark Cunningham, of course, was the expert retained by Mr. Lee's counsel, and thus counsel's failure to adequately challenge the evidence of psychopathy and the PCL-R was even more unreasonable.

There is no question that it would have been proper for the district court to consider the materials attached to the Rule 59(e) motion. As noted in Mr. Lee's Motion before this Court, the plain language of subsection (c) of Rule 59 itself expressly contemplates the filing of affidavits with the motion. *See* Mtn. at 132; Rule 59(c) ("The opposing party has 14 days after being served to file opposing affidavits. The court may permit reply affidavits"). As the district court implicitly acknowledged when it stated that the materials "might have [led it] to determine[] that

49

an evidentiary hearing was required" on Mr. Lee's claim, [Doc. 1189 at 9], the materials constituted additional support for an existing claim, and did not raise a new claim. As a result, it was well within the district court's discretion to consider them. *Cf. United States v. Ortiz,* 2011 WL 6306687 at *11 (8th Cir.) (remanding capital § 2255 matter for further proceedings and noting that, following remand, district court has "considerable discretion" to consider affidavits and documents in support of existing claims that were submitted for the first time on appeal).

Accordingly, if the district court's ruling on this portion of the Rule 59(e) Motion were deemed to be on the merits, it was clearly wrong. As noted, however, the court's comments regarding the merits are better understood as an aside; the actual basis for the court's decision was manifestly that it believed itself legally precluded from considering the materials accompanying the motion by the restrictions upon second or successive 2255 applications. The reasons why the district court erred in this conclusion are set forth in Mr. Lee's Motion, Mtn. at 125-32, and will not be repeated here. Since the Motion was filed, however, additional authority for the position stated therein has issued. In *Blystone v. Lambert*, 2011 WL 6598166 at *13 (3d Cir. Dec. 12), the Third Circuit joined the Sixth and Seventh Circuits in holding that a timely filed Rule 59(e) motion is not subject to the AEDPA's restrictions upon second or successive applications for relief. The court found that the purpose and operation of motions to reconsider under Rule 59(e) are sufficiently different than those of a motion to reopen judgment under Rule 60(b) as to render the analysis of the Supreme Court in *Gonzales v. Crosby*, 545 U.S. 524 (2005), inapplicable. *Id.* at *12-13 ("we cannot logically subject a Rule 59(e) motion to the statutory limitations imposed upon second or successive collateral attacks on criminal judgments because, unlike a Rule 60(b) motion, it is neither a collateral attack on the initial habeas judgment, nor a new collateral attack on the underlying criminal judgment – rather it is part and parcel of the

50

petitioner's one full opportunity to seek collateral review") (internal quotations omitted).
Holding further that applying the AEDPA restrictions to Rule 59(e) motions "would unduly interfere with the prompt reconsideration of just-entered judgments . . . which in turn 'furthers the important goal of avoiding piecemeal appellate review of judgments,'" *id.* at \*12 (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989)), the court declined to subject Rule 59(e) motions to those restrictions.[5]

The district court's refusal to consider the materials attached to the Rule 59(e) Motion and consequent denial of the motion was thus based upon a clear error of law, i.e. a mistaken belief that the statutory restrictions of 28 U.S.C. § 2255(h) and 28 U.S.C. § 2244(b)(3)(A) precluded it from considering those materials. A decision to deny a 59(e) motion is reviewed for abuse of discretion. *See, e.g., United States v. Metro St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006)). "'A district court abuses its discretion when it bases its decision on a legal error or a clearly erroneous finding of fact.'" *Roach v. Stouffer*, 560 F.3d 860, 863 (8th Cir. 2009) (quoting *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 533 (8th Cir. 2007)). Remand to the district court is accordingly required. *See Howard*, 533 F.3d at 475-76 (reversing district court's denial of Rule 59(e) motion based on erroneous conclusion that it constituted successive petition and remanding to district court for further consideration). At a minimum, reasonable jurists could surely disagree regarding the propriety of the district court's ruling, and a COA should therefore issue on this claim.

---

[5] The Third Circuit relied heavily in its opinion on the decision of the Sixth Circuit in *Howard v. United States*, 533 F.3d 472 (6th Cir. 2008), which was issued prior to the time that Mr. Lee's Motion was filed but previously overlooked by counsel. In *Howard*, a §2255 case, the court reached the same conclusion, using virtually the same analysis, as the Third Circuit later did in *Blystone*.

51

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Appellant Daniel Lewis Lee respectfully requests that his Motion be granted and that the certificate of appealability granted by the district court be expanded to include all of the issues discussed herein.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

-and-

/s/ Laurence E. Komp
Laurence E. Komp
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330
(636) 207–7351 (fax)
lekomp@swbell.net

-and-

/s/ Julie Brain
Julie Brain
Karl Schwartz
Delaware Federal Defender Office
Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
Julie_brain@fd.org
Karl_schwartz@fd.org

COUNSEL FOR MOVANT

52

**CERTIFICATE OF SERVICE**

Movant's counsel have filed this Reply to Response to Motion to Expand Certificate of

Appealability on today's date via ECF, thereby serving the United States and all parties.


/s/ David A. Ruhnke
COUNSEL FOR MOVANT


Electronically St. Louis, Missouri
filed: February 13, 2012

53

Appellate Case: 11-1380    Page: 53    Date Filed: 02/13/2012 Entry ID: 3879827