# Case No. 11-1380

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

## UNITED STATES OF AMERICA,
### *Respondent-Appellee,*

### *v.*

## DANIEL LEWIS LEE,
### *Petitioner-Appellant.*

---

Appeal from the United States District Court for the Eastern District of Arkansas,
Honorable G. Thomas Eisele

---

## APPELLANT'S BRIEF

---

LAURENCE E. KOMP, #40446 (MO)   DAVID A. RUHNKE
Attorney at Law                  Ruhnke & Barrett
P.O. Box 1785                    47 Park Street
Manchester, MO 63011             Montclair, New Jersey 07042
(636) 207-7330; (636) 207-7351(f)   (973)744-1000; (973)746-1490 (f)
lekomp@swbell.net                davidruhnke@ruhnkeandbarrett.com

JULIE BRAIN
KARL SCHWARTZ
Delaware Federal Defender Office, Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
(302) 442-6545
Julie_brain@fd.org

**Attorneys for Appellant**

# SUMMARY AND REQUEST FOR ORAL ARGUMENT

This is an appeal by Petitioner Daniel Lewis Lee ("Mr. Lee") from the district court's Judgment and Order dated August 28, 2008, denying a Petition filed by Mr. Lee pursuant to 28 U.S.C § 2255. R. 1163. The district court found trial counsel's utilization of race as a factor in striking jurors was not prohibited by the Constitution, and further found that Petitioner's death sentence was not otherwise constitutionally infirm. *Id.*

This Court should hear oral argument in this death penalty case because the appeal involves important constitutional issues. This appeal contests the denial of a petition filed pursuant to 28 U.S.C. § 2255 from the imposition of death sentences in the face of two significant constitutional questions upon which a certificate of appealability ("COA") has been granted: 1) whether the admitted use of racial discrimination in the defense use of peremptories was constitutional, and 2) whether, on the facts and circumstances of Mr. Lee's case, a death sentence is fundamentally fair.

Oral argument will assist this Court in resolving these issues. Thus, Mr. Lee respectfully requests that this Court hear oral argument. Because of the significance and complexity of the issues raised in this appeal, Mr. Lee suggests that 30 minutes per side is reasonable and necessary.

i

Appellate Case: 11-1380　　Page: 2　　Date Filed: 10/10/2012 Entry ID: 3961969

# TABLE OF CONTENTS

**SUMMARY AND REQUEST FOR ORAL ARGUMENT** ...................................i

**TABLE OF CONTENTS** ...................................................... ii

**TABLE OF AUTHORITIES** ...................................................iv

**JURISDICTIONAL STATEMENT**................................................1

**STATEMENT OF THE ISSUES**................................................1

**STATEMENT OF THE CASE**..................................................2

    **A.**    **Nature of the Case** ..............................................2

    **B.**    **Procedural History** .............................................2

    **C.**    **Statement of Facts** .............................................6

        **1. Facts Relevant to the Racism in the Exercise of Peremptories**...7

        **2. Facts Relevant to the Unconstitutional Death Sentence.** ..........10

**SUMMARY OF ARGUMENT**....................................................12

**STANDARD OF REVIEW** ......................................................14

**ARGUMENT**...................................................................16

**I.**    **MR. LEE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT BECAUSE HIS TRIAL COUNSEL EXERCISED PEREMPTORY CHALLENGES BASED ON RACE.** ......................................16

Appellate Case: 11-1380    Page: 3    Date Filed: 10/10/2012 Entry ID: 3961969

A     **Mr. Lee's Trial Counsel Were Prohibited by Law From Discriminating Against Potential Jurors On The Basis Of Race.** ...................................................................16

B.     **Mr. Lee's Counsel Nevertheless Struck Potential Jurors Because of Their Race.** ...................................................................21

C.     **Trial Counsel Rendered Ineffective Assistance by Engaging In Overt Racial Discrimination Based on Racial Stereotypes in Violation of the Constitution Because of Their Race.** ..................24

     1.     **Trial Counsel's Performance Was Deficient**...........................24

     2.     **Prejudice is Automatically Present When Counsel Commits Constitutional Error under the *Batson* Line of Cases**...............................................................27

     3.     **Mr. Lee Can In Fact Establish Prejudice Under the Unique Circumstances of This Case** ......................................31

D.     **The District Court Erred in Denying Relief on This Claim** ........33

II.     **IN LIGHT OF THE LIFE SENTENCE RETURNED AS TO THE MORE CULPABLE OF THE TWO DEFENDANTS, CHEVIE KEHOE, AND THE DISTRICT COURT'S FINDING THAT MR. LEE'S SENTENCE OF DEATH IS ARBITRARY AND CAPRICIOUS, IT WOULD VIOLATE THE FIFTH AND EIGHTH AMENDMENTS TO ALLOW HIS EXECUTION TO PROCEED.** ...................................................................35

**CONCLUSION**...................................................................42

**CERTIFICATE OF SERVICE** ...................................................................44

**CERTIFICATE OF COMPLIANCE** ...................................................................45

Appellate Case: 11-1380    Page: 4    Date Filed: 10/10/2012 Entry ID: 3961969

# TABLE OF AUTHORITIES

## CASES

*Avery v. Georgia*, 345 U.S. 559 (1953) ........................................................23

*Batson v. Kentucky,* 476 U.S. 79 (1986) ...............................................*passim*

*Bolling v. Sharpe*, 347 U.S. 497 (1954) .....................................................18

*Carter v. Kemna,* 255 F.3d 589 (8th Cir. 2001) .........................................28

*Eagle v. Linahan,* 279 F.3d 926 (11th Cir. 2001) ................................28,34

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) .............................................42

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) ....................23

*Ex parte Yelder,* 575 So.2d 137 (Ala. 1991) ............................................27

*Ford v. Norris,* 67 F.3d 162, 170 (8th Cir. 1995) .....................................28

*Gardner v. Florida*, 430 U.S. 339 (1977) ...........................................1,41,42

*Georgia v. McCollum*, 505 U.S. 42 (1992) .........................................*passim*

*Hamburg v. United States*, 675 F.3d 1170 (8th Cir. 2012) ......................14

*Hill v. Texas,* 316 U.S. 400 (1942) ...........................................................28

*Holloway v. Arkansas,* 435 U.S. 475 (1978) ...........................................35

*J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994) ..............................34

*Lee v. United States*, 545 U.S. 1141 (2005) ..............................................4

*Maples v. Thomas,* 132 S. Ct. 912 (2012) ...............................................30

*McGurk v. Stenberg,* 163 F.3d 470 (8th Cir. 1998) .................................30

Appellate Case: 11-1380    Page: 5    Date Filed: 10/10/2012 Entry ID: 3961969

*Neal v. Delaware*, 103 U.S. 370 (1881) ......................................................18

*Neder v. United States,* 527 U.S. 1 (1999) ...............................................29

*Nix v. Whiteside,* 475 U.S. 157 (1986) .....................................................25

*Norris v. Alabama*, 294 U.S. 587 (1935) ...................................................18

*O'Neal v. McAninch*, 513 U.S. 432 (1995) .........................................13,32

*Ortiz v. United States*, 664 F.3d 1151 (8th Cir. 2011) ............................14

*Powers v. Ohio*, 499 U.S. 400 (1991) ....................................19,25,28,29,34

*Rivera v. Illinois*, 556 U.S. 148 (2009) ................................................12,29

*Smith v. Texas*, 311 U.S. 128 (1940) ......................................................18

*Strickland v. Washington,* 466 U.S. 668 (1984) ......................24,27,29,30

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) ..........................40

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008) ........................11,40

*United States v. Grant*, 563 F.3d 385 (8th Cir. 2009) ............................17

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ............................41

*United States v. Huey,* 76 F.3d 638 (5th Cir. 1996) .......................28,31,34

*United States v. Kimbrel,* 532 F.3d 461 (6th Cir. 2008) ..........................31

*United States v. Lee*, 197 F.3d 310 (8th Cir. 1999) ("*Lee I*") ..............3,10

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) ("*Lee II*") ................4

*United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) ("*Lee III*") ............4,7

*United States v. Lee*, No. 4:97-cr-243-GTE, March 21, 2000 ...............3,4

Appellate Case: 11-1380    Page: 6    Date Filed: 10/10/2012 Entry ID: 3961969

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ...................................17

*United States v. Nelson*, 277 F.3d 164 (2nd Cir. 2002) .........................................18

*United States v. Pearson*, 448 F.2d 1207 (5th Cir. 1971) .....................................20

*United States v. Popsisil*, 186 F.3d 1023 (8th Cir. 1999) ...................................1,17

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) .........................37

*Vasquez v. Hillery,* 474 U.S. 254 (1986) ...............................................................31

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ...................................................18

*Winston v. Boatwright*, 649 F.3d 618 (7th Cir. 2011) .....................................*passim*

*Young v. Bowersox,* 161 F.3d 1159 (8th Cir. 1998) ...............................................30

## STATUES AND RULES

18 U.S.C. § 243 ...................................................................................................18,19

18 U.S.C. § 1959 ......................................................................................................2

18 U.S.C. § 1962(c) ..................................................................................................2

18 U.S.C. § 1962(d) ..................................................................................................2

18 U.S.C. § 3553(a)(6) ............................................................................................37

18 U.S.C. § 3592(c)(16) ..........................................................................................41

18 U.S.C. § 3595(c)(1) ............................................................................................41

18 U.S.C. § 3595(c)(2)(A) .......................................................................................41

28 U.S.C. § 1291 ......................................................................................................1

28 U.S.C. § 2253(a) ..................................................................................................1

Appellate Case: 11-1380    Page: 7    Date Filed: 10/10/2012 Entry ID: 3961969

28 U.S.C. § 2255 .......................................................................4,14,36,37

28 U.S.C. § 2255(a) .........................................................................1,37

28 U.S.C. § 2255 (b) ........................................................................1,40

28 U.S.C. § 2255 (d) ............................................................................1

Fed. R. Civ. P. 59(e) ............................................................................5

Ark. R. Prof'l. Conduct Preamble.......................................................20

Ark. R. Prof'l. Conduct 3.4.................................................................20

Ark. R. Prof'l. Conduct 8.4(d) ........................................................20,21

Local R. 83.5(e) ..................................................................................20

Model Federal Rules of Disciplinary Enforcement IV ..........................20

## CONSTITUTIONAL PROVISIONS

U.S. Const. Fifth Amendment ..........................................................18,35

U.S. Const. Sixth Amendment ......................................................16,25,30

U.S. Const. Eighth Amendment ..........................................................1,35

U.S. Const. Fourteenth Amendment .................................................17,18

Appellate Case: 11-1380    Page: 8    Date Filed: 10/10/2012 Entry ID: 3961969

# JURISDICTIONAL STATEMENT

On June 26, 2006, Mr. Lee filed his § 2255 Petition with the United States District Court for the Eastern District of Arkansas.  R. 1118, App'ant Apx. 141-183.  The district court exercised jurisdiction pursuant to 28 U.S.C. § 2255(a).  On August 28, 2008, the district court issued an order denying Mr. Lee's Petition.  Add. 1-119.  After the denial of his timely Rule 59 Motion on December 22, 2010, Add. 120-32, Mr. Lee filed his notice of appeal on February 14, 2011.  R. 1195, App'ant Apx. 462-463. This Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253(a) and 2255(d).

## STATEMENT OF ISSUES PRESENTED

1.	Whether the district court correctly found that defense counsel's racially motivated peremptory strikes did not violate the Constitution as prohibited by *Georgia v. McCollum*, 505 U.S. 42 (1992)?

	*Georgia v. McCollum*, 505 U.S. 42 (1992)
	*Batson v. Kentucky*, 476 U.S. 79 (1986)
	*United States v. Popsisil*, 186 F.3d 1023 (8th Cir. 1999)
	*Winston v. Boatwright*, 649 F.3d 618 (7th Cir. 2011)

2.	Whether the death sentences imposed upon Mr. Lee can be constitutional and fundamentally fair under the Eighth Amendment, when the district court found that they constitute an arbitrary and capricious application of the death penalty?

	*Gardner v. Florida*, 430 U.S. 339 (1977)
	28 U.S.C. § 2255 (b)

1

**STATEMENT OF THE CASE**

**A.	Nature of the Case**

This case involves an appeal of the district court's Order issued August 28, 2008, denying in its entirety Mr. Lee's 28 U.S.C § 2255 petition challenging his convictions and sentences of death imposed in the Eastern District of Arkansas in 2002, Add. 1-119, and the Order denying Mr. Lee's Rule 59 Motion, Add. 120-32.

**B.	Procedural History**

Mr. Lee was sentenced to death by a jury in the United States District Court for the Eastern District of Arkansas on May 13, 2002, following his convictions for conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1962(c) and (d), and for three murders in aid of racketeering in violation of 18 U.S.C. § 1959. Mr. Lee and his co-defendant, Chevie Kehoe, were convicted of the murders of William Mueller, his wife Nancy Mueller, and Nancy's eight year old daughter, Sarah Powell.

The district court severed the penalty-phase trials, with Chevie Kehoe's going first. Kehoe, the undisputed leader of the purported RICO enterprise and by far the more culpable defendant, was tried first and the jury returned sentences of life without possibility of release. After the jury declined to impose a death sentence on Mr. Kehoe, the local United States Attorney attempted to withdraw the

2

death notice for Mr. Lee.  Then-Deputy Attorney General Eric Holder refused to authorize the withdrawal.  Mr. Lee challenged this procedure and secured permission from the district court to subject Mr. Holder and Attorney General Janet Reno to examination; however, the Government successfully appealed. *United States v. Lee*, 197 F.3d 310, 311-312 (8th Cir. 1999) ("*Lee I*") (granting Petition for Writ of Mandamus and quashing subpoenas).

Thereafter, Mr. Lee's case proceeded to a penalty trial, at the conclusion of which he was sentenced to death by the same jury that spared Mr. Kehoe's life. After the jury returned its verdict of death, Mr. Lee sought, and was granted, a new sentencing proceeding.  *See United States v. Lee*, No. 4:97-cr-243-GTE, Doc. 941, March 21, 2000 (Order Granting Motion for New Penalty Phase Trial). The district court ordered the resentencing based upon its conclusion that it had erroneously permitted the government to introduce evidence of Mr. Lee's alleged future dangerousness and a diagnosis of "psychopathy."  The defense had opted not to introduce evidence on those topics, and the district court found that it had erroneously allowed the government to do so on cross-examination of the defense expert, Mark Cunningham, Ph.D., and in the so-called rebuttal testimony of its own expert, Thomas Ryan, Ph.D.  The district court further found that Deputy Attorney General Holder had not followed the Justice Department's Death Penalty Protocol

3

Appellate Case: 11-1380   Page: 11   Date Filed: 10/10/2012 Entry ID: 3961969

when he declined to authorize withdrawal of the death notice. The district court therefore further ordered the Department and the Attorney General to revisit the decision in accordance with the Protocol, which specifies that the final decision on withdrawal of a death notice can only be made by the Attorney General. *Id.*

The Government appealed both aspects of the district court's order. This Court reversed and reinstated Mr. Lee's death sentences. *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) ("*Lee II*"). This Court thereafter considered Mr. Lee's direct appeal, and affirmed his convictions and sentences of death. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) ("*Lee III*"). The Supreme Court denied a certiorari petition on June 27, 2005. *Lee v. United States*, 545 U.S. 1141 (2005).

Mr. Lee filed a Motion for Post-Conviction Relief Pursuant to 28 U.S.C. § 2255 in the district court on June 26, 2006. R. 1118, App'ant Apx. 141-183. The government responded on December 6, 2006, R. 1126, App'ant Apx. 184-285, and Mr. Lee filed a Reply thereto on April 9, 2007. R. 1134, App'ant Apx. 294-347. On November 1, 2007, the parties filed a Joint Motion to Set Status Conference, suggesting that the court schedule a conference to discuss "the need for a hearing, scheduling, and any other pertinent issues." R. 1152, App'ant Apx. 348-349. The court denied the motion, finding no reason to conduct a status conference, noting that it would schedule a hearing when it considered Mr. Lee's § 2255 Motion if it

4

concluded that one would be helpful in resolving the Motion. R. 1153, App'ant Apx. 350. On August 28, 2008, the court issued an order denying all relief. Add. 10. No evidentiary hearing was held on any issue. Indeed, the parties never appeared before the district court even once in connection with this challenge to the imposition of a federal sentence of death.

Mr. Lee thereafter filed a Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e), accompanied by a number of affidavits outlining some of the proof that he would have presented at an evidentiary hearing had one been granted. R. 1165, App'ant Apx. 351-431. The district court denied the motion on December 22, 2010, noting that, had it previously been provided with the affidavits that were attached to that Motion, it "might have determined that an evidentiary hearing was required." Add. 128. In the same order, the district court denied, with minimal analysis, a COA on all claims. Add. 131.

Mr. Lee subsequently filed a Motion to Reconsider the Denial of a COA. R. 1194, App'ant Apx. 464-487. The district court refused to reconsider its denial of a COA with the exception of one claim, issuing an order granting the motion with respect to "whether the death penalty is being unconstitutionally applied in this case." R. 1204, App'ant Apx. 488-490.

Mr. Lee filed a timely notice of appeal. R. 1195, App'ant Apx. 462-463.

5

This Court docketed the appeal as Case #11-1380. Mr. Lee then requested this Court to expand the COA. On February 17, 2012, this Court expanded the COA to include: "Lee's claim that he received ineffective assistance of counsel because his trial counsel exercised peremptory challenges based on race." Case #11-1380, Entry ID 3881641.

## C.     Statement of Facts.

The facts as alleged by the Government which led to Mr. Lee's convictions and death sentences were previously detailed by this Court in its opinion on direct appeal. *See Lee III*, 374 F.3d 637. Mr. Lee and his co-defendant Chevie Kehoe were found guilty of the murders of Robert Mueller, his wife, Nancy Mueller, and her eight-year-old daughter, Sarah Powell. Each victim was shot with a stun gun, and had a plastic bag duct-taped to their heads. Rocks were then taped to the bodies and they were dumped in an Arkansas lake, to be discovered months later by fishermen. *Id.*

Mr. Kehoe was by far the more culpable actor in both the alleged RICO Enterprise and in the murders themselves. Indeed, the testimony at trial, *see* TR. 4974, 5328, App'ant Apx. 507, 508, as noted previously by this Court, was that Mr. Lee "would have no part in the killing of Sarah Powell so Kehoe had done it

6

alone." *Lee III*, 374 F.3d at 642. In spite of this, Mr. Kehoe received life sentences from the same jury that sentenced Mr. Lee to death.

The following are the facts relevant to the two appellate claims currently before the Court upon which Mr. Lee has received a COA.

**1.      Facts Relevant to the Racism in the Exercise of Peremptories.**

The jury that convicted Mr. Lee and sentenced him to death was comprised of nine African Americans and three whites. TR. 1216, App'ant Apx. 491-493. Defense counsel jointly used every one of their 30 peremptory challenges to strike white venire members. TR. 1224, App'ant Apx. 492. The prosecution commented upon this fact, and cited both *McCollum* and the Equal Protection Clause to the district court. *Id.* Specifically, the Government stated "[i]f the Court does take a look at McCollum vs. Georgia and Batson vs. Kentucky, the right being safeguarded is equal protection under the laws. Defense counsel struck all whites in this case." *Id.* The district court, however, declined to conduct any inquiry at all into the propriety of the defense strikes. TR. 1225, App'ant Apx. 492 ("I guess we could go through the process of taking up every white, but I'm not going to do it.") The district court conceded that "you are not going to end up with a cross-section of the community if you give either side any number of peremptories such as we have here." *Id.* The prosecution chose not to pursue the objection further,

7

and the jury was seated.

In its Response to Mr. Lee's § 2255 Petition, the Government attached the affidavit of Mark Hampton, one of the attorneys that represented Mr. Lee's co-defendant, Chevie Kehoe, at the joint trial. *See* R. 1126-3, Add. 133-138. In his affidavit, Mr. Hampton wrote:

> Selecting a jury with as many black jurors as possible was a strategic decision made by defense counsel. Jury consultant Bob Berry concurred in the strategy. Defense counsel felt this strategy was reasonable because (1) blacks are more likely than whites to discredit government testimony, (2) research of attitudes indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely to give the death penalty than whites in this particular case. There were general conversations regarding the strategy with defendant Chevie Kehoe.

Add. 134. The district court found it to be "highly unlikely" that Mr. Lee's counsel and Chevie Kehoe's counsel did not consult on jury selection strategies. Add. 50-51. There is no factual dispute that racism was the sole basis of the 30 peremptories utilized by trial counsel.

Unlike Mr. Kehoe, who appeared fresh-faced and clean-cut, Mr. Lee was emblazoned with racially offensive tattoos that were visible to the jury throughout the entire trial and penalty phases. *See* TR. 4426, App'ant Apx. 506 (Testimony of Rochelle Ezzi) ("Can't see any of his tattoos except for the ones on his neck"). Further, the Government presented testimony from witnesses regarding additional

8

non-visible tattoos which adorned Mr. Lee's body. *See* TR. 2785-2790, App'ant

Apx. 494-499 (Testimony of Sean Haines); 4113-4115, App'ant Apx. 503-505.

(Testimony of Jack Price). The Government also introduced 11 photographs of

Mr. Lee's tattoos, as follows:

| Govt. Exhibit # | Description |
| --- | --- |
| 826 | On arm, eagle with a swastika on its chest. |
| 827 | On forearm, says "skins" with an iron cross and flames, with a Viking warrior on one side and a Nazi SS soldier on the other. |
| 828 | On shins, one shin saying "Skin" the other "Head." |
| 829, 830 | On inside right arm, saying "White" and on inside left arm saying "Pride." |
| 831 | Across stomach, saying "Ein Volk, Ein Riech, Ein Fuhrer," which means "one people, one nation, one leader." TR. 2789, App'ant Apx. 498. |
| 832 | Left forearm of man chained to a hammer and sickle, arm band of swastikas and celtic crosses, and a triskelion tattoo on his neck (the triskelion was visible in court). A triskelion was an emblem of the counter-resistance of South African whites. TR. 2789, App'ant Apx. 498. |
| 833 | Nazi SS lightning bolts on neck, which were visible in court. |
| 834 | Left forearm of man chained to a hammer and sickle, which relates to whites being shackled by communism. TR. 2790, App'ant Apx. 499. |
| 927 | On back, mocking tattoo of Justice Department emblem. |
| 928 | Necklace of barbed wire and a death head skull emblem with a wolf's hook. |

The Government would later argue that the tattoos reflected Mr. Lee's abhorrent,

racist philosophy. TR. 6995, App'ant Apx. 513 ("I guess the thing that tells you

most about [his beliefs] are all the tattoos. Remember seeing the pictures of the

Appellate Case: 11-1380    Page: 17    Date Filed: 10/10/2012 Entry ID: 3961969

tattoos? He's printed all over his body his philosophy, and he's telling the world what he thinks.").

### 2. Facts Relevant to the Unconstitutional Death Sentences.

The district court granted a COA on the issue of whether, in light of the life sentence returned by the jury for the more culpable co-defendant, Chevie Kehoe, Mr. Lee's death sentences should be vacated. As set forth most extensively in *Lee I*, and, as noted above, Mr. Lee's penalty phase was conducted separately from co-defendant Chevie Kehoe's. Mr. Kehoe's penalty phase, which went first, ended with a life verdict. While Mr. Kehoe's jury was still deliberating, the district court inquired of the prosecution as to what course they would pursue if Kehoe's jury did not return a verdict of death. The lead prosecutor noted that it was likely the United States would withdraw its request for a death sentence as to Lee. *Lee I,* 197 F.3d at 311, 312. When the Kehoe jury in fact returned a life verdict, the then-United States Attorney for the Eastern District of Arkansas, Paula Casey, confirmed to the district court that the United States wished to withdraw its request for a sentence of death for Mr. Lee but stated that she was not clear she had the authority to do so without permission from the Department of Justice. *Id.* When Ms. Casey was unable to reach Attorney General Janet Reno, she spoke with Deputy Attorney General Eric Holder who instructed her that the death notice

10

could not be withdrawn.  *Id*.  Mr. Lee's jury then went on to sentence him to death.

The district court made extensive fact-findings below - discussed in detail *infra* - suggesting that Mr. Lee's death sentences are an arbitrary and irrational miscarriage of justice when viewed in light of Mr. Kehoe's life sentence.  The district court noted most tellingly that Kehoe was the one who murdered the child, Sarah Powell, and did so because Mr. Lee was unwilling to do so.  The district court also noted that by any measure Kehoe was the more culpable of the two, had twice attempted to murder police officers, and that Mr. Lee was nothing but a follower.

Moreover, events since the trial - including the exclusion of Mr. Lee as the source of the hair found on the raid cap, a primary piece of the evidence according to the Government at the time of trial - further underscore the arbitrary nature of the sentences of death now before this Court.  That the Government's case is undermined should also be read in the context that certain of the statutory aggravators upon which the Government relied could not legally apply.  First, the multiple-murder aggravator had not yet been enacted by Congress at the time of the crimes.  Second, the pecuniary gain factor has been defined by this Court as not applicable to the facts and circumstances of Mr. Lee's case.  *United States v. Bolden*, 545 F.3d 609, 615 (8th Cir. 2008).

11

Appellate Case: 11-1380     Page: 19     Date Filed: 10/10/2012 Entry ID: 3961969

**SUMMARY OF ARGUMENT**

In *Georgia v. McCollum*, 505 U.S. 42, 55 (1992), the Supreme Court prohibited defense counsel from using race-based peremptory challenges to strike jurors in criminal cases. Mr. Lee and his more culpable co-defendant, exercised all of their 30 peremptories on the basis of race – deliberately striking only white jurors – because of a stereotype: that African-American jurors are less likely to impose death and are more distrustful of the Government than white jurors. At the time of trial, the Government raised *McCollum* and its equal protection basis, TR. 1224, App'ant Apx. 492, and then *acquiesced* in the racial discrimination by choosing not to press the objection.

It was unreasonable for Mr. Lee's trial counsel, or any counsel for that matter, to engage in this appalling strategy, and for the Government to stand silent after noting the racism that had occurred. This is especially true in Mr. Lee's case where sitting jurors were able to view Mr. Lee's visible, racially antagonistic tattoos on a daily basis in a lengthy trial, as well as considering proof of the racially hostile non-visible tattoos and an abundance of evidence of deplorable racist beliefs.

Mr. Lee is not required to demonstrate prejudice resulting from his counsel's unconstitutional actions. The Supreme Court, in *Rivera v. Illinois*, 556 U.S. 148,

12

Appellate Case: 11-1380     Page: 20     Date Filed: 10/10/2012 Entry ID: 3961969

161 (2009), noted unanimously that the *Batson* line of cases, which includes *McCollum*, are "automatic reversal precedents." Even if prejudice were required to be shown, however, in light of the overwhelming amount of evidence of Mr. Lee's particular antipathy towards African-Americans, the inference that the nine African-American members of the jury were affected by that evidence and that it influenced their decision to convict Mr. Lee is inescapable.

Further, the disparity between the life sentence received by the more-culpable, yet non-tattooed, co-defendant, and the death sentences imposed upon Mr. Lee demonstrate that Mr. Lee was prejudiced by this unreasonable strategy. At a minimum, given the difficulty that surrounds the determination of whether counsel's conduct prejudiced Mr. Lee's rights, the evidence sits in equipoise and Mr. Lee prevails under *O'Neal v. McAninch*, 513 U.S. 432 (1995).

The death sentences against Mr. Lee should be questioned for many reasons which separately and in combination compound the prejudice from counsel's race-based jury rigging: 1) Mr. Lee's lesser role in the murders and the events surrounding them; 2) the primary actor and hands-on-killer of all three victims received a life sentence; 3) the local U.S. Attorney's Office no longer believed that a death sentence for Mr. Lee was fair or justified once the primary actor received life; 4) the case for Mr. Lee's future dangerousness was premised upon testimony

13

that is scientifically invalid (and Mr. Lee is the only person on federal death row against whom the use of such testimony has been permitted to stand); 5) the Government's case against Mr. Lee has been substantially undermined by mtDNA testing that excluded Mr. Lee as the source of the hair found in a "raid cap" allegedly used in the crime; 6) the statutory aggravator of pecuniary gain was improperly applied in Mr. Lee's case; and 7) the statutory aggravator of multiple murder was inappropriately submitted to the in that it had not been enacted by Congress  as part of the federal death penalty statute when these crimes are alleged to have occurred.  As noted by the district court: "In the eyes of this Court, the DOJ's insistence on continuing to seek the death penalty as to Lee, under the circumstances, casts a pall over the case."  Add. 117.  In short, Mr. Lee's sentences of death is the essence of arbitrariness and caprice as found by the district court.

**STANDARD OF REVIEW**

This Court reviews a district court's denial of a § 2255 motion *de novo*.  *See Hamburg v. United States*, 675 F.3d 1170, 1172 (8th Cir. 2012).  This *de novo* review applies to the district court's legal conclusions and mixed questions of law and fact.  *Ortiz v. United States*, 664 F.3d 1151, 1164 (8th Cir. 2011).  Any underlying factual findings are reviewed for clear error.  *Id.; Hamburg*, 675 F.3d at

14

1172. Mr. Lee's ineffective assistance claim "presents a mixed question of fact and law." *Ortiz*, 664 F.3d at 1164.

15

Appellate Case: 11-1380     Page: 23     Date Filed: 10/10/2012 Entry ID: 3961969

## ARGUMENT

**I.     MR. LEE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT BECAUSE HIS TRIAL COUNSEL EXERCISED PEREMPTORY CHALLENGES BASED ON RACE.**

**A.     Mr. Lee's Trial Counsel Were Prohibited by Law From Discriminating Against Potential Jurors On The Basis Of Race.**

As defense attorneys in a criminal case, Mr. Lee's trial counsel were forbidden by the Constitution, a federal criminal statute and applicable rules of professional conduct from engaging in race discrimination when selecting Mr. Lee's jury. In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause forbids a prosecutor from exercising peremptory challenges based on race. 476 U.S. 79, 89 (1986). The Supreme Court extended the prohibition against race-based peremptory challenges to strikes by defense counsel in criminal cases in *Georgia v. McCollum*, 505 U.S. 42, 55 (1992).

The Court ruled that the exercise of a peremptory challenge by any party, including a defendant in a criminal case, constitutes state action because it is the exercise of the power to choose "the institution of government on which our judicial system depends." *Id.* at 54. As a result, for the limited purpose of jury selection, both the government and the defense are state actors and racial discrimination by either one violates the Constitution and must be remedied. *Id.*;

16

*See also United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000)( "[u]nder the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race").

In *United States v. Popsisil*, 186 F.3d 1023, 1027-28 (8th Cir. 1999), this Court recognized the Supreme Court's mandate in *McCollum* that both prosecutors and defense counsel are prohibited from using peremptory strikes in a discriminatory manner. The Court held: "The Supreme Court 'firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror.'" *Id.* at 1028 (quoting *McCollum,* 505 U.S. at 59). In *United States v. Grant*, 563 F.3d 385, 389 (8th Cir. 2009), this Court noted that defense counsel could not utilize peremptories on the basis of gender, and that "the government made a prima facie showing of a *J.E.B.* gender violation when the government offered its objection to the pattern of [defense counsel's] strikes and told the district court that [the defense] exercised ten of her eleven strikes on females."

Because *Batson* and *McCollum* involved the use of peremptory challenges by state actors, the Supreme Court's equal protection analysis was pursuant to the Fourteenth Amendment. Because this case involves a criminal defendant in

17

federal court, Mr. Lee's equal protection analysis is based on the Due Process clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954). Of course, the Supreme Court approaches equal protection claims under the Fifth Amendment in the same fashion as it considers such claims under the Fourteenth Amendment. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

The principle that racial discrimination has no place in jury selection is long standing. As noted by the Seventh Circuit in *Winston v. Boatwright*, 649 F.3d 618, 622 (7th Cir. 2011), "[f]or more than 130 years, federal courts have held that discrimination in jury selection offends the Equal Protection Clause. *See, e.g., Smith v. Texas*, 311 U.S. 128, 130-32 [] (1940); *Norris v. Alabama*, 294 U.S. 587, 599[] (1935); *Neal v. Delaware*, 103 U.S. 370, 397-98 [] (1881)." This echoed the Supreme Court's recognition in *McCollum*, 505 U.S. at 46, that "[o]ver the last century, in an almost unbroken chain of decisions, this Court gradually has abolished race as a consideration for jury service."

In addition to the constitutional prohibition of discriminating on the basis of race, it is both unethical and illegal pursuant to 18 U.S.C. § 243 to act in such a fashion as a sworn officer of the court. *See United States v. Nelson*, 277 F.3d 164 (2nd Cir. 2002) (noting § 243 violated when defense counsel and government

18

Appellate Case: 11-1380    Page: 26    Date Filed: 10/10/2012 Entry ID: 3961969

allow district court to reshuffle jury on the basis of race).  Pursuant to 18 U.S.C. § 243, "[n]o citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude."  The statute goes on to criminalize conduct that is antithetical to this principle, prescribing that "whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000." *Id.*  This statutory prohibition, as the Supreme Court has said, "makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution," and accordingly, "the courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition." *Powers v. Ohio*, 499 U.S. 400, 416 (1991).

Especially in light of the fact that a defense attorney is a "state actor" when exercising peremptory strikes during jury selection, *see McCollum*, 505 U.S. at 50-55, he or she clearly qualifies as "an officer or any other person charged with [a] duty in the selection" of jurors.  18 U.S.C. § 243.  And when he or she exercises a peremptory strike against a juror because of the juror's race, he or she "excludes"

19

that citizen from jury service and therefore violates the criminal statute. *See United States v. Pearson*, 448 F.2d 1207, 1216 (5th Cir. 1971) (noting that requiring a prosecutor to testify regarding his reasons for exercising peremptories against African-American potential jurors might require him to testify as to whether he had committed a crime under § 243).

Discriminating against potential jurors on the basis of race also violated trial counsel's ethical obligations. Appearing in the United States District Court for the Eastern District of Arkansas, trial counsel were governed by the Arkansas Rules of Professional Conduct. *See* Local R. 83.5(e) (attorneys appearing in district court are subject to Uniform Rules of Disciplinary Enforcement); Model Federal Rules of Disciplinary Enforcement IV (court adopts rules of professional conduct of highest court of state in which court sits). The deliberate violation of the constitutional and statutory prohibitions on race discrimination in jury selection violated several of the Arkansas Rules. For example, the Rules direct that "[a] lawyer's conduct should conform to the requirements of the law . . . in professional service to clients." Ark. R. Prof'l. Conduct Preamble. Rule 3.4 mandates that "[a] lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal.

Ark. R. Prof'l. Conduct 8.4(d) and the Comment thereto specifically address the use of race discrimination during jury selection. The Rule states: "It is

20

Appellate Case: 11-1380    Page: 28    Date Filed: 10/10/2012 Entry ID: 3961969

professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Ark. R. Prof'l. Conduct 8.4(d).  The Comment elaborates that this "proscription includes the prohibition against discriminatory conduct committed by a lawyer," because "[s]uch discriminatory conduct, when directed towards . . . jurors . . .including [on grounds of] race . . . subverts the administration of justice and undermines the public's confidence in our system of justice, as well as notions of equality." *Id.* cmt.1.  There can be no question, therefore, that striking potential jurors on the basis of race is unconstitutional, illegal and unethical conduct for any attorney, no matter who they represent.

### B.  Mr. Lee's Counsel Nevertheless Struck Potential Jurors Because of Their Race.

That Mr. Lee's trial counsel nevertheless engaged in racial discrimination when selecting his jury is not in dispute.  Indeed, the Government introduced the evidence of the misconduct in the § 2255 proceeding in the form of an affidavit by the co-defendant's trial counsel.  Add. 133 (Hampton Affidavit).  Mr. Hampton indicated that the trial strategy was to seat as many "blacks" as possible.  *Id.*  Mr. Hampton relied on specific racial stereotypes as the reasons for his strikes of

---

1 The Comment points out that "[a] trial judge's finding that peremptory challenges were exercised on a discriminatory basis does not alone establish a violation of this rule." *Id.* cmt.1.  Plainly, this provision governs the quantum of proof required in order to discipline an attorney under this Rule, it in no way condones the practice of striking potential jurors on the basis of race.

Appellate Case: 11-1380     Page: 29     Date Filed: 10/10/2012 Entry ID: 3961969

"white" jurors:

> Selecting a jury with as many black jurors as possible was a strategic decision made by defense counsel. Jury consultant Bob Berry concurred in the strategy. Defense counsel felt this strategy was reasonable because (1) blacks are more likely than whites to discredit government testimony, (2) research of attitudes indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely to give the death penalty than whites in this particular case. There were general conversations regarding this strategy with defendant, Chevie Kehoe.

*Id*. The district court found it was "highly unlikely" that Mr. Lee's counsel did not consult and concur with the racist jury selection strategy. Add. 50-51.

The trial proceedings support Mr. Hampton's admission of improper racial motives. The jury that convicted Mr. Lee and sentenced him to death was comprised of nine (9) African-Americans and three (3) whites. TR. 1216, App'ant Apx. 491. Defense counsel used each of their thirty (30) peremptory strikes to exclude white venire members. TR. 1224, App'ant Apx. 492 ("Defense counsel struck all whites in this case.") Thus, the composition of the jury was impermissibly determined based on race.

During jury selection, the Government cited to the district court *McCollum*'s prohibition based on the equal protection clause and noted that "[d]efense counsel struck all whites in this case." *Id.* However, the district court declined to conduct

22

any inquiry into the propriety of the defense strikes.  TR. 1225, App'ant Apx. 493

("I guess we could go through the process of taking up every white, but I'm not

going to do it."). This inaction alone violated constitutional principles because

"[b]e it at the hands of the State or the defense, if a court allows jurors to be

excluded because of a group bias, it is a willing participant in a scheme that could

only undermine the very foundation of our system of justice - our citizens'

confidence in it." *McCollum,* 505 U.S. at 49-50.  Indeed, when a court permits a

party to discriminate against potential jurors on the basis of race, it becomes a

vehicle facilitating discrimination by "those who are of the mind to discriminate"

through the use of peremptory challenges. *Batson*, 476 U.S. at 96 (quoting *Avery v.*

*Georgia*, 345 U.S. 559, 562 (1953)).

Just as the court decided to ignore the issue, the Government made its own

choice to not press the issue further.  Thus, the Government acquiesced and agreed

to the seating of the jury despite the fact that it was constructed based on racial

stereotypes and was the product of purposeful racial discrimination.  Stated another

way, the improper "Government actions" of Mr. Lee's attorneys received the

Government's seal of approval.  *See Edmonson v. Leesville Concrete Co.*, 500 U.S.

614, 630-631 (1991) ("If our society is to continue to progress as a multiracial

democracy, it must recognize that the automatic invocation of race stereotypes

23

retards that progress and causes continued hurt and injury").

## C. Trial Counsel Rendered Ineffective Assistance by Engaging In Overt Racial Discrimination Based On Racial Stereotypes in Violation of the Constitution.

Mr. Lee will not belabor the familiar legal standard regarding ineffective assistance of counsel claims established in *Strickland v. Washington*, 466 U.S. 668 (1984). In short, counsel is ineffective when his or her performance falls below an objective standard of reasonableness and the defendant suffers prejudice as a result. *Id.* at 687-88. *Strickland's* first prong is simply whether counsel's performance "fell below an objective standard of reasonableness." *Id.*

### 1. Trial Counsel's Performance Was Deficient

Mr. Lee's trial counsel rendered deficient performance by exercising peremptory challenges against prospective jurors on the basis of their race. "Deliberately choosing to engage in conduct that the Supreme Court has unequivocally banned is both professionally irresponsible and well below the standard expected of competent counsel." *Winston*, 649 F.3d at 630. Unconstitutional discrimination against jurors "is not consistent with, or reasonable under, 'prevailing professional norms.'" *Id.* at 631 (quoting *Strickland*, 466 U.S. at 688). It therefore constitutes deficient performance. *Id.*

Trial counsel's actions were impermissible even if they could have somehow

24

been expected to inure to Mr. Lee's benefit:

> Calling the lawyer's actions 'strategic' does not help: as the Court has repeatedly stated, the *Batson* rule exists not only to protect the criminal defendant, but also to protect the prosecutor's interests, the interests of the prospective jurors, and society's interest in an unbiased system of justice. We may assume that defense counsel can waive the rights of his client, but he has no authority to waive the other rights implicated by *Batson*.

*Winston*, 649 F.3d at 631. *See also McCollum*, 505 U.S. at 57 (noting that "neither the Sixth Amendment right [to the effective assistance of counsel] nor the attorney-client privilege gives a criminal defendant the right to carry out through counsel an unlawful course of conduct," and that "defense counsel is limited to 'legitimate, lawful conduct'") (quoting *Nix v. Whiteside*, 475 U.S. 157, 166 (1986)). Striking a venireperson on the basis of race is thus deficient performance as a matter of law.

But in actual fact, the use of racial stereotypes to guide the jury selection process never benefits a party. "Race cannot be a proxy for determining juror bias or competence. A person's race is simply unrelated to his fitness as a juror." *Powers*, 499 U.S. at 410 (quoting *Batson*, 476 U.S. at 87). This truism was confirmed by the affidavit of Attorney Kevin McNally, an experienced criminal defense lawyer with extensive federal death penalty trial experience, filed by Mr. Lee in support of his Rule 59 Motion. Attorney McNally averred:

> It is my opinion that selecting jurors strictly on the basis of racial stereotypes is not a reasonable, effective strategy in any case…such

25

> an approach ignores the fact that all racial groups are composed of individuals with their own views and opinions on the death penalty and other topics…It is always important that jurors be selected with care and the race of the jurors not trump the individual views of the jurors on the death penalty and other case-related issues. Given the repugnant views on race allegedly held by the two defendants on trial, it was even more important in this case…In my opinion, therefore, any strategic decision made by defense counsel in this case to select a jury based on the race of the jurors fell below prevailing professional norms for the defense of a capital case.

R. 1165-3 pp. 3-4 (Affidavit of Attorney Kevin McNally), Add. 141-142.

Racially discriminatory use of peremptory challenges is thus the antithesis of legitimate, lawful behavior and has no basis in reason or logic in any case. In this case in particular, however, such a "strategy" is exceptionally unreasonable. At Mr. Lee's trial he and his co-defendants were accused of being white supremacists engaged in murder and racketeering in order to create a pure "whites-only" Aryan nation in the northwest United States. The trial was saturated with accounts of repugnant racist beliefs, and Mr. Lee wore visible tattoos resembling Nazi swastikas and SS lightning bolts on his neck as a constant reminder of his antipathy towards other races. *See* Tr. 4426, App'ant Apx. 506 (Testimony of Rochelle Ezzi) ("Can't see any of his tattoos except for the ones on his neck"). Indeed, as noted in the statement of facts, the Government introduced numerous photographs of the non-visible tattoos, including but not limited to tattoos of an eagle with a swastika on its chest, a Nazi SS soldier, "Skin Head," "White Pride,"

26

and arm band of swastikas and Celtic crosses.

There is simply no conceivable basis upon which a decision by defense counsel to exclude whites and stack the jury with African-Americans in a case in which the defendant is accused of being a white supremacist engaged in murder and racketeering in order to create a whites-only Aryan nation could be deemed reasonable. *See* Add. 141-142 (Affidavit of Attorney Kevin McNally). Mr. Lee has unquestionably satisfied *Strickland's* first prong.

### 2. Prejudice is Automatically Present When Counsel Commits Constitutional Error under the *Batson* Line of Cases

Turning to *Strickland's* prejudice prong, this Court should follow the Seventh Circuit and hold that prejudice is automatically present when defense counsel engages in unconstitutional race discrimination in jury selection. *Strickland's* second prong generally requires a petitioner to show "a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, when counsel engages in unconstitutional race discrimination during jury selection, a structural defect is created and prejudice is automatically present. *See Winston*, 649 F.3d at 632 ("Prejudice . . . is automatically present when the selection of a petit jury has been infected with a violation of *Batson* or *J.E.B.*"). *See also Ex parte Yelder*, 575 So.2d 137, 139 (Ala. 1991) (same).

27

Appellate Case: 11-1380     Page: 35     Date Filed: 10/10/2012 Entry ID: 3961969

The Seventh Circuit's decision maintains uniformity with the Fifth Circuit's decision in *United States v. Huey*, 76 F.3d 638 (5th Cir. 1996), which also reversed and remanded for a new trial based on a proven *Batson-McCollum* violation without requiring a showing of prejudice.  Specifically, the Fifth Circuit held:

> The discriminatory jury selection process of this trial offends the Constitution and calls into question the integrity of our judicial system. We conclude that only by repudiating all results from such a trial can public confidence in the integrity of this system be preserved, even when it means reversing the conviction of the very defendant who exercised the discriminatory challenges.

*Huey*, 76 F.3d at 641-42.  Similarly, in granting relief on an appellate ineffectiveness claim for failing to raise a *Batson* violation, the Eleventh Circuit held, after analogizing to *Hill v. Texas*, 316 U.S. 400 (1942):

> The fundamental premise of *Batson* and its progeny is that criminal defendants and excluded jurors alike are denied equal protection of the laws when the trial jury is constructed in a racially discriminatory manner. The remedy for such an equal protection violation is reversal of the conviction without regard to whether we perceive the defendant to be actually innocent or guilty.

*Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001).

A *Batson/McCollum* violation is a structural defect because it corrupts the entire jury fact finding process.  *See Carter v. Kemna*, 255 F.3d 589, 591 (8th Cir. 2001); *Ford v. Norris*, 67 F.3d 162, 170-71 (8th Cir. 1995).  As noted in *Powers*, "the composition of the trier of fact itself is called in question, and the irregularity

28

may pervade all the proceedings that follow." *Powers*, 499 U.S. at 413. *See also Rivera v. Illinois*, 556 U.S. 148, 161 (2009) (noting *Batson* and its progeny are "automatic reversal precedents").[2]

The Supreme Court has recognized that structural constitutional errors "'are so intrinsically harmful as to require automatic reversal.'" *Winston*, 649 F.3d at 632 (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)). When they occur as a result of ineffective assistance of defense counsel, such errors "inevitably 'undermine confidence in the outcome' of a proceeding." *Id.* (quoting *Strickland*, 466 U.S. at 694)). Treating racial discrimination as a structural defect, even when committed by defense counsel in a criminal case, is analytically sound in light of the way in which the United States Supreme Court has characterized counsel's actions in this narrow context. Under a traditional *Strickland* analysis, the defense attorney is an agent of the defendant, not a state actor. Under *McCollum*, in contrast, for the purposes of selecting who serves on a jury the attorney is not an agent of the defendant but a state actor. *Id.* at 54. Because the defense attorney is a state actor for this limited purpose, it follows that traditional *Strickland* prejudice

---

[2] The United States Supreme Court has never suggested that the discriminatory exclusion of prospective jurors is subject to harmless error review. Instead, the Court has illuminated the core constitutional mandate of unbiased juries by reversing convictions without pausing to determine whether the improper exclusion of jurors made any difference to the trial's outcome. *See Powers*, 499 U.S. at 416; *Batson*, 476 U.S. at 100.

Appellate Case: 11-1380     Page: 37     Date Filed: 10/10/2012     Entry ID: 3961969

analysis cannot apply, because the actual constitutional violation, while clothed in the Sixth Amendment, is an Equal Protection and Due Process violation.

While this Court has applied the *Strickland* prejudice prong in the context of defense counsel's failure to object to a **potential**[3] *Batson* violation by the State, s*ee Young v. Bowersox*, 161 F.3d 1159, 1160-1161 (8th Cir. 1998), it has never done so when it was defense counsel's own conduct that created the structural error. In that circumstance, the Court has squarely held that "[w]hen counsel's deficient performance causes a structural error, we will presume prejudice under *Strickland*." *McGurk v. Stenberg*, 163 F.3d 470, 475 (8th Cir. 1998) (holding that counsel's failure to inform client of his right to jury trial constituted structural error requiring that prejudice be presumed, and noting that "it will be a rare event when the failings of counsel rise to the level of structural error").

This distinction is entirely consistent with the Supreme Court's Sixth Amendment jurisprudence. Although normally counsel is a defendant's agent and under principles of agency law the defendant "bears the risk of negligent conduct on the part of" his counsel, such as a failure to object, *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012), when counsel's conduct is so egregious as to "sever[] the principal-agent relationship," the legal consequences for the defendant are entirely

---

[3] Unlike *Young*, it is undisputed that there is a racial discrimination in Mr. Lee's case, it is not a hypothetical.

Appellate Case: 11-1380    Page: 38    Date Filed: 10/10/2012 Entry ID: 3961969

different.  *Id.* at 922-24.  And in *McGurk*, the Court expressly noted that intentional race discrimination in jury selection is a structural error that results in a "deprivation of a similar constitutional dimension" to the error that entitled Mr. McGurk to a presumption of prejudice.  *Id.* at 475 (citing *Vasquez v. Hillery*, 474 U.S. 254, 264 (1086)).  *See also United States v. Huey*, 76 F.3d 638 (5th Cir. 1996) (holding that discriminatory jury selection offends the Constitution and calls into question integrity of judicial system, thus "only by repudiating all results from such a trial can public confidence in the integrity of this system be preserved, even when it means reversing the conviction of the very defendant who exercised the discriminatory challenges");  *United States v. Kimbrel*, 532 F.3d 461 (6th Cir. 2008) (holding that flawed reverse-*Batson* inquiry required reversal and remand for a new trial) .

### 3. Mr. Lee Can In Fact Establish Prejudice Under the Unique Circumstances of This Case

In any event, this is the highly unusual case where the prejudice to the defendant is clear from the record.  Throughout the guilt and penalty phases of Mr. Lee's trial, the jury was subjected to an unrelenting barrage of accusations of abhorrent racist beliefs on the part of Mr. Lee.  By way of example, James Wanker testified that Mr. Lee told him that "he liked to go 'nigger bashing,'" TR. 4081, App'ant Apx. 500, and that he was going downtown to "do some nigger bashing"

31

on the 4th of July, TR. 4091-92, App'ant Apx. 501-502. A pamphlet found in a storage locker associated with Mr. Lee read: "We could go on indefinitely quoting scripture to prove that the negro is merely an articulate member of the beast creation. Even though he has not been given the intelligence and spiritual understanding of the white race, he can think and reason up to a point, therefore he is to have dominion over the other animals. Let us give credit where credit is due. The negro is king, king of the beasts." TR. 5566, App'ant Apx. 512. In light of the overwhelming amount of evidence of Mr. Lee's particular antipathy towards people of color,[4] the inference that the nine African-American members of the jury were affected by that evidence and that it influenced their decision to convict Mr. Lee and sentence him to death is inescapable. At a minimum, "grave doubt" exists. *O'Neal v. McAninch*, 513 U.S. 432 (1995) (holding that when the evidence sits in equipoise doubts should be resolved in favor of granting relief).

As to the penalty phase, prejudice is established by the disparate sentencing between Mr. Lee and his co-defendant, Mr. Kehoe. Even if the Court were to find that Mr. Lee has not shown prejudice sufficient to justify guilt phase relief, at a

---

[4] For example, the Government's first five witnesses presented lengthy testimony regarding Mr. Lee's abhorrent racial views. *See* TR. 1280-1428 (Testimony of John Shults); 1428-1474 (Testimony of Georgianna Williams); 1475-1565 (Testimony of Kevin Flynn); 1566-1683 (Testimony of Angela Desilets); 1684-1715 (Testimony of Lorraine Marie).

32

Appellate Case: 11-1380    Page: 40    Date Filed: 10/10/2012 Entry ID: 3961969

### D. The District Court Erred in Denying Relief on This Claim

The district court found that Mr. Lee's counsel deliberately exercised their peremptory strikes in a racially discriminatory manner. Nevertheless, the district court denied relief based upon the wholly erroneous conclusion that "[r]ace-based jury selection offends the constitutional rights of the <u>jurors</u> who are eliminated from jury service because of their race. That Petitioner's counsel may have allowed race to influence the jury selection process does not offend <u>Petitioner's</u> constitutional rights." Add. 51 (emphasis in original).

As is clear from the authorities cited above, however, racially discriminatory jury selection processes most assuredly do implicate the rights of the defendant, even in the ordinary case. Where, as here, the end result is that the defendant, an accused white supremacist, skinhead and hater of other races, is tried for his life by a mostly black jury from which members of his own race have been systematically excluded, the violation of Mr. Lee's rights could hardly be plainer. This general point was further exacerbated by Mr. Lee's visible tattoos as well as the non-visible tattoos presented via numerous Government's Exhibits which included, but were not limited to, tattoos of an eagle with a swastika on its chest, a Nazi SS

33

soldier, "Skin Head," "White Pride," and an arm band of swastikas and celtic crosses.

Mr. Lee had an absolute right to be tried by a jury whose members were selected by nondiscriminatory criteria. *Powers*, 499 U.S. at 404. Racially discriminatory jury selection processes manifestly implicate the rights of the defendant. *See Batson* 476 U.S. at 87 (noting that "[r]acial discrimination of jurors harms . . . the accused whose life or liberty they are summoned to try"); *McCollum*, 505 U.S. at 47 (noting that one of multiple ends that *Batson* was designed to serve is "to protect individual defendants") (internal citations omitted).

"The discriminatory use of peremptory challenges . . . causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice." *Powers,* 499 U.S. at 411. The Supreme Court has squarely rejected the district court's ruling: "Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants . . . The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994). Again, the fact that it was Mr. Lee's own counsel that engaged in the unconstitutional discrimination does not affect this result. *Huey*, 76 F.3d at 641-42; *Winston*, 649 F.3d 618; *Eagle*, 279 F.3d 926.

34

Appellate Case: 11-1380    Page: 42    Date Filed: 10/10/2012 Entry ID: 3961969

## II. IN LIGHT OF THE LIFE SENTENCE RETURNED AS TO THE MORE CULPABLE OF THE TWO DEFENDANTS, CHEVIE KEHOE, AND THE DISTRICT COURT'S FINDING THAT MR. LEE'S SENTENCE OF DEATH IS ARBITRARY AND CAPRICIOUS, IT WOULD VIOLATE THE FIFTH AND EIGHTH AMENDMENTS TO ALLOW HIS EXECUTION TO PROCEED.

Regarding the relative roles of the two defendants who stood trial in this case and whose lives were, *seriatim*, put into the hands of the same jury, the district court found as a matter of fact: "[T]here was no question about Kehoe's and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower." Add. 17. The Government conceded this point, albeit in more offensive language, when it referred to Mr. Lee in summation as Kehoe's "faithful dog."[5] *See* TR. 6821, App'ant Apx. 514. In terms of the two actors and their relative moral culpability and death-worthiness, the district court found that: "The undisputed evidence was that Lee was unwilling to kill Sarah, the little girl, so Kehoe killed her." Add. 9.

In addition to being the leader and moving force behind these crimes, Kehoe, without Mr. Lee, engaged in two separate shoot-outs with law enforcement, intending, but failing, to kill the officers he encountered. As reflected in the

---

[5] In a capital proceeding, reducing the defendant to the status of an animal to be put down is more than problematic. *See, e.g.*, *Holloway v. Arkansas*, 435 U.S. 475 (1978).

Appellate Case: 11-1380     Page: 43     Date Filed: 10/10/2012 Entry ID: 3961969

district court's opinion, it was the view of all concerned, including prosecutors, agents, and members of the victims' family, that if Chevie Kehoe's life were spared at the penalty phase, "a death sentence should not be pursued against Lee . . . ." Add. 117. Summarizing its views on Lee's sentence of death, the district court wrote: "In the eyes of this Court, the DOJ's insistence on continuing to seek the death penalty as to Lee, under the circumstances, casts a pall over the case." *Id.* The court further noted that it agreed with Mr. Lee that the DOJ's action "was unreasonable, unfair, and possibly even an abuse of prosecutorial discretion." *Id.* at 118. The court's went on to say that "[p]erhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations." *Id.* at 119.

This Court should now take this perhaps final opportunity to set aside a sentence of death that, in the eyes of the district court who presided over the trial and penalty phases was inappropriate, disproportionate, irrational, unreasonable, unfair and potentially the product of the abuse of prosecutorial discretion.

Moreover, although the district court viewed itself as limited to remedies of *constitutional* violations, in a § 2255 proceeding, a district court is authorized to set aside a judgment where it was imposed "in violation of the Constitution *or laws of*

36

*the United States . . .* " 28 U.S.C. § 2255(a) (emphasis added). In this regard, the court took note of the requirement of the Sentencing Reform Act that there is a need "to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In *United States v. Sampson*, 335 F. Supp. 2d 166, 195-196 (D. Mass. 2004), the Court observed in this regard:

> Proportionality is generally regarded as important to sentencing. It is the foundation of the current regime of sentencing under the United States Sentencing Guidelines. The Guidelines use nationwide statistics to promote proportional sentences throughout the United States. It would be anomalous if the choice between a life sentence and a death sentence were the only sentencing decision in the federal system in which proportionality is not a proper consideration.

The disparity in sentences between Mr. Lee and Mr. Kehoe is all the more significant in light of the fact that the government's case for guilt, which was never as strong against Mr. Lee as it was against Mr. Kehoe to begin with, has steadily eroded as more facts have come to light since the trial. There is now no forensic or physical evidence that directly establishes Mr. Lee's involvement in the crime. Indeed, the Government's one piece of scientific evidence, on which the core of the Government's case rested, a hair found in a cap allegedly used by one of the killers in the course of the murders, was conclusively demonstrated below, through

37

mitochondrial DNA testing, to have come from someone other than Mr. Lee.

The Government's entire case against Mr. Lee therefore rested squarely on the testimony of a co-defendant's family members, witnesses whose credibility and motives are suspect in light of the substantial consideration and sentence reductions they received in exchange for providing testimony consistent with the government's version of "the truth."  Indeed, the Government's theory of the case, which relies on a tight and inflexible time-frame, has been deconstructed by disinterested witnesses whose observations undermining that time-frame are not sullied by improper motives or the need to curry favor with authorities.  Moreover, the Government's theory of the case relies on the existence of an organization which it still cannot conclusively demonstrate has ever existed, much less give a consistent answer as to what its alleged name –"APR" – stands for.

But most egregiously, even if all of the Government's evidence of guilt is accepted as true, the indisputably more culpable party in the crime, Chevie Kehoe, who was the hands-on killer of the eight-year old little girl that Mr. Lee refused to harm, received a life sentence, while Mr. Lee was sentenced to die.[6]

---

[6] Additionally, according to Gloria and Cheyne Kehoe, Chevie Kehoe told them that he subdued a struggling Mr. Mueller by bashing in his head with the butt of a shotgun.  TR. 4973, App'ant Apx. 507 (Gloria) ("Chevie used the butt of a shotgun. . . [He said] Bill was putting up such a fight that he had to take the shotgun and hit him over the head, and it busted his head"); TR. 5328, App'ant

38

Appellate Case: 11-1380   Page: 46   Date Filed: 10/10/2012 Entry ID: 3961969

In addition to this disparate involvement in the murders, it is also the case that the Government alleged that Chevie Kehoe was the founder and leader of the alleged white supremacist movement, and that he independently engaged in a variety of criminal activity to promote and fund that movement. Among the activities that Kehoe was said to have engaged in are:

- A prior robbery of William Mueller with his father, Kirby Kehoe, the fruits of which (guns, ammunition, gun parts, and gun-related merchandise) were used to fund the movement;

- The kidnap robbery of Malcolm and Jill Friedman, a Jewish couple with whom Chevie Kehoe was acquainted, which netted $15,000, the proceeds of which were used to purchase land in Idaho; and

- A shootout with police in Ohio, involving Chevie Kehoe and his brother Cheyne.

In this case, this Court is faced not with a situation in which two defendants

Apx. 509 (Cheyne) ("[Chevie] said that he…turned the shotgun that he had around and hit Mr. Mueller with the stock of the shotgun and that it shattered the stock of the shotgun. He said he then took it, turned it around and grabbed it by the receiver and hit him in the back of the head with the barrel. He said that he knew it was over when he hit him with the barrel. He said he felt his skull cave in, and Mr. Mueller quit moving at that point"); TR. 5442, App'ant Apx. 511 (Cheyne) ("[Chevie] said he hit him with the butt of the shotgun…[h]e said he felt the skull collapse"). Further, Cheyne Kehoe testified that Chevie told him that he took the duct tape and plastic bags with which he killed the decedents with him to the residence. TR. 5328-29, App'ant Apx. 509-510. Chevie told Cheyne that he also took with him in his truck three rocks, which he planned to, and did, use to weigh down the bodies before placing them in the bayou where they were later found. TR. 5329, App'ant Apx. 510. Thus, there can be no doubt as to Chevie's greater role in the killings and greater degree of moral culpability.

39

have been found guilty of similar conduct, but one in which an undeniably less culpable defendant received the greater punishment. This Court is urged to exercise its authority to correct unfair sentencing disparities by vacating Mr. Lee's sentence of death. *See* 28 U.S.C. § 2255 (b) "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial *or correct the sentence as may appear appropriate*") (emphasis added).

All of the above is exacerbated by the erroneous consideration by the jury of improper statutory aggravating circumstances, and evidence that is scientifically invalid because it is inaccurate. In short, the arbitrariness of Mr. Lee's death sentences is exacerbated by the following:

- This Court has held that felony murder in which the *underlying felony* was committed for pecuniary gain is not a federal capital offense. *United States v. Bolden*, 545 F.3d 609, 615 (8th Cir. 2008). Rather, the pecuniary gain aggravating circumstance applies "only 'where pecuniary gain is expected to follow as a direct result of the murder.'" *Id.* (quoting *United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002)). Thus, the pecuniary gain aggravator as used in Mr. Lee's case was improper;

- Pursuant to the version of the federal death penalty statute in effect at

Appellate Case: 11-1380    Page: 48    Date Filed: 10/10/2012 Entry ID: 3961969

the time of Mr. Lee's trial, the fact that "[t]he defendant intentionally killed or attempted to kill more than one person in a single criminal episode" constituted a statutory aggravating factor for the crime of homicide. *See* 18 U.S.C. § 3592(c)(16). However, that multiple murder aggravating factor was not made a part of the statute until April, 1996, three months after the government claims that the homicides of the Muellers took place. *See United States v. Higgs*, 353 F.3d 281, 300 (4th Cir. 2003). Thus, the multiple murder aggravator as used in Mr. Lee's case was improper; and,

• The government's evidence of future dangerousness is premised upon junk science. Dr. Ryan, Ph.D., the Government's own expert, now admits that the use of the PCL-R to diagnose psychopathy and predict future dangerousness in capital cases is scientifically and ethically inappropriate, because there is no scientific basis whatsoever for the proposition that individuals diagnosed as psychopaths are likely to be dangerous when incarcerated. *See* R. 1165-7 at 2-4 (Affidavit of Dr. Stephen David Hart), App'ant Apx. 437-439.

Moreover, the district court's conclusion that Mr. Lee's sentence of death was indeed arbitrary resonates in settled principle of statutory and constitutional law. For example, the FDPA itself admonishes reviewing courts that sentences of death may not stand if imposed under any "arbitrary factor." 18 U.S.C. § 3595(c)(1) and 3595(c)(2)(A). Indeed, arbitrariness and caprice represent the antithesis of a constitutional death verdict. This has been so since 1972.

As stated in *Gardner v. Florida*, 430 U.S. 339 (1977):

> [D]eath is a different kind of punishment from any other which may be imposed in this country. From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its

41

Appellate Case: 11-1380    Page: 49    Date Filed: 10/10/2012 Entry ID: 3961969

> citizens differs dramatically from any other legitimate state action. *It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.*

*Gardner*, 430 U.S. at 357-58 (emphasis added). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court noted that, in order to pass constitutional muster, "capital punishment be imposed fairly, and with reasonable consistency, or not at all." The outcome of this case suggests a verdict rendered on caprice, as found by the district court, and one that is not consistent with the punishment visited on Mr. Lee's far more culpable co-defendant.

## CONCLUSION

For the foregoing reasons, the judgment and order of the district court denying Mr. Lee's § 2255 Petition should be reversed. As to Mr. Lee's First Argument, because this error is structural, prejudice is presumed. Therefore, this case should be vacated and remanded for a new trial not infected by racial discrimination. Alternatively, given the disparity in sentences this Court should vacate Mr. Lee's death sentences and remand for further proceedings consistent with this Court's decision. As to Mr. Lee's Second Argument, this Court should vacate Mr. Lee's death sentences and remand for further proceedings consistent with this Court's decision.

42

Respectfully submitted,

/s/ Julie Brain
JULIE BRAIN
KARL SCHWARTZ
Delaware Federal Defender Office
Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
(302) 442-6545
Julie_brain@fd.org

LAURENCE E. KOMP
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330; (636) 207–7351
(fax)
lekomp@swbell.net

-and-

DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000; (973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

COUNSEL FOR APPELLANT LEE

43

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2012, a copy of the Brief and Addendum was served via this Court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

/s/ Julie Brain<br>JULIE BRAIN

44

Appellate Case: 11-1380    Page: 52    Date Filed: 10/10/2012 Entry ID: 3961969

# CERTIFICATE OF COMPLIANCE

I, hereby certify that appellant's brief is filed in compliance with Fed. R. App. P. 32 and 8th Cir. R. 28A. This Brief was prepared and formatted in Microsoft Word, Times New Roman, size 14 point, and the entire document contains 10,2033 words. The Brief and Addendum have been converted to PDF for electronic filing and have been scanned for viruses and are virus-free.

Respectfully submitted,

/s/ Julie Brain
JULIE BRAIN
Attorney for Appellant Lee

Appellate Case: 11-1380    Page: 53    Date Filed: 10/10/2012 Entry ID: 3961969