No. 11-1380

In the
# United States Court of Appeals
## For the Eighth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

DANIEL LEWIS LEE,
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
District Court No. 97-CR-243-GTE
Hon. Garnett Thomas Eisele, United States District Judge

**BRIEF FOR THE UNITED STATES**

CHRISTOPHER R. THYER
United States Attorney
Eastern District of Arkansas

LANNY A. BREUER
Assistant Attorney General

JOHN D. BURETTA
Acting Deputy Assistant Attorney
    General

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766

Appellate Case: 11-1380    Page: 1    Date Filed: 12/26/2012 Entry ID: 3988297

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ........................................................ 1

STATEMENT OF THE CASE ........................................................ 2

STATEMENT OF FACTS ........................................................ 4

    I.    The Offense Conduct .................................................... 4

    II.    Trial Proceedings ........................................................ 7

        A.    Indictment .................................................... 7

        B.    Jury Selection .................................................... 7

        C.    Conviction and Sentencing .................................... 9

            1.    Kehoe's Sentencing ................................ 10

            2.    Lee's Sentencing ................................ 12

SUMMARY OF ARGUMENT ........................................................ 15

ARGUMENT ........................................................ 19

    ISSUE 1:    LEE DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL DURING JURY SELECTION ................ 19

    I.    Background ................................................... 19

    II.    Standard of Review .................................... 21

    III.    Argument .................................... 21

Appellate Case: 11-1380    Page: 2    Date Filed: 12/26/2012 Entry ID: 3988297

A. If Lee's and Kehoe's Lawyers Shared the Same Jury Selection Strategy, Lee's Counsel Violated the Equal Protection Rights of the Excluded Jurors ........................ 21

B. Even if Lee's Counsel Violated the Equal Protection Rights of the Excluded Jurors, He Did Not Receive Ineffective Assistance of Counsel .................................... 24

1. Lee Has Not Shown Prejudice Resulting from His Counsel's Purportedly Deficient Performance ........ 25

a. Lee Is Not Exempt from Establishing Strickland Prejudice ...................................... 26

i. Even if McCollum Error Is Deemed Structural, Like Batson Error, Lee Must Nonetheless Show Prejudice ...... 26

ii. McCollum Error Is Not Structural ...... 33

b. Lee Was Not Prejudiced by His Counsel's Jury Selection Strategy ................................. 39

2. The Performance of Lee's Lawyers Did Not Fall Below Prevailing Professional Norms .................... 44

ISSUE 2: LEE'S DEATH SENTENCE DOES NOT VIOLATE THE EIGHTH AMENDMENT .......................................... 54

I. Background ................................................................... 54

A. Direct Appeal ..................................................... 54

B. Section 2255 Motion ...................................... 54

II. Standard of Review ................................................... 55

III. Argument ................................................................... 55

Appellate Case: 11-1380   Page: 3   Date Filed: 12/26/2012 Entry ID: 3988297

CONCLUSION ............................................................... 63

CERTIFICATE OF COMPLIANCE ....................................... 64

CERTIFICATE OF SERVICE ............................................. 65

Appellate Case: 11-1380    Page: 4    Date Filed: 12/26/2012 Entry ID: 3988297

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alexander v. Sandoval, 532 U.S. 275 (2001) ............................................... 31

Allen v. Hardy, 478 U.S. 255 (1986) ......................................................... 38

Anderson v. United States, 25 F.3d 704 (8th Cir. 1994) ............................... 62

Batson v. Kentucky, 476 U.S. 79 (1986) ............................................. passim

Bell v. Cone, 535 U.S. 685 (2002) ............................................................ 29

Bobby v. Van Hook, 130 S. Ct. 13 (2009) ............................................ 44, 48

Bousley v. United States, 523 U.S. 614 (1998) ........................................... 33

Brewer v. Aiken, 935 F.2d 850 (7th Cir. 1991) ........................................... 49

Brewer v. Marshall, 119 F.3d 993 (1st Cir. 1997) ...................................... 41

Bullington v. Missouri, 451 U.S. 430 (1981) .............................................. 35

Coleman v. Thompson, 501 U.S. 722 (1991) .............................................. 28

Cuyler v. Sullivan, 446 U.S. 335 (1980) ................................................... 28

Davis v. United States, 411 U.S. 233 (1973) .............................................. 32

Davis v. United States, 673 F.3d 849 (8th Cir. 2012) .................................. 55

Davis v. Woodford, 384 F.3d 628 (9th Cir. 2004) ....................................... 39

Eddings v. Oklahoma, 455 U.S. 104 (1982) ............................................... 57

Florida v. Nixon, 543 U.S. 175 (2004) ................................................. 31, 32

Appellate Case: 11-1380    Page: 5    Date Filed: 12/26/2012 Entry ID: 3988297

Ford v. Norris, 67 F.3d 162 (8th Cir. 1995) ............................................ 27, 34

Francis v. Henderson, 425 U.S. 536 (1976) ............................................ 32

Fry v. Pliler, 551 U.S. 112 (2007) ............................................ 26

Georgia v. McCollum, 505 U.S. 42 (1992) ............................................ passim

Getsy v. Mitchell, 495 F.3d 295 (6th Cir. 2007) ............................................ 56

Harrington v. Richter, 131 S. Ct. 770 (2011) ............................................ 48

Jackson v. Herring, 42 F.3d 1350 (11th Cir. 1995) ............................................ 28, 30

Janofsky v. St. Amand, 594 F.3d 39 (1st Cir. 2010) ............................................ 24

Lowenfeld v. Phelps, 484 U.S. 231 (1988) ............................................ 57

Mader v. United States, 654 F.3d 794 (8th Cir. 2011) ............................................ 32

Maples v. Thomas, 132 S. Ct. 912 (2012) ............................................ 30

Massaro v. United States, 538 U.S. 500 (2003) ............................................ 33

Mata v. Johnson, 99 F.3d 1261 (5th Cir. 1996) ............................................ 23, 37

McCleskey v. Kemp, 481 U.S. 279 (1987) ............................................ 2, 56, 57, 58

McGehee v. Norris, 588 F.3d 1185 (8th Cir. 2009) ............................................ 56

McGurk v. Stenberg, 163 F.3d 470 (8th Cir. 1998) ............................................ 30, 31

Mercer v. Armontrout, 864 F.2d 1429 (8th Cir. 1988) ............................................ 33

Michel v. Louisiana, 350 U.S. 91 (1955) ............................................ 50

Middleton v. Roper, 498 F.3d 812 (8th Cir. 2007) ............................................ 56

Appellate Case: 11-1380     Page: 6     Date Filed: 12/26/2012 Entry ID: 3988297

Murray v. Carrier, 477 U.S. 478 (1986) ...................................................... 28

New v. United States, 652 F.3d 949 (8th Cir. 2011) ..................................... 25

Nix v. Whiteside, 475 U.S. 157 (1986) ......................................................... 49

Norris v. Alabama, 294 U.S. 587 (1935) ..................................................... 34

Ortiz v. United States, 664 F.3d 1151 (8th Cir. 2011) ................................. 44

Owens v. United States, 483 F.3d 48 (1st Cir. 2007) ................................... 31

Padilla v. Kentucky, 130 S. Ct. 1473 (2010) ............................................... 44

Person v. Miller, 854 F.2d 656 (4th Cir. 1988) ........................................... 40

Peters v. Kiff, 407 U.S. 493 (1972) .............................................................. 50

Powers v. Ohio, 499 U.S. 400 (1991) ..................................................... 22, 23

Pulley v. Harris, 465 U.S. 37 (1984) ......................................................... 2, 56

Purvis v. Crosby, 451 F.3d 734 (11th Cir. 2006) ......................................... 30

Reed v. Norris, 195 F.3d 1004 (8th Cir. 1999) ....................................... 27, 43

Rivera v. Illinois, 556 U.S. 148 (2009) ............................................. 26, 27, 38

Rose v. Clark, 478 U.S. 570 (1986) ............................................................. 38

Rose v. Mitchell, 443 U.S. 545 (1979) .................................................... 34, 38

Sanders v. Norris, 529 F.3d 787 (8th Cir. 2008) ......................................... 39

Strauder v. West Virginia, 100 U.S. 303 (1880) ......................................... 22

Strickland v. Washington, 466 U.S. 668 (1984) .................................... passim

Appellate Case: 11-1380    Page: 7    Date Filed: 12/26/2012 Entry ID: 3988297

<u>Sumner v. Shuman</u>, 483 U.S. 66 (1987) ...................................................... 57

<u>Tuilaepa v. California</u>, 512 U.S. 967 (1994) ............................................... 56

<u>In re United States</u>, 197 F.3d 310 (8th Cir. 1999) ................................... 2, 12

<u>United States v. Alama</u>, 486 F.3d 1062 (8th Cir. 2007) .............................. 31

<u>United States v. Aptt</u>, 354 F.3d 1269 (10th Cir. 2004) ............................... 24

<u>United States v. Bolden</u>, 545 F.3d 609 (8th Cir. 2008) .......................... 42, 61

<u>United States v. Boyd</u>, 86 F.3d 719 (7th Cir. 1996) .............................. passim

<u>United States v. Cronic</u>, 466 U.S. 648 (1984) ............................................. 29

<u>United States v. Dale</u>, 614 F.3d 942 (8th Cir. 2010) ...................................... 8

<u>United States v. Frady</u>, 456 U.S. 152 (1982) ............................................... 33

<u>United States v. Fulks</u>, 683 F.3d 512 (4th Cir. 2012) .................................. 39

<u>United States v. Greer</u>, 968 F.2d 433 (5th Cir. 1992) .................................. 40

<u>United States v. Higgs</u>, 353 F.3d 281 (4th Cir. 2003) .................................. 61

<u>United States v. Huey</u>, 76 F.3d 638 (5th Cir. 1996) ..................................... 37

<u>United States v. Johnson</u>, 495 F.3d 951 (8th Cir. 2007) .......................... 2, 56

<u>United States v. Kehoe</u>, 310 F.3d 579 (8th Cir. 2002) ........................... 4, 5, 6

<u>United States v. Lee</u>, 89 F. Supp. 2d 1017 (E.D. Ark. 2000) ......................... 2

<u>United States v. Lee</u>, 274 F.3d 485 (8th Cir. 2001),
    <u>cert. denied</u>, 537 U.S. 1000 (2002) .................................................. 2, 62

Appellate Case: 11-1380    Page: 8    Date Filed: 12/26/2012 Entry ID: 3988297

United States v. Lee, 374 F.3d 637 (8th Cir. 2004),
 cert. denied, 545 U.S. 1141 (2005) ................................................... passim

United States v. Lee, No. 97-CR-342, 2008 WL 4079315
 (E.D. Ark. Aug. 28, 2008) ................................................................. 3

United States v. Lee, No. 97-CR-342, 2010 WL 5347174
 (E.D. Ark. Dec. 22, 2010) ................................................................. 3

United States v. Martin, 677 F.3d 818 (8th Cir. 2012) ................................. 55

United States v. Mechanik, 475 U.S. 66 (1986) ......................................... 34

United States v. Mitchell, 502 F.3d 931 (9th Cir. 2007) .............................. 61

United States v. Nelson, 277 F.3d 164 (2d Cir. 2002) ................................. 51

United States v. Nickerson, 556 F.3d 1014 (9th Cir. 2009) ......................... 49

United States v. Pospisil, 186 F.3d 1023 (8th Cir. 1999) ............................ 40

United States v. Purkey, 428 F.3d 738 (8th Cir. 2005) ................................ 9

United States v. Regenos, 405 F.3d 691 (8th Cir. 2005) .............................. 21

United States v. Rimell, 21 F.3d 281 (8th Cir. 1994) .................................. 49

Vasquez v. Hillery, 474 U.S. 254 (1986) .......................................... 33, 34, 38

Virgil v. Dretke, 446 F.3d 598 (5th Cir. 2006) ......................................... 31

Ward v. Norris, 577 F.3d 925 (8th Cir. 2009) .......................................... 30

Winston v. Boatright, 649 F.3d 618 (7th Cir. 2011) .................................... 37

Wright v. Nix, 928 F.2d 270 (8th Cir. 1991) ...................................... 27, 41, 43

Wright v. Van Patten, 552 U.S. 120 (2008) ............................................. 32

Appellate Case: 11-1380     Page: 9     Date Filed: 12/26/2012 Entry ID: 3988297

<u>Young v. Bowersox</u>, 161 F.3d 1159 (8th Cir. 1998) ............................ passim

**FEDERAL STATUTES**

18 U.S.C. § 243 ............................................................ 17, 18, 48, 50, 51

18 U.S.C. § 1959(a)(1) ............................................................ 2, 7

18 U.S.C. § 1962(c) ............................................................ 2, 7

18 U.S.C. § 1962(d) ............................................................ 2, 7

18 U.S.C. § 3551(a) ............................................................ 62

18 U.S.C. § 3553(a)(6) ............................................................ 62

18 U.S.C. § 3591 ............................................................ 62

18 U.S.C. § 3591(a)(2) ............................................................ 57

18 U.S.C. § 3592(a)(3) ............................................................ 58

18 U.S.C. § 3592(a)(4) ............................................................ 58

18 U.S.C. § 3592(a)(8) ............................................................ 58, 59

18 U.S.C. § 3592(c) ............................................................ 57

18 U.S.C. § 3593(d) ............................................................ 57, 58

18 U.S.C. § 3593(e) ............................................................ 58

18 U.S.C. § 3593(e)(2) ............................................................ 57

18 U.S.C. § 3593(f) ............................................................ 12, 15

28 U.S.C. § 1291 ............................................................ 1

Appellate Case: 11-1380   Page: 10   Date Filed: 12/26/2012 Entry ID: 3988297

28 U.S.C. § 1331 ............................................................................................ 1

28 U.S.C. § 2253 ............................................................................................ 1

28 U.S.C. § 2255 ..................................................................................... passim

The Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3593 ........ passim

Fed. R. Civ. P. 59 .......................................................................................... 1

## OTHER AUTHORITIES

3 Wayne R. LaFave et al., Criminal Procedure § 11.10(b) (3d ed. 2011) ...... 50

6 Wayne R. LaFave et al., Criminal Procedure § 22.3(d) (3d ed. 2011) ........ 36

ABA Standards for Criminal Justice: Discovery and Trial By Jury
    15-2.8 (3d ed. 1996) ............................................................................ 47

ABA Standards for Criminal Justice: Prosecution and Defense Function
    4-1.2(c) (3d ed.1993) ............................................................................ 45

Abbe Smith, "Nice Work if You Can Get It": "Ethical" Jury Selection in
    Criminal Defense, 67 Fordham L. Rev. 523 (1998) ..................... 44, 45, 53

A Legislative History: The Development of the ABA Model Rules of
    Professional Conduct, 1982-2005 (2006) ............................................... 52

Arkansas Rules of Prof'l Conduct R. 8.4(d) cmt. 3 (2012) .......................... 52

Audrey M. Fried, Comment, Fulfilling the Promise of Batson: Protecting
    Jurors From the Use of Race-Based Peremptory Challenges by Defense
    Counsel, 64 U. Chi. L. Rev. 1311 (1997) ................................................ 34

D.C. Rules of Prof'l Conduct R. 3.4(g) (2007) ............................................ 53

D.C. Rules of Prof'l Conduct R. 3.8(h) (1999) ........................................... 53

Appellate Case: 11-1380    Page: 11    Date Filed: 12/26/2012 Entry ID: 3988297

John Wesley Hall, Jr., <u>Professional Responsibility in Criminal Defense Practice</u> (2005) ............................................................... 35, 45, 50

Lonnie T. Brown, Jr., <u>Racial Discrimination in Jury Selection: Professional Misconduct, Not Legitimate Advocacy</u>, 22 Rev. Litig. 209 (2003) .......... 53

Mattie Johnstone & Joshua M. Zachariah, <u>Peremptory Challenges and Racial Discrimination: The Effects of Miller-El v. Cockrell</u>, 17 Geo. J. Legal Ethics 863 (2004) ............................................................... 52

Model Rules of Prof'l Conduct R. 8.4(d) (1998) ........................................... 53

Model Rules of Prof'l Conduct R. 8.4(d) cmt. 2 (1998) .......................... 51, 53

Restatement (Third) of the Law Governing Lawyers § 52(a)(2)(a) (2000) ..... 49

Sheri Lynn Johnson, <u>Batson Ethics for Prosecutors and Trial Court Judges</u>, 73 Chi.-Kent L. Rev. 475 (1998) ........................................................ 45

Stephen Gillers & Roy D. Simon, <u>Regulation of Lawyers: Statutes and Standards</u> (2000) ............................................................... 52

Texas Disciplinary Rules of Prof'l Conduct R. 5.08(a) & (b) (2012) ............. 53

Texas Disciplinary Rules of Prof'l Conduct R. 5.08 cmt. 4 (2012) ............... 53

Theodore Eisenberg et al., <u>Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty</u>, 30 J. Legal Stud. 277 (2001) .... 46

William J. Bowers et al., <u>Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition</u>, 3 U. Pa. J. Const. L. 171 (2001) ........................................ 46

Appellate Case: 11-1380    Page: 12    Date Filed: 12/26/2012 Entry ID: 3988297

## STATEMENT OF JURISDICTION

This is an appeal from a denial of postconviction relief under 28 U.S.C. § 2255. See LA 9-127.[1] After the district court denied a timely motion for reconsideration under Fed. R. Civ. P. 59, LA 140, Lee filed a timely notice of appeal, LA 462-63. The district court granted a certificate of appealability as to one issue, LA 488-90, and this Court granted a certificate of appealability as to one additional issue. The district court had jurisdiction under 28 U.S.C. § 2255 and 28 U.S.C. § 1331. This Court's jurisdiction rests on 28 U.S.C. § 2253 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether Lee received ineffective assistance of counsel if, as assented, his lawyers used peremptory challenges to strike white veniremembers and maximize the number of black jurors based on counsel's belief that black jurors would be more likely to closely scrutinize the government's evidence and vote against the death penalty.

> Strickland v. Washington, 466 U.S. 668 (1984)
> Georgia v. McCollum, 505 U.S. 42 (1992)
> Young v. Bowersox, 161 F.3d 1159 (8th Cir. 1998)

---

[1]"LA" refers to Lee's appendix. "GA" refers to the government's appendix. "Tr." refers to the consecutively-paginated trial transcript.

Appellate Case: 11-1380    Page: 13    Date Filed: 12/26/2012 Entry ID: 3988297

2.     Whether Lee's death sentence violates the Eighth Amendment because his allegedly more culpable co-defendant, Chevie Kehoe, received a sentence of life imprisonment.

Pulley v. Harris, 465 U.S. 37 (1984)
McCleskey v. Kemp, 481 U.S. 279 (1987)
United States v. Johnson, 495 F.3d 951 (8th Cir. 2007)
United States v. Lee, 374 F.3d 637 (8th Cir. 2004)

## STATEMENT OF THE CASE

After a jury trial in the United States District Court for the Eastern District of Arkansas, Lee was convicted on one count of conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); one count of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); and three capital counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The jury imposed a sentence of death. See LA 11-12.

Lee filed a motion for a new sentencing hearing, and this Court issued a writ of mandamus precluding Lee from obtaining certain discovery in connection with the motion. In re United States, 197 F.3d 310 (8th Cir. 1999). After the district court granted Lee a new sentencing hearing, United States v. Lee, 89 F. Supp. 2d 1017 (E.D. Ark. 2000), this Court reversed, United States v. Lee, 274 F.3d 485 (8th Cir. 2001), cert. denied, 537 U.S. 1000 (2002), and

-2-

Appellate Case: 11-1380   Page: 14   Date Filed: 12/26/2012 Entry ID: 3988297

affirmed Lee's conviction and sentence on direct appeal, <u>United States v. Lee</u>, 374 F.3d 637 (8th Cir. 2004), <u>cert. denied</u>, 545 U.S. 1141 (2005).

Lee filed a motion for postconviction relief under 28 U.S.C. § 2255. The district court denied the motion and a subsequent motion for reconsideration. LA 9-140; <u>see</u> <u>United States v. Lee</u>, No. 97-CR-342, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008); <u>United States v. Lee</u>, No. 97-CR-342, 2010 WL 5347174 (E.D. Ark. Dec. 22, 2010). The district court initially denied a certificate of appealability, <u>see</u> LA 139-40, but later reconsidered and granted a certificate of appealability on one issue: whether the death penalty is unconstitutional as applied to Lee because co-defendant Chevie Kehoe received a sentence of life imprisonment. LA 488-90. After Lee filed a motion to expand the certificate of appealability to encompass 16 additional issues, this Court issued an order granting the motion "as to Lee's claim that he received ineffective assistance of counsel because his trial counsel exercised peremptory challenges based on race and denying the motion as to all other claims."[2] The Court denied Lee's petition for rehearing en banc.

---

[2]An appeal by Kehoe raising an ineffective assistance claim on the same grounds is currently pending before this Court. <u>See</u> <u>United States v. Chevie O'Brien Kehoe</u>, No. 11-1382. Argument was heard on November 15, 2012.

-3-

Appellate Case: 11-1380    Page: 15    Date Filed: 12/26/2012 Entry ID: 3988297

## I.    The Offense Conduct

Lee was a member of the Aryan Peoples' Republic, or the Aryan Peoples' Resistance (APR), a white-supremacist organization formed by Chevie Kehoe for the purpose of establishing an independent nation of white members of the Christian Identity movement in the Pacific Northwest. Lee, 374 F.3d at 641; LA 505. Adherents of the Christian Identity ideology, such as Lee and Kehoe, believed that the "white man" is the "chosen race" descended from Adam; Jews are the Devil's children and must be killed; and "blacks" are inferior "mud people." Tr. 1308-10, 1315-16, 1433-35, 1452; see LA 13. Kehoe, Lee, and other APR members engaged in a variety of criminal activity to promote and fund the organization. Lee, 374 F.3d at 641.

In January 1996, expecting to find valuable property, Kehoe and Lee traveled from Washington to the Arkansas home of William Mueller, a gun dealer who held anti-government views and owned a large collection of weapons and ammunition.[3] They arrived dressed in police raid clothing and waited until Mueller returned home with his wife Nancy and their eight-year-

---

[3]Kehoe and his father Kirby came to know Mueller at gun shows and had robbed Mueller on a previous occasion in February 2005. Tr. 2428-33, 2468-70, 2510-17, 2572-75, 4950; see United States v. Kehoe, 310 F.3d 579, 584-85 (8th Cir. 2002).

Appellate Case: 11-1380    Page: 16    Date Filed: 12/26/2012 Entry ID: 3988297

old daughter, Sarah Powell. The men overpowered and incapacitated Mueller and his wife. Then they questioned Sarah Powell about the location of cash, guns, and ammunition. After taking weapons and $50,000 in cash, Lee and Kehoe shot the three victims ("the Muellers") with a stun gun, placed plastic trash bags over their heads, and sealed the bags with duct tape to asphyxiate them. The men taped rocks to the Muellers' bodies and threw them into the nearby Illinois Bayou. Lee, 374 F.3d at 641-42; Kehoe, 310 F.3d at 584-85.[4]

Lee and Kehoe brought the stolen property back to Washington, where they both separately confessed to Kehoe's mother, Gloria Kehoe. Lee, 374 F.3d at 642-43; Kehoe, 310 F.3d at 584, 590; Tr. 4972-75. Kehoe told his mother that he and Lee had murdered Mueller and his wife but that he had to carry out the murder of the Muellers' daughter because Lee could not go through with it. Tr. 4972-75. Lee said, among other things, that "Bill [Mueller] was one tough son of a bitch because he fought so hard" and that Nancy Mueller was "dumb" because she thought the police raid was real and "helped put the trash bag on her head." Tr. 4975. Lee also told residents of the Washington motel where he lived that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped

---

[4]The bodies were discovered in the water in June 1996. Lee, 374 F.3d at 642.

them, and [threw] them in the swamp." Tr. 4082-83, 4093.

Kehoe and Lee thereafter separately fled after learning that a friend had been arrested in possession of one of Mueller's guns and questioned about whether the gun had been purchased from Kehoe. Tr. 2794, 2799, 4980. Lee went to Oklahoma, where his mother lived. Tr. 4980. Kehoe went to Montana and then traveled throughout the country with his brother, Cheyne Kehoe, selling Mueller's property. See Kehoe, 310 F.3d at 584. The Kehoe brothers got into a shootout with police in Ohio, but escaped to Utah, where Kehoe continued to devise plans for the APR. Id. at 585; Tr. 5370-73. Kehoe also gave a detailed confession to his brother about the Mueller murders. Kehoe, 310 F.3d at 584-85. He said, among other things, that he and Lee had killed William and Nancy Mueller but that he, not Lee, killed Sarah Powell. Tr. 5326-31.

Cheyne and Gloria Kehoe eventually cooperated with authorities, leading to the discovery of storage units containing property belonging to the Muellers. Kehoe's and Lee's fingerprints were recovered from a gun display case that had belonged to William Mueller. Kehoe, 310 F.3d at 585, 592; Tr. 3707-10.

Appellate Case: 11-1380    Page: 18    Date Filed: 12/26/2012 Entry ID: 3988297

## II. Trial Proceedings

### A. Indictment

Lee and Kehoe were charged with one count of conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); one count of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); and three capital counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The government provided notice of its intent to seek the death penalty against both defendants for each of the three murders. See Lee, 374 F.3d at 642; LA 10-11. Lee and Kehoe were tried together.

### B. Jury Selection

Jury selection took place over the course of five days in March 1999. Tr. 20-1219. Defense counsel were assisted by a jury consultant who provided advice about "jury composition, selection and statistical breakdown." GA 20-21.

As relevant here, the district court and defense counsel asked the veniremembers whether they could be impartial despite the fact that defendants were white supremacists and held racist beliefs. GA 1-5, 8-11 13-17. One veniremember responded that the "potential racial considerations" and "the

-7-

Appellate Case: 11-1380    Page: 19    Date Filed: 12/26/2012 Entry ID: 3988297

racial undertones of the case would bias [him] toward the state and [he] would not be able to give [defendants] a fair trial." GA 6-7. The district court accordingly dismissed the man from the venire. GA 7. None of the remaining veniremembers said they would be biased due to defendants' racism. GA 10-11; see also GA 18-19.

The district court granted all except one of the defendants' requests to dismiss veniremembers for cause. GA 24.[5] Seventy-four veniremembers remained. GA 22-23. Defendants jointly exercised 30 peremptory strikes; the government exercised 20. GA 24-25. The government struck two black veniremembers; defendants struck none. None of the parties challenged any of the peremptory strikes as racially discriminatory, in violation of the Equal Protection Clause of the Fourteenth Amendment. GA 24. The district court observed that nine of the 12 jurors were black, as were three of the six alternates, "[s]o there's not any under-representation." GA 24.

---

[5]"[A] party seeking to strike a venire member for cause must show that the prospective juror is unable to lay aside his or her impressions or opinions and render a verdict based on the evidence presented in court." United States v. Dale, 614 F.3d 942, 959 (8th Cir. 2010). The district court rejected the defense claim that Juror 539 should be dismissed for cause because she had a fixed position in favor of the death penalty and would not be able to consider or weigh mitigating circumstances. Tr. 1074-76, 1079-87. The defense ultimately used a peremptory challenge to exclude Juror 539 from the jury. GA 24-25.

-8-

Appellate Case: 11-1380     Page: 20     Date Filed: 12/26/2012 Entry ID: 3988297

The court nonetheless asked the government to state its rationale for striking the two black veniremembers. After the court accepted the government's non-discriminatory reasons for striking the jurors, the government noted, without objecting, that Kehoe and Lee had struck only white jurors. GA 26-27. The district judge said he could "get into a whole thing of having [defendants] justify every white strike," GA 27, but "[n]o one has made a Batson challenge," and he was "not going to do it," GA 28. "We will just go forward," he concluded. GA 28.

## C. Conviction and Sentencing

After a two-month trial, the jury found Kehoe and Lee guilty on all counts. Tr. 7111-16. Separate hearings were held for each defendant to determine whether they should receive the death penalty for the three capital murders. See Tr. 7169-7337 (Kehoe sentencing hearing); Tr. 7367-8022 (Lee sentencing hearing).

The Federal Death Penalty Act, 18 U.S.C. §§ 3591-3593, requires the jury to determine whether aggravating factors proved by the government sufficiently outweigh any mitigating factors proved by the defendant to justify the death penalty. See generally United States v. Purkey, 428 F.3d 738, 749, 761 (8th Cir. 2005). At both hearings, the government argued that five

Appellate Case: 11-1380    Page: 21    Date Filed: 12/26/2012 Entry ID: 3988297

aggravating factors supported imposition of the death penalty: the defendants committed the murders in expectation of receiving something of pecuniary gain; they committed the murders after substantial planning and premeditation; they killed more than one person during a single criminal episode; they would be a danger in the future to the lives and safety of others; and Sarah Powell was a vulnerable victim. See GA 31, 60.

### 1. Kehoe's Sentencing

Kehoe conceded proof of each aggravating factor except for future dangerousness, see GA 37-47, which was predicated on evidence of Kehoe's APR affiliation and his conduct during the crime spree that culminated in his capital convictions, see GA 34-36. Kehoe claimed, however, that 16 mitigating circumstances weighed against a sentence of death. GA 37-47; see GA 31-33.

The jury rejected the government's contention that Kehoe would be a danger to others in the future or that he committed the murders after substantial planning and premeditation. The jury concluded, however, that the evidence established each of the other alleged aggravating factors. GA 50-59.

One or more jurors found the existence of each of the 16 mitigating factors claimed by Kehoe. Specifically, one or more jurors found, as a mitigating factor, that Kehoe was "the product of a dysfunctional family" (12

Appellate Case: 11-1380    Page: 22    Date Filed: 12/26/2012 Entry ID: 3988297

jurors); he was influenced by his parents "to accept and espouse extremist religious views" (12 jurors); he was influenced by his parents "to accept and espouse extremist political views" (12 jurors); he was influenced by his parents "to accept and espouse extremist social views" (12 jurors); he was "influenced by his father to commit crimes" (12 jurors); his father "was involved in the planning of the 1996 burglary of the Muellers" (9 jurors); he was "removed from public schools at age 13 by his parents and thus deprived by his parents of normal social development" (8 jurors); he "could live a productive life in prison" (8 jurors); he had no prior criminal record (8 jurors); other persons "involved in the racketeering enterprise" would "receive no sentence or substantially less punishment or were not prosecuted" (7 jurors); he was "a loving father with young children" (7 jurors); he was "relatively young" at the time of the offenses (6 jurors); if sentenced to "life imprisonment without the possibility of release, [he] could still be involved in the lives of his children" (6 jurors); he "is a human being" (5 jurors); he was "ordered to kill another human being at the direction of his father, and he refused" (3 jurors); and he was "a responsible[,] honest and hard worker in the past" (1 juror). GA 52-54.

After weighing the aggravating and mitigating factors, the jury unanimously decided against a sentence of death for each of the three murders

Appellate Case: 11-1380    Page: 23    Date Filed: 12/26/2012 Entry ID: 3988297

and in favor of life imprisonment without the possibility of release. GA 50-59. Each juror certified, as required by 18 U.S.C. § 3593(f), that Kehoe's race and "religious beliefs" did not influence his or her decision. See GA 48-49, 54, 57, 59.

### 2. Lee's Sentencing

The United States Attorney for the Eastern District of Arkansas, Paula Casey, informed the court that in light of Kehoe's life sentence her office no longer wished to pursue the death penalty against Lee. In re United States, 197 F.3d at 311-12. The Department of Justice's death penalty protocol required, however, that Ms. Casey submit a request to withdraw Lee's death notice to the Attorney General's Review Committee on Capital Cases – which consisted of the Deputy Attorney General and other DOJ officials – and that the Committee then make a recommendation to the Attorney General for a final decision. Id. at 311. Deputy Attorney General Eric Holder convened a meeting of the Committee to consider Ms. Casey's request and – after conferring with Ms. Casey by telephone – informed her that the death notice against Lee would not be withdrawn. Id. at 312.

Lee's sentencing hearing therefore went forward. The emphasis of the government's case at the hearing was Lee's future dangerousness. See GA 64-

Appellate Case: 11-1380    Page: 24    Date Filed: 12/26/2012 Entry ID: 3988297

69. The government introduced evidence showing that in 1990 Lee severely beat an individual named Joey Wavra, forced Wavra down a manhole into a storm sewer, and retrieved a knife for his cousin, who killed Wavra by repeatedly stabbing him and slitting his throat. GA 74-93. The government also introduced the testimony of a prison guard who stated that Lee screamed and yelled and threatened to kill her after she told Lee he could not leave his cell to call his lawyer. GA 94-99. Lee told the guard she was going to "die like the others" and he was "going to have [her] head blown off like the others." GA 99. The government argued that this evidence, and the evidence of Lee's offense conduct introduced during the guilt phase of the trial, showed that Lee was violent and volatile and would present a danger to others in the future. GA 66, 101-120.

Lee claimed 14 mitigating factors. See GA 60-62. The emphasis of the defense presentation, however, was that Lee suffered from mental impairment due to his troubled upbringing. See, e.g., GA 70-73. In support, Lee offered, *inter alia*, testimony from Dr. Mark Cunningham, Ph.D., who opined that Lee "experienced many traumatic and adverse life experiences that fundamentally shaped him . . . neurologically, psychologically, socially, emotionally and ethically, and that . . . contributed to his involvement in this offense." GA 100.

Appellate Case: 11-1380     Page: 25     Date Filed: 12/26/2012 Entry ID: 3988297

Lee also argued that he should not receive a death sentence because Kehoe was the leader and more culpable and had received a sentence of life imprisonment. See GA 121-23.

The jury rejected the government's claim that Lee committed the murders after substantial planning and premeditation. The jury concluded, however, that the evidence established the other alleged aggravating factors, including that Lee would be a danger to others in the future. GA 124, 127.

The jury largely rejected Lee's mitigation case. One or more of the jurors found the existence of only five of the 14 mitigating factors claimed by Lee, namely that he was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of needed parental guidance and protection (6 jurors); another person equally culpable in the crimes would not be punished by death (3 jurors); other persons involved in the racketeering enterprise would "receive no sentence or substantially less punishment or were not prosecuted" (3 jurors); Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers (2 jurors); and he would likely benefit from the structured environment that a prison would provide (1 juror). GA 124-27. No juror found, as a mitigating factor, that Lee's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of

-14-

Appellate Case: 11-1380    Page: 26    Date Filed: 12/26/2012 Entry ID: 3988297

law was impaired"; that he acted under duress; that he "does not have a significant prior criminal record other than his juvenile record"; that he committed the murders "under mental or emotional disturbance"; that he "suffered from neurological impairments that were identified and which could have been treated when he was a child and adolescent"; that he "suffers from brain dysfunction, which has gravely impaired his ability to function in the absence of strong support and guidance"; that he "was introduced to drugs and alcohol while still a child"; that he was "only 22 years old when the murders were committed"; or that he "is a follower and was under the influence of Chevie Kehoe and possibly others at the time of the offense." GA 125-26.

After weighing the aggravating and mitigating factors, the jury unanimously decided to impose a sentence of death for each of the three capital murders. GA 126-29. Each juror certified, as required by 18 U.S.C. § 3593(f), that Lee's race and religious beliefs did not influence his or her decision. GA 127; see GA 48-49.

### SUMMARY OF ARGUMENT

1.     Lee fails to make out a claim that he received ineffective assistance of counsel in violation of the Sixth Amendment. To be sure, assuming his lawyers exercised peremptory challenges on the basis of race, they precipitated

Appellate Case: 11-1380     Page: 27     Date Filed: 12/26/2012 Entry ID: 3988297

a constitutional violation, namely a violation of the equal protection rights of the excluded jurors. As required by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), however, Lee has not shown a reasonable probability that the results of his trial would have been different but for his counsel's race-based jury selection. Nor has he shown that his counsel's performance fell below prevailing professional norms.

a. *Prejudice*. First, it is not appropriate to apply the presumption of prejudice urged by Lee. Lee contends that the race-based exercise of peremptory challenges by defense counsel (<u>McCollum</u> error) is structural error and therefore necessarily results in prejudice. But even if it is assumed that <u>McCollum</u> error is structural, this Court's binding and correct decision in <u>Young v. Bowersox</u>, 161 F.3d 1159 (8th Cir. 1998), requires that Lee nonetheless show prejudice. In any event, race-based jury selection by the defense does not constitute structural error.

Second, Lee cannot affirmatively show he was prejudiced by his counsel's race-based jury selection strategy. In order to establish prejudice, Lee must show that his counsel's conduct during jury selection resulted in the seating of one or more biased juror. A prospective juror's race, standing alone, is not enough to establish bias, however, even in a case alleging the defendant

-16-

committed a crime motivated by racial animus. Lee's conclusory claims that his racist beliefs "affected" black jurors and "influenced" their decisions therefore do not suffice. Moreover, in contrast to Lee's rank speculation that the black jurors were influenced by his racism, the record in this case – including the voir dire, jury instructions, and juror certifications – establishes that in fact none of the jurors was biased.

b. *Deficient Performance*. At the time of Lee's trial, prominent members of the defense bar opined that defense lawyers should take race into account when selecting a jury if doing so might feasibly benefit the defendant, particularly in a capital case. Although the government does not condone such conduct, in light of those defense views, the performance of Lee's lawyers cannot be said to violate any professional norms that prevailed at the time of his trial.

To be sure, McCollum makes clear that defense counsel violated the equal protection rights of the excluded jurors. And according to Lee, counsel also violated 18 U.S.C. § 243 and ethical rules prohibiting discriminatory conduct by attorneys. Even if that is the case, however, those legal and ethical rules – including the McCollum rule – protect the rights of excluded jurors and the integrity of the justice system, not the trial rights of criminal defendants. As

-17-

Appellate Case: 11-1380    Page: 29    Date Filed: 12/26/2012 Entry ID: 3988297

a result, those rules do not establish professional norms for the representation criminal defendants, and any violation of them is not pertinent to assessing attorney performance for purposes of the Sixth Amendment. Moreover, it is far from clear that Lee's lawyers violated 18 U.S.C. § 243 or applicable ethical rules.

2.      During Lee's direct appeal, this Court rejected his argument that his death sentence violated the Eighth Amendment because Kehoe was allegedly more culpable but did not receive the death penalty. Lee therefore cannot relitigate this claim in a postconviction motion under 28 U.S.C. § 2255. In any event, the claim lacks merit. The Eighth Amendment does not require comparative proportionality review between sentences received by similarly-situated defendants.

Beyond that, the disparate sentences received by Lee and Kehoe do not support a claim that Lee's death sentence was arbitrarily and capriciously imposed. As required by the Constitution, the Federal Death Penalty Act allowed the jury, in determining whether to impose the death penalty, to consider in mitigation any factor in the background, record, or character of Lee and Kehoe, as well as the additional weighty aggravating factor found as to Lee, but not Kehoe. This constitutionally-mandated process caused the jury to

Appellate Case: 11-1380    Page: 30    Date Filed: 12/26/2012 Entry ID: 3988297

distinguish between Lee and Kehoe and impose different sentences on the basis of their unique individual circumstances.

## ARGUMENT

### ISSUE 1
### LEE DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL DURING JURY SELECTION

### I. Background

In his motion for postconviction relief under 28 U.S.C. § 2255, Lee claimed, among other things, that his lawyers "were ineffective in adopting a jury-selection strategy that emphasized seating as many African-Americans as possible." LA 160. Lee argued that his racist views were "likely to be particularly offensive to non-white people" and therefore "a strategy that emphasized the selection of African-American jurors was unreasonable and prejudicial." Id.; see also LA 317 (Lee reply brief).

The government argued that defense counsel's jury-selection strategy was objectively reasonable. See LA 231-32. In support, the government provided an affidavit from one of Kehoe's lawyers, Mark F. Hampton, stating that "[s]electing a jury with as many black jurors as possible was a strategic decision made by defense counsel" in conjunction with a jury consultant. LA 287. According to Hampton, defense counsel believed that this strategy was

-19-

Appellate Case: 11-1380    Page: 31    Date Filed: 12/26/2012 Entry ID: 3988297

reasonable based on (1) their determination that "blacks are more likely than whites to discredit government testimony," (2) "research of attitudes indicat[ing] that blacks are generally less likely to give the death penalty," and (3) their assessment that "blacks were less likely to give the death penalty than whites in this particular case." Id.

The district court rejected Kehoe's ineffective assistance claim, concluding that Kehoe could not meet the Strickland ineffective assistance standard. See LA 58-60. The court noted that it was "unclear" whether Lee's counsel joined in the race-based jury selection strategy of Kehoe's counsel but determined it was "unnecessary to resolve this issue." LA 58-59. The court concluded that even assuming Lee's counsel joined in or approved the race-based selection strategy of Kehoe's lawyers, the court could "not say that defense counsel's jury selection strategy fell below an objective standard of reasonableness." LA 59. The court further concluded that whether or not Lee's counsel joined in the strategy, Lee had "failed to demonstrate that he was prejudiced as a result of such a strategy." LA 59-60. The court could "not find that a jury with a different racial composition would have returned a different verdict." LA 60. Although recognizing that the defense strategy of maximizing black jurors by striking whites "offends the constitutional rights of the jurors

-20-

Appellate Case: 11-1380    Page: 32    Date Filed: 12/26/2012 Entry ID: 3988297

who are eliminated from serving jury service because of their race," the court ruled that the strategy "d[id] not offend [Lee's] constitutional rights." LA 59 (emphases omitted).

## II.    Standard of Review

When reviewing the denial of an ineffective assistance claim raised in proceedings under 28 U.S.C. § 2255, this Court applies the Strickland standard *de novo* and reviews any underlying findings of fact for clear error. See, e.g., United States v. Regenos, 405 F.3d 691, 692-93 (8th Cir. 2005).

## III.   Argument

Lee renews his argument that he received ineffective assistance of counsel due to race-based jury selection by his lawyers. His claim is without merit.

### A.    If Lee's and Kehoe's Lawyers Shared the Same Jury Selection Strategy, Lee's Counsel Violated the Equal Protection Rights of the Excluded Jurors

As an initial matter, the district court did not resolve whether Lee's lawyers in fact exercised peremptory challenges on the basis of race, instead assuming that they engaged in that conduct and rejecting Lee's claim on legal grounds. LA 58. Because Lee's ineffective assistance claim fails as a matter of law, we likewise will assume that his lawyers – like Kehoe's – used peremptory

-21-

Appellate Case: 11-1380     Page: 33     Date Filed: 12/26/2012 Entry ID: 3988297

challenges to strike white veniremembers and maximize the number of black jurors based on a belief that black jurors would be more likely to acquit and less likely to vote for the death penalty.[6]

In light of that factual assumption, it is plain that defense counsel's jury selection strategy violated the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court has long held that the government's exclusion of black citizens from jury service on account of race violates the Equal Protection Clause. See, e.g., Strauder v. West Virginia, 100 U.S. 303, 305 (1880). In Batson v. Kentucky, 476 U.S. 79 (1986), the Court made clear that this prohibition applies to a prosecutor's race-based use of peremptory challenges to strike black veniremembers. Id. at 89, 97-98, 99 n.22; see Powers v. Ohio, 499 U.S. 400, 409-10 (1991). And in Georgia v. McCollum, 505 U.S. 42 (1992), the Court extended the Batson rule by holding that a defendant's exercise of peremptory challenges qualifies as state action for purposes of the Equal Protection Clause, id. at 50-54, and thus "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground

---

[6]If the Court rejects the government's legal arguments, it should remand for further fact finding. Although Lee now contends that his lawyers shared the race-based jury selection strategy outlined in the affidavit of Kehoe's lawyer, Mark Hampton, see Br. 12, before the district court he argued that "no such strategy basis informed [his] trial counsel's decisions," LA 317.

-22-

Appellate Case: 11-1380     Page: 34     Date Filed: 12/26/2012 Entry ID: 3988297

of race in the exercise of peremptory challenges," id. at 59.

These cases teach that race-based peremptory challenges by either the defense or the government violate the equal protection rights of the excluded jurors and harm society as a whole by undermining public confidence in the justice system. Batson, 476 U.S. at 87; Powers, 499 U.S. at 413-14; McCollum, 505 U.S. at 48-50. When the government exercises peremptory challenges to exclude members of the defendant's race, the equal protection rights of the defendant are also violated. Batson, 476 U.S. at 86-87; Powers, 499 U.S. at 404.

A defendant who excludes jurors on the basis of race arguably harms himself by casting doubt on the integrity of the judicial process, see Powers, 499 U.S. at 411-13, but he suffers no constitutional violation, because he waives his equal protection rights, United States v. Boyd, 86 F.3d 719, 721-22 (7th Cir. 1996); Mata v. Johnson, 99 F.3d 1261, 1270 (5th Cir. 1996); see McCollum, 505 U.S. at 50 (explaining that "a defendant's use of discriminatory peremptory challenges harms the jurors and the community"). A defendant's use of discriminatory peremptory challenges violates the equal protection rights of only the excluded jurors, and the government has standing to assert those rights. 505 U.S. at 55-56. Thus, when a prosecutor objects to a

-23-

Appellate Case: 11-1380    Page: 35    Date Filed: 12/26/2012 Entry ID: 3988297

defendant's exercise of a peremptory challenge on behalf of the excluded juror, the trial judge must apply the three-part procedure established in Batson. If the prosecutor makes out a prima facie showing of purposeful discrimination, the defendant "must articulate a racially neutral explanation for [the] peremptory challenge[]." Id. at 59; see Batson, 476 U.S. at 96-98.

## B. Even if Lee's Counsel Violated the Equal Protection Rights of the Excluded Jurors, He Did Not Receive Ineffective Assistance of Counsel

In sum, if Lee's lawyers implemented a race-based jury selection strategy, they simultaneously violated the equal protection rights of the excluded jurors and waived Lee's equal protection rights. It does not follow, however, that Lee received ineffective assistance of counsel in violation of the Sixth Amendment. Cf. United States v. Aptt, 354 F.3d 1269, 1284-85 (10th Cir. 2004) (holding that counsel waived defendant's Sixth Amendment confrontation rights but not reaching separate question of ineffective assistance); Janofsky v. St. Amand, 594 F.3d 39, 48 (1st Cir. 2010) (counsel's decision to elicit potentially damaging hearsay testimony that would have been inadmissible under the Confrontation Clause did not constitute ineffective assistance because it was "part of a plausible trial strategy").

A defendant claiming that he received ineffective assistance of counsel,

-24-

Appellate Case: 11-1380    Page: 36    Date Filed: 12/26/2012 Entry ID: 3988297

in violation of the Sixth Amendment, must generally satisfy the two-prong standard set forth in Strickland. See, e.g., New v. United States, 652 F.3d 949, 952 (8th Cir. 2011). The defendant must first "show that counsel's representation fell below an objective standard of reasonableness," measured according to "prevailing professional norms." Strickland, 466 U.S. at 688. He must then "affirmatively prove prejudice," which means he must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693-94.

Lee's ineffective assistance claim fails under both prongs of the Strickland standard. Because the Supreme Court has instructed that courts should generally dispose of "an ineffectiveness claim on the ground of lack of sufficient prejudice" if it is the easier course, Strickland, 466 U.S. at 697, we first address Lee's failure to show prejudice.

### 1. Lee Has Not Shown Prejudice Resulting from His Counsel's Purportedly Deficient Performance

Lee argues that "prejudice is automatically present when defense counsel engages in unconstitutional race discrimination in jury selection," Br. 27, and that, in any event, "this is the highly unusual case where the prejudice to the defendant" from his lawyer's race-based peremptory challenges "is clear from the record," Br. 31. These arguments do not stand up to scrutiny.

Appellate Case: 11-1380     Page: 37     Date Filed: 12/26/2012 Entry ID: 3988297

### a. Lee Is Not Exempt from Establishing <u>Strickland</u> Prejudice

According to Lee, when defense counsel "engages in unconstitutional race discrimination during jury selection, a structural defect is created and prejudice is automatically present." Br. 27. This argument fails for two reasons. First, controlling precedent precludes Lee's presumption-of-prejudice argument even it is assumed that <u>McCollum</u> error is structural.[7] Second, <u>McCollum</u> error should not be deemed structural.

### i. Even if <u>McCollum</u> Error Is Deemed Structural, Like <u>Batson</u> Error, Lee Must Nonetheless Show Prejudice

Claims of constitutional error raised on direct or collateral review are generally subject to harmless-error review before a defendant is entitled to reversal of his conviction. <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 116 (2007). Certain types of constitutional errors designated as "structural," however, are excepted from harmless-error review and result in automatic reversal. <u>Rivera v. Illinois</u>, 556 U.S. 148, 160 (2009).

This Court and the Supreme Court have deemed <u>Batson</u> to be an

---

[7]We use "<u>McCollum</u> violation" or "<u>McCollum</u> error" as shorthand for unlawful race-based jury selection by the defense. We use "<u>Batson</u> violation" or "<u>Batson</u> error" as shorthand for unlawful race-based jury selection by the government.

Appellate Case: 11-1380     Page: 38     Date Filed: 12/26/2012 Entry ID: 3988297

"automatic reversal precedent[]." <u>Rivera</u>, 556 U.S. at 160; <u>see</u> <u>Ford v. Norris</u>, 67 F.3d 162, 170-71 (8th Cir. 1995). As discussed <u>infra</u>, it does not follow that <u>McCollum</u> errors also require automatic reversal. But even if it is assumed that <u>McCollum</u> error – like <u>Batson</u> error – is structural, this Court's binding precedent requires that Lee show <u>Strickland</u> prejudice.

Specifically, <u>Young v. Bowersox</u>, 161 F.3d 1159 (8th Cir. 1998), is dispositive here. In that case, the defendant claimed that he received ineffective assistance of counsel because his lawyer failed to object to the government's use of peremptory challenges to exclude black jurors on the basis of race, in violation of <u>Batson</u>. He argued, like Lee, that "a <u>Batson</u> error is a structural defect which renders the entire trial unreliable, and it necessarily follows that prejudice should be presumed" for purposes of <u>Strickland</u>. <u>Id.</u> at 1160-61. The Court flatly rejected this argument and held that, assuming deficient performance by defense counsel, the defendant's ineffective assistance claim failed because he did not establish <u>Strickland</u> prejudice. <u>Id.</u> at 1161; <u>see</u> <u>Wright v. Nix</u>, 928 F.2d 270, 273 (8th Cir. 1991) (concluding that defendant claiming ineffective assistance for failing to raise a <u>Batson</u> objection had to show prejudice); <u>Reed v. Norris</u>, 195 F.3d 1004, 1006 (8th Cir. 1999) (same); <u>see also</u> <u>Wright v. Nix</u>, 928 F.2d at 274 (R. Arnold, J., concurring) (same);

Appellate Case: 11-1380     Page: 39     Date Filed: 12/26/2012 Entry ID: 3988297

Jackson v. Herring, 42 F.3d 1350, 1361 (11th Cir. 1995) (same).

If a defendant must show prejudice to make out an ineffective assistance claim on the theory that his lawyer, by negligently failing to object, allowed the government to engage in race-based jury selection, then so too must a defendant claiming ineffective assistance on the theory that his own lawyer negligently engaged in race-based jury selection. Lee's presumption-of-prejudice argument is therefore foreclosed by Young v. Bowersox, and Lee's attempts to avoid the holding of Young v. Bowersox fall short.

1.    Lee argues that "traditional Strickland prejudice analysis cannot apply" because, under McCollum, his lawyers were state actors when exercising peremptory challenges. Br. 30-31. In every instance, however, when defense counsel provides effective assistance – i.e., whenever the two-prong Strickland standard is satisfied – the attorney error is "imputed to the State." Murray v. Carrier, 477 U.S. 478, 488 (1986) (citing Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)); see Coleman v. Thompson, 501 U.S. 722, 753 (1991). It therefore would make no sense to absolve Lee of establishing Strickland prejudice simply because, during jury selection, his lawyers' conduct can be "deemed 'fairly attributable' to the government." McCollum, 505 U.S. at 54.

2.    Lee suggests that a defense lawyer's failure to object to Batson

-28-

error (as in <u>Young v. Bowersox</u>) is merely negligent, whereas actively engaging in race-based jury selection is "so egregious" that it warrants a presumption of prejudice. Br. 30-31. The Supreme Court has made clear, however, that attorney errors may not be "classified according to likelihood of causing prejudice." <u>Strickland</u>, 466 U.S. at 693. Thus, the Court has carved out only a very narrow category of ineffective assistance cases in which prejudice is presumed: actual or constructive denial of counsel altogether at a critical stage of the litigation, certain kinds of state interference with counsel's assistance, and counsel's complete failure to subject the government's case to adversarial testing. <u>See</u> <u>United States v. Cronic</u>, 466 U.S. 648, 658-62 (1984); <u>Bell v. Cone</u>, 535 U.S. 685, 695-96 & n.3 (2002); <u>Strickland</u>, 466 U.S. at 692-93. Lee does not, and cannot, contend that any of those circumstances exist here.

Lee's argument also fails to the extent it rests on the assertion that certain "egregious" conduct severs the principal-agent relationship between attorney and client. Br. 30-31. There is no severance exception to <u>Strickland</u>'s prejudice requirement. <u>See</u> <u>Cronic</u>, 466 U.S. at 658-62. In any event, race-based jury selection by defense counsel does not sever the principal-agent relationship. <u>See</u> <u>United States v. Boyd</u>, 86 F.3d 719, 721-22 (7th Cir. 1996) (defense counsel exercising race-based peremptory challenges is the defendant's agent). <u>Maples</u>

Appellate Case: 11-1380     Page: 41     Date Filed: 12/26/2012 Entry ID: 3988297

v. Thomas, 132 S. Ct. 912 (2012), does not hold otherwise. Maples makes clear that abandonment of a client without notice results in severance, but other types of "attorney error, however egregious," do not. Id. at 922-23. Lee, of course, does not contend that his lawyers abandoned him without notice.

3.     Lee argues that McGurk v. Stenberg, 163 F.3d 470 (8th Cir. 1998), supports a presumption of prejudice in this case. Br. 30, 31. McGurk, however, is inapposite.

McGurk's holding, which the Court characterized as "narrow," 163 F.3d at 475 n.5, is that denial of the right to trial by jury is a structural error and that Strickland prejudice should be presumed when defense counsel causes his client to be denied that particular right, id. at 474-75; see Ward v. Norris, 577 F.3d 925, 937 (8th Cir. 2009) (confirming that McGurk's "holding was narrow"). To be sure, the Court used broader language in the opinion, stating that it "will presume prejudice under Strickland" "when counsel's deficient performance causes a structural error." Id. at 475.[8] At the same time, however,

_____

[8]In addition to this Court's ruling in Young v. Bowersox, the Eleventh Circuit has also held that a defendant must show prejudice to make out a claim that he received ineffective assistance because his lawyer failed to object to Batson error. See Jackson v. Herring, 42 F.3d 1350, 1361 (11th Cir. 1995). There is disagreement, however, as to whether Strickland prejudice should be presumed when counsel causes or allows other types of structural error. Compare Purvis v. Crosby, 451 F.3d 734, 741-42 (11th Cir. 2006) (no prejudice presumed where counsel failed to object to closure of courtroom during trial),

-30-

the Court found it "difficult to imagine situations that would trigger [this] analysis beyond the failure on the part of counsel to inform a defendant of certain basic rights, such as the right to trial by jury, to self-representation, or to an appeal as a matter of right," id. at 475 n.5, all of which are situations where defense counsel has failed to inform a defendant about fundamental decisions that only the defendant alone has the authority to make, see Florida v. Nixon, 543 U.S. 175 175, 187 (2004). In contrast, "[d]ecisions about challenges to jurors are of another order altogether" and are entrusted to defense counsel. Boyd, 86 F.3d 723-24.

Moreover, this Court is "bound by holdings, not language." Alexander v. Sandoval, 532 U.S. 275, 282 (2001). McGurk was decided after Young v. Bowersox, and its general language does not trump the Court's specific (and correct) prior holdings. There is no reason to believe that the McGurk panel intended to overrule Young v. Bowersox, and even if it did, it was without authority to do so; "[o]nly the en banc court may overrule a prior panel decision." United States v. Alama, 486 F.3d 1062, 1067 (8th Cir. 2007); see

and Virgil v. Dretke, 446 F.3d 598, 607 (5th Cir. 2006) (no presumption of prejudice where counsel failed to move to strike two jurors who expressly stated their inability to serve as fair and impartial jurors), with McGurk v. Stenberg, 163 F.3d at 475, and Owens v. United States, 483 F.3d 48, 64-65 & n.14 (1st Cir. 2007) (prejudice presumed where counsel failed to object to closure of courtroom during trial).

-31-

Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be followed.").

Apart from the binding nature of Young v. Bowersox, the decision is correct and finds strong support in Supreme Court precedent. First, as discussed above, the Supreme Court has recognized only three extreme circumstances where a defendant claiming ineffective assistance of counsel need not establish prejudice. See supra p. 29. The Court has made clear that the presumption of prejudice is a "narrow exception" to Strickland and applies only "infrequently." Florida v. Nixon, 543 U.S. at 190; see Wright v. Van Patten, 552 U.S. 120, 124-25 (2008). The Court has never suggested that the presumption is warranted when counsel causes or allows structural error, let alone causes error – like McCollum error – that does not impugn the truth-seeking function of the trial. See infra pp. 38-39.

Second, the Supreme Court has concluded that a defendant seeking to collaterally attack his conviction on the basis of a procedurally defaulted claim of racial discrimination in the composition of the grand jury must show that he suffered actual prejudice. See Francis v. Henderson, 425 U.S. 536, 542 (1976); Davis v. United States, 411 U.S. 233 (1973).[9] Racial discrimination in the

---

[9]A defendant seeking to collaterally attack his conviction on unpreserved grounds generally must show "cause" for the procedural default and "actual

-32-

grand jury, like <u>Batson</u> error, is structural error. <u>See</u> <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986). In addition, the prejudice standards that apply in the procedural-default and ineffective-assistance contexts are highly similar, if not the same. <u>See</u> <u>Mercer v. Armontrout</u>, 864 F.2d 1429, 1434 & n.3 (8th Cir. 1988). Thus, if a defendant must show prejudice to overcome procedural default of a claim of racial discrimination in the grand jury, it logically follows that a defendant must similarly show prejudice to make out a claim of ineffective assistance due to race-based selection of petit jurors.

### ii.    <u>McCollum</u> Error Is Not Structural

In any event, <u>McCollum</u> error should not be deemed structural and result in automatic reversal. Lee's presumption-of-prejudice argument therefore fails on this basis as well.

The Supreme Court's decision in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986), strongly suggests that <u>Batson</u> error is structural because of the "societal interest in deterring" racial discrimination in the composition of the jury and the "long line of precedent" requiring automatic reversal in that context.

---

prejudice." <u>Massaro v. United States</u>, 538 U.S. 500, 504 (2003); <u>Bousley v. United States</u>, 523 U.S. 614, 620-23 (1998); <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982). To show prejudice in this context, the defendant must establish that the alleged error "worked to [the defendant's] actual and substantial disadvantage." <u>Frady</u>, 456 U.S. at 170 (emphasis omitted).

-33-

Appellate Case: 11-1380    Page: 45    Date Filed: 12/26/2012 Entry ID: 3988297

United States v. Mechanik, 475 U.S. 66, 70 n.1 (1986) (construing Vasquez); see also Rose v. Mitchell, 443 U.S. 545, 551-59 (1979).[10] The same considerations, however, do not support automatic reversal for a defendant's race-based exercise of peremptory challenges.

First, automatic reversal plainly would not deter other defendants from exercising race-based peremptory challenges. If a defendant exercises race-based peremptory challenges to select a jury perceived to be more likely to acquit and the strategy is successful, leading to acquittal, the Double Jeopardy Clause prevents any re-trial despite the constitutional violation. If the jury convicts, under a rule of automatic reversal, the defendant would then be entitled to another trial. This win-win scenario would provide an extremely strong "incentive to violate the rights of jurors in order to plant an error as a hedge against conviction," creating "perverse incentives that may actually increase the number of Batson violations." Audrey M. Fried, Comment,

_____

[10]Vasquez involved race discrimination in the composition of the grand jury, not the petit jury. This Court and the Supreme Court have concluded, however, that there is "no meaningful analytic distinction between racial discrimination in composing the grand jury and racial discrimination in selecting the petit jury." Ford v. Norris, 67 F.3d at 170; see Batson, 476 U.S. at 84 n.3. As with discrimination in the grand jury, the Supreme Court has long followed a rule of automatic reversal in cases of state-induced discrimination in the petit jury. See, e.g., Norris v. Alabama, 294 U.S. 587, 599 (1935). And in both contexts, automatic reversal of a criminal conviction due to a prosecutor's intentional discrimination likely provides future deterrence.

-34-

Fulfilling the Promise of Batson: Protecting Jurors From the Use of Race-Based Peremptory Challenges by Defense Counsel, 64 U. Chi. L. Rev. 1311, 1325 (1997).

That is especially true in a capital case. An "acquittal" of the death penalty, like an acquittal on the issue of guilt or innocence, is immune from review under double jeopardy principles. See Bullington v. Missouri, 451 U.S. 430, 445 (1981). And, as a statutory matter, the Federal Death Penalty Act provides for the imposition of a default life sentence in case of juror deadlock at the penalty phase. See 18 U.S.C. § 3594. As a result, defense counsel might arguably feel obligated, despite any "ethical obligation to the state and to the system of justice," to pursue a potentially successful strategy that simultaneously creates reversible error that "could save the defendant's life." John Wesley Hall, Jr., Professional Responsibility in Criminal Defense Practice xx (2005).

Second, there is no long line of cases holding that race-based jury selection by the defendant is unconstitutional, let alone that such conduct requires reversal. To the contrary, neither the Supreme Court nor any court of appeals has applied a rule of automatic reversal to claims of McCollum error.

McCollum itself did not result in reversal of a criminal conviction and

-35-

Appellate Case: 11-1380     Page: 47     Date Filed: 12/26/2012  Entry ID: 3988297

does not support a rule of automatic reversal. <u>McCollum</u> establishes that the prosecution has standing to assert the equal protection rights of excluded jurors and challenge the defendant's use of peremptory challenges during jury selection. <u>McCollum</u> does not hold, however, that race-based peremptories by the defense justifies a new trial. <u>See</u> <u>United States v. Boyd</u>, 86 F.3d 719, 724-25 (7th Cir. 1996) (concluding that <u>McCollum</u> does not support reversal of a conviction when the defense exercises race-based peremptory challenges); <u>Henderson v. Le Marque</u>, 82 Fed. Appx. 182, 184 (9th Cir. 2003) (unpublished) (same); 6 Wayne R. LaFave et al., <u>Criminal Procedure</u> § 22.3(d) (3d ed. 2011) (same). In fact, to the extent <u>McCollum</u> emphasizes the harm to public confidence in the justice system caused by race-based peremptory challenges, a rule of automatic reversal would only further exacerbate public cynicism. "Giving a defendant a new trial because of his own violation of the Constitution would make a laughingstock of the judicial process." <u>Boyd</u>, 86 F.3d at 725.

The courts of appeals accordingly have rejected a rule of automatic reversal for <u>McCollum</u> error. The Seventh Circuit has correctly held that a defendant is not entitled to a new trial when his lawyer exercises race-based peremptory challenges because in those circumstances the defendant has

Appellate Case: 11-1380    Page: 48    Date Filed: 12/26/2012 Entry ID: 3988297

waived any claim that his equal protection rights were violated. <u>Boyd</u>, 86 F.3d at 721-22. And although the Fifth Circuit has concluded that a defendant who exercises race-based peremptory strikes may obtain reversal of his conviction, that court will reverse only after weighing the harm to public perception of the justice system caused by race-based jury selection against the harm to public perception caused by allowing a defendant to benefit from invited error. <u>Mata v. Johnson</u>, 99 F.3d at 1270-71; <u>see</u> <u>United States v. Huey</u>, 76 F.3d 638, 641-42 (5th Cir. 1996) (granting new trials to both defendants when one exercised race-based peremptories and the other objected); <u>see also</u> <u>Mata</u>, 99 F.3d at 1271 (distinguishing <u>Huey</u>); <u>Boyd</u>, 86 F.3d at 724-25 (criticizing <u>Huey</u>).

Following the erroneous reasoning of <u>Winston v. Boatright</u>, 649 F.3d 618 (7th Cir. 2011), Lee conflates <u>Batson</u> and <u>McCollum</u> error and argues that a "<u>Batson</u>/<u>McCollum</u> violation is a structural defect because it corrupts the entire jury fact finding process." Br. 28. According to Lee, when such errors occur as a result of ineffective assistance of defense counsel, they "inevitably undermine confidence in the outcome" of the trial for purposes of the <u>Strickland</u> prejudice inquiry. Br. 29 (citations and quotation marks omitted). Lee's arguments are without merit, however, and <u>Winston v. Boatright</u> is wrong.

Appellate Case: 11-1380     Page: 49     Date Filed: 12/26/2012 Entry ID: 3988297

First, even assuming it is proper to group together <u>Batson</u> and <u>McCollum</u> error, the Supreme Court has rejected the contention that <u>Batson</u> error corrupts the entire factfinding process. <u>See</u> <u>Allen v. Hardy</u>, 478 U.S. 255, 259 (1986) (per curiam). The Court has concluded, in determining that <u>Batson</u> is not retroactive, that the <u>Batson</u> rule does not "go[] to the heart of the truthfinding function" or have a "fundamental impact on the integrity of factfinding" at trial. <u>Id.</u> (internal citation and quotation marks omitted). Thus, <u>Batson</u> error requires automatic reversal in order to vindicate "important values that are unrelated to the truth-seeking function of the trial." <u>Rose v. Clark</u>, 478 U.S. 570, 587 (1986) (Stevens, J., concurring).[11]

Second, even if <u>Batson</u> error "may have some bearing on the truthfinding function of a criminal trial," <u>Allen</u>, 478 U.S. at 259, the same cannot be said of <u>McCollum</u> error. To the extent a defendant's race-based exercise of peremptory

---

[11]<u>Vasquez v. Hillery</u> suggested that racial discrimination in the grand jury requires automatic reversal because, in addition to stare decisis principles and the deterrent value of reversal, the error "undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review." 474 U.S. at 263-64. Only four justices, however, joined that portion of the opinion. <u>Id.</u> at 264 n.6; <u>see</u> <u>Rose v. Mitchell</u>, 443 U.S. at 551-59 (explaining reasons for rejecting harmless-error review for race discrimination in the gand jury). Thus, although the Supreme Court has "typically" deemed error as structural when it "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," <u>Rivera v. Illinois</u>, 556 U.S. at 160-61 (internal quotation marks and citations omitted; alteration in <u>Rivera</u>), <u>Batson</u> error is apparently atypical.

-38-

challenges could feasibly "corrupt" the fact-finding process, it could only be in a manner that tends to favor the defendant, by resulting in a jury that the defendant believes will be more inclined to vote for acquittal. When a defendant engages in race-based jury selection intended to avoid a guilty verdict, but the jury nonetheless finds the defendant guilty, there is no basis to doubt the accuracy of the jury's verdict.

### b. Lee Was Not Prejudiced by His Counsel's Jury Selection Strategy

Because a presumption of prejudice is inappropriate in this case, Lee must affirmatively show prejudice as required by Strickland. He fails to satisfy that burden.

In order to establish prejudice in the context of a claim of ineffective assistance in the selection of a jury, a defendant must show that "as a result of trial counsel's [error], the jury panel contained at least one juror who was biased." Davis v. Woodford, 384 F.3d 628, 643 (9th Cir. 2004); see Sanders v. Norris, 529 F.3d 787, 791-94 (8th Cir. 2008). It does not suffice to show that counsel "could have conceivably empaneled a marginally more sympathetic jury by electing to seat different jurors in place of [those] that actually served." United States v. Fulks, 683 F.3d 512, 522 (4th Cir. 2012). Moreover, a juror's race standing alone is never sufficient to establish bias, even in a case involving

Appellate Case: 11-1380    Page: 51    Date Filed: 12/26/2012 Entry ID: 3988297

a racially-motivated crime. See United States v. Pospisil, 186 F.3d 1023, 1028 (8th Cir. 1999) (in a case involving a racist defendant, cause exists to strike a black prospective juror only if voir dire reveals that the individual juror is biased; there can be no assumption of bias on the basis of the juror's race); United States v. Greer, 968 F.2d 433, 435 & n.3 (5th Cir. 1992) (en banc) (same); Person v. Miller, 854 F.2d 656, 665 (4th Cir. 1988) (same).

In light of these principles, Lee's attempt to establish Strickland prejudice plainly fails. Lee contends that the "overwhelming amount of evidence" of his "antipathy towards people of color" makes "inescapable" the "inference that the nine African-American members of the jury were affected by that evidence and that it influenced their decision to convict [him] and sentence him to death." Br. 32. This Court's decision in Pospisil makes clear, however, that a juror's race standing alone is never enough to support an inference of bias. 186 F.3d at 1028 (black jurors not presumptively biased in case charging defendants with burning a cross on the lawn of a family they believed to be African American).

Moreover, in contrast to Lee's conclusory and unsupported assertions, the voir dire conducted in this case confirms that none of the seated jurors harbored bias against Lee, due to his racist beliefs or for any other reason. The

Appellate Case: 11-1380    Page: 52    Date Filed: 12/26/2012 Entry ID: 3988297

court and the parties conducted careful questioning during jury selection designed to uncover any juror bias arising from Kehoe's and Lee's white supremacist beliefs. The court asked the veniremembers if they could give a fair trial to an individual who possessed racist beliefs like Kehoe and Lee. GA 1. Defense counsel also asked if the veniremembers could "set aside" the "overtones of bigotry, racism, [and] prejudice that are already in this case" and "judge [the defendants] totally unbiased." GA 9. The voir dire was effective in identifying the one juror who felt he would be biased because of defendants' racism. GA 7. The rest of the jurors confirmed that they could be impartial. See GA 10-11, 12, 18-19. "Such a voir dire creates a 'high probability that the individual jurors seated'" in this case were "'free from bias.'" Brewer v. Marshall, 119 F.3d 993, 1005 (1st Cir. 1997) (quoting Allen, 478 U.S. at 259). Consequently, there is no basis in the record to conclude that "'the individual jurors who tried [Lee] were not impartial.'" Young v. Bowersox, 161 F.3d at 1161 (quoting Wright v. Nix, 928 F.2d at 274 (R. Arnold, J., concurring)).[12]

_____

[12]In addition, each of the jurors filled out a juror questionnaire. The questionnaires, which are a part of the record in this case and were transmitted to the Court on July 5, 2012, further demonstrate that the jurors were impartial. In particular, the questionnaire asked whether each juror had "any feelings toward any racial, religious, or ethnic group which would cause you to judge a member of that group differently than you would judge a member of your own racial or ethnic group." Each selected juror answered that question in the negative. Moreover, the questionnaires reveal that defendants were

Appellate Case: 11-1380    Page: 53    Date Filed: 12/26/2012 Entry ID: 3988297

The district court also repeatedly instructed the jurors that Lee's beliefs could not form the basis for a criminal conviction. GA 1, 16-17, 29-30. Defendants' racist beliefs, the court explained, "may not . . . be considered . . . as evidence against the defendants unless they bear directly upon the motivation of the defendants individually to commit the specific criminal acts alleged in the indictment in this case." GA 29. Not only are the jurors presumed to have followed those instructions, see, e.g., United States v. Bolden, 545 F.3d 609, 619 (8th Cir. 2008), but they individually certified that Lee's race and "religious beliefs" did not influence their decision to impose the death penalty, GA 127; see GA 48-49.

Lee nonetheless contends that "[a]s to the penalty phase, prejudice is established by the disparate sentencing between" himself and Kehoe. Br. 32-33. To the contrary, the differing sentencing verdicts for Lee and Kehoe demonstrate that the jury was influenced not by defendants' racism but by factors bearing on their individual backgrounds and characters. The government presented powerful evidence of Kehoe's racism, including evidence of Kehoe's founding role in the APR and other evidence that "Kehoe

---

successful in impaneling a group of jurors who were, for the most part, either neutral or generally opposed to the death penalty. The verdict at Kehoe's penalty hearing confirms that the jurors were not predisposed towards the death penalty.

-42-

Appellate Case: 11-1380    Page: 54    Date Filed: 12/26/2012 Entry ID: 3988297

was so concerned with racial purity that at one point he contemplated killing his own wife and children because of suspicions that his wife's blood was tainted with Indian blood and therefore impure." LA 13. The jury concluded, however, that Lee, but not Kehoe, would be a danger to others in the future, and that Kehoe's personal circumstances and background, but not Lee's, mitigated against the death penalty. See infra pp. 59-60.

In sum, the race-based jury selection by Lee's lawyers was designed to benefit Lee, supposedly by producing a jury that would more closely scrutinize the government's case and that would be less likely to impose the death penalty. Nothing in the record suggests that this strategy backfired and that the exercise of peremptory challenges to maximize the number of black jurors "produced a jury that was likely to convict an innocent person, or even a jury more likely to convict a guilty one." Boyd, 86 F.3d at 722. There is "absolutely no reason to suppose that a jury" with additional white members "would have reached a different result in [Lee's] trial," Wright v. Nix, 928 F.2d at 274 (R. Arnold, J., concurring), particularly in light of the compelling evidence of Lee's guilt, see Reed v. Norris, 195 F.3d 1004, 1006 (8th Cir. 1999).

Appellate Case: 11-1380    Page: 55    Date Filed: 12/26/2012 Entry ID: 3988297

## 2. The Performance of Lee's Lawyers Did Not Fall Below Prevailing Professional Norms

The benchmark for measuring attorney performance for purposes of Strickland is objective reasonableness under the professional norms that prevailed at the time of the allegedly deficient conduct. See Bobby v. Van Hook, 130 S. Ct. 13, 16 (2009); Strickland, 466 U.S. at 688; Ortiz v. United States, 664 F.3d 1151, 1169 (8th Cir. 2011). This standard is "linked to the practice and expectations of the legal community." Padilla v. Kentucky, 130 S. Ct. 1473, 1482 (2010).

The conduct of Lee's lawyers did not deviate from then-prevailing professional norms. At the time of Lee's 1999 trial, members of the defense bar posited that "[t]he preeminent obligation of criminal defense lawyers is zealous advocacy," and that as a result – notwithstanding McCollum – defense lawyers should exercise race-based peremptories to the extent doing so could feasibly help a client avoid conviction. Abbe Smith, "Nice Work if You Can Get It": "Ethical" Jury Selection in Criminal Defense, 67 Fordham L. Rev. 523, 565-66 (1998).[13] Under this view, the defense lawyer's concrete obligation to serve the

---

[13]Professor Abbe Smith is the Director of the Criminal Defense and Prisoner Advocacy Clinic at the Georgetown Law Center. See Faculty Biography, http://www.law.georgetown.edu/faculty/facinfo/tab_faculty.cfm?Status=Facutly&ID=327 (last visited Dec. 17, 2012).

Appellate Case: 11-1380   Page: 56   Date Filed: 12/26/2012 Entry ID: 3988297

defendant's interests should override any abstract obligation to protect the general interests of the larger society or the rights of the removed juror. Smith, supra, at 538-42; cf. Hall, supra, at xx-xxii (arguing that a defense lawyer's duty to the client may override any "duty to the system of justice"); Sheri Lynn Johnson, Batson Ethics for Prosecutors and Trial Court Judges, 73 Chi.-Kent L. Rev. 475, 476 n.7 (1998) (stating that "the defense attorney's competing Sixth Amendment obligation" "complicate[s]" whether defense lawyers should take race into account when exercising peremptory challenges).

Another professional norm prevalent at the time of Lee's trial held that "[d]eath penalty cases are different." Hall, supra, at 350. Under this norm, defense lawyers in capital cases are expected to "mak[e] extraordinary efforts on behalf of the accused," ABA Standards for Criminal Justice: Prosecution and Defense Function 4-1.2(c) (3d ed. 1993), and to make a "higher level" of effort "to avoid the death penalty," Hall, supra, at 350-51.

In light of these views, the race-based jury selection strategy of Lee's lawyers cannot be considered contrary to any prevailing professional norms. To the contrary, the strategy was consistent with the view that defense counsel should exercise race-based peremptory challenges if doing so might benefit the defendant, particularly in a capital case. After conferring with a jury

-45-

Appellate Case: 11-1380   Page: 57   Date Filed: 12/26/2012 Entry ID: 3988297

consultant, Lee's lawyers concluded that black jurors might be less likely to impose the death penalty or to credit government evidence. Although reductionist, there was contemporaneous or near-contemporaneous support for that approach as a matter of defense strategy. See, e.g., Theodore Eisenberg et al., Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. Legal Stud. 277, 308-09 (2001) ("All else being equal, white jurors are more apt to vote for death than are black jurors."); William J. Bowers et al., Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition, 3 U. Pa. J. Const. L. 171, 181 (2001) ("Blacks may be more critical in their interpretation of factual questions presented at trial, particularly when police testimony is involved.").

Lee argues that it was unreasonable for his lawyers "to exclude whites and stack the jury with African-Americans in a case in which the defendant is accused of being a white supremacist engaged in murder and racketeering in order to create a whites-only Aryan nation." Br. 26-27. "Judicial scrutiny of counsel's performance must be highly deferential," however, and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Lee cannot

Appellate Case: 11-1380    Page: 58    Date Filed: 12/26/2012 Entry ID: 3988297

overcome that presumption here.[14]

To be clear, race-based jury selection is unconstitutional, whether by the prosecution or the defense, and the government does not in any way condone such conduct. Nor, apart from constitutional concerns, does the government accept the premise that a juror's race can serve as a proxy for how the juror will vote in a criminal case. The government agrees with the ABA Standards for Criminal Justice adopted a few years before Kehoe's trial, which stated that "[n]either party should be permitted to use peremptory challenges to dismiss a prospective juror for constitutionally impermissible reasons." ABA Standards for Criminal Justice: Discovery and Trial By Jury 15-2.8 (3d ed. 1996). The United States expects its prosecutors to adhere to that standard and believes that defense counsel should as well.

_____

[14]The affidavit from Kevin McNally that accompanied Lee's Rule 59 motion does not establish otherwise. McNally's affidavit states that using race as the "*sole basis* for a jury-selection strategy" is unreasonable because it "ignores the fact that all racial groups are composed of individuals with their own views and opinions on the death penalty and other topics." LA 434 (emphasis added). According to McNally, it is "important that jurors be selected with care and that the race of the jurors not trump the individual views of the jurors on the death penalty and other case-related issues." LA 434. Lee erroneously contends that "[t]here is no factual dispute that racism was the sole basis of the 30 peremptories utilized by [defense] counsel." Br. 8. The record does not support the conclusion, however, that defense counsel elevated consideration of race over other pertinent factors such as views on the death penalty. In fact, the juror questionnaires and Kehoe's death acquittal strongly suggest the opposite. See supra n.12.

Appellate Case: 11-1380     Page: 59     Date Filed: 12/26/2012 Entry ID: 3988297

No matter how undesirable or distasteful, however, defense counsel's McCollum-barred conduct cannot be deemed objectively unreasonable for purposes of Strickland. The relevant "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (quoting Strickland, 466 U.S.at 690). Although the ABA Standards can be helpful for assessing attorney performance, they are only useful if "they describe the professional norms prevailing when the representation took place." Bobby, 130 S. Ct. at 17. The views expressed by prominent members of the defense bar prior to Lee's trial preclude a finding that Lee's lawyers violated prevailing professional norms.

Lee nonetheless argues that "[s]triking a venireperson on the basis of race is . . . deficient performance as a matter of law," even if intended to benefit the defendant, because such conduct runs afoul of McCollum. Br. 24-25. He similarly suggests that defense counsel performed deficiently because they allegedly violated ethical rules proscribing discriminatory conduct and a federal statute (18 U.S.C. § 243) that makes it a crime for a public official to exclude anyone from a jury on the basis of race. See Br. 18-21.

The purposes of the laws and rules invoked by Lee, however, are to

-48-

protect the integrity of the justice system and the rights of excluded jurors, not the rights of criminal defendants. And "[i]neffective assistance of counsel claims have validity only to the extent that the attorney has departed from a professional norm established for defending a law violator," not legal or ethical rules intended to protect the justice system or third parties. Brewer v. Aiken, 935 F.2d 850, 859-60 (7th Cir. 1991) (allegation that attorney knowingly offered false alibi evidence cannot support claim of ineffective assistance); cf. Restatement (Third) of the Law Governing Lawyers § 52(a)(2)(a) (2000) ("Proof of a violation of a rule or statute regulating the conduct of lawyers . . . does not give rise to an implied cause of action for professional negligence . . . .").

Thus, in the context of ethical rules, the Supreme Court has made clear that "[u]nder the Strickland standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." Nix v. Whiteside, 475 U.S. 157, 165 (1986); see also United States v. Rimell, 21 F.3d 281, 286 (8th Cir. 1994); United States v. Nickerson, 556 F.3d 1014, 1019 (9th Cir. 2009). An attorney who violates an ethical standard of professional responsibility may still "meet the reasonably competent attorney standard" if "the violation was in the interest of the defendant." 3

Appellate Case: 11-1380     Page: 61     Date Filed: 12/26/2012 Entry ID: 3988297

Wayne R. LaFave et al., Criminal Procedure § 11.10(b) (3d ed. 2011). In fact, some have expressed the view that the obligation to provide effective assistance of counsel "may *compel* criminal defense lawyers to violate ethical standards in seeking to assure the client's interest is fully protected." Hall, supra, at 21 (emphasis added).

In sum, although defense counsel violated the equal protection rights of the excluded jurors and undermined the integrity of the justice system by infusing it with racial discrimination, it does not follow that defense counsel performed deficiently for purposes of the Sixth Amendment. Lee received ineffective assistance of counsel only if his lawyers deficiently represented his interests as measured against prevailing standards within the profession, irrespective of any harm counsel may have caused to third parties. As explained above, defense counsel's conduct did not violate any then-prevailing professional norms for the representation of criminal defendants.

Moreover, it is far from clear that defense counsel's conduct violated 18 U.S.C. § 243 or applicable ethical rules. Enacted in 1875, Section 243 "made it a crime for state or federal officers to disqualify citizens from grand or petit jury service on account of race or color." Michel v. Louisiana, 350 U.S. 91, 102 (1955) (Black, J., dissenting); see Peters v. Kiff, 407 U.S. 493, 497-98 (1972)

-50-

Appellate Case: 11-1380     Page: 62     Date Filed: 12/26/2012 Entry ID: 3988297

(statute makes "it a crime for a public official to exclude anyone from a grand or petit jury on the basis of race"). Even though the Supreme Court held in 1992 that defense counsel are "state actors" when exercising peremptory challenges, <u>see</u> <u>McCollum</u>, 505 U.S. at 50-55, Lee provides no support for the contention that a defense attorney is a "state or federal officer[]" for the purposes of Section 243 or that the statute otherwise reaches a defense lawyer's use of peremptory challenges. In <u>United States v. Nelson</u>, 277 F.3d 164 (2d Cir. 2002), for instance, the court suggested that the district judge (a federal officer), not defense counsel, violated Section 243 by undertaking a race- and religion-based reshuffling of the petit jury venire. <u>Id.</u> at 208.

As for applicable ethical rules, the Arkansas Rules of Professional Conduct did not explicitly address discriminatory conduct by attorneys at the time of Lee's trial. To be sure, in 1998, shortly before the trial, the ABA added a comment to Rule 8.4(d) of the Model Rules of Professional Responsibility stating that a lawyer violates Rule 8.4(d) when he or she "in the course of representing a client, knowingly manifests by words or conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status," if "such actions are prejudicial to the administration of justice." Model Rules of Prof'l Conduct R. 8.4(d) cmt. 2

Appellate Case: 11-1380     Page: 63     Date Filed: 12/26/2012 Entry ID: 3988297

(1998), <u>reprinted in</u> Stephen Gillers & Roy D. Simon, <u>Regulation of Lawyers:</u> <u>Statutes and Standards</u> 424 (2000). The Arkansas Supreme Court did not adopt the new comment of the Model Rules until 2000, however, after Lee's trial. <u>See</u> In re Appointment of Ad Hoc Task Force, https://courts.arkansas.gov/ opinions/2000a/20000113/98-1060.html (last visited Dec. 17, 2012).

In addition, there is disagreement whether Rule 8.4(d) proscribes race-based peremptory challenges by defense counsel even after adoption of the new comment. The comment states that "[l]egitimate advocacy respecting the foregoing factors does not" violate Rule 8.4(d), and that a "trial judge's finding that peremptory challenges were exercised on a discriminatory basis does not alone establish a violation of this rule." Arkansas Rules of Prof'l Conduct R. 8.4(d) cmt. 3 (2012). This language was added at the behest of the "criminal bar." Gillers & Simon, <u>supra</u>, at 431; <u>see also</u> <u>A Legislative History: The</u> <u>Development of the ABA Model Rules of Professional Conduct, 1982-2005</u>, at 812-18 (2006) (discussing comment's history). To some, this language appears to create an "exception for prejudiced peremptory challenges," Mattie Johnstone & Joshua M. Zachariah, <u>Peremptory Challenges and Racial</u> <u>Discrimination: The Effects of Miller-El v. Cockrell</u>, 17 Geo. J. Legal Ethics 863, 884, 886 (2004), or at least "give[s] the impression that something more

Appellate Case: 11-1380     Page: 64     Date Filed: 12/26/2012 Entry ID: 3988297

than intentional discrimination must be established before an attorney can be subject to discipline under Rule 8.4(d)," Lonnie T. Brown, Jr., <u>Racial Discrimination in Jury Selection: Professional Misconduct, Not Legitimate Advocacy</u>, 22 Rev. Litig. 209, 217 & n.27 (2003).[15] Thus, at least one commentator could make the assertion in November 1998, after the ABA's adoption of the comment to Rule 8.4(d) of the Model Rules, that "[n]othing in the applicable rules, codes, and standards governing professional responsibility of criminal defense lawyers explicitly prohibits race- or gender-based jury selection." Smith, <u>supra</u>, at 547; <u>see also</u> <u>id.</u> at 531.

---

[15]The ambiguity of the comment stands in contrast to the rules that currently exist in Texas and the District of Columbia. The Texas Disciplinary Rules of Professional Conduct prohibit discriminatory conduct by attorneys but make clear that the prohibition does not apply "to the process of jury selection." Texas Disciplinary Rules of Prof'l Conduct R. 5.08(a) & (b) (2012). The Texas Rules simply note that "[a] lawyer should remember, however, that the use of peremptory challenges to remove persons from juries based solely on [race] raises separate constitutional issues." Texas Disciplinary Rules of Prof'l Conduct R. 5.08 cmt. 4 (2012). In the District of Columbia, at the time of Lee's trial, the applicable rules stated that the "prosecutor in a criminal case shall not . . . [p]eremptorily strike jurors on grounds of race, religion, national or ethnic background, or sex." D.C. Rules of Prof'l Conduct R. 3.8(h) (1999). The D.C. Rules are now broader, stating that a "lawyer shall not . . . [p]eremptorily strike jurors for any reason prohibited by law." D.C. Rules of Prof'l Conduct R. 3.4(g) (2007).

Appellate Case: 11-1380     Page: 65     Date Filed: 12/26/2012 Entry ID: 3988297

## ISSUE 2
## LEE'S DEATH SENTENCE DOES NOT
## VIOLATE THE EIGHTH AMENDMENT

### I.     Background

#### A.     Direct Appeal

On direct appeal from his conviction and sentence, Lee argued that "his death sentence was arbitrarily imposed in violation of 18 U.S.C. § 3595(c)(1), the Fifth Amendment, and the Eighth Amendment because Kehoe, the more culpable defendant, did not receive the death penalty." Lee, 374 F.3d at 652-53. This Court rejected the argument, concluding that Lee had "not provided support for his claim that the death penalty was arbitrarily imposed on him." Id. at 653.

#### B.     Section 2255 Motion

In his motion for postconviction relief under 28 U.S.C. § 2255, Lee again argued that his death sentence was irrational and arbitrary when compared to Kehoe's life sentence. LA 179, 295 n.1, 339-40. The district court concluded that Lee could not relitigate the claim on collateral review because it had been addressed and rejected on direct appeal. LA 120. The court also rejected Lee's claim "on the merits." LA 120. The court found "troubling" the "disparity between penalties" imposed on Lee and Kehoe, LA 120, and said it was

-54-

Appellate Case: 11-1380     Page: 66     Date Filed: 12/26/2012 Entry ID: 3988297

"unfair to impose the death penalty on Lee, but not Kehoe, for the murders of the Muellers," LA 122. The court found no violation of the Constitution, however, "under applicable legal principles." LA 127; see LA 120-22, 126-27.

## II.    Standard of Review

This Court reviews *de novo* whether a sentence violates the Eighth Amendment. See, e.g., United States v. Martin, 677 F.3d 818, 821 (8th Cir. 2012).

## III.    Argument

Lee renews his claim that his death sentence violates the Eighth Amendment because Kehoe received a sentence of life imprisonment. Br. 35. It is well established, however, that claims "which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." Davis v. United States, 673 F.3d 849, 852 (8th Cir. 2012) (internal citations and quotation marks omitted). As the district court concluded, this Court "specifically rejected Lee's claim that his death sentence was 'arbitrarily imposed in violation of . . . the Eighth Amendment because Kehoe, the more culpable defendant, did not receive the death penalty.'" LA 118 (quoting Lee, 374 F.3d at 652-53). Lee's claim therefore must fail on procedural grounds.

Lee's claim falls short on the merits as well. The Supreme Court and the

Appellate Case: 11-1380    Page: 67    Date Filed: 12/26/2012 Entry ID: 3988297

courts of appeals, including this Court, have uniformly held that the Constitution does not require comparative proportionality review of sentences received by defendants convicted of the same crime. Pulley v. Harris, 465 U.S. 37, 50-51 (1984); United States v. Johnson, 495 F.3d 951, 961 (8th Cir. 2007); see McGehee v. Norris, 588 F.3d 1185, 1199 (8th Cir. 2009); Middleton v. Roper, 498 F.3d 812, 821 (8th Cir. 2007); Getsy v. Mitchell, 495 F.3d 295, 304-06 (6th Cir. 2007) (en banc). A defendant therefore may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987) (emphasis in original).

Lee does not attempt to explain why, in light of these controlling cases, his death sentence should be set aside. The arguments Lee offers are unavailing.

1.     Lee contends that the disparate sentences that he and Kehoe received "suggests a verdict rendered on caprice" and emotion, in violation of the Constitution. Br. 41-42. Lee's argument is without merit.

The Supreme Court has articulated two constitutional requirements that protect against arbitrary sentencing in capital cases. See, e.g., Tuilaepa v. California, 512 U.S. 967, 982 (1994) (Stevens, J., concurring) (describing "two

Appellate Case: 11-1380     Page: 68     Date Filed: 12/26/2012 Entry ID: 3988297

principal protections"). First, statutory procedures must channel or limit the sentencer's discretion by establishing specific standards that narrow the class of persons eligible for the death penalty and justify the imposition of a more severe sentence. See, e.g., Lowenfeld v. Phelps, 484 U.S. 231, 244 (1988); McCleskey, 481 U.S. at 303-04. Second, if a defendant is eligible for the death penalty under the narrowing standards, the sentencer must be "permitted to consider any relevant mitigating evidence" – including "any aspect of the defendant's character or record and any of the circumstances of the offense" – before imposing a death sentence. Sumner v. Shuman, 483 U.S. 66, 75-76 (1987) (internal citations and quotation marks omitted); see Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982).

The Federal Death Penalty Act (FDPA) comports with these standards. Under the FDPA, before a jury in a murder case may sentence a defendant to death, it must find the existence of at least one of the "intent" factors enumerated in 18 U.S.C. § 3591(a)(2), to ensure that the defendant acted with a sufficient degree of culpability, and the existence of at least one of the "statutory" aggravating factors enumerated in 18 U.S.C. § 3592(c). See 18 U.S.C. §§ 3593(d) & (e)(2). If the jury makes both findings, it may impose a sentence of death if it concludes that the aggravating factors proved by the

-57-

government sufficiently outweigh any mitigating factors established by the defendant, or, in the absence of any mitigating factors, that the aggravating factors are sufficient to justify a capital sentence. See 18 U.S.C. §3593(e). In weighing the aggravating and mitigating factors, each juror can individually consider any mitigating factor that the juror found to exist by a preponderance of the evidence, see 18 U.S.C. §§ 3593(d) & (e), including whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death," 18 U.S.C. § 3592(a)(4), or any "[o]ther factors in the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence," 18 U.S.C. § 3592(a)(8).

The Constitution and the FDPA therefore contemplate the possibility that sentencing outcomes for different defendants may not directly reflect the defendants' relative culpability for the charged offense. The "Constitution requires that [the death penalty] decision rest on consideration of innumerable factors that vary according to" not only "the facts of the particular capital offense," but also "the characteristics of the individual defendant." McCleskey, 481 U.S. at 294. The FDPA adheres to this requirement by specifying that a capital sentencer can consider in mitigation not only the defendant's relative role and culpability in the offense, see 18 U.S.C. §§ 3592(a)(3) & (4), but also

-58-

Appellate Case: 11-1380     Page: 70     Date Filed: 12/26/2012 Entry ID: 3988297

any other "factors in the defendant's background, record, or character," or "circumstances of the offense," 18 U.S.C. § 3592(a)(8).

In this case, the jury plainly concluded that, whatever may have been Kehoe's relative culpability for the Mueller murders, in light of factors bearing on their personal backgrounds and characters, Lee, but not Kehoe, should be sentenced to death. The jury concluded that Lee, but not Kehoe, would be a danger to others in the future in light of Lee's more violent background that included involvement in another homicide and his poor institutional record. The jury further determined that the personal character and background of Kehoe sufficiently mitigated against the death penalty. The jury unanimously found as mitigating factors, for instance, that Kehoe was the product of a dysfunctional family that had raised him to espouse extremist religious, political, and social views and had influenced him to commit crimes. In contrast, the jury largely rejected Lee's mitigation case, and fully rejected Lee's central contention that he had neurological impairments and brain dysfunction that should be considered in mitigation. See supra pp. 10-15.

In sum, the jury's death verdict was not arbitrary and capricious. To the contrary, the jury, guided by the FDPA's statutory standards, considered the aggravating factors proved by the government and all of the mitigation

Appellate Case: 11-1380     Page: 71     Date Filed: 12/26/2012 Entry ID: 3988297

evidence offered by Lee and Kehoe. After assessing the relevant evidence, the jury made the particularized determination required by the Constitution, concluding that Lee, but not Kehoe, should receive the death penalty.

2.    Lee suggests that alleged weaknesses in the government's evidence at the guilt stage of his trial render the "disparity in sentences between" him and Kehoe "all the more significant." Br. 37-38. Lee provides no legal rationale for this argument, which in any event is factually unfounded.

Both this Court and the district court have found that the government's case against Lee was substantial and compelling. Lee, 374 F.3d at 642-43 (summarizing trial evidence); LA 25. The district judge who presided over Lee's trial further observed that the "bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee." LA 25. In light of these factors, the court concluded, the jury's guilty verdict against Lee was "well-founded." LA 25.

Lee contends that the government's evidence "has steadily eroded as more facts have come to light since the trial." Br. 37. He apparently refers to trial evidence regarding a hair found in a raid cap seized from Kehoe. A government expert testified that the hair was microscopically similar to a hair

Appellate Case: 11-1380    Page: 72    Date Filed: 12/26/2012 Entry ID: 3988297

sample taken from Lee, Tr. 4720-24, but a postconviction DNA test concluded that the hair did not belong to him, see LA 54-55. As the district court concluded, however, "[t]he evidence in this case overwhelmingly supported the jury's finding of guilt," even without the hair evidence. LA 57.

3. Lee argues that "the arbitrariness of [his] death sentence is exacerbated by" the jury's "erroneous consideration" of "improper statutory aggravating circumstances" and "evidence that is scientifically invalid." Br. 40-41. He provides no support, however, for the contention that these purported errors rendered his death sentence arbitrary.

In addition, his claims of error are without merit. The pecuniary gain statutory aggravator was properly submitted to the jury under this Court's decision in United States v. Bolden, 545 F.3d 609, 615 (8th Cir. 2008). The erroneous submission of the multiple murder aggravator as a statutory aggravating factor, rather than a non-statutory aggravating factor, could not have had an impermissible effect on the jury's decision to impose the death penalty, since it was properly included in the jury's weighing process. United States v. Higgs, 353 F.3d 281, 319-20 (4th Cir. 2003); see United States v. Mitchell, 502 F.3d 931, 977 (9th Cir. 2007). And this Court previously found no "threat of unfair prejudice" from the elicitation of the psychopathy evidence

-61-

Appellate Case: 11-1380    Page: 73    Date Filed: 12/26/2012 Entry ID: 3988297

by the government during cross-examination of Lee's expert witness, Dr. Cunningham. <u>Lee</u>, 274 F.3d at 495.[16]

4.     Lee suggests that this Court should vacate his death sentence on the basis of an alleged violation of the Sentencing Reform Act, specifically 18 U.S.C. § 3553(a)(6). Br. 36-37. The Sentencing Reform Act is inapplicable in capital cases, however, where the detailed provisions of Federal Death Penalty Act apply. <u>See</u> 18 U.S.C. § 3551(a) (the Sentencing Reform Act applies "[e]xcept as otherwise provided"); 18 U.S.C. § 3591 (the FDPA applies in capital cases). In addition, Lee has not previously raised this claim, and he "simply cannot raise a nonconstitutional or nonjurisdictional issue in a [Section] 2255 motion if the issue could have been raised on direct appeal but was not." <u>Anderson v. United States</u>, 25 F.3d 704, 706 (8th Cir. 1994).

---

[16]These arguments are reprisals of claims that have previously been rejected by the district court and this Court. The government's brief in opposition to Lee's motion to expand the certificate of appealability, filed in this Court on November 21, 2011, explains in greater depth why these claims lack merit. <u>See</u> Gov't Br. 10-15, 42-57, 70-80.

Appellate Case: 11-1380    Page: 74    Date Filed: 12/26/2012 Entry ID: 3988297

# CONCLUSION

For the foregoing reasons, the judgment should be affirmed.

Respectfully submitted,

CHRISTOPHER R. THYER
United States Attorney
Eastern District of Arkansas

LANNY A. BREUER
Assistant Attorney General

JOHN D. BURETTA
Acting Deputy Assistant Attorney
 General

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W.,
Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

December 21, 2012

Appellate Case: 11-1380    Page: 75    Date Filed: 12/26/2012 Entry ID: 3988297

# CERTIFICATE OF COMPLIANCE

1. This brief contains 13,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced, 14-point serif typeface using WordPerfect X4.

3. Pursuant to Eighth Circuit Rule 28A(h)(2), I hereby certify the government's brief has been scanned for viruses, using Symantec Endpoint, and is virus-free. The brief was created using WordPerfect X4.

 /s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

Appellate Case: 11-1380     Page: 76     Date Filed: 12/26/2012 Entry ID: 3988297

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on December 21, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

      /s/John M. Pellettieri  
JOHN M. PELLETTIERI  
Attorney, U.S. Department of Justice  
Criminal Division, Appellate Section  
950 Pennsylvania Ave., N.W., Rm. 1264  
Washington, D.C. 20530  
(202) 307-3766  
john.pellettieri@usdoj.gov

-65-

Appellate Case: 11-1380   Page: 77   Date Filed: 12/26/2012 Entry ID: 3988297