Case No. 11-1380

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

**UNITED STATES OF AMERICA,**
*Respondent-Appellee,*

*v.*

**DANIEL LEWIS LEE,**
*Petitioner-Appellant.*

---

Appeal from the United States District Court for the Eastern District of Arkansas,
Honorable G. Thomas Eisele

---

APPELLANT'S REPLY BRIEF

---

LAURENCE E. KOMP, #40446 (MO)   DAVID A. RUHNKE
Attorney at Law                            Ruhnke & Barrett
P.O. Box 1785                              47 Park Street
Manchester, MO 63011                       Montclair, New Jersey 07042
(636) 207-7330; (636) 207-7351(f)          (973)744-1000; (973)746-1490 (f)
lekomp@swbell.net                          davidruhnke@ruhnkeandbarrett.com

KARL SCHWARTZ
JENNIFER MERRIGAN #57633 (MO)
Delaware Federal Defender Office, Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
(302) 442-6550
Karl_Schwartz@fd.org

**Attorneys for Appellant**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..............................................................................................i

TABLE OF AUTHORITIES ......................................................................................ii

I. APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT BECAUSE HIS TRIAL COUNSEL EXERCISED PEREMPTORY CHALLENGES BASED ON RACE......................................................... 1

    A. This Court Should Order A Remand Because The Parties Dispute  Numerous Material Facts. ................................................................................... 4

        1. Counsel's Race-Based Approach to Jury Selection ................................. 4

        2. Deficient Performance ................................................................. 5

        3. Prejudice ...................................................................................... 6

    B. Alternatively, Appellant Is Entitled To Relief On The Existing  Record Because His Attorney's Intentional Race Discrimination  Resulted In Structural Error.. 13

        1. Prejudice Is Presumed When Counsel's Ineffectiveness  Results In Structural Error. .................................................................................. 13

        2. *Batson*/*McCollum* Error is Structural...................................................... 17

II. AS THE DISTRICT COURT FOUND, APPELLANT'S DEATH  SENTENCE IS UNFAIR, IRRATIONAL, AND ARBITRARY, IN  VIOLATION OF HIS RIGHTS UNDER THE FIFTH AND EIGTH  AMENDMENTS.............................................................. 20

    A. Appellant's Claim Is Not Procedurally Barred ........................................ 22

    B. A Sentence Rendered on Caprice and Emotion, and Thus  Arbitrarily  Imposed, Violates the Eighth Amendment ................................................ 23

    C. The Jury's Verdict and Findings Were Irrational and  Arbitrary....................... 26

    D. The Violations of Appellant's Fifth and Eighth Amendment Rights Warrant Reversal of His Death Sentences, or in the Alternative, a Remand for an Evidentiary Hearing.................................................................. 28

CONCLUSION ..................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................. 31

CERTIFICATE OF COMPLIANCE .................................................................... 32

i

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)……………………………………..16

*Arizona v. Fulminante*, 499 U.S. 279 (1991)……………………..………………13

*Batson v.Kentucky*,476 U.S. 79 (1986)……………………………………….passim

*Becht v. United States*, 403 F.3d 541 (8th Cir. 2005)……………………………13

*Beck v. Alabama*, 447 U.S. 625 (1980)………………………………..………24

*Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000)……………………………………16

*Bloomer v. United States*, 162 F.3d 187 (2d Cir. 1998)…………………….……16

*Caldwell v. Mississippi*, 472 U.S. 320 (1985)…………………..………..11,24

*Cody v. Hillard*, 139 F.3d 1197 (8th Cir. 1998)……………………..…………..3

*Eagle v. Linahan*, 279 F.3d 926, (11th Cir. 2001)……………………..….……15

*Estes v. United States*, 883 F.2d 645 (8th Cir. 1989)………………………………3

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002)……………………………….5

*Ford v. Wainwright*, 477 U.S. 399 (1986)……………………………………….24

*Grutter v. Bollinger*, 539 U.S. 306 (2003)……………………..……………..….12

*Henley v. Brown*, 686 F.3d 634 (8th Cir. 2012)…………………..……………..2

*Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001)………………………….16

*Johnson v. Sherry*, 586 F.3d 439 (6th Cir. 2009)………………………………16

*Kingsberry v. United States*, 202 F.3d 1030 (8th Cir. 2000)………………………4

*Lafarge North America, Inc. v. Discovery Group L.L.C.,* 574 F.3d 973(8th Cir. 2009)……………………………………………………………..……2,3

*Lewis v. Jeffers*, 497 U.S. 764 (1990)……………………………………………24

*Lockett v. Ohio*, 438 U.S. 586 (1978)……………………………………………26

*McCollum v. Georgia*, 505 US 42, 50 (1992)……………………………….passim

*McGurk v.Stenberg*, 163 F.3d 470 (8th Cir. 1998)…………………..……15,16,17

*Miller v. Dormire*, 310 F.3d 600 (8th Cir. 2002)……………………………15,17

*Miller v. Webb*, 385 F.3d 666 (6th Cir. 2004)……………………………………16

*Neder v. United States*, 527 U.S. 1 (1999)……………………….……………13,17

*Nelson v. United States*, 297 Fed. Appx. (8th Cir. 2008)…………………………3

*Owens v. United States*, 483 F.3d 48 n.14 (1st Cir. 2007)………………………16

*Powers v. Ohio*, 499 U.S. 400 (1991)…………………………………..…………14

*Richmond v. Lewis*, 506 U.S. 40 (1)………………………………..…………24

*Rivera v. Illinois*, 556 U.S. 148 (2009)…………………………...…………13

Appellate Case: 11-1380     Page: 3     Date Filed: 02/19/2013 Entry ID: 4005891

*Rose v. Mitchell*, 443 U.S. 545 (1979)……………………….…………..14

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010)………………………….3

*Strickland*, 466 U.S. ……………………………………………….………passim

*Sumner v. Shuman*, 483 U.S. 66 (1987)……………………………………….12

*Turner v. Murray*, 476 U.S. 28 (1986)……………………....…………...……..12

*United States v. Boyd*, 86 F.3d 719 (7th Cir. 1996)……………………..…….2

*United States v. Caro*, 597 F.3d 608, 629-30 (4th Cir. 2010)…………………28

*United States v. Colbert*, 172 F.3d 594 (8th Cir. 1999)…………………..………23

*United States v. Daniele*, 886 F.2d 1046 (8th Cir. 1989)…………………………23

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)……………………….14

*United States v. Huey* 76F.3d 638(5th Cir 1996)………………………..2,19

*United States v. Johnson*, 495 F.2d 951 (8th Cir. 2007)…………………………..23

*United States v. Kehoe*, 11-1382 (8th Cir. Nov. 15, 2012)…………………..………6

*United States v. Means*, 513 F.2d 1329 (8th Cir. 1975)…………………….………23

*United States v. Mechanik*, 475 U.S. 66, (1986)…………………………..……..18

*United States v. Sampson*, 300 F.Supp. 2d 275 (D. Mass. 2004)……..…………..28

*United States v. Perez*, 2004 U.S. Dist. Lexis 7500, *53-54 (D. Conn. Apr. 29, 2004)…………………………………………………………………….………..28

*United States v. Unger*, 665 F.2d 251 (8th Cir. 1981)………………….………..4

*United States v. Withers*, 638 F.3d 1055 (9th Cir. 2011)…………………………16

*Vasquez v. Hillery*, 474 U.S. 254 (1986)……………………………………….17

*Winston v. Boatwright*, 649 F.3d 618 (7th Cir. 2011)…………………………17

*Young v. Bowersox*, 161 F.3d 1159 (8th Cir. 1998)…………………………14,16

**Statutes and Rules**

18 U.S.C. § 243…………………………………………….…………...5,6

18 U.S.C. § 3592(a)(4)…………………………………………..….9

28 U.S.C. § 2254……………………………………………………..…3

28 U.S.C. § 2255……………………………………………….………passim

Sentencing Reform Act18 U.S.C. § 3553(a)(6)……………………………..27,28

The Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3593…………..11,28

Ark. R. Prof'l Conduct 8.4(d)……………………………………………………5

Appellate Case: 11-1380   Page: 4   Date Filed: 02/19/2013 Entry ID: 4005891

**I.   APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT BECAUSE HIS TRIAL COUNSEL EXERCISED PEREMPTORY CHALLENGES BASED ON RACE.**

As set forth in Appellant's Brief, trial counsel exercised peremptory challenges based on the race of each venireperson. Counsel used all of their peremptory challenges to exclude white veniremembers, which resulted in a predominantly African-American jury. AB7-10, 12, 21-23. Counsel either did not have a strategic reason for this race-based approach, or any such strategy was unreasonable. Their performance was therefore deficient. AB8, 12, 24-27.

Appellant maintains that prejudice is presumed because *McCollum* error is structural and violated Appellant's, the community's, and the excluded jurors' fundamental rights. AB12-13, 27-31. Even if prejudice is not presumed, under the unique circumstances of this case, Appellant can establish he was prejudiced by counsels' actions. AB8-9, 13, 31-34.

In response, the government disputes almost every aspect of this claim, including the extent to which counsel relied on race in exercising peremptory challenges, whether such reliance amounted to deficient performance, whether prejudice is presumed, and whether prejudice can be established under the unique circumstances of this case.

The District Court resolved *none* of these fact-intensive disputes. Indeed, the District Court acknowledged that it was "unclear on this record" whether

1

Appellant's counsel even made a strategic decision to exclude white persons from the jury. AA50. The District Court then assumed that any strategy would be unassailable; and, if not, the Court "can not find" prejudice for such a claim. AA51-52. Its ruling suggests that ineffective assistance of counsel for conducting race-based jury selection cannot be a valid claim for relief – a view that is squarely contradicted by every other federal court to address the issue. Though federal courts disagree on whether a petitioner must affirmatively demonstrate prejudice to prevail on such a claim, no court has embraced the paradoxical view that a showing of prejudice is both required and impossible.[1]

The government aptly notes that, if this Court cannot resolve this claim as a matter of law, then "it should remand for further fact finding." GB22 n.6. Appellant agrees. Specifically, Appellant believes the Court's options are either to remand for further fact-finding, or hold that Appellant is entitled to relief as a matter of law. Given the parties' numerous and material factual disputes, however, it appears that "[p]rudence . . . compels [the Court] to remand the action to the District Court for consideration of [these questions] in the first instance." *Henley v. Brown*, 686 F.3d 634, 644 (8th Cir. 2012); *see also Lafarge North America, Inc. v.*

---

[1] *Compare, e.g., United States v. Huey*, 76 F.3d 638 (5th Cir.1996) (finding structural error where defense counsel caused *Batson-McCollum* violation) with *United States v. Boyd*, 86 F.3d 719, 724 (7th Cir. 1996) (*Batson-McCollum* violation "does not entitle the defendant to a new trial unless the challenge amounts to ineffective assistance of counsel.")

Appellate Case: 11-1380    Page: 6    Date Filed: 02/19/2013 Entry ID: 4005891

*Discovery Group L.L.C.*, 574 F.3d 973, 983 n.4 (8th Cir. 2009) (remand appropriate "where there are factual questions still to be resolved or where we would benefit from having the District Court decide the issue in the first instance") (internal quotation omitted); *Cody v. Hillard*, 139 F.3d 1197, 1200 (8th Cir. 1998) ("we may remand . . . for findings and conclusions if our review would be hindered without them").

Indeed, as the Court has explained, "[o]ur cases teach that issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record." *Nelson v. United States*, 297 F. App'x 563, 565 (8th Cir. 2008); *see also Sinisterra v. United States*, 600 F.3d 900, 908 (8th Cir. 2010) (remanding for evidentiary hearing for factual development of ineffectiveness claim); *Estes v. United States*, 883 F.2d 645, 649 (8th Cir. 1989) (same).[2] At a minimum, the briefs of the parties make clear that this Court's review would benefit from the District Court's consideration of the parties' fact-intensive disputes in the first instance.

---

[2] In contrast to a habeas proceeding pursuant to 28 U.S.C. § 2254, wherein considerations of comity and deference may counsel against a federal evidentiary hearing, 28 U.S.C. § 2255 presumes that a hearing will be held, unless "[t]he motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001) (citing § 2255's liberal hearing standard).

3

**A.  This Court Should Order A Remand Because The Parties Dispute Numerous Material Facts.**

In proceedings arising under § 2255, evidentiary hearings are required unless a prisoner's claims can be denied as a matter of law. As this Court has stated, "[a]n evidentiary hearing on a § 2255 motion must be granted unless the motion, files and records of the case establish conclusively that the petitioner is not entitled to relief." *Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000); *United States v. Unger*, 665 F.2d 251, 254 (8th Cir. 1981) (same). In this claim of ineffective assistance of counsel, the parties dispute essentially all of the operative facts necessary to resolve the issue. Specifically, the parties dispute: 1) the extent to which counsel relied on race in exercising peremptory challenges; 2) if counsel did rely on race, whether they had any strategic reason for doing so; 3) whether any potential strategy could be considered reasonable; and 4) whether prejudice can be established under the unique circumstances of this case. The District Court erred in denying the claim without permitting Appellant to prove his factual allegations at a hearing.

**1.  Counsel's Race-Based Approach to Jury Selection.**

Appellant proffered below, and argued in this Court, that trial counsel emphasized each venireperson's race in exercising peremptory challenges, and that race was the sole basis for at least some peremptory challenges. According to the

4

government, trial counsel did not "elevate [] consideration of race over other pertinent factors such as views on the death penalty." GB47 n.14. The District Court, however, "did not resolve whether Lee's lawyers in fact exercised peremptory challenges on the basis of race." *Id.* at 21. It declined to hold a hearing and never heard from Appellant's trial counsel, thereby ensuring that this factual dispute would not be resolved.

## 2. Deficient Performance

Appellant further contended that trial counsel did not pursue a reasonable strategy in conducting race-based jury selection and thus provided deficient representation under then-prevailing professional norms. In support of this position, Appellant submitted an affidavit from a highly experienced capital defense attorney that such a strategy was not reasonable. *See* AB25-26; *see also Fisher v. Gibson*, 282 F.3d 1283, 1305 (10th Cir. 2002) ("incantation of strategy does not insulate attorney behavior from review. . . . [Counsel's] strategic choices are still subject to the standard of reasonableness." (citing *Strickland*, 466 U.S. at 691)). Appellant also submitted that 18 U.S.C. § 243 and Ark. R. Prof'l Conduct 8.4(d) both prohibit counsel's conduct and that such conduct, *a fortiori*, is deficient under prevailing norms. *Id.* at 19-21.

The government countered by citing academic articles, at least one of which apparently advocated the approach taken by counsel here. *See* GB44-45. The

5

government cited two additional articles – both published after trial – that arguably support the reasonableness of a race-based approach to jury selection. *See id.* at 46. The government went on to question whether 18 U.S.C. § 243 and Ark. R. Prof'l Conduct 8.4 in fact prohibit counsel's conduct. *Id.* at 50-52.[3] The parties thus dispute the reasonableness of counsel's strategy (if any) and the prevailing professional norms under which counsel's conduct should be analyzed. Again, the District Court did not resolve these fact-intensive disputes.

### 3. Prejudice

The parties dispute whether Appellant can establish prejudice from counsel's race-based selection of jurors. Appellant submits that this case establishes as strong a claim of prejudice as any case possibly could, particularly with respect to the penalty phase hearing.[4] Appellant sat in the courtroom bearing racist tattoos; his racism and racist behavior were the focus of significant testimony and argument; and most of the jurors who sat in judgment of Appellant's character and life were

---

[3] Conversely, the government acknowledged that ABA Standards issued before trial plainly state that counsel's race-based approach "should not be permitted." *Id.* at 47.

[4] During oral argument in Kehoe's appeal on this issue, two of the three judges on the panel expressed doubt as to whether prejudice could be found since Kehoe was spared the death penalty. Oral Argument, *United States v. Kehoe*, 11-1382 (8th Cir. Nov. 15, 2012). Appellant's death sentence, by contrast, brings to the fore the question of whether, in the absence of his counsel's racially based jury selection, there is a reasonable probability that the result of the penalty phase proceeding would have been different.

6

members of the very group against whom Appellant directed his racial enmity. Yet, the presence of those jurors was the direct result of counsel's deficient performance.

The discrepant sentences underscore that Appellant was prejudiced at the penalty phase, particularly in light of Appellant's lesser role in the crimes. As the District Court found, "there was no question about Kehoe and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower." AA17. Further, "[t]he undisputed evidence was that Lee was unwilling to kill Sarah, the little girl, so Kehoe killed her [alone]." *Id.* at 9. Understanding how the jury reached a death verdict for Appellant, despite his "undisputed" lesser role in the murders, requires consideration of the evidence and argument unique to him. This is another fact-intensive inquiry that the District Court did not undertake. Among the facts that should have been considered was the following evidence that was specific to Appellant:

- Appellant participated in white supremacist rallies that included cross burnings. Tr.2772;

- Appellant believed that whites were the supreme race, responsible for ruling over minorities and other "lower races." Tr.2774.

  Photographs of each of the following tattoos on Appellant's body were shown to the jury;

- Appellant had a tattoo of a swastika on his shoulder. The jury was informed that the tattoo represented white supremacy. Tr.2784 - 85; Ex.826;

7

Appellate Case: 11-1380    Page: 11    Date Filed: 02/19/2013 Entry ID: 4005891

- Appellant had a tattoo on his forearm, stating "Skins" down the center, with an iron cross in flames, a Viking warrior on one side, and a Nazi SS soldier on the other. Below the cross was a skull and crossbones; above it, a phoenix. The tattoo was described as standing for "various white supremacist ideals." Tr.2784 - 86; Ex.827;

- Appellant had a tattoo on each shin, one saying "Skin" and the other "Head." Tr.2788; Ex.828. The jury was told that the "Skinheads" are a group that promotes white supremacist ideals and views. Tr.2804;

- Appellant had a tattoo on each arm, one saying "White" and the other saying "Pride." Tr.2788; Exs.829, 830;

- Appellant had a tattoo across his stomach that read "Ein Volk, Ein Riech, Ein Fuhrer," a Nazi slogan that means "one people, one nation, one leader." Tr.2788 - 89; Ex.831;

- Appellant had a tattoo on his upper left forearm of an arm band with swastikas and Celtic crosses, and a tattoo on the left side of his neck with a triskelion. The jury was told that the Celtic cross was used by the white supremacist movement to symbolize purity, the swastika was a symbol of the Third Reich, and the triskelion was a symbol of the white counter-resistance in South Africa. Tr.2789; Ex.832;

- Appellant had a tattoo on the right side of his neck of Nazi lightning bolts. The jury was told that the Nazi lightning bolts were common symbols used by white supremacists. Tr.2789-90; Ex.833;

- Appellant had a tattoo on his left forearm of a man chained to a hammer and sickle. The jury was told that this represented the white race shackled by communism. Tr.2790; Ex.834.

- Appellant told government witness James Wanker that he "liked to go nigger bashing," Tr.4081, and that he wanted to "do some nigger bashing," Tr.4091-92;

- Appellant believed that white people were the "ultimate breed" of race. Tr.7461; and

8

Appellate Case: 11-1380    Page: 12    Date Filed: 02/19/2013 Entry ID: 4005891

- Appellant possessed literature that stated, "the negro is merely an articulate member of the beast creation. Even though he has not been given the intelligence and spiritual understanding of the white race, he can think and reason up to a point, therefore he is to have dominion over the other animals. Let us give credit where credit is due. The negro is king, king of the beasts." Tr.5566.

After hearing this inflammatory and offensive evidence, the predominantly African-American jury sentenced Appellant to death, despite his lesser role in the crimes.

In reaching these disparate verdicts, the jury made a number of curious findings:

- Six jurors found it mitigating that Kehoe, at 22, was "relatively young" at the time of the crimes. GA52-54; Tr.7259. By contrast, zero jurors found Appellant's age mitigating, despite the fact that he was also 22 at the time of the crimes. GA125-26.

- No juror found as a mitigating factor that Appellant was a "follower," and only three jurors found that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4). The government had conceded these facts. *See,* Tr.6821 ("Chevie Kehoe is the leader of this enterprise. Danny Lee, Danny Lee is like the faithful dog."); Tr.7970 ("[I]f it wasn't for Chevie Kehoe, Danny Lee would not have killed the Mueller family."); Tr.6823 ("Danny could not bring himself to murder the little

9

Appellate Case: 11-1380     Page: 13     Date Filed: 02/19/2013 Entry ID: 4005891

girl, to hold the bag over her head, Chevie Kehoe had to step forward to do the act himself.").

- Similarly, the government conceded that "there's no question [Lee] was subjected to emotional and physical abuse." Tr.7971. Yet, only six jurors found the mitigating factor that "Mr Lee was subjected to emotional and physical abuse . . . ." GA125.

- At Kehoe's sentencing, seven jurors found that other persons "involved in the racketeering enterprise" would "receive no sentence or substantially less punishment or were not prosecuted." GA53, Tr. 7331. At Appellant's sentencing, only three members of the same jury found the identical mitigating factor to be present. GA126.

These anomalies certainly suggest that *something* influenced the jury's decision-making. The government argues that the differences are explained by the opposite conclusions the jury reached as to each defendant's future dangerousness. *See* GB42, 59. But these numerous disparate findings are unrelated to future dangerousness, making the government's speculation implausible. The more likely explanation is that Appellant's racist views, body art, and conduct affected the jury's ability to credit his mitigating evidence. In any event, the record before this Court is not developed enough to resolve these disputes in an informed fashion. A remand is necessary.

Appellate Case: 11-1380    Page: 14    Date Filed: 02/19/2013 Entry ID: 4005891

The government makes additional prejudice arguments. First, the government argues that the court specifically instructed the jury not to consider the defendants' individual beliefs unless they "bear directly upon the motivation of the defendants individually to commit the specific criminal acts alleged." GB42. This instruction, however, was given during – and was only relevant to – the guilt phase deliberations, and not to penalty.

Second, the government argues that, pursuant to 18 U.S.C. § 3593(f), the jurors certified that Appellant's race and religion did not affect their verdicts. GB12, 17, 42. Appellant's claim, however, is not based on allegations of *the jury's* racial or religious discrimination, but rather on his counsel's racial discrimination and the effects that flowed therefrom.

Third, the government argues that Appellant must show juror "bias" in order to demonstrate prejudice. GB39-43. Appellant's prejudice argument does not depend on finding that any of the jurors were "biased" or that "bias" dictated the verdict. A capital jury necessarily sits in judgment of a defendant's character and background at the penalty phase of trial, and might properly consider in its weighing process the racist beliefs and motivations of a defendant. The task of a capital jury, however, is not to reach an objectively correct answer with respect to life or death, but to offer a "highly subjective" and "reasoned moral response," to the complex array of aggravating and mitigating evidence presented to it. *See*

11

Appellate Case: 11-1380     Page: 15     Date Filed: 02/19/2013 Entry ID: 4005891

*Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985) (capital sentencing requires a "highly subjective . . . judgment regarding the punishment that [the defendant] deserves"); *Sumner v. Shuman*, 483 U.S. 66, 76 n.5 (1987) ("the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime.") (internal quotation omitted).

That in modern America a person's race affects their "subjective" perspective and their "responses" to such difficult moral issues is unquestionable, as the Supreme Court has recognized. *See*, *e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) ("Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters."). In other words, the jury need not have acted out of bias or improper racial motive for their verdict to have been affected by counsel's race-based jury selection. *See id.* at 327 ("[c]ontext matters" in evaluating race-based conduct and "[n]ot every decision influenced by race is equally objectionable"); *see also Turner v. Murray*, 476 U.S. 28 (1986) (where racial issues are present, even if the record discloses no juror bias, "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing . . . subtle, less consciously held racial attitudes could [] influence a juror's decision . . . ." ).

To be sure, prejudice inquiries are inherently difficult, fact-intensive, and

12

case-specific, as the preceding discussion makes clear. The District Court, however, failed to undertake this inquiry. If this Court does not grant relief as a matter of law, the case should be remanded to the District Court so that it may consider these questions in the first instance.

**B.     Alternatively, Appellant Is Entitled To Relief On The Existing Record Because His Attorney's Intentional Race Discrimination Resulted In Structural Error.**

As discussed above, should this Court find that Appellant must demonstrate prejudice stemming from counsel's intentional race discrimination, it should remand for further proceedings. Appellant nonetheless maintains that because *Batson*/*McCollum* error is structural, he need not establish prejudice.

**1.     Prejudice Is Presumed When Counsel's Ineffectiveness Results In Structural Error.**

The Supreme Court has specified a narrow class of "structural" defects "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," that defy harmless error review. *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). Such structural errors require automatic reversal. *Id.*; *see also Becht v. United States*, 403 F.3d 541, 547 (8th Cir. 2005) (quoting *Neder*, 527 U.S. at 8).

"[R]acial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process'[] and places the fairness of the criminal proceeding in doubt." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (quoting *Rose v.*

13

*Mitchell*, 443 U.S. 545, 556 (1979)). As such, the Supreme Court has declared the *Batson* line of juror discrimination cases to be "automatic reversal precedents" that constitute structural error. *Rivera v. Illinois*, 556 U.S. 148, 161 (2009).

The government concedes, as it must, that *Batson* error is structural. GB26-27. The government argues, however, that *Young v. Bowersox*, 161 F.3d 1159 (8th Cir. 1998), dictates that even when structural error is established, a showing of prejudice is required to sustain an ineffective assistance claim. The government is mistaken, and misconstrues *Young*. In *Young*, the Court did not find that a *Batson* error occurred, much less that counsel performed deficiently for failing to object to the claimed error. *Id.* at 1160. While the Court did find that the defendant in that case could not show prejudice for his counsel's allegedly negligent conduct, the instant case presents a very different issue. Here, defense counsel's actions were not merely negligent, they were deliberate. Further, the government has conceded the existence of error. GB22 (assuming Appellant's counsel shared Mr. Kehoe's counsel's jury selection plan, "it is plain that defense counsel's jury selection strategy violated the Equal Protection Clause of the Fourteenth Amendment"). The *Young* Court simply did not confront a situation in which racial stereotypes were intentionally and openly utilized by defense counsel in jury selection.

Under these circumstances, the focus is on the conceded structural error, not on whether the client suffered actual prejudice during the subsequent proceedings,

14

which would require "speculative inquiry into what might have occurred in an alternate universe." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006); s*ee also Eagle v. Linahan,* 279 F.3d 926, 943 n.22 (11th Cir. 2001) (in case of *Batson* error, "requiring a petitioner to make [a prejudice] showing, [would be] asking that he convince us of the very conclusion that *Batson* prohibits . . . .").

Additionally, the government's view of *Young* cannot be squared with this Court's opinion in *McGurk v. Stenberg*, 163 F.3d 470 (8th Cir. 1998), which held that prejudice is presumed when structural error occurs. *See also Miller v. Dormire*, 310 F.3d 600, 603 (8th Cir. 2002) ("When a defendant's right to a jury trial is denied as a result of his attorney's deficient performance, this circuit has determined that on the basis of Supreme Court precedent, *Strickland* prejudice is presumed because such misconduct is tantamount to a structural error") (citing *McGurk*, 163 F.3d at 475)).

In *McGurk* and *Miller* this Court declined to require a showing of *Strickland* prejudice after finding structural error. In each case, the constitutional error was based on the conduct of defense counsel (specifically, failure to inform their clients of the jury trial right). By contrast, in *Young*, the prosecutor committed the constitutional error (by allegedly discriminating on the basis of race). A close reading of these three precedents thus stands for the proposition that a defendant need not show prejudice resulting from a structural constitutional error when his

15

own counsel's conduct caused the error; but he must show prejudice when the error is attributable to the government. *See* AB30-31.

Other courts of appeal agree with the rationale of *McGurk* and *Miller* that structural error results in a presumption of prejudice. *See, e.g., Bell v. Jarvis,* 236 F.3d 149, 165 (4th Cir. 2000) (*en banc*) (citing *McGurk* for the proposition that "the prejudice component of the Strickland analysis may be presumed if the nature of the deficient performance is that of a structural error"). *See also Owens v. United States*, 483 F.3d 48 n.14 (1st Cir. 2007); *Bloomer v. United States,* 162 F.3d 187 (2d Cir. 1998); *Johnson v. Sherry,* 586 F.3d 439, 447 (6th Cir. 2009); *Miller v. Webb,* 385 F.3d 666, 676 (6th Cir. 2004); *Hughes v. United States,* 258 F.3d 453, 463 (6th Cir. 2001); *United States v. Withers,* 638 F.3d 1055, 1066 (9th Cir. 2011).

The government's attempts to explain away *McGurk* are meritless. First, the government points out that the holding in *McGurk* was "narrow." GB30. This truism simply reflects the fact that structural errors represent a narrow subset of constitutional error. The government then offers the irrelevant observation that this Court is "bound by holdings, not language." GB31 (citing *Alexander v. Sandoval*, 532 U.S. 275, 282 (2001)). Contrary to the government's parsed quotes, *see* GB30, Appellant is relying on the explicit holding of *McGurk*:

> [W]e *hold* that when counsel's deficient performance causes a structural error, we will presume prejudice under *Strickland.*

*McGurk*, 163 F.3d at 475 (emphasis added). The government next notes that *Young*

16

temporally precedes *McGurk* and argues that in the case of conflicting opinions, the earliest prevails. GB31-32. But because *Young* is inapposite, the order of the two decisions has no significance.

Lastly, the government suggests that Appellant's position (as expressed in *McGurk* and *Dormire*) is inconsistent with Supreme Court precedent. As the Seventh Circuit recently explained, however, because structural errors as defined by the Supreme Court are not subject to harmless error analysis, they likewise are not subject to *Strickland* prejudice analysis. *Winston v. Boatwright*, 649 F.3d 618, 632 (7th Cir. 2011) ("the Supreme Court has said that structural errors fall within 'a limited class of fundamental constitutional errors that defy analysis by harmless error standards.' *Neder* [*v. United States*, 527 U.S. 1, 7 (1999)] (internal quotation marks deleted). If, therefore, analysis is impossible for harmless-error purposes, then it is hard to see how it would be possible for purposes of *Strickland* prejudice . . . .").

### 2. *Batson*/*McCollum* **Error is Structural.**

The government further argues that defense counsel's race discrimination in the seating of Appellant's jury does not constitute structural error. The thrust of the government's argument is that discrimination on the part of prosecutors (*Batson* error) is distinguishable from discrimination on the part of defense attorneys (*McCollum*, or "reverse-*Batson*" error). The government's attempt to distinguish

17

the two does not withstand scrutiny.

The government concedes that the "Supreme Court's decision in *Vasquez v. Hillery*, 474 U.S. 254 (1986), strongly suggests *Batson* error is structural because of the 'societal interest in deterring' racial discrimination in the composition of the jury and the 'long line of precedent' requiring automatic reversal in that context." GB33 (quoting *United States v. Mechanik*, 475 U.S. 66, 70 n.1 (1986)). Having made this concession, the government is relegated to arguing that *McCollum* error is somehow different. But the government does not explain how the societal interest in deterring race discrimination in jury selection is any greater with respect to prosecutors than defense attorneys. *McCollum* itself rejects such a distinction. *McCollum v. Georgia*, 505 US 42, 50 (1992) ("The experience of many state jurisdictions has led to the recognition that a race-based peremptory challenge, regardless of who exercises it, harms not only the challenged juror, but the entire community.").

Because the government is unable to meaningfully distinguish one type of race discrimination from another, its argument reduces to a suggestion that treating *McCollum* error as structural would lead to "perverse incentives" for defense lawyers. GB34. Such speculation is baseless. In such a scenario, defense attorneys would first intentionally violate the Constitution, and then admit that they had done so. This not only would force the attorneys to publicly proclaim their "repugnant"

18

beliefs, *McCollum*, 505 U.S. at 50, it would also subject them to disciplinary procedures and potential criminal liability. *See* AB18-21. There is simply no reason to believe that finding *McCollum* error to be structural would lead to widespread gaming of the criminal justice system by unscrupulous defense lawyers, to their own detriment. *Cf. United States v. Huey*, 76 F.3d 638, 642 (5th Cir. 1996) (potential "mischief" by defense lawyers seeking to intentionally create *McCollum* error "can be avoided with relative ease by the exercise of diligent oversight and sound judgment on the part of trial judges, and through their proper application of the well-known three-step inquiry for ensuring race-neutral use of peremptory challenges").

The "perverse incentives" argument also ignores the fact that, just as defense attorneys guard against *Batson* violations, prosecutors must guard against *McCollum* violations. In Appellant's case, the government knew exactly what was occurring and knew that it was improper. *See* Tr.1224. Yet the government did not object, which raises the real question of perverse incentives: whether the government recognized that its case would profit from trial counsel's *McCollum* violation because of the extensive evidence of Appellant's racist beliefs and conduct the government intended to present. When the government determines that it is in its tactical interest to allow defense counsel to violate the Constitution, an appellate court's failure to apply the Supreme Court's automatic reversal precedent

19

creates a perverse incentive for the government to allow the violation. On the other hand, application of the automatic reversal rule ensures that the prosecutor will take seriously his role of doing justice, and prevent what he surely knows is taking place in front of him.

**II.    AS THE DISTRICT COURT FOUND, APPELLANT'S DEATH SENTENCE IS UNFAIR, IRRATIONAL, AND ARBITRARY, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH AND EIGTH AMENDMENTS.**

In its Order denying relief, the District Court noted that "the local U.S. Attorney and her assistants involved in the case (including lead counsel), the case agents, and even the victims' family," believed that a death sentence should not be pursued against Appellant if the jury spared Mr. Kehoe's life. AA117. *See also id.* ("The DOJ's insistence on continuing to seek the death penalty as to Lee, under the circumstances, casts a pall over the case.")

In that same Order, the District Court observed:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all its implementations.

AA119. It could not be plainer that the District Court which presided over the trial and sentencing hearings of both defendants considered the sentencing decisions made by the jury in Appellant's case to be unfair, irrational, and arbitrary. The

20

District Court erred, however, in its conclusion that this arbitrariness "is not redressable." Because it violates the Eighth Amendment, this arbitrary sentence must be vacated.

The District Court further noted that while "much ha[d] been said about the DOJ's disregard of its own protocol for making death decisions," i.e., the issue that had previously been argued to and addressed by this Court, "little has been said about the fact that the DOJ exercised its prosecutorial discretion in disregard of the recommendation of the local U.S. Attorney and her assistants involved in the case (including lead counsel), the case agents, and even the victims' family that a death sentence should not be pursued against Lee if the jury spared Kehoe's life . . . . In the eyes of this Court, the DOJ's insistence on continuing to seek the death penalty as to Lee, under the circumstances, casts a pall over the case." AA117. As explained in detail below, the District Court (and the government in its Brief) took far too narrow a view of Eighth Amendment jurisprudence.

The ultimate goal of Eighth Amendment capital jurisprudence is to ensure fair, rational and non-arbitrary results in death sentencing - results not reached through caprice, whim, sympathy or prejudice. When the system breaks down as it did in Appellant's case, so that the judge who presided at trial and at both co-defendants' sentencing hearings finds that the outcome of sentencing was arbitrary, unfair and irrational, the Eighth Amendment requires a remedy.

21

Allowing Appellant's death sentences to stand would constitute a manifest injustice. This Court should either grant a new sentencing hearing or remand his case to the District Court for additional fact-findings and an evidentiary hearing.

The government's arguments are without merit.

## A.      Appellant's Claim Is Not Procedurally Barred.

Contrary to the government's assertion, Appellant's claim - that his death sentence was applied in an arbitrary manner - is not procedurally barred. The Government ignores two critical facts in making this assertion.

First, the claim before this Court in this 2255 proceeding is different from the claim raised on direct appeal. Appellant's argument on direct appeal was a proportionality claim, that if his more culpable co-defendant received sentences of life without release, it was disproportionate and unfair to permit him to be sentenced to death. Here, Appellant has asserted that his death sentence was rendered on caprice and emotion, based on evidence now known to be unreliable, *see* Section B *infra*, at 23-26, and that the sentencing jury acted irrationally and arbitrarily in violation of the Eighth Amendment. *See* Section C *infra*, at 26-28.

Second, the District Court itself provided new information during the 2255 proceedings that was unavailable at the time of direct appeal: *i.e.*, it found that Appellant's death sentence was arbitrary. The District Court found that Appellant's death sentence was neither a "fair" nor "rational" result "under the peculiar and

22

special circumstances of this particular case." AA119. As this Court has repeatedly recognized, the trial court is in the best position to determine whether the ends of justice are being furthered or defeated in his courtroom. *See, e.g., United States v. Johnson*, 495 F.2d 951, 964 (8th Cir. 2007) ("trial judge is in the best position to analyze the demeanor and credibility of a venireperson"); *United States v. Colbert*, 172 F.3d 594, 597 (8th Cir. 1999) (sentencing decision "best entrusted to the trial judge who can personally gauge the defendant and gauge the quality of his repentance"); *United States v. Daniele*, 886 F.2d 1046, 1055 (8th Cir. 1989) ("The trial judge was in the best position to evaluate the potential prejudice to defendant from continuing after the other defendants' guilty pleas had been accepted."); *United States v. Means*, 513 F.2d 1329, 1333 (8th Cir. 1975) (trial judge is "best situated" to make decision as to whether "the ends of substantial justice cannot be obtained without discontinuing the trial"). Thus, the District Court's judgment - that the jury's decision to impose death sentences on Appellant was unfair, irrational and arbitrary - must be given great deference, and constitutes new facts not previously known to Appellant, or presented to this Court on direct appeal.

**B.    A Sentence Rendered on Caprice and Emotion, and Thus Arbitrarily Imposed, Violates the Eighth Amendment.**

The Government argues that Appellant's claim that his sentence was rendered on caprice and emotion, and was therefore arbitrarily imposed, fails on the merits because the United States Supreme Court has articulated only two

Appellate Case: 11-1380    Page: 27    Date Filed: 02/19/2013 Entry ID: 4005891

requirements, which, if present, are sufficient to protect against the imposition of an arbitrary sentence: that the sentencer's discretion be channeled or limited by narrowing the class of people eligible to be death-sentenced; and that the sentencer be permitted to consider any relevant mitigating evidence before determining sentence. GB56-57. This argument fails for at least two reasons.

First, the goal of Eighth Amendment jurisprudence is to ensure a fair and non-arbitrary result at capital sentencing. If the result of sentencing was, in fact, unfair, arbitrary, capricious, irrational, or based on sympathy or prejudice, the death sentence cannot stand. *See Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (arbitrary or capricious sentencing process violates due process and Eighth Amendment); *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) ("Eighth Amendment [contains] bedrock guarantee against arbitrary or capricious imposition of the death penalty."). The Supreme Court has also made it clear that capital sentencing must be rational, and based neither on anger toward the defendant nor sympathy toward the victims. *See, e.g., Beck v. Alabama*, 447 U.S. 625, 638 (1980) ("To insure that the death penalty is indeed imposed on the basis of reason rather than caprice or emotion, we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination.") (citations omitted); *accord Ford v. Wainwright*, 477 U.S. 399, 414 (1986); *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). These requirements identified by the Supreme Court to ensure a capital

24

sentencing proceeding that comports with the Eighth Amendment are far more extensive than the two suggested by the government.

Second, even assuming that the Eighth Amendment requires only these two elements, Appellant's right to a fair, reliable and impartial sentencing was violated because the elements were not satisfied in this case. The government argued at trial that a hair found in a cap used at the murder scene was Appellant's hair, based on expert testimony. AA14. During 2255 proceedings, mtDNA testing proved conclusively that it was not. AA46-46. Although a separate guilt phase claim regarding this evidence was rejected by the District Court, a claim for which this Court declined to grant a COA, as to capital sentencing the trial testimony connecting Appellant to the cap was highly prejudicial, and evidence conclusively breaking that connection would be extremely favorable to Appellant.

Additionally, the proceedings below demonstrated the scientific invalidity of critical expert testimony that Appellant was a psychopath, which was presented by the government at penalty to rebut Appellant's evidence of impairment resulting from severe childhood abuse. That expert testimony has been rejected by the community of mental health professionals, including the expert who testified for the government at Appellant's trial. Although the District Court rejected a free-standing claim that trial counsel was ineffective for failing to object to the psychopathy evidence, and this Court declined to issue a COA on the claim, the

25

negative impact this invalid and unreliable evidence had on the jury's consideration of mitigation was never reviewed or addressed by the District Court. This incendiary classification of Appellant, now known to be false, likely helped convince the jury to reject Appellant's mitigation, which otherwise strongly suggested that he was far more "sick" than he was "bad."

The government argues that there is no support in the record to show that introduction of the scientifically invalid hair match and psychopathy testimony rendered Appellant's death sentence arbitrary. GB60-62. Appellant, however, was never given the opportunity for an evidentiary hearing by the District Court. This Court should remand for an evidentiary hearing on this claim, where Appellant will show the unreliability and prejudicial effect of the evidence at issue. Moreover, even without additional evidence, the use of discredited science to rebut Appellant's mitigation evidence at least created an "unacceptable" "risk that the death penalty [was] imposed in spite of factors" calling for a lesser penalty, *Lockett v. Ohio,* 438 U.S. 586, 605 (1978), thereby violating the Eighth Amendment.

### C. The Jury's Verdict and Findings Were Irrational and Arbitrary.

Appellant's claim before this Court is not, as the government attempts to characterize it, that the jury's weighing of aggravation and mitigation should have turned out differently. Rather, he claims that the jury's decision-making was irrational and arbitrary. Appellant proffered below, and should now be given the

26

opportunity to present to the District Court, evidence of arbitrary decision making. He is prepared to do so based on the evidence introduced at trial and penalty, together with the jury's inexplicable findings at penalty. The discussion of these findings, *supra* 9-10, is incorporated by reference, as if set forth fully herein.

As detailed above, there was no rational basis for some or all of the jurors to reject the following mitigating factors, which had previously been found and/or conceded by the government:

- he was only 22 years old when the murders were committed;

- another person equally culpable in the crimes would not be punished by death;

- he was a follower;

- he was subjected to emotional and physical abuse;

- other persons involved in the racketeering enterprise would receive no sentence or substantially less punishment or were not prosecuted.

Penalty phase jurors' unwillingness to find facts for Appellant that were incontrovertible is telling evidence of arbitrariness. Any doubt as to the arbitrariness of these findings, is resolved by the jurors' refusal to find immutable, objective mitigating factors for Appellant that were found for Chevie Kehoe.

Unequal weighing of identical evidence, without any rational basis for doing so violates not only the Eighth Amendment, but also the Sentencing Reform Act's (SRA) need "to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6). AB37. The

27

Appellate Case: 11-1380     Page: 31     Date Filed: 02/19/2013 Entry ID: 4005891

government counters that the SRA is "inapplicable in capital cases," GB62, yet cites no authority for this position. Several federal courts have considered the SRA in capital sentencing under the FDPA, thus strongly implying that the statutes are not mutually exclusive. *See, e.g., U.S. v. Caro*, 597 F.3d 608, 629-30 (4th Cir. 2010) (considering §3553 in relation to FDPA sentencing claim); *U.S. v. Perez*, 2004 U.S. Dist. Lexis 7500, *53-54 (D. Conn. Apr. 29, 2004) (considering co-conspirators' sentencing disparities under SRA, but finding capital defendants had a greater role in crimes); *U.S. v. Sampson*, 300 F.Supp. 2d 275, 277 (D. Mass. 2004) (referencing §3553(a) in sentencing defendant to death). The government's argument that this "claim" is procedurally defaulted is similarly unavailing. The statutory argument is not a freestanding claim, but an aspect of the Eighth Amendment arbitrariness claim, and thus properly before this Court.

**D.     The Violations of Appellant's Fifth and Eighth Amendment Rights Warrant Reversal of His Death Sentences, or in the Alternative, a Remand for an Evidentiary Hearing.**

In light of the new evidence showing that the sentencing jury in Appellant's case was deprived of the ability to fairly consider the evidence he offered in mitigation; the new information that the victims' family believed it was unfair to seek death for Appellant after the jury had rejected death sentences for Kehoe; the SRA's admonition to "avoid unwarranted sentence disparities among defendants . . . guilty of the same conduct"; and the new information that the

28

Appellate Case: 11-1380     Page: 32     Date Filed: 02/19/2013 Entry ID: 4005891

District Court, after presiding at trial and considering the issues raised in the 2255 Motion, believed that the death sentences had been imposed unfairly, irrationally, and arbitrarily, this Court should find that Appellant's death sentences were imposed in violation of the Eighth Amendment's requirements for heightened reliability in death sentencing.

Alternatively, this Court should remand this case to the District Court for two sets of findings with regard to this claim. First, the Court should order an evidentiary hearing at which Appellant can demonstrate the unreliable nature of the evidence offered against him at penalty, its likely effect on the jury, and the arbitrary and capricious nature of the jury findings and verdict. Second, the Court should remand with instructions that the District Court provide factual findings as to why the death sentences imposed were rendered unfairly, irrationally and arbitrarily. Such findings would enable this Court to properly determine whether Appellant's death sentences offend the Eighth Amendment.

29

Appellate Case: 11-1380     Page: 33     Date Filed: 02/19/2013 Entry ID: 4005891

**CONCLUSION**

Wherefore, Appellant respectfully requests that the Court vacate Appellant's underlying conviction and/or sentence or, in the alternative, remand to the District Court for an evidentiary hearing as set forth above.

Respectfully submitted,

/s/ Karl Schwartz
KARL SCHWARTZ
JENNIFER MERRIGAN
Delaware Federal Defender Office
Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
(302) 442-6545
Karl_Schwartz@fd.org

LAURENCE E. KOMP
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330; (636) 207–7351 (fax)
lekomp@swbell.net

DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000; (973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2013, a copy of this Reply was served via this Court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

/s/ Karl Schwartz
KARL SCHWARTZ

31

Appellate Case: 11-1380   Page: 35   Date Filed: 02/19/2013 Entry ID: 4005891

# CERTIFICATE OF COMPLIANCE

I, hereby certify that Appellant's reply brief is filed in compliance with Fed. R. App. P. 32 and 8th Cir. R. 28A. This Brief was prepared and formatted in Microsoft Word, Times New Roman, size 14 point, and the entire reply contains 6980 words. The Reply has been converted to PDF for electronic filing, has been scanned for viruses, and is virus-free.

Respectfully submitted,


/s/ Karl Schwartz
KARL SCHWARTZ

Appellate Case: 11-1380    Page: 36    Date Filed: 02/19/2013 Entry ID: 4005891