# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-1380

_____

United States of America

*Plaintiff - Appellee*

v.

Daniel Lewis Lee, also known as Danny Lee, also known as D L Graham, also known as Daniel Lewis Graham,

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: March 13, 2013
Filed: April 29, 2013

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Daniel Lewis Lee and codefendant Chevie Kehoe were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1962(c)–(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959. The government sought the death penalty for both Lee and Kehoe, but only Lee received a death sentence. Kehoe was sentenced to life

Appellate Case: 11-1380     Page: 1     Date Filed: 04/29/2013 Entry ID: 4030060

imprisonment without the possibility of release. After Lee's conviction and sentence were affirmed on direct appeal, <u>United States v. Lee</u>, 374 F.3d 637 (8th Cir. 2004), <u>cert. denied</u>, 545 U.S. 1141 (2005), Lee brought this action seeking habeas corpus relief under 28 U.S.C. § 2255. Lee claims in part that he received ineffective assistance of counsel during voir dire and that his sentence violated the United States Constitution. The district court[1] denied his petition, but granted him a certificate of appealability on "whether the death penalty is being unconstitutionally applied" in this case. We then expanded Lee's certificate to include the question of whether he received ineffective assistance based on counsel's use of peremptory strikes during voir dire. We now affirm.

I.

The facts of the offenses for which Lee was convicted in this case are reported in our affirming opinion. <u>See</u> <u>Lee</u>, 374 F.3d at 641–43. Lee was a member of the Aryan Peoples' Republic or the Aryan Peoples' Resistance, a white supremacist organization formed by codefendant Kehoe. Its goal was to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. With robbery in mind, Lee and Kehoe traveled to the Arkansas home of gun dealer William Mueller in January 1996. They waited there until Mueller returned home with his wife and her eight year old daughter. Kehoe and Lee then incapacitated the couple and asked the child where they could find cash, guns, and ammunition. After that Kehoe and Lee killed Mueller and his wife, and Kehoe killed the young girl.

Kehoe and Lee were indicted on several charges including racketeering in violation of 18 U.S.C. § 1962(c), conspiracy to commit racketeering in violation of

---

[1]The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas, presided over the trial as well as the postconviction matters.

-2-

Appellate Case: 11-1380     Page: 2     Date Filed: 04/29/2013 Entry ID: 4030060

18 U.S.C. § 1962(d), and three counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). The government noticed its intent to seek the death penalty against both defendants. 18 U.S.C. § 3593(a). Lee and Kehoe were tried together.

Jury selection took place over five days in March 1999, and defense counsel for Kehoe and Lee were given thirty peremptory strikes. A consultant assisted the defense with "jury composition, selection and statistical breakdown." The record does not reflect whether the jury consultant assisted counsel for both Lee and Kehoe. It also does not conclusively show the extent to which counsel for the two defendants worked together to create a jury selection strategy. The district court explained to the jurors during voir dire that the defendants were alleged to "hold white supremacist, white separatists and race-based opinions and attitudes." It advised the venire members to "please raise [their] hand" if they had "such strong feelings against [a] person who possesses such race-based beliefs or opinions that you could not give that person a fair trial based upon the law and the evidence in the case." One venire member was dismissed by the district court after he explained that "the racial undertones of the case would bias [him] toward the state and [he] would not be able to give [the defendants] a fair evaluation."

Kehoe and Lee jointly exercised all of their thirty peremptory strikes against Caucasian venire members, and the government exercised two of its twenty peremptory strikes against African American venire members. The equal protection clause forbids a prosecutor from exercising peremptory challenges based on race because that harms the rights of defendants, the rights of excluded jurors, and the integrity of the criminal justice system. Batson v. Kentucky, 476 U.S. 79, 89 (1986). That prohibition has been extended to race based challenges made by defense counsel because the exercise of a racially motivated peremptory challenge in a criminal case by any party is state action which violates the United States Constitution. Georgia v. McCollum, 505 U.S. 42, 54–55 (1992).

-3-

Defense counsel in this case explained that while "the government struck two African Americans" and the "defense struck none," it was choosing not to challenge the constitutionality of the peremptory strikes under <u>Batson</u>. The district court observed that there was "not any under-representation" because nine of the twelve seated jurors were African American, as were three of the six alternates. The district court nevertheless asked the government to provide a rationale for its two strikes of African American venire members. The government explained that one had given "relatively nonresponsive" answers at times and the other had "expressed deep religious convictions." The district court accepted those explanations. The government then noted that Kehoe and Lee had only stricken Caucasian venire members and that under <u>McCollum</u> and <u>Batson</u> "the right being safeguarded . . . is equal protection under the laws." The district court stated that it could "get into a whole thing of having [the defendants] justify every white strike," but since "[n]o one has made a <u>Batson</u> challenge," it was "not going to do it." The court concluded that the trial "will just go forward."

An attorney who represented Kehoe has since signed an affidavit explaining that the Caucasian venire members were stricken from the jury as a strategic choice. He explained that

> [s]electing a jury with as many black jurors as possible was a strategic decision made by defense counsel . . . because (1) blacks are more likely than whites to discredit government testimony, (2) research of attitudes indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely to give the death penalty than whites in this particular case.

The case proceeded to trial before the seated jurors. Kehoe's mother testified that Lee and Kehoe had confessed to the murders. She related that Kehoe had told her that Lee had participated in murdering the adults, but that Kehoe had killed the child himself because Lee refused to do it. The government also introduced physical

-4-

evidence, including a hair similar to Lee's which had been found on a cap allegedly used during the murders. Photographs of racially offensive tattoos on Lee's body were also introduced by the government. At the close of trial the jury returned a guilty verdict against both defendants on all counts.

Lee and Kehoe had separate sentencing hearings before the same jury, and the government indicated its intent to seek the death penalty for both. Under the Federal Death Penalty Act, 18 U.S.C. §§ 3591–93, a jury may impose the death penalty only if it determines that aggravating factors proved by the government sufficiently outweigh any mitigating facts proved by the defense. See United States v. Purkey, 428 F.3d 738, 749 (8th Cir. 2005). At the hearings for both Kehoe and Lee the government argued that five aggravating factors supported a death sentence: (1) the murders had been committed for pecuniary gain, (2) more than one person had been killed during a single criminal episode, (3) substantial planning and premeditation for the murders had occurred, (4) each defendant would be a future danger, and (5) the eight year old girl had been a vulnerable victim.

Kehoe's sentencing proceeded first, and he argued that 16 mitigating circumstances weighed against death. One or more jurors found the existence of each of the 16 mitigating factors, including that Kehoe was the product of a dysfunctional family, that he was influenced by his parents to accept extremist political views, and that he could live a productive life in prison. The jury also rejected several of the aggravating factors put forward by the government, including that Kehoe would be a future danger and that he had committed the murders after substantial planning. The jury unanimously decided against a death sentence for him and in favor of life imprisonment without the possibility of release. Each juror certified that Kehoe's race and religious beliefs had not influenced his or her decision. See 18 U.S.C. § 3593(f).

The United States Attorney for the Eastern District of Arkansas then informed the district court that she no longer wished to seek the death penalty for Lee, but the

Appellate Case: 11-1380    Page: 5    Date Filed: 04/29/2013 Entry ID: 4030060

Department of Justice's death penalty protocol required the prosecutor to request withdrawal of a death notice from the Attorney General's Review Committee on Capital Cases. Since Attorney General Janet Reno was unavailable at that time, Deputy Attorney General Eric Holder convened the other members of the review committee and determined that the death notice against Lee would not be withdrawn. Thereafter the government presented its position that death was the appropriate sentence for Lee because he would be a future danger and he had a history of committing other violent crimes. Lee cited 14 mitigating factors before the jury, including that he suffered from mental impairment and had a troubled upbringing. He also argued that he should not receive the death penalty because Kehoe was more culpable than he and Kehoe had received a sentence of life imprisonment.

The jury unanimously sentenced Lee to death for each of the capital murders. Each juror certified that Lee's race and religious beliefs had not influenced his or her decision. See 18 U.S.C. § 3593(f). Although the jury did not find that Lee had committed the murders after substantial planning and preparation, it did find that Lee would be a future danger, that he had committed the offenses with the expectation of receiving something of pecuniary value, and that he had killed more than one person in a single criminal episode. The jury also largely rejected Lee's mitigation case, deciding that Lee could not appreciate the wrongfulness of his conduct and that he could not conform his conduct to the requirements of the law. The district court granted Lee's motion for a new sentencing phase after concluding that Lee could force the Department of Justice "to comply with [its] death penalty protocol" and reconsider the prosecutor's request to withdraw Lee's death notice. We reversed after concluding that the government's death penalty protocol was unenforceable by individuals. United States v. Lee, 274 F.3d 485, 493 (8th Cir. 2001). We also decided that it had not been improper for the district court to permit the government to elicit testimony at sentencing from mental health experts regarding Lee's past acts and his future dangerousness. Id. at 496.

-6-

Lee directly appealed his conviction and sentence on a number of grounds, including that his sentence violated his constitutional rights. Lee did not raise any allegations in his direct appeal relating to counsel's racially motivated strategy in selecting a jury. We affirmed after concluding in relevant part that Lee had cited "no case indicating that imposition of the death penalty on one defendant but not the other violates § 3595(c)(1)." Lee, 374 F.3d at 653. Citing United States v. Paul, 217 F.3d 989, 999–1000 (8th Cir. 2000), we also concluded that the death penalty had not been arbitrarily imposed on Lee despite the jury's refusal to consider Kehoe's sentence of life imprisonment as a mitigating factor. Lee, 374 F.3d at 653. We pointed out that "Lee [had] not provided support for his claim that the death penalty was arbitrarily imposed on him." Id. The Supreme Court then denied Lee's certiorari petition. Lee v. United States, 545 U.S. 1141 (2005).

Lee then moved for postconviction relief under 28 U.S.C. § 2255, arguing among other points that he had received ineffective assistance of counsel during voir dire and that his sentence of death was unconstitutional. He also presented information about mitochondrial DNA testing on a hair the government had used against him at trial. Lee explained that the analytical report on that hair had concluded that the "mitochondrial DNA sequence data from the hair . . . differs from that of the hair from Danny [Lee]." The district court denied Lee's petition for postconviction relief without a hearing, concluding there was an "abundance of evidence supporting the guilt phase convictions." The court also stated that it was "highly unlikely that counsel for Kehoe and Lee would not have consulted on jury selection strategies." While such a strategy offends the jurors' constitutional rights, McCollum, 505 U.S. at 48–49, Lee had not shown that his counsel was ineffective because of it or that any prejudice had resulted. The district court also concluded that Lee could not raise a constitutional challenge to his death sentence because that argument had already been rejected on his direct appeal.

Appellate Case: 11-1380     Page: 7     Date Filed: 04/29/2013 Entry ID: 4030060

Lee then moved under Federal Rule of Civil Procedure 59(e) to alter and amend the district court's judgment denying his motion for post conviction relief pursuant to 28 U.S.C. § 2255. For the first time in that motion he argued that his counsel's use of a race based jury selection strategy was a "structural defect" that affected the "entire conduct of the trial from beginning to end." Arizona v. Fulminante, 499 U.S. 279, 309 (1991). He contended that prejudice against him by trial counsel's errors could thus be presumed. The district court denied his Rule 59 motion in its entirety.

The district court first declined to grant Lee a certificate of appealability on any issue, and Lee sought reconsideration. The court then granted him a certificate on the question of "whether the death penalty is being unconstitutionally applied" in this case. We later expanded Lee's certificate of appealability to include the question of whether he received ineffective assistance when his trial counsel exercised peremptory challenges based on race in violation of the Constitution. We declined to expand Lee's certificate to include other issues, including whether he received ineffective assistance of counsel relating to the submission of aggravating factors to the jury to support his death sentence. We review de novo the denial of a § 2255 motion and review any underlying factual findings for clear error. Davis v. United States, 673 F.3d 849, 852 (8th Cir. 2012).

II.

Lee argues that he received ineffective assistance when defense counsel exercised peremptory challenges based on race. Ineffective assistance of counsel claims are governed by Strickland v. Washington, 466 U.S. 668 (1984), which generally requires proof that trial counsel's representation "fell below an objective standard of reasonableness" and that the deficient representation prejudiced the defense. Id. at 688–92. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

-8-

adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. "Failure to establish either Strickland prong is fatal to an ineffective-assistance claim." Worthington v. Roper, 631 F.3d 487, 498 (8th Cir. 2011) (citation omitted). We need not "address the performance prong if petitioner does not affirmatively prove prejudice." Boysiewick v. Schriro, 179 F.3d 616, 620 (8th Cir. 1999) (citation omitted).

The district court determined that it was unclear on the record whether Lee's counsel had joined the racially motivated jury selection strategy, but it "appear[ed] highly unlikely that counsel for Kehoe and Lee would not have consulted on jury selection strategies." The district court found it unnecessary to resolve the issue, however, because it concluded that the use of race based peremptory challenges by defense counsel did "not offend Petitioner's constitutional rights." To the extent that Lee's attorney approved of the jury selection strategy, the district court concluded that counsel's performance did not fall below an objective standard of reasonableness. To the extent that Lee's counsel did not participate in or authorize the strategy, the district court concluded that Lee could not show that he was prejudiced because no evidence suggested that "a jury with a different racial composition would have returned a different verdict."

Lee concedes in his brief that his counsel joined Kehoe's counsel in exercising all thirty peremptory strikes based on the racial stereotype that "African-American jurors are less likely to impose death and are more distrustful of the Government than white jurors." Lee cites Supreme Court case law which indicates that a strategy by defense counsel to choose jurors on the basis of race offends the equal protection clause of the United States Constitution by harming the rights of defendants, the rights of excluded jurors, and the integrity of the criminal justice system. See McCollum, 505 U.S. at 55. He further contends that when counsel violates McCollum by choosing jurors on the basis of race, it amounts to a "structural error" in the trial where we presume that counsel's actions prejudiced the defendant. See

-9-

Neder v. United States, 527 U.S. 1, 7 (1999). That is because such a structural error corrupts the entire fact finding process by raising a question about the composition and integrity of the jury.

Codefendant Kehoe's petition for postconviction relief under § 2255 raised the same McCollum issue as Lee does on appeal, arguing that "prejudice should be presumed because his trial counsel's decision to purposefully strike only Caucasian venire members in violation of McCollum was a 'structural error.'" United States v. Kehoe, No. 11-1382, 2013 WL 1707338, at *2 (8th Cir. Apr. 22, 2013). We disagreed, citing Young v. Bowersox, 161 F.3d 1159, 1160–61 (8th Cir. 1998), where we had rejected the argument that an ineffective assistance of counsel claim premised on a Batson error should be considered a structural error entitled to a presumption of prejudice. Kehoe, 2013 WL 1707338, at *2–3. Although Young had addressed the requisite proof for an ineffective assistance claim related to a Batson violation, we concluded "that the holding of Young must apply with equal force to a claim premised on a McCollum violation." Id. at *2. We noted that the Seventh Circuit had concluded that a McCollum violation was a structural error, id. at *4 n.4 (citing Winston v. Boatwright, 649 F.3d 618, 632–34 (7th Cir. 2011)),[2] and that the Eleventh Circuit had acknowledged the "troubling application of the Strickland prejudice prong to Batson-type claims," id. (quoting Eagle v. Linahan, 279 F.3d 926, 943–44 n.22 (11th Cir. 2001)). We concluded in Kehoe however that "whether defense counsel's decision to select the jury in a racially discriminatory manner should result in a presumption of prejudice is a question that is foreclosed by our holding in Young." Id. at *4.

In addressing Kehoe's postconviction petition we concluded that under Young, a McCollum violation is not a structural error and that a showing of prejudice is thus required to make out an ineffective assistance claim. Id. That conclusion also applies

---

[2] But see United States v. Boyd, 86 F.3d 719, 725 (7th Cir. 1996).

-10-

Appellate Case: 11-1380    Page: 10    Date Filed: 04/29/2013 Entry ID: 4030060

in Lee's case. Kehoe and Lee were tried together, and their counsel jointly decided to use all thirty of their peremptory strikes against Caucasian venire members. We agree with the district court that in these circumstances it would be highly unlikely that counsel for Lee and Kehoe did not work together to create the racially motivated jury selection strategy. As Lee points out in his briefing before this court, it "is not in dispute" that his counsel "engaged in racial discrimination when selecting his jury." Lee, like Kehoe, must thus show that he was prejudiced by counsel's racially motivated jury selection strategy in order to succeed on his ineffective assistance claim.

The term "prejudice" is defined as "a reasonable probability that the outcome of the trial would have been different." White v. Al Luebbers, 307 F.3d 722, 728 (8th Cir. 2002) (citing Strickland, 466 U.S. 668). Such a reasonable probability "is shown if the reviewing court, after surveying the entire record, lacks confidence in the outcome." Id. "In articulating the prejudice component of the Strickland analysis, the Supreme Court provided that in certain circumstances the requisite showing of prejudice may be presumed due to the nature of the deficient performance." McGurk v. Stenberg, 163 F.3d 470, 473 (8th Cir. 1998). In Kehoe we concluded that no prejudice could be shown because Kehoe had not been "denied counsel entirely, nor was the assistance of counsel denied entirely during a critical stage of the proceeding." 2013 WL 1707338, at *3. While we acknowledged that "trial counsel's strategy may have been misguided," we concluded that it could not "be said that it denied entirely Kehoe the assistance of counsel during voir dire." Id.

Lee argues that he can establish prejudice by counsel's decision to use all his peremptory strikes against Caucasian venire members. He contends that throughout "the guilt and penalty phases of [his] trial, the jury was subjected to an unrelenting barrage of accusations of abhorrent racist beliefs." He argues that in light of the "overwhelming amount of evidence of [his] particular antipathy towards people of color, the inference that the nine African-American members of the jury were affected

-11-

by that evidence and that it influenced their decision to convict [him] and sentence him to death is inescapable." Lee finally contends that he can prove prejudice because he was sentenced to death while Kehoe was only sentenced to life imprisonment.

The record evidence does not show that any of the jurors who served were biased by trial counsel's decision to strike Caucasian venire members. See Sanders v. Norris, 529 F.3d 787, 794 (8th Cir. 2008). Bias will not be presumed simply because some jurors were of a different race than the defendant. See United States v. Pospisil, 186 F.3d 1023, 1028 (8th Cir. 1999). One venire member in Lee's case was excused after he expressed concern that he would be biased by the defendants' racism, but the other empaneled jurors confirmed their impartiality. While some of Lee's body tattoos were visible to the jury and the government introduced photographs of others, the record does not indicate that "the individual jurors who tried [Lee] were not impartial." Young, 161 F.3d at 1161 (citation omitted). Nothing in the record shows that the jury made its decisions on anything other than the evidence presented. Lee's counsel was "present and active" during voir dire and actively involved throughout trial. Kehoe, 2013 WL 1707338, at *3. Lee has not shown that his defense counsel's use of racially motivated peremptory strikes entirely denied him of the assistance of counsel. We conclude that Lee has not shown that his counsel's offensive use of peremptory strikes during voir dire resulted in prejudice to him.

The difference between Lee's sentence of death and Kehoe's sentence of life imprisonment does not show that Lee was prejudiced by counsel's actions. The evidence against Lee and Kehoe was not identical, and the fact that the jury sentenced the two defendants differently supports that the jury was not simply motivated by racism to impose the death penalty. The jury accepted Kehoe's mitigation case, believing that he had been indoctrinated from a young age and would not be a future danger. By contrast, the jury rejected Lee's arguments for mitigation and instead

-12-

Appellate Case: 11-1380    Page: 12    Date Filed: 04/29/2013 Entry ID: 4030060

found that he would be a future danger. The district court explained to the jury that both defendants had strong racist beliefs, and the differing sentences for the two men shows that the jury impartially weighed the aggravating and mitigating factors to determine the appropriate sentence for each defendant.

Counsel's race based jury selection strategy was designed to produce a jury that would closely scrutinize the government's case and be less likely to impose the death penalty. While this strategy did not create the desired result, no evidence has been provided to show that the resulting jury was biased against Lee. We therefore conclude that Lee's claim for ineffective assistance of counsel fails.

III.

Lee also argues in his § 2255 petition that the district court should have set aside his death sentence because it was imposed in violation of the United States Constitution and the laws of the United States. Lee contends that the disparity between his sentence and that of Kehoe shows that his sentence of death was arbitrarily imposed. Lee further argues that the finding of his guilt was undercut because (1) DNA testing after the trial concluded that the hair at the crime scene was not his and (2) the jury was tainted by the government's multiple references to his tattoos. Whether a sentence violates the Eighth Amendment is reviewed de novo. United States v. Martin, 677 F.3d 818, 821 (8th Cir. 2012). Claims that "were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." Davis v. United States, 673 F.3d 849, 852 (8th Cir. 2012) (citing Bear Stops v. United States, 339 F.3d 777, 780 (8th Cir. 2003)).

We have already rejected Lee's constitutional challenges to his sentence. In ruling on his direct appeal, we concluded that Lee had "not provided support for his claim that the death penalty was arbitrarily imposed on him." Lee, 374 F.3d at 653. Lee had not cited any case which indicated that "imposition of the death penalty on

-13-

one defendant but not the other violates § 3595(c)(1)." Id. Nothing in the Federal Death Penalty Act "require[s] proportional review of sentences." Id. We observed that the death penalty is not "arbitrarily imposed on a capital defendant despite the jury's refusal to consider the accomplice's sentence of life imprisonment as a mitigating factor." Id. (citing United States v. Paul, 217 F.3d 989, 999–1000 (8th Cir. 2000)). Since this claim was "raised and decided on direct appeal," it cannot be relitigated by Lee in his petition for postconviction relief under § 2255. Davis, 673 F.3d at 852.

Lee also challenges the government's reliance on three aggravating factors which were accepted by the jury. Lee argues that the pecuniary gain aggravating factor was inappropriate because he did not expect pecuniary gain from the murders, the multiple murder aggravating factor was improper because it was not part of 18 U.S.C. § 3592 until three months after the murders, and the government's evidence of future dangerousness was premised on junk science. Lee raised these arguments in his motion to expand his certificate of appealability, but we declined to grant him a certificate on the issues.

In "the collateral context of a § 2255 motion," the issues "are limited by the grant and scope of a certificate of appealability." United States v. Alaniz, 413 F.3d 877, 879 (8th Cir. 2005). These issues raised by Lee are beyond the scope of our certificate of appealability and are therefore not properly before the court. See Fields v. United States, 201 F.3d 1025, 1026 n.2 (8th Cir. 2000). Furthermore, we have previously concluded that there was no "threat of unfair prejudice" from the elicitation in this case of psychopathy evidence by the government during sentencing. Lee, 274 F.3d at 495. We conclude that the jury properly considered the aggravating factors advanced by the government in determining that Lee should be sentenced to death.

-14-

IV.

Accordingly, we affirm the order dismissing the petition for habeas corpus relief.

_____

-15-

Appellate Case: 11-1380     Page: 15     Date Filed: 04/29/2013 Entry ID: 4030060